# EXHIBIT B

**E-filed for Record**
**11/19/2019 3:57 PM**
**Floyd County, GA**

IN THE SUPERIOR COURT OF FLOYD COUNTY
STATE OF GEORGIA

THE CITY OF ROME, GEORGIA, )
                             )
      Plaintiff, )
                             )
v. )
                             )
3M COMPANY; ALADDIN )
MANUFACTURING CORPORATION; )
APRICOT INTERNATIONAL, INC.; )
ARROWSTAR, LLC; DALTONIAN )
FLOORING, INC.; DEPENDABLE )
RUG MILLS, INC.; DORSETT )
INDUSTRIES, INC.; DYSTAR, L.P.; )
ECMH, LLC d/b/a CLAYTON )
MILLER HOSPITALITY CARPETS; )
E.I. DU PONT DE NEMOURS AND )
COMPANY; EMERALD CARPETS, INC.; )
ENGINEERED FLOORS, LLC; )
FORTUNE CONTRACT, INC.; )
HARCROS CHEMICALS, INC.; INDIAN )
SUMMER CARPET MILLS, INC.; )
INDUSTRIAL CHEMICALS, INC.; )
LEXMARK CARPET MILLS, INC.; )
LYLE INDUSTRIES, INC.; MFG )
CHEMICAL, INC.; MILLIKEN & )
COMPANY; MOHAWK CARPET, LLC; )
MOHAWK INDUSTRIES, INC.; )
NPC SOUTH, INC.; ORIENTAL )
WEAVERS USA, INC.; S & S MILLS, )
INC.; SHAW INDUSTRIES, INC.; SHAW )
INDUSTRIES GROUP, INC.; TANDUS )
CENTIVA, INC.; TANDUS CENTIVA )
US, LLC; TARKETT, INC.; TARKETT )
 USA, INC.; THE CHEMOURS )
COMPANY; THE DIXIE GROUP, INC.; )
THE SAVANNAH MILLS GROUP, LLC; )
VICTOR CARPET MILLS, INC.; )
Q.E.P. CO., INC.; and FICTITIOUS )
DEFENDANTS A-J, those persons, )
corporations, partnerships or entities who )
acted either as principal or agent, )
for or in concert with the other named )
Defendants and/or whose acts caused )

Civil Action Number: 19CV02405JFL003
_____

**TRIAL BY JURY REQUESTED**

**E-filed for Record**
**11/19/2019 3:57 PM**
**Floyd County, GA**

or contributed to the damages sustained )
by the Plaintiff, whose identities are )
unknown to the Plaintiff, but which )
will be substituted by amendment )
when ascertained, )
)
    Defendants. )

## COMPLAINT

Plaintiff, The City of Rome, Georgia ("Rome"), brings this Complaint against Defendants

3M Company, Aladdin Manufacturing Corporation, Apricot International, Inc., ArrowStar, LLC,

Daltonian Flooring, Inc., Dependable Rug Mills, Inc., Dorsett Industries, Inc., Dystar, L.P.,

ECMH, LLC d/b/a Clayton Miller Hospitality Carpets, E.I. DuPont De Nemours and Company,

Emerald Carpets, Inc., Engineered Floors, LLC, Fortune Contract, Inc., Harcros Chemical, Inc.,

Indian Summer Carpet Mills, Inc., Industrial Chemicals, Inc., Lexmark Carpet Mills Inc., Lyle

Industries, Inc., MFG Chemical, Inc., Milliken & Company, Mohawk Carpet LLC, Mohawk

Industries, Inc., NPC South, Inc., Oriental Weavers USA, Inc., S & S Mills, Inc., Shaw

Industries, Inc., Shaw Industries Group, Inc., Tandus Centiva Inc., Tandus Centiva US LLC,

Tarkett, Inc., Tarkett USA, Inc., The Chemours Company, The Dixie Group, Inc., The Savannah

Mills Group, LLC, Victor Carpet Mills, Inc., Q.E.P. Co., Inc. and Fictitious Defendants A-J

("Defendants"), and allege as follows:

### STATEMENT OF THE CASE

1.    Plaintiff, Rome, has and continues to be damaged due to the negligent, willful,

and wanton conduct of the Named and Fictitious Defendants, as well as a result of continuous

nuisance and trespass caused by Defendants' past and present manufacture and release of toxic

chemicals and/or perfluorinated compounds, including but not limited to perfluorooctanoic acid

("PFOA"), perfluorooctane sulfonate ("PFOS"), related chemicals that degrade to PFOA and/or

PFOS (including, but not limited to, C3-C15 perfluorinated compounds such as PFBA, PFBS, PFNA, PFHxS, PFHpA), precursors to PFOA and PFOS, and related chemicals from Defendants' manufacturing processes and facilities (PFOA and PFOS and their respective related chemicals are hereinafter collectively referred to as "PFCs").

