## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

JARROD JOHNSON, individually, and
on Behalf of a Class of Persons
Similarly Situated,

      Plaintiff,

v.

3M COMPANY, ET AL.,

      Defendants.

Civil Action No.:
4:20-cv-00008-AT

## CARPET MANUFACTURING DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

FACTUAL BACKGROUND.............................................................3

ARGUMENT AND CITATION TO AUTHORITY .........................5

I.    The Economic Loss Rule Bars Plaintiff's Claims. ............................5

II.   Plaintiff's Public Nuisance Claim Fails as a Matter of Law................9

    A.    The Carpet Manufacturing Defendants Do Not Control Any Instrumentality of Nuisance..............................................10

    B.    The Carpet Manufacturing Defendants Acted Lawfully And, As Such, Cannot Be Liable For Public Nuisance...........15

    C.    Plaintiff Has Failed to Show He Has Suffered a "Special Harm."....................................................................................17

III.  Plaintiff Fails to Allege Duty and Proximate Cause. .........................19

    A.    Plaintiff Does Not Sufficiently Allege That The Carpet Manufacturing Defendants Owed Him a Duty.......................19

    B.    Plaintiff Does Not Allege Proximate Cause. ...........................21

IV.   Plaintiff's Claims are Barred by the Statute of Limitations................23

    A.    CERCLA's Discovery Rule Does Not Lengthen the Statute of Limitations for Plaintiff's Claims. ...........................23

        1.    Plaintiff Do Not Base Its Claims on Any Alleged Exposure to Hazardous Substances. ................25

        2.    Plaintiff Cannot State a Viable CERCLA Claim. ..........25

    B.    Plaintiff Alleges No Facts Tending to Show Any Right of Recovery Within the Statute of Limitations. ............................28

V.    The Public Services Doctrine Bars The Tort Claims for Damages. ..........................................................................................30

    A.    Plaintiff Seeks to Recover the Cost of Providing a Public Service.....................................................................................31

      B.     The Doctrine of Sovereign Immunity Makes No Difference Here. ........................................................................32

      C.     How Governments Funded the Public Service Makes No Difference Here Either. ............................................................33

      D.     The Doctrine's Public Policy Rationale Applies to Claims by Taxpayers or Ratepayers. ........................................34

VI.    Plaintiff Has Failed to Establish Subject Matter Jurisdiction Over Tarkett USA Inc. ..........................................................35

VII.   Plaintiff is Not Entitled to Punitive Damages, Attorneys Fees, or Litigation Expenses. .....................................................38

CONCLUSION .............................................................................40

CERTIFICATION UNDER L.R. 7.1.D. ..............................................43

CERTIFICATE OF SERVICE ..........................................................44

iii

## INTRODUCTION

Plaintiff's claims are barred for several reasons—the most obvious being the straightforward application of the economic loss rule. Plaintiff sues in tort and alleges damages in the form of paying more for public water than he otherwise would have but for the alleged torts. Thus, Plaintiff seeks to recover pure economic losses. But the economic loss rule prevents recovery of such losses under any tort theory unless a clearly-defined exception exists under well-settled Georgia law. *See Int'l Bus. Machs. Corp. v. Corning Optical Comm. LLC*, No. 1:18-cv-05027-AT (N.D. Ga. Sept. 11, 2019) (Totenberg, J.) (Exhibit A). In his Response, Plaintiff strains to fit his case within the economic loss rule's exception for damage to his property, arguing the water he purchased, his "property," was "damaged." *See* Dkt. No. 175, Response Brief, at 43-46. But Plaintiff's claims do not fit within this exception. As an initial matter, Plaintiff does not allege that the Carpet Manufacturing Defendants[1] interfered with Plaintiff's use or enjoyment of his water after he purchased it. In fact, the City of Rome proudly proclaims the water is safe to drink. *See* Dkt. No. 175, Response Brief, at 45, n. 20.

---

[1] As referred to in this Reply, the "Carpet Manufacturing Defendants" are Shaw Industries, Inc. and Shaw Industries Group, Inc.; Aladdin Manufacturing Corp.; Mohawk Carpet, LLC, and Mohawk Industries, Inc.; Tarkett USA Inc..; The Dixie Group, Inc.; and Milliken & Company.

1

More fundamentally, however, the economic loss rule prohibits a plaintiff that purchases an item from recovering in tort for (1) damage to the item itself or (2) costs associated with repair to the damaged item itself. *See McGaffin v. Cementos Argos S.A.*, No. 4:16-CV-104, 2016 U.S. Dist. LEXIS 145868 at *3 (S.D. Ga. Oct. 20, 2016) (citing *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986)) (prohibiting "tort recovery when a defective product results in damage only to itself") (other citations omitted); *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 948 (11th Cir. 1982) (prohibiting "recovery in tort when a defective product has resulted in the loss of the value or use of the thing sold, or the cost of repairing it"). With this lawsuit, Plaintiff seeks only to recover for the costs associated with "repairing" purchased water itself and does not allege damage to "other property."

Enforcing the economic loss rule's bar here advances its underlying policy of preventing multiple suits arising out of the same operative facts. The City of Rome has already asserted nearly identical claims against the same defendants. *City of Rome v. 3M Co.*, No. 19-CV-02405 (Ga. Super. Ct. Nov. 19, 2019). The Georgia Supreme Court created a "bright-line" application of the economic loss rule to prevent precisely this situation. *See Gen. Elec. Co. v. Lowe's Home Ctrs.,*

*Inc.*, 608 S.E.2d 636 (Ga. 2005). Accordingly, and respectfully, Plaintiff's claims should be dismissed now under the economic loss rule.[2]

In addition, Plaintiff's claims fail, in whole or in part, because his nuisance and tort claims fail as a matter of law, his claims are wholly barred by the statute of limitations or public services doctrine, he has failed to establish subject matter jurisdiction over Defendant Tarkett USA, and he is not entitled to punitive damages, attorneys fees, or litigation expenses.

## FACTUAL BACKGROUND

This lawsuit is about perfluorinated compounds ("PFCs")—man-made chemicals that are estimated to be present in 99% of Americans and are used to make thousands of products, including firefighting foams, medical supplies, textiles, food packaging, and electronics. United States Environmental Protection Agency, *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan* at 9, 11 (Feb. 2019).[3] PFCs are ubiquitous in everyday lives and, as a result, in the environment.

---

[2] Recognizing that the claims fail as a matter of law, Plaintiff's counsel suggested for the first time at a June 16 telephone conference before this Court that they may seek to amend their Complaint to assert claims under the Clean Water Act. If those claims are ever asserted in this lawsuit, they too fail as a matter of law.

[3]   *available   at*   https://www.epa.gov/sites/production/files/2019-02/documents/pfas_action_plan_021319_508compliant_1.pdf.

3

The EPA has not set a legally enforceable drinking water standard for any PFC, but it has issued a non-enforceable lifetime health advisory for two PFCs (PFOA and PFOS) at a combined total of 70 parts per trillion. *Id.* at 20; Dkt. No. 1-A, Compl. ¶ 59. Meanwhile, states, water utilities, and private citizens have initiated PFC litigation against a variety of defendants. *See, e.g.*, *Minnesota v. 3M Co.*, No. 27-cv-10-28862 (Minn. Dist. Ct. Jan. 11, 2011) (3M settling for $850 million Minnesota's claims that 3M knowingly dumped certain PFCs into groundwater); *Rhodes v. E.I. du Pont de Nemours, Co.*, 636 F.3d 88 (4th Cir. 2011) (affirming summary judgment for DuPont on negligence, public nuisance, and other tort claims and finding the denial of class certification to be moot). In fact, the City of Rome has already asserted nearly identical claims against the very same defendants. *See* Dkt. No. 154, Notice of Filing.