2. The City of Rome, through the Rome Water and Sewer Division, owns and operates the Bruce Hamler Water Treatment Facility located at 1 Blossom Hill Road in Rome, Georgia, which provides drinking water to the public, comprised of residential and commercial customers within the Rome city limits and portions of Floyd County, Georgia. Rome also wholesales water to the Floyd County Water Department who, in turns, provides water to its customers. Rome utilizes a water intake in Rome, Georgia on the Oostanaula River as its primary raw water source. Rome also has a secondary water intake on the Etowah River as a secondary, temporary emergency source of water. Water drawn from these rivers is treated at the Bruce Hamler Water Treatment Facility prior to distribution to the public.

3. The Named and Fictitious Defendants own and/or operate manufacturing facilities related to the carpet industry and have in the past and/or currently use PFCs as part of manufacturing processes or otherwise supply PFCs to Defendants' manufacturing facilities. These carpet manufacturing facilities are located upstream of Rome's water intake, in or near the City of Dalton, Georgia. Named and Fictitious Defendants use PFCs and related chemical compounds at their manufacturing facilities to impart water, stain, and grease resistance to their carpet and other textile products. Industrial wastewater discharged from Named and Fictitious Defendants' manufacturing facilities contains high levels of Defendants' PFCs. These PFC chemicals resist degradation during processing at wastewater treatment facilities and ultimately

- 3 -

E-filed for Record
**11/19/2019 3:57 PM**
**Floyd County, GA**

contaminate the Conasauga River, the Oostanaula River, the Coosa River and other tributaries and watersheds in Floyd County, Georgia.

4.     Named and Fictitious Defendants' PFCs have contaminated waterways in Floyd County, including but not limited to the water that supplies Rome's water intake site and the Bruce Hamler Water Treatment Facility. The Defendants' PFCs cannot be adequately removed for Rome's long-term water supply—the Oostanaula River—nor Floyd County waterways by the existing and/or emergency water treatment processes and technologies in use at the Bruce Hamler Water Treatment Facility and wastewater treatment facilities.

5.     As a direct and proximate result of Named and Fictitious Defendants' contamination of Rome's raw water source and the waterways located in Floyd County, Rome has suffered, and will continue to suffer, substantial economic and consequential damage, including, but not limited to, expenses associated with the installation of temporary emergency filtration and pumping systems; pilot program costs associated with a permanent filtration system; costs associated with the purchase, installation and operation of a permanent filtration system capable of removing the Named and Fictitious Defendants' PFCs from the water; expenses incurred to monitor PFC contamination levels; damage to goodwill and reputation; and lost profits and sales.

6.     Wherefore, Plaintiff Rome seeks compensatory and punitive damages to the fullest extent allowed by Georgia law. Rome also seeks abatement of the continuous nuisance and trespass and equitable and injunctive relief compelling the Named and Fictitious Defendants to remediate their contamination and prevent additional releases of PFCs and other toxic chemicals, including, but not limited to PFOS and PFOA, into Rome's raw water source.

- 4 -

## JURISDICTION AND VENUE

7.  Jurisdiction is proper in this Court pursuant to Article 6, § 4, ¶ 1 of the Georgia Constitution.

8.  Plaintiff asserts no federal cause of action in this Complaint.

9.  The wrongful acts perpetrated by Defendants, which form the basis of this Complaint, including the trespass and the creation of a nuisance, occurred in Floyd County, Georgia and injured Rome in Floyd County, Georgia.

10.  Venue is proper in this Court because Rome's causes of action originated in Floyd County and because at least one of the Defendants has an office and transacts business in Floyd County.

11.  Venue is proper in this Court as to any Named and Fictitious Defendants that do not have an office in Floyd County because the Named and Fictitious Defendants are joint tort-feasors and joint trespassers with those Defendant(s) that have an office and transact business in Floyd County, Georgia.

## PARTIES

12.  Plaintiff, The City of Rome, Georgia is a municipal corporation organized under the laws of the State of Georgia. The City of Rome, through its Rome Water and Sewer Division, owns and operates the Bruce Hamler Water Treatment Facility located in Rome, Georgia and also wholesales water to Floyd County Water Department located in Floyd County, Georgia.

13.  Defendant 3M Company ("3M") is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

- 5 -

E-filed for Record
11/19/2019 3:57 PM
Floyd County, GA

14.     Defendant Aladdin Manufacturing Corporation is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

15.     Defendant Apricot International, Inc. is a foreign corporation that was authorized to transact business in the State of Georgia at the time the claims giving rise to this cause of action arose and is causing and/or has caused a nuisance, trespass and injury in Floyd County, Georgia. Defendant Apricot International, Inc. is committing and/or has committed a tortious act or omission within this state.