This lawsuit, however, appears to be the first of its kind—a lawsuit about paying more for public water due to alleged tortious conduct. There is a reason why no other plaintiff has filed a lawsuit alleging similar tort claims—Plaintiff's claims are quintessential economic losses that are barred by the economic loss rule.

## ARGUMENT AND CITATION TO AUTHORITY

### I.   The Economic Loss Rule Bars Plaintiff's Claims.

Plaintiff buries his economic loss rule rebuttal on page 42 of his Response for good reason—it completely bars his claims.[4] Though its roots are in products liability, Georgia courts have expanded the economic loss rule to prevent recovery under any tort theory where plaintiff seeks to recover economic losses unless certain exceptions apply.[5] *See* Exhibit A at 12-20.

Plaintiff does not deny his losses are purely economic. Instead, he contends that the economic loss rule does not bar his claims only because Defendants allegedly damaged his property—the "surcharged water" he buys from Rome.[6]

---

[4] Contrary to Plaintiff's assertion, the economic loss rule bars not only negligence-based claims, but all tort claims.  *Flintkote*, 678 F.2d at 948 ("[T]he economic loss rule prevents recovery in tort . . ."). Nuisance "sounds in tort." *Mock v. Exxon Mobil Corp.*, No. 1:08-CV-2503-BBM, 2009 U.S. Dist. LEXIS 139283 at *22 (N.D. Ga., Dec. 21, 2009) (Martin, J.).

[5] The economic loss rule has clearly-defined, well-settled exceptions, including where a plaintiff seeks to recover damages for harm to his person or property or where an independent duty exists. *See Bates & Assocs. v. Romei*, 426 S.E.2d 919, 921 (Ga. Ct. App. 1993). Plaintiff does not argue that his person has been injured or an independent duty exists. *See* Dkt. No. 175, Response Brief, at 42-46. Therefore, the only issue before this Court is whether Plaintiff alleges damage to his property sufficient to invoke that particular exception.

[6] Plaintiff has no property right under Georgia law to purchase water from Rome. If Plaintiff refused to pay his water bill and Rome in turn refused to supply him with water, Plaintiff would have no claim under Georgia law.

These are markedly different facts than *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, cited by Plaintiff, where the Maryland residents alleged both personal injuries and property damage in the form of contamination of "at least 360 <u>private</u> wells." 457 F. Supp. 2d 298, 306-7 (S.D.N.Y. 2006) (emphasis added). Plaintiff does not draw water from a private source; he purchases it from a public water utility. This case is thus about damage allegedly sustained when he purchases the water. And claims for that type of economic loss are plainly barred by the rule.

Two of the economic loss rule's bedrock principles affirm this result. First, "the economic loss rule prevents recovery in tort when a defective product has resulted in the loss of value or use of the thing sold, or the <u>cost of repairing it</u>." *Flintkote*, 678 F.2d at 948 (emphasis added). The cost of repair "is not a concept of narrow application, but includes inter alia, the cost of modifying the thing sold . . . to cause the thing to be merchantable or suitable for its intended use." *Bates*, 426 S.E.2d at 921.

"Cost of repair" is precisely what is at issue here. Plaintiff alleges that Rome was required to take certain measures to remove PFCs from the water to make it suitable for its intended use—i.e. public drinking water. See Dkt. No. 1-A, Compl.

¶¶ 80-82. According to the Complaint, the cost of repairing the public water has simply been passed on to Plaintiff as rate increases and surcharges. *Id.* ¶ 82.

Second, the economic loss rule "prohibits tort recovery when a defective product results in damage <u>only to itself</u>, causing economic loss but no attendant injury to persons or <u>other property</u>." *McGaffin,* 2016 U.S. Dist. LEXIS 145868 at *3 (citing *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986)) (emphasis added) (other citations omitted). In *McGaffin*, homeowners sued a concrete manufacturer for damages after the concrete allegedly failed to cure properly and caused silicate dust to blanket their dwellings, electronics, furniture, carpet, rugs, and clothing. *McGaffin v. Cementos Argos S.A.*, No. 4:16-CV-104, 2017 U.S. Dist. LEXIS 5478 at *2-*3 (S.D. Ga. Jan. 13, 2017). The court distinguished between the losses, holding "Plaintiffs cannot sue Argos for damage to the concrete itself because of the economic loss rule, [but] they have adequately alleged that the dust has damaged other property." *Id.* at *1-2. The "surcharged water" here is akin to the concrete in *McGaffin*—because Plaintiff only alleges economic losses related to the surcharged water itself, his claims must be dismissed.

The Georgia Court of Appeals upheld this very outcome in *City of Atl. v. Benator*, 714 S.E.2d 109 (Ga. Ct. App. 2011). There, the plaintiff ratepayers

argued the city's contractors installed defective water meters that caused the ratepayers to be overcharged. 714 S.E.2d at 116. The Court of Appeals, however, declined, noting "the only specific damages alleged by plaintiffs are overpayments to the city for which they seek a refund. They do not seek damages due to injury to their person or to their real or personal property." *Id.* at 116-17. If the claims against city contractors that installed defective water meters at the ratepayers' homes were barred by the economic loss rule, so too must Plaintiff's claims against the Carpet Manufacturing Defendants that are far more removed than the contractors.

Such a conclusion serves the policies behind the rule. The parties and the Georgia Supreme Court refer to one of the policies as preventing "double recovery," and "avoid[ing] the unfairness to defendants that would come with duplicative liability for the same damage." *Gen. Elec. Co.*, 608 S.E.2d at 639. But it is more than just avoiding liability for the same damage. In *Gen. Elec. Co.*, Lowe's was not seeking the same damages (lost profits) as the actual owner of the contaminated property could have (*e.g.*, diminution in value or cost of repair), and the Court expressed concern that the party who owned an option to purchase the adjacent property could be yet another party to recover from the defendant. *See id.*

Each of these parties would be seeking different damages, some of which would not overlap at all.

But the economic loss rule "affords predictability" and avoids multiple suits arising out of the same alleged wrongdoing. *Id.* Allowing Plaintiff to proceed with its claim here—where the City of Rome has already filed a lawsuit against the same Defendants based on the same underlying facts and is seeking the same form of damages—could create an avalanche of copy-cat claims across Georgia (and the country) where rate payers seek to hold entities liable in tort for economic losses sustained when their utilities upgrade their own treatment systems. The Georgia Supreme Court recognized the potential for such claims to propagate and instead opted for the "certainty of a bright-line rule." *See id.* Because Plaintiff seeks economic losses solely related to the water he purchases from Rome, this Court should enforce that "bright-line rule" here and dismiss Plaintiff's claims.

## II.    <u>Plaintiff's Public Nuisance Claim Fails as a Matter of Law.</u>

Nothing in Plaintiff's Response Brief changes the facts that (1) the Carpet Manufacturing Defendants did not control any instrumentality of nuisance; (2) the Carpet Manufacturing Defendants have acted lawfully in sending their wastewater to Dalton Utilities; and (3) Plaintiff cannot show the necessary "special harm."