16.     Defendant ArrowStar, LLC is a domestic limited liability company and is causing a nuisance, trespass and injury in Floyd County, Georgia. According to its website, ArrowStar uses "fluorochemicals for all carpets" and a "C-6 based fluorine product."

17.     Defendant Daltonian Flooring, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

18.     Defendant Dependable Rug Mills, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

19.     Defendant Dorsett Industries, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

20.     Defendant Dystar, L.P. is a foreign limited partnership authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

21.     Defendant E.I. du Pont de Nemours and Company ("Dupont") is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

- 6 -

E-filed for Record
11/19/2019 3:57 PM
Floyd County, GA

22. Defendant ECMH, LLC d/b/a Clayton Miller Hospitality Carpets f/k/a ECMH, Inc. is a domestic limited liability company and is causing a nuisance, trespass and injury in Floyd County, Georgia.

23. Defendant Emerald Carpets, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

24. Defendant Engineered Floors, LLC is a domestic limited liability company and is causing a nuisance, trespass and injury in Floyd County, Georgia. According to its website, Engineered Floors, LLC uses stain protection, which contains PFCs upon information and belief, on its carpets.

25. Defendant Fortune Contract, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

26. Defendant Harcros Chemicals, Inc. is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

27. Defendant Indian Summer Carpet Mills, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

28. Defendant Industrial Chemicals, Inc. is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

29. Defendant Lexmark Carpet Mills, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

30. Defendant Lyle Industries, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

- 7 -

31.     Defendant MFG Chemical, LLC, f/k/a MFG Chemical, Inc., is a foreign limited liability company authorized to transact business in the State of Georgia, whose predecessor was a domestic corporation, and is causing a nuisance, trespass and injury in Floyd County, Georgia.

32.     Milliken & Company is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

33.     Defendant Mohawk Carpet, LLC is a foreign limited liability company authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

34.     Defendant Mohawk Industries, Inc. is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia. Mohawk Industries, Inc. has an office in Floyd County, Georgia (420 Lavender Drive, Rome, Georgia 30165) and transacts business in Floyd County, Georgia. According to its own website, Mohawk Industries, Inc. uses Scotchgard™, which contains PFCs upon information and belief, in its carpets.

35.     Defendant NPC South, Inc. is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

36.     Defendant Oriental Weavers U.S.A., Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

37.     Defendant S&S Mills, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia. According to its website, S&S Mills, Inc. uses R2X® Stain & Soil Resistance System, which contains PFCs upon information and belief, on its carpets.

- 8 -

E-filed for Record
11/19/2019 3:57 PM
Floyd County, GA

38.     Defendant Shaw Industries, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

39.     Defendant Shaw Industries Group, Inc. is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

40.     Defendant Tandus Centiva, Inc. is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

41.     Defendant Tandus Centiva US, LLC is a foreign limited liability company authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

42.     Defendant Tarkett, Inc. is a foreign corporation that was authorized to transact business in the State of Georgia at the time the claims giving rise to this cause of action arose and is causing and/or has caused a nuisance, trespass and injury in Floyd County, Georgia. Defendant Tarkett, Inc. is committing and/or has committed a tortious act or omission within this state.

43.     Defendant Tarkett USA, Inc. is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

44.     Defendant The Chemours Company ("Chemours") is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

45.     Defendant The Dixie Group, Inc. is a foreign corporation authorized to transact business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

46.     Defendant The Savannah Mills Group, LLC is a domestic limited liability company and is causing a nuisance, trespass and injury in Floyd County, Georgia.

47.     Defendant Victor Carpet Mills, Inc., is a domestic corporation and is causing a nuisance, trespass and injury in Floyd County, Georgia.

48.     Defendant Q.E.P. Co., Inc. is a foreign corporation doing business in the State of Georgia and is causing a nuisance, trespass and injury in Floyd County, Georgia.

49.     Fictitious Defendants A, B, C, D, E, F, G, H, I, & J are those persons, corporations, partnerships, or entities who manufactured, utilized as part of their manufacturing processes and/or discharged PFCs and their precursor compounds, including, but not limited to PFOA, PFOS and related chemicals into the water supply upstream of Rome's water intake site, who acted either as principal or agent, for or in concert with the named Defendants, and/or whose acts caused or contributed to the damages sustained by Rome, whose identities are unknown to Rome, but which will be substituted by amendment when ascertained.

## FACTUAL ALLEGATIONS

50.     The City of Dalton, Georgia is known as the carpet capital of the world, and there are over 100 carpet manufacturing plants in Dalton and surrounding communities, including Floyd County.  It is estimated that more than 90% of the world's carpet is produced within a 65-mile radius of the City of Dalton. These carpet manufacturing plants have used Defendants' PFCs and other related chemicals in the carpeting manufacturing process.