### A.   The Carpet Manufacturing Defendants Do Not Control Any Instrumentality of Nuisance.

That the Carpet Manufacturing Defendants do not control any instrumentality of nuisance here is fatal to Plaintiff's claim. Plaintiff acknowledges that control is "the essential element of nuisance," but then quibbles with the Carpet Manufacturing Defendants' allegedly "strict interpretation of the term 'control.'" *See* Dkt. No. 175, Response Brief, at 14. The Defendants' interpretation of "control" is neither strict nor liberal; it simply comports with existing Georgia case law. *See Klingensmith v. Long Cty.*, 833 S.E.2d 608, 616 (Ga. App. 2019) (rejecting nuisance claim, in part, because there was insufficient evidence to "conclude that the County has exercised control" over drainage system).[7]

This element of control is inextricably linked to proximate cause, another necessary element of a public nuisance claim. *See Alexander v. Hulsey Envtl. Servs., Inc.*, 702 S.E.2d 435, 439 (Ga. App. 2010). Without the requisite finding of control, there can be no proximate cause, and a nuisance claim must fail. *See id.* (finding that defendant did not "direct or control any conduct of the waste disposal operation."

---

[7] *See also Grinold v. Farist*, 643 S.E.2d 253, 255 (Ga. App. 2007) (rejecting nuisance claim due to no control over discharges onto property), and 14 Ga. Jur. § 22:3, Necessity of Control ("The essential element of nuisance is control over the cause of the harm.").

10

The nuisance in the present case is alleged to be a wastewater treatment facility operated by Dalton Utilities. *See* Dkt. No. 1-A, Compl. ¶¶ 50-51. Plaintiff alleges that this facility treats wastewater from defendants, pumps the wastewater onto a 9,800-acre LAS, and that this LAS "pollutes the Conasauga River as it flows past the LAS." *Id.* The Plaintiff does not suggest that any of the Carpet Manufacturing Defendants actually had "control" over the Dalton Utilities wastewater treatment plant, or the LAS.  Instead, the Plaintiff argues that the defendants "controlled" these operations by sending their wastewater to Dalton Utilities pursuant to their permits. As we shall see, however, that definition of "control" has been rejected by the Georgia courts.

Indeed, the facts here mirror those before the Georgia Court of Appeals in *Hulsey*. That case involved a waste disposal facility and one of its customers, Hulsey Environmental Services (HES). As the Court of Appeals noted in that case when it affirmed the trial court's grant of summary judgment: "As for HES, it is a customer which brings waste material to the LHR site for disposal. As a customer, it does not direct or control any conduct of the waste disposal operation." *Id*. at 460-61 (emphasis added). The Carpet Manufacturing Defendants here stand in precisely the same position as HES. As such, they are entitled to a dismissal in this case because they lacked control over the operations of the Dalton Utilities waste

11

treatment facility, just as HES lacked control over the waste disposal operations, and thus could not be the proximate cause of any damages to Plaintiff. *Id.*

Plaintiff, as did the plaintiff in *Hulsey*, struggles to avoid this outcome, citing some of the very same authority that was rejected by the Georgia Court of Appeals in *Hulsey*. Plaintiff first cites *Fielder v. Rice Const. Co., Inc*., 522 S.E.2d 13, 17 (Ga. App. 1999), where the plaintiff was evicted due to raw sewage constantly seeping from a septic system on his property. Importantly, the Macon-Bibb County Health Department was in charge of inspecting and testing soil in that area to determine whether the land was suitable for septic fields.  *Id*. at 16. The plaintiff sued the Health Department for creating and maintaining a nuisance, and the trial court entered summary judgment in favor of the Health Department on that count. *Id*. at 15.   The Court of Appeals reversed and found that the Health Department "had control over whether or not the lot was approved for septic tank use and had such control that it could have required significant improvements in the soil and terrain that would have resolved the ground water problem for the septic field prior to approval of a septic system." *Id*. at 17. Thus, the "genesis of Fiedler's septic problems was the failure of the Health Department to properly carry out its function." *Id*. at 15.

12

Unlike the Health Department in *Fielder*, the Carpet Manufacturing Defendants had no such control over the wastewater once delivered to Dalton Utilities, no control over the LAS onto which the wastewater is land-applied, and certainly no control over Dalton Utilities' operations. That may explain why Plaintiff failed to even allege this essential element of control in its Complaint. *See* Dkt. No. 1-A, Compl. ¶¶ 106-115.

Plaintiff then turns to *Citizens & S. Trust Co. v. Philips Petroleum Co., Inc.*, 385 S.E.2d 426, 428-29 (Ga. App. 1989) for relief but the Georgia Court of Appeals has already considered and rejected this very same argument. That case is limited the unique tort liability of suppliers of electricity and gasoline. In *Phillips Petroleum*, the plaintiffs brought suit to recover damage to real property, after gasoline leaked from underground storage tanks at nearby service stations, which then invaded the plaintiffs' property. After finding that the service station owners could not be liable in nuisance because no leaks occurred during their time of ownership, the Court of Appeals held that a genuine issue of fact existed as to Phillips Petroleum's liability, specifically due to its status as a gas supplier. *Id*.

The Court there noted the unique rule of law applicable to gas providers: "[w]henever . . . gas is supplied with actual knowledge on the part of the one supplying it of the defective and dangerous condition of the customer's appliances,

he is liable for injuries caused by . . . the gas thus supplied for use on such defective and dangerous appliances." *See id.* (quoting *Milligan v. Ga. Power Co.*, 22 S.E.2d 662 (Ga. App. 1942)).

In a very recent case from the Georgia Court of Appeals, the Court referred to the rule articulated in *Phillips Petroleum* as the "gas supplier's duty" as defined by "Georgia common law." *See Henry v. Atlanta Gas Light Co.*, 841 S.E.2d 10, 13 (Ga. App. 2020). Moreover, in the *Hulsey* case, the Court of Appeals held that the plaintiff's reliance on *Phillips Petroleum* was "misplaced" because "that case involved a gasoline supplier that was not entitled to summary judgment because there was a genuine issue of material fact as to whether it deposited gasoline into underground storage tanks with actual knowledge that the tanks were defective." 702 S.E.2d at 438-39. Because the holding in *Phillips Petroleum* is very narrowly limited to suppliers of gasoline and electricity, no analogy can be drawn to the facts at hand.

Moreover, both of the cases cited by Plaintiff in support of his nuisance claim involve accidental leakages or spills by the parties charged, resulting in the nuisances complained of in those cases. *See Fielder*, 522 S.E.2d at 17; *Phillips Petroleum*, 385 S.E.2d at 428-29. This case is wholly different. Here, there are no accidental leaks or spills alleged to have been committed by the Carpet

14

Manufacturing Defendants. Instead, the Plaintiff alleges that Defendants delivered their wastewater to an intermediary for treatment, Dalton Utilities, without causing any accidental leakage or spill, and that the leakage or spill at issue occurred thereafter. Under the *Hulsey* decision, such an act simply does not fall within the applicable definition of "control" under Georgia nuisance law.

### B.    The Carpet Manufacturing Defendants Acted Lawfully And, As Such, Cannot Be Liable For Public Nuisance.

The Carpet Manufacturing Defendants have, at all times, complied with their permits held with Dalton Utilities. These defendants therefore <u>cannot</u> be liable in nuisance. As the Georgia Supreme Court has long articulated:  "That which the law authorizes to be done, if done as the law authorizes, <u>cannot be a nuisance</u>. . . Thus, where the act is lawful in itself, it becomes a nuisance <u>only when conducted in an illegal manner</u> to the hurt, inconvenience or damage to another." *See City of Douglasville v. Queen*, 514 S.E.2d 195, 199 (Ga. 1999) (emphasis added) .