- 10 -

E-filed for Record
11/19/2019 3:57 PM
Floyd County, GA

51.     Defendants are not only the owners and operators of the carpet plants, but also the chemical suppliers to the carpet manufacturing facilities in and around Dalton, Georgia, which utilize various PFCs and their precursors in the manufacturing process. Defendants discharge PFCs, including, but not limited to PFOA, PFOS, their precursors and related chemicals in their industrial wastewater, which is then treated by Dalton Utilities and other wastewater treatment plants, including, but not limited to, the Loopers Bend Wastewater Treatment Plant in Dalton, Georgia, before being pumped to a 9,800-acre Land Application System ("LAS") where it is sprayed onto the property.  PFCs have been detected in dangerous and high levels in the soil, wastewater effluent, groundwater, sewage sludge, biosolids and compost at the Loopers Bend Wastewater Treatment Plant, which borders and is hydrologically connected to the Conasauga River.

52.     Defendants' PFCs, including, but not limited to, PFOA and PFOS, that are discharged to Dalton Utilities and other wastewater treatment facilities, resist degradation during the treatment process utilized by Dalton Utilities and increase in concentration as waste accumulates in the LAS. The LAS is bordered by and hydrologically connected to the Conasauga River, and runoff contaminated with PFCs pollutes the river as it flows past the LAS. Defendants have had knowledge for decades that their PFCs cannot be removed from the discharges sent to Dalton Utilities or other treatment facilities which discharge wastewater in Floyd County.

53.     The United States Environmental Protection Agency ("EPA"), the University of Georgia ("UGA"), and the Georgia Environmental Protection Division ("EPD") have identified industrial wastewater from Defendants' manufacturing facilities as the source of PFCs including,

but not limited to, PFOA and PFOS, being applied to the LAS and entering the Conasauga River, the Oostanaula River, the Coosa River and, ultimately, Rome's water supply.

54.     The stable carbon-fluorine bonds that make PFCs such pervasive industrial and consumer products also result in their persistence in the environment. There is no known environmental breakdown mechanism for these chemicals. They are readily absorbed into biota and have a tendency to bioaccumulate with repeated exposure. PFOS crosses the placenta in humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

55.     When humans ingest PFCs, these toxic chemicals bind to plasma proteins in the blood and are readily absorbed and distributed throughout the body.  The liver and kidneys are important binding and processing sites for PFCs, resulting in physiologic changes to these and other organs.   Because of strong carbon-fluorine bonds, PFCs are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body.  These toxic chemicals accumulate in the body over time and cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs.

56.     The human diseases caused by exposure to PFOA, PFOS, and related chemicals include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The association between exposure to these chemicals and certain cancers has been reported by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking certain PFCs to diseases based on health research carried out by the Science Panel in the Mid-Ohio Valley population exposed to certain PFCs as a result of releases from an E. I. du Pont de Nemours and Company chemical plant. The C8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley

population exposed to PFOA in drinking water. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer and also suggest associations with prostate and ovarian cancer and non-Hodgkin's lymphoma. Rodent studies also support the link with cancer. The majority of an EPA Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans."

57.     Additionally, the C8 Science Panel has found a probable link between exposure to certain PFCs and the following human diseases: pregnancy-induced hypertension, ulcerative colitis, and high cholesterol. Furthermore, in recent years, immunotoxicity of PFOA, PFOS, and related compounds, has been demonstrated in a wide variety of species and models, including humans. For instance, a study of ninety-nine Norwegian children at age three found that maternal serum PFOA concentrations were associated with decreased vaccine responses, especially toward rubella vaccine, and increased frequencies of common cold and gastroenteritis. The combined human and experimental evidence is in strong support of adverse effects on immune functions at relatively low exposure levels.

58.     In 2009, EPA, based on the science available at that time, published provisional drinking water health advisories for short-term exposure (weeks to months) to PFOA and PFOS. The advisory for PFOA was 0.4 micrograms per liter ("μg/L") or 0.4 ppb, and for PFOS was 0.2 μg/L or 0.2 ppb.

59.     The State of New Jersey adopted a drinking water health advisory in 2006 for PFOA that is 0.04 ppb, which is 10 times lower than the 2009 EPA provisional drinking water health advisory for PFOA. In 2014, based on review of recent scientific studies, New Jersey proposed lowering this number even further to 0.02 ppb. Currently, the states of New York,

- 13 -

immune challenges, and association with tumors, when these two chemicals co-occur in a drinking water source, the combined concentrations should be compared with the Health Advisories of 0.07 µg/L or 0.07 ppb in order to offer the necessary margin of protection to all Americans with these chemicals in their drinking water.

65.    Defendants have long been aware of the persistence and toxicity of PFOA, PFOS, and related chemicals. Yet, Defendants knowingly and intentionally discharged and continue to discharge these chemicals into the rivers and watersheds which supply drinking water to Rome.