The Plaintiff attempts to skirt this body of case law by advancing new arguments not previously set forth in the Complaint that the Defendants have violated the Sewer User Rules and Regulations ("SURR"), the Georgia Water Quality Control Act ("GWQCA"), and their permits held with Dalton Utilities, thereby causing <u>Dalton Utilities</u> to violate its permit held with the Georgia EPD. *See* Dkt. No. 175, Response Brief, at 9-13. The arguments are surprising, not only

15

because they are not found within the four corners of the Complaint, but because the Defendants' permits have been in place literally for decades without challenge, and Dalton Utilities, the Georgia EPD, and the EPA have all been long "aware that PFC's are widely used in carpet manufacturing, and that many carpet manufacturers discharge wastewater to the Dalton Utilities wastewater treatment plant."[8] In fact, <u>over a decade ago</u>, in 2009, following extensive investigation, the EPA concluded at that "[b]ased on the available information, the [Dalton Utilities LAS] is in compliance with its GA EPA issued land application permit." *Id.* In the absence of pleadings that support the Plaintiff's new claims of illegality, the Carpet Manufacturing Defendants are therefore entitled to a dismissal.  Nonetheless, we understand that these new allegations will be the subject of a proposed amendment by Plaintiffs in the future. Assuming for the sake of argument that dismissal is not granted on a different ground, and in the interest of judicial economy, the Carpet Manufacturing Defendants urge this Court to defer ruling on this point until a more fulsome record can be placed before the Court.

---

[8] *See* copies of the EPA reports of its investigation on the EPA website at https://archive.epa.gov/pesticides/region4/water/documents/web/pdf/doc_i_qa_pfc _daltonga.pdf,                                                                             and https://archive.epa.gov/pesticides/region4/water/documents/web/pdf/doc_h_pfc_. The Court may take judicial notice of the website, pursuant to Fed. R. Evid. 201(b)(2).

16

### C.     Plaintiff Has Failed to Show He Has Suffered a "Special Harm."

Plaintiff has not suffered a "special harm" and thus his claim for public nuisance must fail. To avoid this result, Plaintiff attempts to distinguish between the "common damages" suffered by all class members and the "special damages" that are allegedly unique to him to support his claim for public nuisance. Plaintiff asserts that the "common damages" are interference with the right to consume safe drinking water" while the "special damages" are "increased rates and surcharges" paid for the consumption of that water. *See* Dkt. No. 175, Response Brief, at 23-24. But those categories are, for all intents and purposes, the same. Consumers of the City of Rome's water supply are surely also customers of the City of Rome Water and Sewer Division and ratepayers for that same water. Either way, the Plaintiff does not allege a harm that is different in kind from the harm suffered by any other consumer or customer of the City of Rome Water and Sewer Division.

Plaintiff cannot distinguish *Rhodes v. E.I. du Pont de Nemours and Co.,* 657 F. Supp.2d 751 (S.D. W.V. 2009). There, the plaintiffs alleged contamination of the drinking water in the Parkersburg Water District ("PWD") arising from DuPont's release of the chemical PFOA. *Id*. at 756-57. The court entered summary judgment on plaintiffs' public nuisance claim because they had "not suffered a special injury different in degree from other PWD customers." *Id*. at 769. Notably,

the court also found that "plaintiffs' attempt to seek class certification of their public nuisance claim [] undermined their ability to demonstrate standing for that claim," *i.e.* allege a "special injury" to support a public nuisance claim. *Id*. at 770. The court held: "the class is the same set of people as the comparative population in the special injury analysis: the set of people exercising the public right to consume clean, safe water from the public water supply." *Id.*

Plaintiff suffers from the exact same problem here. Plaintiff tries to sidestep *Rhodes* by distinguishing between the consumers of City of Rome water, on the one hand, and water subscribers, or "ratepayers" for that same water, on the other. *See* Dkt. No. 175, Response Brief. But that is a distinction without a difference – it doesn't matter who actually pays the water bill. By styling this case as a putative class action, Plaintiff is alleging everyone in the community is paying too much for water. Therefore, Plaintiff has failed to allege any "special injury" that is different in kind from any other water subscriber and ratepayer for the City of Rome's water, and Plaintiff's public nuisance claim must necessarily fail for this additional reason.

III.    **Plaintiff Fails to Allege Duty and Proximate Cause.**

A.     **Plaintiff Does Not Sufficiently Allege That The Carpet Manufacturing Defendants Owed Him a Duty.**

Try as Plaintiff might to bolster his Complaint through a Response, he simply does not allege the Carpet Manufacturing Defendants owed him any duty recognized under Georgia law. The test, Plaintiff agrees, is whether the Carpet Manufacturing Defendants' actions were "reasonable to be foreseen as injurious to others coming within the range of such acts." See Dkt. No. 175, Response Brief, at 30. Put another way, a "duty to the individual complaining must be sought and found, the observance of which duty would have averted or avoided the injury or damage." *City of Douglasville*, 514 S.E.2d at 197 (emphasis added).

Plaintiff alleges that the Carpet Manufacturing Defendants owe a legal duty to persons who may, more than a decade after the allegedly harmful conduct ceases, claim they have been over-charged by their water utility. These cost increases, Plaintiff alleges, were in turn caused by the water utility's voluntary decision to modify its water treatment procedures even though the subject water had already been treated by a different water utility upstream. Moreover, Plaintiff alleges, his water utility made this decision in response to a non-binding health advisory, the scientific underpinnings of which are heavily debated still today, let alone a decade ago. If effects this attenuated are foreseeable, there is no end.

19

Plaintiff does not even attempt to distinguish the *City of Douglasville* decision. *See* 514 S.E.2d at 199. Instead, Plaintiff cites multiple statutes and local ordinances that have nothing to do with the nondescript, sole legal duty allegation in his Complaint. *See Mitchell v. Thompson*, 564 F. App'x 452, 458 (11th Cir. 2014) (cannot raise new allegations not included in complaint in response to motion to dismiss). Under these statutes and ordinances, Plaintiff argues, the Carpet Manufacturing Defendants had a duty "to exercise due and reasonable care in their chemical manufacturing and chemical supply operations as well as their carpet manufacturing operations to prevent the discharge of toxic PFC chemicals into the Rome and Floyd County water supply." *See* Dkt. No. 1-A, Compl. ¶ 101.

But the Carpet Manufacturing Defendants did not discharge toxic PFC chemicals into the Rome and Floyd County water supplies. Rather, they dutifully sent their wastewater to Dalton Utilities, a heavily regulated entity that (i) maintains a Georgia EPD Permit and (ii) treated the subject water in strict accordance with the terms of that Permit. Under these allegations, the ratepayer Plaintiff simply does not "com[e] within the range" of the Carpet Manufacturing Defendants' allegedly improper conduct.

**B.      Plaintiff Does Not Allege Proximate Cause.**

Plaintiff heavily relies upon *Pulte Home Corp. v. Simerly,* 746 S.E.2d 173 (Ga. Ct. App. 2013), in support of his proximate cause argument. But that decision demonstrates what actually constitutes proximate cause under Georgia law. Pulte was developing a neighborhood and built a "weir" to prevent stormwater from entering a local creek. The weir ended up being insufficient for the significant volume of stormwater running off the property, and when the weir was overwhelmed, sediment and pollutants ran off Pulte's property into the creek, polluting nearby ponds. *See id.* at 175-76.