66.    Defendants that manufacture PFCs have known for at least 40 years that PFOA, PFOS, and related chemicals persist in the environment and accumulate in the bodies of humans, fish, and test animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the Wheeler Dam in Alabama (26 miles downstream from the 3M plant in Decatur, Alabama) showed that the chemicals bioaccumulate in fish.

67.    Defendant 3M has also known for at least 40 years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1978 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all of the monkeys died as a result of exposure to the fluorochemicals. It was not until 21 years later, in March 2000, that 3M told the public that a "new study" of the effects of these compounds on Rhesus monkeys is part of the reason 3M pulled one of its consumer products, Scotchgard, off the market. In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

E-filed for Record
11/19/2019 3:57 PM
Floyd County, GA

68.     Defendant 3M has known for at least 30 years that its disposal of PFOA and PFOS and related chemicals through discharge into waterways, such as the Conasauga River or Oostanaula River, and through disposal on its property, and the property of others, was unsafe. For instance, a Materials Safety Data Sheet ("MSDS") produced by Defendant 3M in 1986 warned that PFOA should be disposed of only through incineration or at specially designed, properly lined landfills for hazardous chemicals, not discharged into rivers and not dumped into the ground.

69.     Defendant 3M has known for at least 18 years that PFOA, PFOS and related chemicals are not effectively treated by conventional wastewater treatment plant processes and are discharged to surface waters in the effluent and also accumulate in the sludge from wastewater treatment processes. For example in 2001, 3M found high concentrations of these chemicals in effluent and sludge samples from the Decatur Utilities WWTP in Decatur, Alabama as a result of discharges from 3M. These high concentrations were not disclosed to Decatur Utilities or the public.

70.     In December 2010, the State of Minnesota filed a lawsuit against 3M seeking payment for damages to natural resources caused by 3M's disposal of PFCs. According to the Minnesota Attorney General's website, 3M settled its lawsuit with the State of Minnesota on February 20, 2018. According to the website, "[t]he Agreement required 3M Company to pay $850 million to the State of Minnesota..."

71.     A 1997 MSDS for a product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

E-filed for Record
11/19/2019 3:57 PM
Floyd County, GA

72.    In 1978, DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but did not disclose this to the public or to the EPA.

73.    In 1981, DuPont failed to disclose to the public and to the EPA data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose to the public and to EPA widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded DuPont's own Community Exposure Guideline.

74.    In 1991, DuPont researchers recommended a follow-up study to a study from ten years earlier of employees who might have been exposed to PFOA. The earlier study showed elevated liver enzymes in the blood of DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

75.    In or around December 2005, DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues."

California, New Jersey, Massachusetts, Vermont, New Hampshire and Minnesota have all recommended and/or enacted PFC health advisories lower than EPA advisories.

60.     On May 19, 2016, due to the evolution of the science surrounding the health effects associated with the consumption of PFOA and PFOS in drinking water, EPA published lifetime Drinking Water Health Advisories for PFOA and PFOS ("May 2016 EPA Health Advisories" or "Health Advisories"). The Health Advisory for PFOA is 0.07 micrograms per liter ("µg/L"), or 0.07 ppb. The Health Advisory for PFOS is also 0.07 µg/L, or 0.07 ppb.

61.     The May 2016 EPA Health Advisories are intended to replace and supersede EPA's 2009 provisional advisories.

62.     The May 2016 EPA Health Advisories are based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and were also informed by epidemiological studies of human populations exposed to PFOA and PFOS.  These studies indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects.

63.     The May 2016 EPA Health Advisories state that PFOA and PFOS have "extremely high" persistence in the environment and the human body, and that the developing fetus and newborn are "particularly sensitive" to PFOA and PFOS induced toxicity.  The May 2016 EPA Health Advisories also state that single exposure to a developmental toxin at a critical time can produce an adverse effect, and that short-term exposure to these chemicals can result in a body burden that persists for years and can increase with additional exposures.

64.     The May 2016 EPA Health Advisories state that, because PFOA and PFOS have similar adverse effects, including effects on the liver, neonatal development, responses to

76.    DuPont made those statements despite the fact that in 2006, its own Epidemiology Review Board advised the company not to make public statements asserting that PFOA does not pose any risk to health.

77.    For decades, 3M manufactured PFOA and supplied it to DuPont for its manufacture of Teflon and other products. In May 2000, 3M decided to stop producing PFOA. Despite DuPont's knowledge of the risks to human health posed by PFOA, in response to the withdrawal of 3M from the market, DuPont opened its own plant to manufacture PFOA to be incorporated into DuPont's products.