It was undisputed that Pulte controlled the construction of the weir and controlled (or failed to control) the runoff. Pulte did not send its wastewater to an EPD-permitted utility for treatment, the pond owners did not undertake voluntary remediation as part of the municipal services they perform, and the pond owners did not then attempt to pass on the remediation costs to ratepayers, who in turn filed a lawsuit. *Pulte Home* exemplifies what water pollution proximate cause looks like—this case is not it.

Plaintiff implies the Carpet Manufacturing Defendants are akin to the gas supplier discussed in *Hulsey*, 702 S.E.2d at 438, who knew a storage tank was defective, yet continued to supply gas into it. Dkt. No. 175, Response Brief, at 36.

But this gas supplier's duty—acknowledged in *Hulsey* and relied upon in *Phillips Petroleum*—has no application here, as discussed above in Section IIA. Moreover, the Complaint contains no <u>factual</u> allegations that the Carpet Manufacturing Defendants knew or should have known, at the time of the alleged transfer of wastewater, that: (1) Dalton Utilities would not sufficiently treat the wastewater to remove or otherwise neutralize the alleged PFCs; (2) the alleged PFCs would persist in the environment; (3) that many years later, the EPA would set health advisory levels; (4) that a second utility downstream from Dalton would thereafter voluntarily upgrade their filtration system; or (5) that the locality would pass on the costs associated with that upgrade to its ratepayers. That is a far cry from knowing a tank is leaking and still putting gas into it.

So, too, with *Ont. Sewing Mach. Co. v. Smith*, 572 S.E.2d 533 (Ga. 2002). The Georgia Supreme Court there found it was potentially foreseeable that a local mop manufacturer would not comply with a product recall. The recall's offer to reimburse the mop manufacturer for the cost of the machine was only available for 90 days—which strongly suggested that the recalling entity could foresee a refusal to comply with the terms of the recall. *Id.* The situation here is simply not analogous.

Finally, Plaintiff argues that the Carpet Manufacturing Defendants merely had to foresee was that PFCs would "reach the drinking water supply." *See* Dkt. No. 175, Response Brief, at 36. No such allegation appears within the Complaint. Regardless, these supplemental allegations are still several steps removed from the harm alleged in this case—increased water rates as a result of a municipality voluntarily upgrading its filtration system and deciding to pass the costs on to its ratepayers.[9]

## IV. Plaintiff's Claims are Barred by the Statute of Limitations.

### A. CERCLA's Discovery Rule Does Not Lengthen the Statute of Limitations for Plaintiff's Claims.

Plaintiff's claims are untimely. *See* Dkt. No. 140-1, Defendant Milliken & Company's Memorandum Supporting Motion to Dismiss Complaint, at 4-7. In a last-ditch attempt to save his claims from dismissal, Plaintiff argues that a federal discovery rule delays the commencement of Georgia's four-year statute of limitations. Dkt. No. 175, Response Brief, at 47-49. That federal discovery rule does not pre-empt the state law governing Plaintiff's tort claims.

The Comprehensive Environmental, Response, Compensation, and Liability Act ("CERCLA") imposes a "federally required commencement date" ("FRCD")

---

[9] Similarly, water rates were not an issue in *Ex parte Aladdin Mfg. Corp.*, 2019 Ala. LEXIS 146 (Ala. Dec. 20, 2019).

for statutes of limitation applying to claims alleging personal injury or property damage from alleged exposure to hazardous substances. 42 U.S.C. § 9658(a)(1). The FRCD creates a "discovery rule" by delaying the running of the statute of limitations until the "date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance …." *Id.* § 9658(b)(4); *CTS Corp. v. Waldburger*, 573 U.S. 1, 3 (2014). CERCLA explicitly reserves the discovery rule to only these kinds of claims. 42 U.S.C. § 9658(a)(2).

Because CERCLA's discovery rule preempts state laws, courts apply it only to actions that meet two criteria. First, the actual claim asserted must "fit[] into the precise terms of the exception" by seeking to recover for personal injury or property damage from exposure to hazardous substances. *Waldburger*, 573 U.S. at 12-13 (emphasis added). Second, the facts alleged in support of that claim must also suggest that the plaintiff could bring an action under CERCLA to remediate any environmental damage from the hazardous substances alleged. *Blankenship v. Consolidation Coal Co.,* 850 F.3d 630, 636–637 (4th Cir. 2017) (analyzing "whether the facts of the plaintiffs' complaints give rise to claims that could be asserted under CERCLA"); *Barnes ex rel. Barnes v. Koppers, Inc.*, 534 F.3d 357,

24

364 (5th Cir. 2008); *Covalt v. Carey Canada, Inc.*, 860 F.2d 1434, 1439 (7th Cir. 1988). Plaintiff's claims meet neither of these two requirements.

1.   Plaintiff Do Not Base Its Claims on Any Alleged Exposure to Hazardous Substances.

The FRCD applies only to claims seeking recovery for personal injury or property damages arising from exposure to hazardous substances. 42 U.S.C. § 9658(a)(1); *see Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 184 (2d Cir. 2002); *Arnold v. U.S. Pipe & Foundry Co.*, 274 F. Supp. 3d 1272, 1276 (N.D. Ala. 2017) (granting summary judgment).

Plaintiff does not allege injuries to his person or property from, nor does he even allege any exposure to, any hazardous substances. Instead, he identifies his alleged injury as the past and future costs of preventing his and others' exposure to PFCs. Dkt. No. 1-A, Compl. ¶¶ 83, 103, 114.  CERCLA's discovery rule therefore does not, and cannot, delay the commencement of Georgia's statute of limitations applicable to Plaintiff's claims. *See Waldburger*, 573 U.S. at 12-13.

2.   Plaintiff Cannot State a Viable CERCLA Claim.

To take advantage of the FRCD, Plaintiff must also show that he can bring a CERCLA claim. *Blankenship*, 850 F.3d at 636 ("Congress could not have intended for § 9658 to preempt state law . . . outside of CERCLA's scope.") (internal

25

quotation marks and citation omitted); *Barnes*, 534 F.3d at 365 (FRCD "operates only where the conditions for CERCLA cleanup are satisfied").

CERCLA is an environmental remediation statute. *See Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) ("CERCLA was intended to promote the timely cleanup of hazardous waste sites …."). It provides private parties a "direct" right to recover from responsible parties the cleanup costs they "directly incur" in investigating and remediating a hazardous waste site. 42 U.S.C. § 9607(a)(4)(B). A prima facie case for such cleanup costs requires: (1) a release (or threatened release) of a hazardous substance; (2) from a facility; (3) that caused the plaintiff to incur necessary response costs consistent with the National Contingency Plan; and (4) because of a defendant among the statutorily-defined group of persons. *Redwing Carriers v. Saraland Apts.,* 94 F.3d 1494, 1496-97 (11th Cir. 1996).

Plaintiff fails to allege facts supporting a claim for cleanup costs under CERCLA for three reasons. First, Plaintiff alleges that the Carpet Manufacturing Defendants' pollutants were transported to, and treated at, Dalton Utilities, the Looper's Bend Wastewater Treatment Plant, and "other treatment plants." Dkt. No. 1-A, Compl. ¶¶ 50-51. Plaintiff does not allege, however, any costs related to

26

cleanup at any of those facilities.[10] Second, Plaintiff did not "incur" any cleanup costs at any location: the City of Rome allegedly did. *See U.S. v. Atlantic Research Corp.*, 551 U.S. 128, 129 (2007) ("by reimbursing response costs paid by other parties, the [claimant] has not incurred its own costs of response and therefore cannot recover under §107(a)"); *In re Trimble*, 232 F.3d 946, 956-57 (8th Cir. 2000); *Chubb Custom Ins.*, 710 F.3d at 962.