78.    In 2015, Dupont spun off its performance chemicals business (which included the design, manufacture, marketing, and sale of PFCs, as well as the environmental liabilities) to Chemours.

79.    Based on information and belief, all Defendants have long been aware of the persistence and toxicity of PFCs, including, but not limited to, PFOA, PFOS, and related chemicals, at least as a result of communications with Defendant manufacturers and users of these chemicals, as well as EPA, UGA and/or EPD.

80.    Based on information and belief, all Defendants knew or should have known that, in its intended and/or common use, PFCs would very likely injure and/or threaten public health and the environment, where this knowledge and information was accessible to all Defendants.

81.    Based on information and belief, all Defendants knew or should have known that PFCs are mobile and persistent, bioaccumulative, biomagnifying and toxic.   Despite this knowledge, Defendants concealed from the public and government agencies its knowledge of the risk of harm to the public posed by PFCs.

- 18 -

82.     In 2002, EPA took regulatory action under the Toxic Substances Control Act to limit the future manufacture of PFOA, PFOS, and related chemicals, based on the persistence and toxicity of these chemicals. In response, Defendants undertook to develop and manufacture and supply to Defendants PFCs with six or fewer carbons, such as GenX, referred to as Short-Chain PFCs. Defendants are aware that these Short-Chain PFCs are also not subject to biodegradation and accumulate in human blood, like PFOA and PFOS, and are known to cause cancer in animal studies, like PFOA and PFOS.

83.     By at least the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig/testicular, liver and pancreatic) in a chronic cancer study in rats. By the mid-2010s, Defendants 3M and Dupont/Chemours were aware that at least one Short-Chain PFC had been found to cause the same triad of tumors in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFC.

84.     Rome began regular testing for PFOA and PFOS in its water supply, leading up to the issuance of the May 2016 EPA Health Advisories, and has consistently found PFOA and PFOS levels that combine to meet or exceed the 0.07 ppb limit, in addition to finding other PFCs. In addition to PFOA and PFOS, Rome has also found Short-Chain PFCs in the water supply.

85.     In 2016, Rome's then-current water treatment filtration system was not capable of removing or reducing levels of PFCs including, but not limited to, PFOA and PFOS. Upon being informed that the May 2016 EPA Health Advisories would set lifetime safe PFOA and PFOS levels drastically lower than the 2009 provisional drinking water health advisories for

short-term exposure, Rome took emergency precautions and implemented an emergency temporary filtration process by installing granular activated carbon in existing filter beds. Rome also efforted to draw additional water from the Etowah River for purposes of blending that water with water drawn from the primary source, the Oostanaula River. These temporary emergency efforts have cost Rome millions of dollars to implement and continue to cost Rome millions of dollars to implement.

86.     Due to the high levels of PFOA and PFOS found in its water supply, and due to the presence of Short-Chain PFCs in the water supply, Rome has and will continue to incur additional expenses and lost profits.

87.     In order to permanently remove the Defendants' PFCs from its water supply, Rome must install a new and permanent filtration system. Such a system is necessary to provide a safe, long-term supply of water which will meet the EPA health advisories and provide safe water for the public. The cost associated with installation of a permanent filtration system is tens of millions of dollars, and Rome is in the process of beginning pilot programs to study and evaluate the permanent filtration systems, including a reverse osmosis treatment system similar to the system installed to safely remove many of the same types of PFCs from drinking water drawn from the Tennessee River in Northern Alabama.

88.     As a direct and proximate result of Defendants' contamination of Rome's water supply, Rome has been damaged, including, but not limited to, past and future monitoring and testing expenses, lost revenues and profits, expenses in remediating, operating and maintaining its water system, expenses incurred as part of temporary emergency treatment and future expenses associated with the purchase and construction of a permanent filtration system.

## COUNT ONE
### Negligence

89. Plaintiff incorporates all prior paragraphs by reference as if fully set forth herein.

90. Named and Fictitious Defendants owed a duty to Plaintiff to exercise due and reasonable care in their chemical manufacturing and chemical supply operations as well as their carpet manufacturing operations to prevent the discharge of toxic PFC chemicals into the Rome water supply.

91. Named and Fictitious Defendants breached the duty owed to Plaintiff, and under the circumstances, Defendants' breaches constitute negligent, willful, and/or reckless conduct.

92. As a direct, proximate, and foreseeable result of the Named and Fictitious Defendants' conduct, practices, actions, and inactions, Rome has incurred expenses and will incur reasonably ascertainable expenditures in the future and has and will continue to suffer damage to its real property and proprietary interest in its water supply.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all defendants, both named and fictitious, jointly and severally, in an amount to be determined by a struck jury, past and future, plus interest and costs.

## COUNT TWO
### Public Nuisance

93. Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

94. Rome owns and occupies property used to serve the citizens of Rome and Floyd County, its water customers, including a water treatment plant, water distribution system, and offices.