Third, Plaintiff did not pay any "necessary costs of response." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669-670 (5th Cir. 1989) (to incur "response costs," a party must have acted to contain a release threatening the public health or the environment); *In re Dant & Russell, Inc.*, 951 F.2d 246, 249 (9th Cir. 1991) (CERCLA "envision[s] that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard."). Plaintiff allegedly paid fees and surcharges related to filtering the relatively small amount of water withdrawn from the Oostanaula River for purification, not of removing hazardous substances "from the environment": the Oostanaula River as a whole, any of its tributaries, or any rivers into which it flows. *See* Dkt. No. 1-A, Compl. ¶ 52 (identifying Conasauga

---

[10] Nor does Plaintiff allege that the Carpet Manufacturing Defendants "by contract, agreement, or otherwise arranged for disposal or treatment" of their wastewater at any facility operated by the City of Rome, where the City incurred its costs. *See* 42 U.S.C. §9607(a)(3). If the City's treatment plants are the facilities covered by CERCLA, the defendants do not meet the definition of "covered persons." *Id.*

and Coosa rivers as allegedly contaminated too). That is insufficient. *See Exxon Corp. v. Hunt*, 475 U.S. 355, 359-60 (1986) (CERCLA cannot "compensate private parties for economic harms that result from discharges of hazardous substances.").

Because Plaintiff has not and could not support a private action under CERCLA, Plaintiff cannot avail himself of its discovery rule.

### B.     Plaintiff Alleges No Facts Tending to Show Any Right of Recovery Within the Statute of Limitations.

Even for a continuing nuisance, Plaintiff can only recover for "damages sustained within less than four years." *City of Chamblee v. Maxwell*, 452 S.E.2d 488, 489 (1994); *Cox v. Cambridge Square Towne Houses, Inc.*, 236 S.E.2d 73, 75 (1977) (companion statute precludes recovery for damages "suffered more than 4 years prior to the filing of the suit"); *Tucker v. Southern Wood*, 28 F.3d 1089, 1091 (11th Cir. 1994) ("Plaintiffs would be entitled to any damages … caused by leakage of hazardous waste onto their property [up to] … four years prior to … the instant action …."). A case that Plaintiff cites agrees. *See Hoffman v. Atlanta Gas Light Co.*, 426 S.E.2d 387, 390 (Ga. Ct. App. 1992). Because the Complaint was filed on November 26, 2019, Plaintiff cannot recover for any damage suffered before November 26, 2015.

Plaintiff argues, without citing any authority, that the <u>nature</u> of the substance discharged, not the <u>time</u> of the discharge, determines when the statute of

limitations expires. Dkt. No. 175, Response Brief, at 52-53. Under this logic, a one-time, widely publicized discharge of a permanently toxic substance might never exhaust the statute of limitations. Georgia law, however, focuses elsewhere: Plaintiff can recover against only those defendants that he alleges have discharged contaminated water into Rome's water supply since November 26, 2015. *See City of Toccoa v. Pittman*, 648 S.E.2d 733, 737 (Ga. Ct. App. 2007) ("The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance.").

Plaintiff alleges no discharges of contaminated water by any defendant over the past four years,[11] and no facts suggesting that discharges years ago have taken this long to reach Rome's water supply.[12] Nor does he allege any fact that suggests he did not or was unable to "discover" the injury until years after it occurred. *See, e.g.*, Dkt. No. 1-A, Compl. ¶¶ 77 (EPA began taking action as to PFCs in 2002), 79 (Rome began testing its water supply for PFC no later than 2016), 80 (EPA set

---

[11] Moreover, it is undisputed that Tarkett USA, Inc. ceased discharge of any industrial process wastewater to Dalton Utilities in 2008. Dkt. No. 128-1 at 4-5.

[12] Plaintiff asserts that he "alleges … the 'continuing exudation and leaching of chemicals … from the contaminants deposited long ago' and presently." Dkt. No. 175, Response Brief, at 51. In support of that assertion, however, Plaintiff cites a 1992 case, not his Complaint. *Id.*

advisory levels for drinking water in 2009). The Court should dismiss the Complaint for this reason as well.

## V.     The Public Services Doctrine Bars The Tort Claims for Damages.

The public services doctrine provides that "absent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Walker Cty v. Tri-State Crematory*, 643 S.E.2d 324, 327 (Ga. Ct. App. 2007). The doctrine acknowledges the Georgia General Assembly's right to establish local governments to provide, and arrange for the funding of, core services for the public. *Id*. 643 S.E.2d at 327 (citing *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323-24 (9th Cir. 1983)); *see also* Ga. Const. Art. 9, § 2, ¶ III. Whether the costs of providing the public service "should be spread among all taxpayers or reallocated in some other manner necessarily implicates fiscal policy, and, therefore, falls within the special purview of the legislature, not this Court." *Walker Cty.*, 643 S.E.2d at 328 (emphasis supplied).

In this case, plaintiffs assert claims in tort to recover the costs of a public service, the purification and provision of drinking water. The public services doctrine bars those claims.

### A.      Plaintiff Seeks to Recover the Cost of Providing a Public Service.

Plaintiff seeks to recover in tort "losses for the increased rates and surcharges incurred as ratepayers for the costs of partially filtering long-chain PFCs from their drinking water." *See* Dkt. No. 1-A, Compl., at ¶¶ 103, 114. The Georgia Constitution enumerates the "purification, and distribution of water" as a public service granted to a county or municipality. Ga. Const., Art. 9, § 2, ¶ III(a)(7). Consistent with such authority, the City of Rome's Charter grants the City Commission the "full power and control of the waterworks system and sewer system of the City of Rome . . . ."[13] The Charter also separately empowers the Commission to "regulate the distribution and use of water . . . and from time to time to fix the price and payment for the use thereof."[14]

Georgia courts have also recognized the purification and provision of water as a public service, regardless of whether undertaken by a private or a municipal corporation. *See Freeman v. Macon Gaslight & Water Co.*, 56 S.E. 61, 62 (Ga. 1906) (private corporation furnishing city with water liable "as a public service corporation"); *Washington Water & Elec. Co. v. Pope Mfg. Co.*, 167 S.E. 286, 289

---

[13]      *See* City of Rome Charter, Art. 8 (available at https://library.municode.com/ga/rome/codes/code_of_ordinances?nodeId=PTICH).

[14]   *Id.; see also* Rome, GA CD:8-36, 22-326 (available at https://library.municode.com/ga/rome/codes/code_of_ordinances).

(Ga. 1932) ("The defendant, as the holder of a franchise to conduct the business of furnishing water . . . was a public service corporation.").

From the state constitution down to the local ordinances at issue, Georgia law recognizes the provision of clean drinking water as a public service. The state scheme allocates the cost of providing that public service to the people and businesses who receive that service. This decision "necessarily implicates fiscal policy, and, therefore, falls within the special purview of the legislature, not this Court." *Walker Cty*, 643 S.E.2d at 328.

### B.    The Doctrine of Sovereign Immunity Makes No Difference Here.

In disputing that the provision of clean drinking water to the public represents a public service, Plaintiff relies on cases dealing with a different issue — the doctrine of sovereign immunity — that turns on a different criterion. A municipality's sovereign immunity depends upon whether it has exercised a legislative or judicial function, on the one hand, or a "ministerial" function, on the other. *McCrary Eng'g Corp. v. City of Bowdon*, 317 S.E.2d 308, 310-11 (Ga. Ct. App. 1984). Ministerial functions do not confer sovereign immunity, but those same functions nevertheless include a wide range of undoubtedly public services, such as paving roads and providing drinking water to the public. *Id*. 317 S.E.2d at 311 (collecting cases).