95. Named and Fictitious Defendants have created a continuous nuisance by their discharge of PFCs including, but not limited to PFOA, PFOS, and related chemicals into the

- 21 -

Oostanaula River and related tributaries and watersheds, which has caused contamination of Plaintiff's water supply, thereby causing Rome hurt and inconvenience, and harm to the citizens of Rome, Georgia and Floyd County, Georgia.

96.     The contamination caused by the Named and Fictitious Defendants unreasonably interferes with a right common to the general public—i.e., safe drinking water—and unreasonably interferes with public health.

97.     All who come into contact with the PFCs released and discharged by Defendants are hurt, inconvenienced, or damaged by, among other things, being exposed to the harmful effects of PFCs. The harm caused by Defendants' conduct is not fanciful, or such as would affect only one of fastidious taste; rather, Defendants' conduct is such that it affects ordinary, reasonable persons. *See* O.C.G.A. § 41-1-1.

98.     The specific damages incurred by Rome include, but are not limited to, expenses associated with the installation of emergency temporary filtration; the future installation and operation of a permanent filtration system capable of removing Named and Fictitious Defendants' PFC chemicals from the water; expenses incurred to monitor PFC contamination levels; and lost profits and sales.

99.     In addition to the special damages sustained by Rome, the levels of toxic chemical contamination found in the Plaintiff's water supply, directly caused by the Named and Fictitious Defendants' pollution, have created a condition that threatens the health and well-being of Rome's customers.

100.     It was reasonably foreseeable, and in fact known to the Named and Fictitious Defendants, that their actions would place, have placed, and will continue to place, Plaintiff at

- 22 -

risk of harm. The nuisance is continuous and has caused substantial damages, and will continue to cause damages until it is satisfactorily abated.

101.    Defendants have acted with a conscious indifference to the consequences of their actions.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory and punitive damages against all Defendants, both named and fictitious, jointly and severally, in an amount to be determined by a struck jury, past and future, plus interest and costs.

### COUNT THREE
### Private Nuisance

102.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

103.    Named and Fictitious Defendants have created a nuisance by their discharge of PFCs including, but not limited to PFOA, PFOS, and related chemicals into the Oostanaula River, groundwaters and others tributaries, which has caused contamination of the Plaintiff's water supply, thereby causing Rome hurt, inconvenience, and harm.

104.    The contamination of the water at Rome's intake site constitutes a private nuisance, interfering with Rome's property interests and depriving Rome of its ability to deliver clean and uncontaminated water to its customers.

105.    It was reasonably foreseeable, and in fact known to the Named and Fictitious Defendants, that their actions would contaminate, and have contaminated, the water at Plaintiff's intake site. The nuisance has caused substantial damages, and will continue to cause damages until it is satisfactorily abated.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for compensatory damages against all Defendants, both named and fictitious, jointly and severally,

- 23 -

E-filed for Record
**11/19/2019 3:57 PM**
**Floyd County, GA**

in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this court, past and future, plus interest and costs.

### COUNT FOUR
**Abatement of Nuisance**

106.    Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

107.    Pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2, Plaintiff has the right to bring an action to abate the nuisance caused by Defendants' manufacture, supply, and discharge of PFOA, PFOS, and related chemicals, which has caused and continues to cause contamination of Rome's water supply.

108.    In addition to its claims for damages, Plaintiff is entitled to an injunction to abate the nuisance created and maintained by Defendants. The Court should issue an injunction requiring Defendants to remove their chemicals and toxins from the water supplies of Plaintiff and/or fund the measures necessary to prevent these chemicals and toxins from continuing to contaminate Plaintiff's water supply, based on the continuing irreparable injury to Plaintiff posed by the continuing nuisance and damage to Plaintiff's property interests, for which there is no adequate remedy at law.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands abatement of the nuisance caused by Defendants.

### COUNT FIVE
**Trespass**

109.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

110.    Plaintiff Rome owns and occupies property used to serve its water customers and other water utilities, including a water treatment plant, water distribution system, and offices.

E-filed for Record
11/19/2019 3:57 PM
Floyd County, GA

111.     Named and Fictitious Defendants' intentional acts in manufacturing, supplying and discharging PFOA, PFOS, and related chemicals, knowing that they would contaminate the water supply and flow downstream, caused an invasion of Plaintiff's property by Defendants' chemicals, which has affected and is affecting Plaintiff's interest in the exclusive possession of its property.

112.     Plaintiff did not consent to the invasion of its property by Named and Fictitious Defendants' chemicals.

113.     Named and Fictitious Defendants knew or should have known that their manufacture, supply, and discharges of PFOA, PFOS, and related chemicals could contaminate the water supply and result in an invasion of Plaintiff's possessory interest in its property.