The public services doctrine does not turn, as the doctrine of sovereign immunity does, on which *kind* of public service is provided. The public services doctrine turns on whether Rome or Floyd County provided a public service. They did, and the public services doctrine applies.

### C.    How Governments Funded the Public Service Makes No Difference Here Either.

Ripping a single phrase from *Walker County* out of context, Plaintiff also asserts that the public services doctrine applies only where local governments have chosen "to provide core services for the public and pay for these services *by spreading the costs to all citizens through taxation*." *See* Dkt. No. 175, Response Brief, at 41 (citing *Walker Cty*, 643 S.E.2d at 327) (emphasis added).

How a local government funds a particular public service has never mattered under Georgia law. In the very first Georgia case applying the free public services doctrine, Putnam County sought "compensatory damages for all the money the defendants' actions allegedly caused it to spend in 'sending the Building Inspector'" to inspect a property for possible violations of zoning and safety codes. *Torres v. Putnam Cty.*, 541 S.E.2d 133, 136 (Ga. Ct. App. 2000). Building inspection services are typically funded by fees, not taxes. *See* City of Rome Comprehensive Annual Financial Rpt. Year Ended December 31, 2018 ("Financial Report") at 7 ("The City uses enterprise funds to account for its water and sewer

33

operation, … building inspection services, … and the tennis center."). The court in *Torres* nevertheless applied the free public services doctrine and reversed the trial court's denial of the motion to dismiss the tort claims. 541 S.E.2d at 137. What mattered was whether the claim sought to recover the cost of a public service, not how that public service was ultimately funded. *Id*. at 136.

The public services doctrine does not apply only where the legislature has decided to allocate the costs of a public service "through taxation." *See* Dkt. 175, Response Brief, at 41. It applies to protect <u>whatever</u> legal mechanism the municipality has chosen to allocate those costs. *See Walker Cty*, 643 S.E.2d at 328 ("Whether the costs of providing the public service should be spread among all taxpayers <u>or reallocated in some other manner</u> … falls within the special purview of the legislature, not a court.") (emphasis added).

### D. The Doctrine's Public Policy Rationale Applies to Claims by Taxpayers or Ratepayers.

The public services doctrine ensures that the method of funding costs for "core services for the public" are determined by "the legislature and its public deliberative processes, rather than the court." *Walker Cty*, 643 S.E.2d at 327. The state Constitution, the General Assembly, and the local elected officials have delegated to the Rome City Commission and the Floyd County Commission the authority to determine their own fiscal policies, and to decide for themselves how

34

to allocate the costs of the public services they provide. *See* Ga. Const., Art. 9, § 2, ¶ III; *Trinity Outdoor, L.L.C. v. Oconee Cty.,* No. 3:02-CV-67(HL) 2003 WL 25301942, *9 (M.D. Ga. May 21, 2003); Floyd County, Georgia Comprehensive Annual Financial Report (Dec. 31, 2018) at 10-11, 13; City of Rome Charter, Art. 8; Rome, GA Municipal Code CD:8-36, 22-326. Plaintiffs' tort claims threaten that thoughtful separation of powers in exactly the same way that claims by the City of Rome or Floyd County would, and do. This Court should heed the crystal-clear rationale of the public services doctrine, and leave the allocation of costs for public services to "the special purview of the legislature." *See Walker Cty*, 643 S.d.2d at 328.

## VI.   <u>Plaintiff Has Failed to Establish Subject Matter Jurisdiction Over Tarkett USA Inc.</u>

Nothing in Plaintiff's response changes the fact that Plaintiff has failed, as a threshold matter, to plead facts sufficient to establish a causal chain that his claimed injury of paying a water utility surcharge is "fairly traceable" to Tarkett USA's actions. Establishing this causal connection is a fundamental requirement necessary to establish his standing and, by extension, subject matter jurisdiction. Plaintiff's only response is to assert the chemicals at issue are environmentally "persistent," but this assertion does not satisfy his causal connection pleading burden in the face of the undisputed fact Tarkett ceased all discharges of industrial

process wastewater to Dalton Utilities in 2008. As such, Plaintiff has failed to establish subject matter jurisdiction over Tarkett USA, and Tarkett USA should be dismissed as a defendant in this action with prejudice.

Plaintiff, in his response, agrees with Tarkett USA that under well-established jurisdictional jurisprudence a plaintiff bears the burden of showing that it has standing to assert its claims against a defendant, including a showing of a concrete injury fairly traceable to that defendant's alleged wrongful conduct. *See* Dkt. No. 175, Response Brief, at 52; Dkt. No. 128-1, Motion to Dismiss, at 8. Nor does Plaintiff contest Tarkett USA's evidence in support of its Motion to Dismiss that Tarkett USA completely ceased discharging industrial process wastewater to Dalton Utilities in 2008. *See* Dkt. No. 175, Response Brief, at 52.

Plaintiff argues, however, that his Complaint establishes that Plaintiff's alleged injury, payment of recently-imposed water utility surcharges by the City of Rome[15], is fairly traceable to Tarkett USA's discharges of industrial process wastewater prior to the time it ceased such discharges in 2008, citing his Complaint for the general allegation that "PFCs persist in the environment, resist degradation in treatment processes, are readily absorbed into biota, and continue to bioaccumulate with repeated exposure." *Id.* (citing Compl. ¶¶ 53, 54).

---

[15] *See* Dkt. No. 1-A, Compl. ¶¶ 80-82.

Subject matter jurisdiction, however, requires that in order to "survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (footnote omitted) (quoting *Allen v. Wright*, 468 U.S. 737, 757, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The links in the causal chain must not be "hypothetical or tenuous." *Id.* (quoting *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)). "In cases where a chain of causation 'involves numerous third parties' whose 'independent decisions' collectively have a 'significant effect' on plaintiff's injuries, the Supreme Court [and others have] found the causal chain too weak to support standing at the pleading stage." *Maya*, 658 F.3d at 1070 (citations omitted). Allegations for each link in the chain of causation must be "plausible" to make it over the constitutional standing hurdle for pleading. *Id*.

Plaintiff's general statements about the persistence of PFCs in the environment do not meet the threshold jurisdictional requirement of showing an injury "fairly traceable" to Tarkett USA's conduct in light of the fact that Tarkett USA indisputably ceased all discharges of PFCs and industrial wastewater to Dalton Utilities a dozen years ago. There is simply nothing in the Complaint or Plaintiff's allegations that create a "plausible" causal link to Tarkett USA,

especially given the numerous other defendants in this action, many of whom, according to Plaintiff, continue to discharge industrial process wastewater containing PFCs to Dalton Utilities. As such, Plaintiff's causal links between his alleged current injury and Tarkett USA's long-ceased conduct are simply too attenuated, hypothetical, and tenuous to survive fundamental standing analysis.

## VII. <u>Plaintiff is Not Entitled to Punitive Damages, Attorneys Fees, or Litigation Expenses.</u>

Plaintiff concedes, as he must, that any award of punitive damages, attorneys fees, or litigation expenses is only available when the underlying claim itself is viable. Because Plaintiff's claims fail as a matter of law, he is not entitled to any of this relief.