114.     Named and Fictitious Defendants' trespass is continuing.

115.     Named and Fictitious Defendants' continuing trespass has impaired Plaintiff's use of its property and has caused it damages by diminishing its value.

WHEREFORE     PREMISES     CONSIDERED,     Plaintiff     demands     judgment     for compensatory damages against all Defendants, both named and fictitious, jointly and severally, in an amount to be determined by a struck jury, past and future, plus interest and costs.

### COUNT SIX
### Wantonness and Punitive Damages

116.     Plaintiff re-alleges all prior paragraphs as if restated herein.

117.     Named and Fictitious Defendants owed a duty to Plaintiff to exercise due and reasonable care in their manufacturing and chemical supply operations to prevent the discharge of PFCs and their precursors, including, but not limited to PFOA, PFOS, and related chemicals, into the water supply

- 25 -

118.    In breaching the duties described above, Named and Fictitious Defendants acted in a wanton, willful, and reckless manner.

119.    Named and Fictitious Defendants knew or should have known the danger to Plaintiff created by Defendants' conduct, practices, actions, and inactions.

120.    Named and Fictitious Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on Plaintiff.

121.    Named and Fictitious Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiff's property.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment for punitive damages against all Defendants, both named and fictitious, jointly and severally, in an amount to be determined by a struck jury, past and future, plus interest and costs.

## COUNT SEVEN
### Injunctive Relief

122.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

123.    Plaintiff requests that this Court enter an Order enjoining Named and Fictitious Defendants from continuing the conduct described above and requiring Named and Fictitious Defendants to take all steps necessary to remove their chemicals from Plaintiff's water supplies and property.

124.    There is continuing irreparable injury to Plaintiff if an injunction does not issue, as Named and Fictitious Defendants' chemicals in its water supplies pose a continuing threat to Plaintiff, and there is no adequate remedy at law.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands injunctive relief against all Defendants, both named and fictitious, jointly and severally, requiring Defendants to remove

their chemicals from Plaintiff's water system and to prevent these chemicals from continuing to contaminate Plaintiff's water supply.

## COUNT EIGHT
### Attorneys' Fees and Expenses of Litigation

125.   Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

126.   Named and Fictitious Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense such that Plaintiff is entitled to recover its attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## RELIEF DEMANDED

Wherefore, Rome respectfully requests this Court grant the following relief:

a)   Award Plaintiff damages in an amount to be determined by a jury sufficient to compensate it for real property damage, out-of-pocket expenses, lost profits and sales, and future expenses;

b)   Issue an injunction requiring Named and Fictitious Defendants to abate their nuisance and/or otherwise remove their chemicals from Plaintiff's water supply and to prevent these chemicals from continuing to contaminate Plaintiff's water supply;

c)   Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

d)   Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Respectfully submitted this 19th day of November, 2019.

**BRINSON, ASKEW, BERRY,**
**SEIGLER, RICHARDSON & DAVIS, LLP**

P.O. Box 5007
Rome, GA 30162-5007
Phone: 706.291.8853
Fax: 706.234.3574

*/s/ J. Anderson Davis*
J. ANDERSON DAVIS
Georgia Bar No. 211077
A. FRANKLIN BEACHAM III
Georgia Bar No. 043743
SAMUEL L. LUCAS
Georgia Bar No. 142305
LEE B. CARTER
Georgia Bar No. 595903
SARAH C. MARTIN
Georgia Bar No. 440539

**FRIEDMAN, DAZZIO, ZULANAS &**
**BOWLING, P.C.**

3800 Corporate Woods Drive
Birmingham, AL 35242
Phone: 205.278.7000
Fax: 205.278.7001

*/s/ Jeffrey E. Friedman*
JEFFREY E. FRIEDMAN*
LEE T. PATTERSON*
MATT D. CONN*

*\*Application for Admission*
*Pro Hac Vice Forthcoming*

682841.1

- 28 -

IN THE SUPERIOR COURT OF FLOYD COUNTY,
STATE OF GEORGIA

| | | |
|---|---|---|
| THE CITY OF ROME, GEORGIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number: |
| v. | ) | |
| | ) | 19CV02405 |
| 3M COMPANY, et al. | ) | |
| | ) | **TRIAL BY JURY REQUESTED** |
| Defendants. | ) | |

## **VERIFICATION**

Personally appeared before the undersigned official, duly authorized by law to administer

oaths, SAMMY RICH, City Manager of the City of Rome, who, after first being duly sworn,

states on oath that the information and responses set out in the foregoing **Complaint** are true and

correct to the best of his knowledge and belief.

This $18^{7H}$ day of November, 2019.

_____
Sammy Rich, City Manager

Subscribed and sworn to before me
this _18_ day of _November_, 2019.

_____
Notary Public
My commission expires: _3-22-2020_

457624.1