Even if an underlying claim survives, the Court should dismiss his claims for punitive damages, attorneys fees, and litigation expenses. Punitive damages are only available if "defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Likewise, under O.C.G.A. § 13-6-11, a plaintiff may recover "expenses of litigation," including attorneys' fees only "where the defendant has acted in bad faith." In this context, "bad faith" means "bad faith connected with the transaction and dealings out of which the cause of action arose, rather than bad faith in

defending or resisting the claim after the cause of action has already arisen." *Lewis v. D Hays Trucking, Inc.*, 701 F. Supp. 2d 1300, 1313 (N.D. Ga. 2010) (internal quotation marks and citation omitted); *Coleman v. Arvey*, No. 1:14-CV-994-MHS, 2015 U.S. Dist. LEXIS 185129, at *10 (N.D. Ga. May 7, 2015) ("Bad faith" cannot be demonstrated without "[a] dishonest purpose, moral obliquity, conscious wrongdoing, [an] interested motive, or ill will."). Plaintiff's bare allegations of willful misconduct and bad faith are undermined by his own acknowledgement that the Carpet Manufacturing Defendants fully complied with Georgia law when they sent wastewater to Dalton Utilities for lawful disposal in accordance with a duly-authorized EPD permit.

*Stone Man, Inc. v. Green*, 435 S.E.2d 205 (Ga. 1993), which Plaintiffs tellingly do not even try to distinguish, makes clear Plaintiff's allegations cannot support an award of punitive damages, attorneys fees, or litigation expenses. In *Stone Man*, the Georgia Supreme Court reversed the jury's punitive damages award to a plaintiff that complained a nearby quarry was a nuisance because the quarry was properly permitted and operated in compliance with its permits. *Id.* at 206. The Court cautioned: "punitive damages, the purpose of which is to punish, penalize, or deter, are, as a general rule, improper where a defendant has adhered to environmental and safety regulations." *Id.* (internal quotation mark omitted). "This

is especially true in the case of a commercial enterprise the operation of which is accompanied by a certain amount of unpleasant but unavoidable efforts or byproducts." *Id.* Because Plaintiff merely alleges that the Carpet Manufacturing Defendants lawfully sent their byproduct industrial wastewater to Dalton Utilities for treatment and disposal pursuant to an EPD-issued permit, his claim for punitive damages against the Carpet Manufacturing Defendants should be dismissed.

Moreover, punitive damages, attorneys fees and litigation expenses are not, as Plaintiff argues, jury issues when Plaintiffs' allegations belie willful misconduct and bad faith altogether. Because Plaintiff merely alleges that the Carpet Manufacturing Defendants sent wastewater to Dalton Utilities for lawful disposal in accordance with a duly-authorized EPD permit, he fails to a "dishonest purpose, moral obliquity, conscious wrongdoing, interested motive, or ill will" necessary for bad faith. *See Windermere, Ltd. v. Bettes*, 438 S.E.2d 406, 409 (Ga. Ct. App. 1993) ("Indicative of whether a party acts in good or bad faith in a given transaction is his abiding by or failing to comply with a public law. . . ." (internal quotation marks and citation omitted)). Claims for such relief should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, the Carpet Manufacturing Defendants respectfully request that this Court dismiss Plaintiff's claims.

Respectfully submitted this 6 day of July, 2020.


/s/ Jennifer B. Dempsey
William V. Custer
bill.custer@bclplaw.com
Georgia Bar No. 202910
Jennifer B. Dempsey
jennifer.dempsey@bclplaw.com
Georgia Bar No. 217536
Julia Fenwick Ost
julia.ost@bclplaw.com
Georgia Bar No. 940532
Christian J. Bromley
christian.bromley@bclplaw.com
Georgia Bar No. 206633
**BRYAN CAVE LEIGHTON
PAISNER LLP**
One Atlantic Center - 14th Floor
1201 West Peachtree Street, NW
Atlanta, Georgia 30309
Phone: (404) 572-6600
Fax:    (404) 572-6999


***Attorneys for Defendants Shaw
Industries, Inc. and Shaw Industries
Group, Inc.***


/s/ Michael J. Sullivan
Michael J. Sullivan
michael.sullivan@wbd-us.com
Georgia Bar No. 142203
Vonnetta L. Benjamin
vonnetta.benjamin@wbd-us.com
Georgia Bar No. 049890
**WOMBLE BOND
DICKINSON (US) LLP**

/s/ David Carpenter
David Carpenter
david.carpenter@alston.com
Georgia Bar No. 292101
Doug Scribner
doug.scribner@alston.com
Georgia Bar No. 632755
Geoff Rathgeber
geoff.rathgeber@alston.com
Georgia Bar No. 195334
**ALSTON & BIRD LLP**
1201 W. Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax:    (404) 881-7777


***Attorneys for Defendants Aladdin
Manufacturing Corporation, Mohawk
Carpet, LLC and Mohawk Industries,
Inc.***


/s/ M. Russell Wofford, Jr.
Jameson B. Carroll
jcarroll@carrollweiss.com
Georgia Bar No. 112640
Michael Weiss
mweiss@carrollweiss.com
Georgia Bar No. 746494
M. Russell Wofford, Jr.
rwofford@carrollweiss.com

41

271 17th Street N.W., Suite 2400
Atlanta, Georgia 30363-1017
Phone: (404) 879-2479
Fax:     (404) 870-4879


John W. Scott
jscott@scottdukeslaw.com
(Admitted Pro Hac Vice)
Ethan A. Wilkinson
ewilkinson@scottdukeslaw.com
(Admitted Pro Hac Vice)
**SCOTT DUKES & GEISLER, P.C.**
*Tarkett USA Inc.*
*Attorneys for Defendant*
211 Twenty Second Street North
Birmingham, Alabama 35203
Phone: (205) 251-2300
Fax:     (205) 251-6773

Georgia Bar No. 773002
**CARROLL & WEISS LLP**
1819 Peachtree Road, Suite 104
Atlanta, Georgia 30309


Phone: (404) 228-5337
Fax:     (404) 228-5564
*Attorneys for Defendant Milliken &*
*Company*


 /s/ Scott Parrish
Scott Parrish
Scott.parrish@millermartin.com
Georgia Bar No. 564980
Ellis Lord
Ellis.lord@millermartin.com
(Admitted Pro Hac Vice)
Neil L. Wilcove
Neil.wilcove@millermartin.com
Georgia Bar 758401
Meredith C. Lee
Meredith.lee@millermartin.com
Georgia Bar 294856
Jenna Fullerton
(Admitted Pro Hac Vice)
Jenna.fullerton@millermartin.com
**MILLER & MARTIN PLLC**
832 Georgia Avenue, Suite 1200
Chattanooga, Tennessee 37402
Phone: (423) 756-6600
Fax: (423) 785-8480

*Attorneys for Defendant The Dixie*
*Group*

42

## **<u>CERTIFICATION UNDER L.R. 7.1.D.</u>**

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is a computer document and was prepared in Times New Roman 14 point font, as mandated in Local Rule 5.1.C.

/s/ Geoffrey C. Rathgeber
Geoffrey C. Rathgeber
Georgia Bar No. 195334

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

JARROD JOHNSON, individually, and
on Behalf of a Class of persons
similarly Situated, ,

     Plaintiff,

v.

3M COMPANY, ET AL. ,

     Defendants.

Civil Action File No.:
4:20-cv-00008-AT

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 6, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which has notified all counsels of record.

/s/ Geoffrey C. Rathgeber
Geoffrey C. Rathgeber, GA Bar No. 195334
E-Mail: geoff.rathgeber@alston.com