# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATIONS, | : : : | |
| Plaintiff, | : : : | |
| v. | : : | |
| CORNING OPTICAL COMMUNICATIONS, LLC, | : : : : | CIVIL ACTION NO. 1:18-cv-5027-AT |
| Defendant. | : : | |

## ORDER

This case arises out of the construction of the Mercedes-Benz Stadium. It is before the Court on Defendant Corning Optical Communications, LLC's (Corning) Motion to Dismiss Plaintiff International Business Machine's (IBM) Amended Complaint [Doc. 32], Defendant's initial Motion to Dismiss [Doc. 19] and Defendant's Motion for a More Definite Statement [Doc. 20].[1]

---

[1] Defendant's initial Motion to Dismiss and Motion for a More Definite Statement [Docs. 19 and 20] were mooted when Plaintiff filed its Amended Complaint [Doc. 24]. Accordingly, Defendant's Motion to Dismiss and Motion for a More Definite Statement [Docs. 19 and 20] are **DENIED AS MOOT.**

## I. Facts[2]

In 2013, the Atlanta Falcons contracted with Holder, Hunt, Russell, Moody ("HHRM" or "Prime Contractor"), a joint venture, to construct the Mercedes-Benz Stadium ("Stadium" or "Stadium Project") in downtown Atlanta.  (Am. Compl., ¶¶ 13-15.)  HHRM, in turn, hired Plaintiff IBM as the technology subcontractor in charge of the technology for the stadium.  (Am. Compl., ¶¶ 18-19.)  Prior to agreeing to be HHRM's subcontractor, IBM entered into a Base Agreement with Defendant Corning. (Am. Compl., ¶ 2, 10 51.) The Base Agreement established the basis for a relationship between IBM and Corning for "Deliverables and Services" described in "Statements of Work" that may issue under the Base Agreement. (Base Agreement, Ex. B to Am. Compl., Doc. 24-2) (effective date August 18, 2014).

The Parties' Base Agreement contains a choice-of-law provision providing that "this agreement and any dispute or controversy arising from or relating to this Agreement will be governed by the laws of the State of New York applicable to contracts executed in and performed entirely within that State." (Am. Compl., Ex. B ¶ 15.3.5.) The Parties' Base Agreement also states that: "[t]his agreement replaces any prior oral or written agreements between the parties with respect to the subject matter of this Agreement, excluding any confidential disclosure agreements." (Amend. Compl., Ex. B ¶ 15.11.) The Base Agreement also prohibits amendments to the agreement: "This agreement may only be amended by a writing specifically

---

[2] The factual background the Court describes below is based on the allegations in Plaintiff's Amended Complaint, which the Court construes in Plaintiff's favor consistent with the Motion to Dismiss standard.

referencing this Agreement which has been signed by authorized representatives of the Parties." (Amend. Compl., Ex. B ¶ 15.1.)

As IBM's subcontractor, Corning was responsible for designing, implementing, testing, and commissioning a technology system that would deliver voice and data services for Mercedes-Benz Stadium through Corning's proprietary Corning ONE Distributed Antenna System (DAS System). (Am. Compl., ¶ 2.) The DAS System consists of a network of antennas that were supposed to be distributed throughout Mercedes-Benz Stadium in such a manner that would provide contractually mandated signal strength, speed, and quality. (Am. Compl., ¶ 2.) The overall purpose was to provide reliably fast cellular service to fans throughout Mercedes-Benz Stadium. (Am. Compl., ¶ 2.)

Prior to Corning's official engagement, Corning attended several meetings with the Prime Contractor and IBM where "Corning made numerous statements about its capabilities . . . , which culminated in a detailed 'Design Overview' first released on April 1, 2015." (Am. Compl., ¶ 29); (*see also id.* ¶¶ 21-29.) By early 2015, a Corning representative regularly attended meetings with the Falcons, IBM, and various cellular carriers. (Am. Compl., ¶ 34.) "During these meetings at the stadium construction site in Atlanta, DAS System performance requirements were defined. This included determining the critical qualitative and quantitative performance requirements such as the Key Performance Indicators [] that Corning itself created and provided to the Falcons, the Prime Contractor, IBM, and to the cellular carriers. At these meetings, the cellular carriers consistently sought

increased metrics of performance of the DAS System." (*Id.*) IBM alleges that "the [Key Performance Indicators] were based on multiple representations and assurances by individuals at Corning . . . regarding Corning ONE System capabilities and Corning's ability to meet them through proper design and commissioning." (Am. Compl., ¶ 40.) "The accuracy of these representations was uniquely within the possession of Corning and its employees and IBM relied on Corning as a DAS expert when it made those representations" (*Id.*)

Many of Corning's representations, including those concerning the system's ability to meet the Key Performance Indicators, were also incorporated into the Statement of Work between IBM and Corning. (Am. Compl., ¶¶ 49-50.) The Statement of Work incorporates the terms of the 2014 Base Agreement between IBM and Corning. (Am. Compl., ¶ 51; Base Agreement, Ex. A to Am. Compl., Doc. 24-1.) IBM alleges that it relied on Corning's representations in entering the Statement of Work, and that the Falcons and the Prime Contractor also relied on Corning's representations in selecting the proprietary Corning ONE DAS System and entering into contracts with cellular carriers. (Am. Compl., ¶¶ 39-45.) Further, IBM alleges that "Corning knew these representations were false at the time Corning made them in the IBM-Corning [Statement of Work]." (Am. Compl., ¶ 50.)

IBM alleges that after entering the contracts, Corning continued to make misrepresentations. (Am. Compl., ¶¶ 62, 64, 78, 100.) Ultimately, IBM alleges that Corning's DAS System proved incapable of meeting the performance requirements. (Am. Compl., ¶¶ 98-110.) IBM claims that Corning's representations

were false; that Corning knew these representations were false when made; that Corning omitted material information about the limits of its designs; and that Corning utilized incorrect assumptions in its model. (Am. Compl., ¶¶ 62-77, 100-105.)

"[A]fter Corning proved unable to fix the performance issues, Corning took the surprising position that it did not agree to implement a *working* DAS System." (Am. Compl., ¶ 113) (emphasis in original). "As a result of Corning's numerous breaches and misrepresentations, the Falcons, the Prime Contractor, and IBM have incurred substantial costs and suffered significant damages. (Am. Compl., ¶ 114.) IBM claims that "the Falcons, the Prime Contractor, and IBM spent millions of dollars and the better part of a year fixing the deficient DAS System designed and implemented by Corning." (Am. Compl., ¶ 115.)

At substantial expense, IBM hired at least two additional independent consultants "to address the numerous problems in the DAS System's performance." (Am. Compl., ¶ 116.) "These consultants confirmed what the Falcons, the Prime Contractor, and IBM had suspected – Corning had designed and implemented a deficient and inferior DAS System." (*Id.*) IBM alleges that "towards the end of 2017, IBM and the consultants came to the realization that the Corning designed and implemented DAS System would never meet the performance requirements developed and approved by Corning and contained in the various agreements." (Am. Compl., ¶ 118.) After considerable time, effort, and money, IBM delivered a system that met the Falcon's needs. (*Id.*)

"In return for IBM's agreement to correct the Corning deficiencies in both the design specified equipment and the testing, commissioning, and overall construction of the Corning ONE DAS System, the Falcons and the Prime Contractor agreed to assign to IBM all of the Falcons' and the Prime Contractor's claims and damages." (Am. Compl., ¶ 121.) "On or about July 31, 2018, the Falcons, the Prime Contractor, and IBM signed an agreement through which the Mercedes-Benz Stadium Developers assigned to IBM all of their 'rights to pursue any and all claims against any of IBM's subcontractors or IBM's sub consultants related to' the Mercedes-Benz Stadium Project." (*Id.* ¶ 122.) Under the Developers-IBM Assignment, "Corning is one such subcontractor" and "the Mercedes-Benz Stadium Developers' claims against Corning are among those assigned to IBM." (*Id.* ¶ 122.)

IBM brings ten claims on behalf of itself and on assignment from HHRM and the Atlanta Falcons (collectively, "the Stadium Developers"). IBM asserts the following claims on behalf of the Stadium Developers:

- Negligent Design and Construction (Count One),
- Grossly Negligent Design and Construction (Count Two),
- Professional Negligence (Count Three),
- Negligent Misrepresentation (Count Four), and
- Attorney's Fees and Costs (Count Five).

And IBM asserts the following claims on its own behalf:

- Breach of Contract (Count Six),
- Grossly Negligent Design and Construction (Count Seven),
- Fraud in the Inducement (Count Eight),
- Fraudulent Misrepresentation (Count Nine),
- Negligent Misrepresentation (Count Ten) and

- Attorney's Fees and Costs (Count Five).

## II.    Standard of Review

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-556 (2007); Fed. R. Civ. P. 12(b)(6). The plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)); Fed. R. Civ. P. 8(a). In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Id.* at 556. A complaint may survive a motion to dismiss for failure to state a claim even if it is

"improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Id*.

## III.  Analysis

Corning has moved to dismiss nine of the ten claims (Counts: One-Four and Seven-Ten) in IBM's Amended Complaint.  (Mot. to Dismiss, Doc. 32.)  The only count that would remain should Corning's motion be granted is IBM's breach of contract claim.  Corning argues that: (1) the economic loss rule bars IBM's negligence-based claims; (2) the assigned negligent misrepresentation is not assignable under Georgia law; (3) IBM's fraud claims are barred by the merger clause in the contract and (4) the claims for negligent misrepresentation, fraud in the inducement, and fraudulent misrepresentation constitute non-actionable puffery.  Finally, Corning argues that IBM cannot state a claim for attorney's fees on behalf of either itself or the Stadium Developers.

### a. *Choice-of-Law*

The first order of business is determining what state law governs Plaintiff's claims in this diversity action.

As an initial matter, the Parties' Base Agreement contains a choice-of-law provision, stating, "this agreement and any dispute or controversy arising from or relating to this Agreement will be governed by the laws of the State of New York applicable to contracts executed in and performed entirely within that State." (Am. Compl., Ex. B ¶ 15.3.5.)

The Parties agree that New York law applies to the Parties' contract, and thus New York law applies to Plaintiff's contract claim. (Def.'s Mot., Doc. 32-1 at 7, 23; Pl.'s Resp., Doc. 34 at 3, n. 1.) The Parties also agree that Georgia law governs the claims that IBM brings by assignment (Counts One-Four and part of Count Five) and IBM's claim for grossly negligent design and construction (Count Seven). However, the Parties dispute the law applicable to Plaintiff's tort claims for Fraud in the Inducement, Fraudulent Misrepresentation, Negligent Misrepresentation (Counts Eight-Ten) and Plaintiff's claim for attorney's fees (Count Five).

Federal jurisdiction in this case is based on diversity of citizenship, and this Court must apply Georgia's choice-of-law rules. *See Federated Rural Elec. Ins. Exch. v. R.D. Moody & Assocs., Inc.*, 468 F.3d 1322, 1325 (11th Cir. 2006); *Colonial Life & Accident Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004) ("A federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits."). Georgia courts follow the traditional rules of *lex loci contractus* and *lex loci delicti. Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998).

Under the rule of *lex loci contractus*, the "validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made." *Id.*; *R.D. Moody & Assocs., Inc.*, 468 F.3d at 1325 (citing *Fed. Ins. Co. v. Nat'l Distrib. Co., Inc.,* 417 S.E.2d 671, 673 (Ga. Ct. App. 1992)) (internal citations and quotations omitted). Under the rule of *lex loci delicti*, tort claims are governed by the substantive law of the state where the tort was

committed.  *Rayle Tech, Inc*, 133 F.3d at 1409; *R.D. Moody & Assocs., Inc.*, 468 F.3d at 1325.  Parties, however, "may stipulate that the laws of another jurisdiction will govern the transaction, unless the law is contrary to Georgia public policy, or the chosen jurisdiction has no substantial relationship to the parties or the transaction." *Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998) (citing *Manderson & Associates, Inc. v. Gore*, 389 S.E.2d 251, 254 (Ga. Ct. App. 1989)) (internal quotations omitted).

IBM argues that the Base Agreement's choice-of-law provision is broad enough to cover IBM's tort claims for Fraud in the Inducement, Fraudulent Misrepresentation, and Negligent Misrepresentation.  While a contractual choice-of-law provision could theoretically be broad enough to cover tort claims between the Parties, that is not the situation before the Court.

Courts often look to the language of the choice-of-law provision to determine whether the parties' intended to stipulate to the law applicable to tort claims.  *Axis Specialty Ins. Co. v. Doty-Moore Tower Servs., LLC*, No. 1:06-CV-0261-JEC, 2008 WL 11335004, at *9 (N.D. Ga. Sept. 22, 2008); *see also Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1300 (11th Cir. 2003) (applying Florida law and evaluating whether a choice-of-law provision reaches tort claims between the parties and concluding that "[t]he clause does not refer to related tort claims or to any and all claims or disputes arising out of settlement or arising out of the relationship of the parties"); *Burger King Corp. v. Austin*, 805 F. Supp. 1007, 1012 (S.D. Fla. 1992) ("claims arising in tort are not ordinarily controlled by a

contractual choice of law provision . . . . Rather, they are decided according to the law of the forum state."). "The court will often try to determine whether the clause is 'narrow,' and intended to govern only the construction of the contract, or whether it expressly covers all rights and liabilities arising out of the transaction." *Axis Specialty Ins. Co. v. Doty-Moore Tower Servs., LLC*, 2008 WL 11335004, at *9 (citing *Green Leaf Nursery*, 341 F.3d at 1300). However, "[n]o Georgia case has ever held that [a choice-of-law provision] will bring in the entire body of law of the chosen state. Instead, in Georgia, a choice of law provision simply allows the contracting parties to choose the law of the state to govern their contractual rights and duties." *Rayle Tech, Inc.*, 133 F.3d at 1409.

Here, the choice-of-law provision provides that "this agreement and any dispute or controversy arising from or relating to this Agreement will be governed by the laws of the State of New York applicable to contracts executed in and performed entirely within that State." (Am. Compl., Ex. B ¶ 15.3.5.) While the language "any dispute or controversy arising from or relating to this Agreement" reads broadly and could be read to encompass tort claims, the provision is further limited by the provision that such disputes "will be governed by the laws of the State of New York *applicable to contracts* executed in and performed entirely within that State." (Id.) (emphasis added). As the choice-of-law provision is explicitly limited to the law applicable to contracts, the choice-of-law provision does not apply to Plaintiff's tort claims. *See Mesa Air Group, Inc. v. Delta Airlines, Inc.*, No: 1:08-CV-1334-CC, 2010 WL 11508953 at *20 (N.D. Ga. May 17, 2010)

(Cooper, J.) (refusing to apply a choice-of-law provision to Plaintiffs' extra-contractual claim for equitable estoppel); *Young v. W.S. Badcock Corp.*, 474 S.E.2d 87, 88 (Ga. Ct. App. 1996) (applying Georgia law to Plaintiff's fraudulent misrepresentation claim despite Florida choice-of-law provision because the provision did not state "that any and all claims arising out of the *relationship* between the parties shall be governed by Florida law.").

Accordingly, the Court will apply Georgia law to Plaintiff's Fraud in the Inducement, Fraudulent Misrepresentation, and Negligent Misrepresentation claims.

### b. *Economic Loss Rule*

In addition to a claim for breach of contract, Plaintiff IBM brings negligence-based tort claims, including claims for negligent design and construction and professional negligence on its own behalf and as an assignee of the Falcons and HHRM.[3] In Counts One and Two for negligent design and construction, IBM alleged that:

> Corning had an independent duty under the law to perform its design and construction work in accordance with industry standards. Corning owed this independent legal duty to the Mercedes-Benz Stadium Developers, who had a pecuniary interest in the construction of the DAS system, and due to the special relationship of trust and care resulting from interactions between Corning and Mercedes-Benz Stadium Developers, as well as various representations made by

---

[3] Plaintiff brings the following negligence-based claims that Defendant argues are barred by the economic loss rule: Count I: Negligent Design and Construction, and Professional Negligence (brought by IBM as the assignee from the Falcons and HHRM); Count II: Grossly Negligent Design and Construction (brought by IBM as the assignee from the Falcons and HHRM); Count III: Professional Negligence (brought by IBM as the assignee from the Falcons and HHRM); Count VII: Grossly Negligent Design and Construction (brought by IBM on behalf of itself). (*See* Mot., Doc. 32-1 at 6.)

Corning to them regarding Corning's purported RF engineering expertise. The above-described duties arise and exist separately and independently from any of the contracts related to the Mercedes-Benz Stadium Project.

(Am. Compl., Doc. 24 ¶ 127); (*see also id.* at ¶¶ 137 145, 179.)   Similarly, Count

Three asserts a claim for professional negligence, alleging:

> Corning owed an independent legal duty to the Mercedes-Benz Stadium Developers, as a party reasonably anticipated to be affected thereby, to perform its professional duties in accordance with the generally accepted and customary engineering standards and design practices and principles with the degree of care, learning, skill, and ability as is ordinarily employed by engineers under similar circumstances and to perform such duties without neglect or negligence. The above-described duties arise and exist separately and independently from any of the contracts related to the Mercedes-Benz Stadium Project.

(*Id.* ¶¶ 144-145.)  As a result of Corning's negligence, IBM asserts in Counts One

through Three that the Stadium Developers:

> suffered damages, including, but not limited to, the loss of millions of dollars of retainage amounts held by the cellular carriers as a result of the failure of Corning's DAS System to meet the performance requirements, the loss of carrier revenues, and the millions of dollars spent to fix, redesign, and reinstall a DAS System, in a nearly completed stadium leading to additional costs that would not have been incurred if installed earlier in the construction, that met the needs of the Falcons and the carriers.

(*Id.* ¶¶ 131, 140, 148.)[4]

---

[4] The damages IBM asserts for breach of contract are similar, but somewhat broader and more expansive.  Specifically, in Count Six, IBM asserts that "As a result of Corning's breaches, IBM incurred substantial damages, including, but not limited to, the cost to purchase equipment and materials that were never needed or became useless as a result of the failure of Corning's DAS System and the need to redesign the system, the purchase of new equipment and materials needed for the redesigned system, the millions of dollars incurred to pay to fix, redesign, and install a new DAS System, in a nearly completed stadium leading to additional costs that would not have been incurred if installed earlier in the construction, that met the needs of the Falcons and the cellular carriers, and damages owed to and settlement amounts paid to the Mercedes-Benz Stadium

Defendant Corning argues that the economic loss rule bars IBM's negligence-based tort[5] claims because IBM seeks purely economic damages and has not also alleged an injury to person or harm to property. (Mot., Doc. 32-1 at 8-14; Reply, Doc. 35 at 4.)  In response, IBM contends that this case falls into the "independent duty" exception to the economic loss rule because IBM has identified and pled a duty of care that Corning owed to IBM and the Stadium Developers independent of any contractual duties. (Resp., Doc. 34 at 12-15.) According to Corning, the existence of an independent duty by itself does not resolve the question of whether a tort claim is barred by the economic loss rule because there can be no recovery in tort for purely economic losses absent allegations of damage to property or personal injury.  Defendant Corning relies on the Eleventh Circuit's 1982 decision in *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 947 (11th Cir. 1982) as support for its assertion that to overcome the economic loss rule, the plaintiff's losses must involve injury to persons or damage to property (other than the property that is the subject of the contract).  *See Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 947 (11th Cir. 1982). IBM asserts that Corning's position is incorrect because (a) *Flinkote* is outdated and limited to product liability cases, and (b) under Georgia law it is not necessary to allege injury to person or harm to property to survive the economic loss rule when an independent duty is alleged.

---

Developers under the Prime Contractor-IBM Agreement due to the failure of Corning's DAS System to meet the contractual performance requirements." (*Id.* ¶ 172.)

[5] Although Corning generically refers to Plaintiff's tort claims as being barred by the economic loss rule, on page 6 of its motion Corning specifies that it is only asserting this challenge as to the negligence-based claims.

The question before the Court is whether the proper application of the economic loss rule requires both an independent duty plus damage to *other* property (or personal injury) as Corning contends. In a recent decision out the Southern District of Georgia in March 2019, District Court Judge Baker discussed at length the history and intricacies of the "long-standing but often difficult to decipher legal doctrines" of Georgia's economic loss rule that "has often confounded law students, lawyers, and jurists." *Murray v. ILG Technologies, LLC*, 378 F. Supp. 3d 1227, 1241 (S.D. Ga. 2019) (analyzing the "independent duty" separately from the property-damage question and finding that there was no independent duty present in that case); *id.* at 1241 n. 5.

"The 'economic loss rule' generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *Gen. Elec. Co. v. Lowe's Home Ctrs., Inc.*, 608 S.E.2d 636, 637 (Ga. 2005); *Hanover Ins. Co. v. Hermosa Const. Group, LLC*, 57 F. Supp. 3d 1389, 1395-96 (2014) ("The economic loss rule provides that a plaintiff may not recover in tort for purely economic damages arising from a breach of contract."). The policy consideration underlying Georgia's economic loss rule is "to prevent a plaintiff from recovering duplicative damages for the same wrongdoing." *Luigino's Intern., Inc. v. Miller*, 311 F. App'x 289, 292 (11th Cir. 2009); *Gen. Elec. Co.*, 608 S.E.2d at 639 (economic loss rule "avoids the unfairness to defendants that would come with duplicative liability for the same damage").

The economic loss rule is applied most often in the context of products liability. *Murray*, 378 F. Supp. 3d at 1241 (discussing *Long v. Jim Letts Oldsmobile, Inc.*, 217 S.E.2d 602 (Ga. Ct. App. 1975) (holding in action against the manufacturer and seller of a new car that, while plaintiffs may recover in tort for personal injuries and damage to property other than the at-issue product, recovery for the loss of value or cost of repairing the product itself is not permitted; instead, a plaintiff must rely on a contract action to recover the "benefit of his bargain")); *see also Hanover Ins. Co. v. Carroll*, Civil Action No. 1:13-cv-01802-SCJ, 2014 WL 5472520, *4 (N.D. Ga. Mar. 5, 2014) (Jones, J.). As the court in *Murray* explained, in the products liability arena, "[t]he rationale behind the economic loss rule is that the purpose of products liability actions in tort is to redress physical injuries and not the losses of bargains by disgruntled customers, which are best addressed through contract and warranty law." *Murray*, 378 F. Supp. 3d at 1242 (quoting Robert M. Travis & Edward C. Brewer, III, Products Liability Law in Georgia Including Recent Developments, 43 Mercer L. Rev. 27, 57 (1991)). Over the years, Georgia courts have expanded the application of the economic loss rule "beyond its initial breadth." *Murray*, 378 F. Supp. 3d at 1242 (discussing cases); *see also City of Atlanta v. Benator*, 714 S.E.2d 109, 116 (Ga. Ct. App. 2011) ("More recently, however, both the Georgia Supreme Court and this court have applied the economic loss rule outside of product liability cases.) In *General Electric Co. v. Lowe's*, the Georgia Supreme Court, on a certified question from the Eleventh Circuit, held that Lowe's could not recover lost profits as a result of the

16

contamination of property Lowe's did not own, but on which it had planned to build one its superstores. 608 S.E.2d at 637 ("Under the economic loss rule, a plaintiff can recover in tort only those economic losses resulting from injury to his person or damage to *his* property; a plaintiff cannot recover economic losses associated with injury to the person or damage to the property of *another*.") (emphasis added).

Despite its broad application, there are exceptions to the economic loss rule. First, the rule does not bar recovery of purely economic losses in tort actions where the defendant breaches a duty imposed by law or arising from a special relationship. *See* O.C.G.A. § 51-1-11(a) (providing "if the tort results from the violation of a duty which is itself the consequence of a contract, the right of action is confined to the parties and those in privity to that contract, except in cases where the party would have a right of action for the injury done independently of the contract . . . ."); *Unger v. Bryant Equip. Sales & Servs., Inc.*, 335 S.E.2d 109, 111 (Ga. 1985) (finding that economic loss rule did not apply where the plaintiff has asserted "a claim in tort which does not arise from the contract, but is independent of it"); *Unified Svcs. v. Home Ins. Co.*, 460 S.E.2d 545 (Ga. Ct. App. 1995) ("While a tort action cannot be based on the breach of a contractual duty only, it can be based on conduct which, in addition to breaching a duty imposed by contract, also breaches a duty imposed by law."); *Luigino's Intern., Inc.*, 311 F. App'x at 292-93 (noting that Georgia law recognizes an exception to the economic loss rule for injuries that occur independently of a contract); *Hanover Ins.. Co. v. Hermosa*

*Constr. Grp., LLC*, 57 F. Supp. 3d at 1396 (Where "an independent duty exists under the law, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the [economic loss] rule."). Georgia Courts have also separately held that the economic loss rule does not apply to claims where a plaintiff seeks to recover damages for harm to his person or property. *E.g., Bates & Associates, Inc. v. Romei*, 426 S.E.2d 919, 921 (Ga. Ct. App. 1993) ("The rule does not prevent a tort action to recover for injury to persons or to property other than the product itself, because the duty breached in such situations generally arises independent of the contract."). Finally, Georgia has recognized exceptions to the economic loss rule in (1) cases of misrepresentation/fraud, and (2) where the conduct of the defendant poses an unreasonable risk of injury to other persons or property (referred to in product liability cases as the "accident exception"). *Home Depot U.S.A., Inc. v. Wabash Nat. Corp.*, 724 S.E.2d 53, 59 (Ga. Ct. App. 2012); *Advanced Drainage Sys., Inc. v. Lowman*, 437 S.E.2d 604, 607 (Ga. Ct. App. 1993).

The Georgia Supreme Court explained the distinction between actions based purely on contract duties and those that invoke independent duties giving rise to a remedy in tort:

> It is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well, if in addition to violating a contract obligation it also violates a duty owed to plaintiff independent of contract to avoid harming him. Such an independent harm may be found because of the relationship

between the parties, or because of defendant's calling or because of the nature of the harm.[6]

However, not all breaches of contract are also independent torts: '. . . where defendant's negligence ends merely in non-performance of the contract and where defendant is not under any recognized duty to act apart from contract, the courts generally still see no duty to act affirmatively except the duty based on - and limited by - defendant's consent.' 2 Harper and James, Torts, p. 1050, s 18.6. In those circumstances, an action in tort may not be maintained for what is a mere breach through non-action or through ineffective performance (which is the same thing) of a contract duty - the duty must arise independent of contract to constitute a tort. Thus, to constitute a tort the duty must arise independent of the contract.

*Sheppard v. Yara Eng'g Corp.,* 281 S.E.2d 586, 587 (Ga. 1981) ("Since the mineral lease, which is attached to Sheppard's complaint, does not authorize the removal of the topsoil and overburden from the owner's premises and makes no provisions otherwise, the removal of it from the premises states a claim for the tort of conversion, if not trespass. The duty not to remove topsoil and overburden from Sheppard's land arises not from any contractual provisions, but from his common law property rights in the soil in which he has not given the defendants any claim by contract.") (quoting *Orkin Exterminating Co. v. Stevens*, 203 S.E.2d 587, 590-91 (Ga. Ct. App. 1973) (disallowing claim for economic losses based on negligent performance of contractual duty to properly treat termite infestation)).

---

[6] *See e.g., The City and Suburban R. Co. of Savannah v. Brauss*, 70 Ga. 368 (1883) (duty of street railway company not wrongfully to eject passenger); *Floyd v. Morgan*, 127 S.E.2d 31 (Ga. Ct. App. 1993) (duty not to provide an article represented to be safe and actually defective); *Tapley v. Youmans*, 97 S.E.2d 365 (Ga. Ct. App. 1957) (relationship of landlord and sharecropper); *Orkin Exterminating Co. v. Wingate*, 67 S.E.2d 250 (Ga. Ct. App. 1951)(duty not to spray flammable liquid around plaintiff's hot chimney, causing his house to burn, in carrying out an extermination contract); *Moody v. Martin Motor Co.*, 46 S.E.2d 197 (Ga. Ct. App. 1948) (duty to perform safety-related-auto repairs in nonnegligent manner).

The independent duty exception to the economic loss rule applies in cases where the plaintiff identifies a statutory or common law duty that would apply regardless of the existence of an underlying contract. *Hanover Ins.. Co. v. Hermosa Constr. Grp., LLC*, 57 F. Supp. 3d at 1396 (allowing claim for fraudulent transfer to proceed because Georgia's Uniform Fraudulent Transfers Act ("UFTA") creates a cause of action independent of any underlying breach of contract claim and allowing claims for statutory and common law conversion to proceed because intentional misconduct in the course of a contractual relationship has been held by Georgia courts to give rise to separate cause of action under tort law); *Waldrip v. Voyles,* 411 S.E.2d 765, 768 (Ga. Ct. App. 1991) (negligence claim not barred by economic loss rule where the "requirement that the creditor honor the debtor's allocation of payments on multiple obligations arises from O.C.G.A. § 13–4–42, not from a contract provision"); *E & M Constr. Co. v. Bob*, 153 S.E.2d 641, 642-3 (Ga. Ct. App. 1967) (negligence claim not barred by economic loss rule where "[i]ndependently of any duty under a contract, the law imposes upon a contractor the duty not to negligently and wrongfully injure and damage the property of another."); *Liberty Mut. Fire Ins. Co. v. Cagle's, Inc.*, No. 1:10–CV–2158–TWT, 2010 WL 5288673, at *3 (N.D. Ga. Dec. 16, 2010) (Thrash, J.) (finding that while an insurance contract does not automatically create an independent duty of reasonableness and good faith on the part of the insurer, Georgia common law had imposed such an independent duty, thereby excepting a breach of fiduciary duty claim from the economic loss rule under those narrow circumstances).

Here, Plaintiff alleged negligent design and construction claims (Counts One, Two, and Seven) that arise not from a breach of contractual duty, but from a breach of a duty implied by law to perform the work in accordance with industry standards. In *Jai Ganesh Lodging, Inc. v. David M. Smith, Inc.*, the Georgia Court of Appeals explained that "our courts have concluded that [negligent construction] claims arise not from a breach of contract claim but from breach of a duty implied by law to perform the work in accordance with industry standards. This cause of action arises in tort and exists independently of any claim for breach of contract." 760 S.E. 2d 718, 724 (Ga. Ct. App. 2014); *see also Schofield Interior Contractors, Inc. v. Standard Bldg. Co.*, 668 S.E.2d 316, 318 (Ga. Ct. App. 2008).

Similarly, Plaintiffs allege that Corning violated an independent professional duty in its assigned professional negligence claim (Count Three). In *Hamilton v. Powell, Goldstein, Frazer & Murphy*, the Georgia Court of Appeals held that the plaintiff had set forth a cause of action in tort as well as contract where he alleged malpractice by a law firm. The Georgia Court of Appeals explained that:

> The law imposes upon persons of professional standing performing medical, architectural, engineering, and those performing other and like skilled services, pursuant to their contracts made with their clients, an obligation to exercise a reasonable degree of care, skill and ability, such as is ordinarily exercised under similar conditions and like circumstances by persons employed in the same or similar professions. This is a duty apart from any express contractual obligation. Therefore, persons of this class performing services pursuant to their contracts with their clients have been held to be liable in tort for their negligence in failing to exercise the required degree of skill, and thus to be liable to a suit *ex delicto* for the negligent performance of the contract.

*Hamilton v. Powell, Goldstein, Frazer & Murphy*, 306 S.E.2d 340, 342 (Ga. Ct. App. 1983).

Corning maintains that for Plaintiff's tort claims to survive the economic loss rule, Plaintiff must allege that Corning's actions or omissions caused physical injury to a person or property, relying on *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 948 (11th Cir. 1982). *Flintkote* is a products liability case in which the Eleventh Circuit applied Georgia's economic loss rule to bar the plaintiff's negligence claims, explaining:

> The rule acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty to produce a product that conforms in terms of quality or performance to the parties expectations or whether the plaintiff seeks to recover for injuries resulting from the breach of the duty arising independently of the contract to produce a nonhazardous product that does not pose an unreasonable risk of injury to person or property. The economic loss rule prevents recovery in tort when a defective product has resulted in the loss of the value or use of the thing sold, or the cost of repairing it.

*Id.* at 947-48. It is therefore no surprise that the Eleventh Circuit held that a plaintiff cannot recover in tort for economic losses resulting from a defective product, including the "loss of value or use of the thing sold, or the cost of repairing it." *Id.* The court in *Flintkote* purported to distinguish between claims involving defective products from claims involving professional negligence/negligent construction:

> It is true that under Georgia law a duty of care independent of contract arises in certain professional relationships. There is a duty implied in every construction contract to avoid harming the plaintiff by performing the contract "skillfully, carefully, diligently, and in a workmanlike manner." *Sam Finley, Inc. v. Barnes*, 275 S.E.2d at 382.

> This rule does not create an exception to the economic loss rule, however; the harm protected against is injury to persons and damage to property other than the product contracted for, unless the damage resulted from an accident. *Compare McClain v. Harveston, supra,* (denying tort recovery from contractor for economic losses resulting from a defective roof) with *Sam Finley, Inc. v. Barnes, supra* (permitting recovery in tort from contractor whose negligent construction of an asphalt base caused damage to the plastic surface of a roller rink). Here, Flintkote seeks to recover only economic losses resulting from the alleged negligent construction of the unloader and therefore is barred from bringing this action in tort.

*Id.* at 949-50.

Two years after *Flintkote*, the Georgia Supreme Court again explained the distinction between the remedy in contract available for injuries caused by defective products and the remedy in tort available for injuries caused by professional negligence and/or negligent construction. *See Unger v. Bryant Equip. Sales & Servs., Inc.,* 35 S.E.2d 109, 111 (Ga. 1985). In *Unger*, the plaintiff a dairy farmer who leased/purchased a computerized feeding system to feed his cows, filed suit against Farmtronix, the manufacturer, and Bryant Equipment, a dealer authorized to sell and install Farmtronix products. The farmer asserted claims for negligence and breach of express and implied warranties after the system broke down, malfunctioned, and adversely affected his dairy cows. In reversing the Georgia Court of Appeal's grant of summary judgment in favor of the defendants, the Supreme Court held:

> The cases relied upon by Farmtronix, Bryant, and the Court of Appeals regarding "economic loss" versus "physical damage to person or property," *Long v. Jim Letts Oldsmobile, Inc., et al.,* 135 Ga.App. 293, 217 S.E.2d 602 (1975), and *Kaiser Aluminum etc. Corp. v. Ingersoll-Rand Co.,* 519 F.Supp. 60 (S.D. Ga. 1981), were concerned

with products that were defective. There is nothing in Unger's complaint that indicates that the system itself was defective. He asserted only that the negligent installation and servicing of the system caused the system to break down and malfunction. The "economic loss" versus "physical damage" dichotomy that is used in products liability cases can find no application in this case. The question here is whether the appellant has asserted "a claim in tort which does not arise from the contract, but is independent of it." *Sheppard v. Yara Engineering Corp.*, 248 Ga. 147, 148, 281 S.E.2d 586 (1981).

Although a tort is the unlawful violation of a private legal right other than a mere breach of contract, O.C.G.A. § 51–1–1, private duties may arise from relations created by contract, and the violation of a private duty accompanied by damage shall give a right of action. O.C.G.A. § 51–1–8. The Court of Appeals found that the injuries allegedly caused by Bryant and Farmtronix resulted from a breach of duties imposed by contract. We do not agree. "[I]ndependently of any duty under the contract, the law imposed upon the [appellees] the duty not to negligently and wrongfully injure and damage the property of [the appellant]." *Monroe v. Guess*, 41 Ga.App. 697, 700, 154 S.E. 301 (1930); *E & M Construction Company, Inc. v. Bob*, 115 Ga.App. 127, 153 S.E.2d 641 (1967), *see also, Sheppard v. Yara Engineering Corp., supra*. Unger alleged that the combined negligence of Sumter, Bryant, and Farmtronix injured his property, i.e., the system he had just leased/purchased and his cows.

*Id.*

Just as in *Unger*, IBM has alleged injury to property – the DAS system that had to be completely redone in the nearly completed Mercedes-Benz stadium – in the form of millions of dollars incurred to pay to fix, redesign, and install a new DAS system resulting from Defendant's alleged negligence. Thus, it is clear under Georgia law, that where an independent duty exists, a plaintiff may recover for purely economic damages to his property resulting from a breach of such duty, despite the existence of a contract between the parties relating to the same

property. Contrary to Corning's position, IBM is not required to allege injury to
*other* property in order to assert its tort claims in this action.[7] *Id.*; *see also Murray*,
378 F. Supp. 3d at 1244-1248 (S.D. Ga. 2019) (analyzing the "independent duty"
exception separately from the property-damage exception and finding that there
was no independent duty present in that case); *In re Equifax, Inc., Customer Data
Sec. Breach Litig.*, 371 F.Supp.3d 1150, 1172-73 (N.D. Ga. Jan 28, 2019) (rejecting
the defendant's argument that the economic loss rule precluded the plaintiffs'
negligence claim because the plaintiffs had not alleged harm to person or property,
resulting from data breach, and finding that because the defendants owed the
plaintiffs a duty of care to take reasonable measures to safeguard their payment
card data, an independent duty existed and the economic loss rule did not apply);
*Waithe v. Arrowhead Clinic*, Inc. No: CV 409–021, 2012 WL 776916 at *8 (S.D.
Ga. Mar. 7, 2012) ("Here, it is beyond question that Plaintiffs' claims for interest
on overpayments are claims for 'purely economic' losses. There is also no dispute
that that the Plaintiffs and Brown–Arrowhead were in a contractual relationship.
The more difficult issue is whether Plaintiffs have asserted a cause of action based
on a duty of care that exists independent from the contract between the parties.
Specifically, in order for Plaintiffs' claim to be viable, Georgia law would need to
impose a duty to pay interest on overpayments to a medical care provider,

---

[7] The Court notes that in some of the cases Plaintiff relies on, courts found that both an
independent legal duty exists (or is alleged to exist) and that plaintiff alleged physical injury to
person or property. However, as discussed herein the question of physical harm is not
determinative, and the question of an independent legal duty is frequently framed as a total
exception to the economic loss rule.

independent of any contractual duty to do so. Although the Court is not aware of any case that perfectly addresses this issue, Georgia cases indicate that there is no such duty.").

At the motion to dismiss stage, where the allegations in IBM's Amended Complaint must be presumed true, the Court cannot conclude as a matter of law that the independent duty exception to the economic loss rule is inapplicable to IBM's claims. *See TTCP Energy Finance Fund II, LLC v. Ralls Corp*., 255 F. Supp. 3d 1285, 1290-91 (N.D. Ga. 2017) (Batten, J.) (finding at the motion-to-dismiss stage, where the complaint allegations must be presumed true, the court cannot conclude as a matter of law that recognized exception to the economic-loss rule is inapplicable).

Accordingly, Defendant's Motion to Dismiss Plaintiff's negligence-based claims based on the economic loss rule is **DENIED**.

### c. *Assigned Negligent Misrepresentation Claim*

In Count Four of the Amended Complaint, IBM asserts a claim for negligent misrepresentation against Corning by virtue of an assignment of claims from the Mercedes-Benz Stadium Developers. Corning argues that the Court should dismiss Plaintiff's negligent misrepresentation claim because it is not assignable under Georgia law and thus IBM may not stand in the shoes of the Stadium Developers to assert this claim.

In support of its negligent misrepresentation claim, Plaintiff alleges that: (1) "the Mercedes-Benz Stadium Developers were misled by the numerous

misrepresentations and omissions listed above into believing that Corning had the capabilities, expertise, and technology needed to deliver a fully operational DAS System that complied with the various performance requirements;" and (2) "[a]s a direct and proximate result of Corning's misrepresentations . . . , the Mercedes-Benz Stadium Developers have suffered economic damages, and *hence a tortious injury directly or indirectly to their rights of property*, including, but not limited to, the loss of millions of dollars of retainage amounts held by the cellular carriers as a result of the failure of Corning's DAS System to meet the performance requirements, the loss of carrier revenues, and the millions of dollars spent to fix, redesign, and reinstall a DAS System, in a nearly completed stadium leading to additional costs that would not have been incurred if installed earlier in the construction, that met the needs of the Falcons and the carriers." (Am. Compl., Doc. 24 ¶¶ 160-161) (emphasis supplied).

Negligent misrepresentation is a species of fraud. "The same principles apply to both fraud and negligent misrepresentation cases and . . . the only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed." *Holmes v. Grubman*, 691 S.E.2d 196, 200 (Ga. 2010) (citing *Mindis Acquisition Corp. v. BDO Seidman*, 559 S.E.2d 111 (Ga. Ct. App. 2002), *rev'd on other grounds*, 578 S.E.2d 400 (Ga. 2003)).

O.C.G.A. § 44-12-24 provides that "a right of action is assignable if it involves, directly or indirectly, a right of property. A right of action for personal

torts, for legal malpractice, or for injuries arising from fraud to the assignor may not be assigned.[8]" While a party may assign a cause of action involving a tortious injury to his property; a cause of action arising from fraud may not be assigned. *Id.*; *see also RES-GA McDonough, LLC v. Taylor English Duma LLP*, 807 S.E.2d 381, 385-87 (Ga. 2017) (holding that Georgia's nonassignment statute, O.C.G.A. § 44-12-24, barred bank's assignee's fraudulent transfer claim under the *former* Uniform Fraudulent Transfers Act[9]); *RES-GA Hightower, LLC v. Golshani*, 778 S.E.2d 805 (Ga. Ct. App. 2015) (describing the issue as "whether a claim under the UFTA to set aside a property transfer as defrauding creditors is a 'right of action … arising from fraud' such that it is not assignable," and holding that such claims were not assignable prior to the amendments specifically allowed assignees and successors to debt to pursue fraudulent transfer claims accruing after July 1, 2015); *Barnes v. Collins*, 423 S.E.2d 308, 309 (Ga. Ct. App. 1992) ("The superior court was correct in recognizing that a right of action for personal torts or for injuries arising from fraud may not be assigned. However, a right of action involving a property right is assignable, including a cause of action for a tort to property."); *Feeney v. Decatur Developing Co.*, 170 S.E. 518, 519 (Ga. Ct. App. 1933) (holding that plaintiff as assignee for bank had no right of action for fraud on deposit drafts,

---

[8] The statute contains two exceptions "for those situations governed by Code Sections 11-2-210 and 11-9-406," which are inapplicable here.

[9] The Uniform Fraudulent Transfers Act was superseded by Ga. L. 2015, p. 996, effective July 1, 2015, and is now known as the Uniform Voidable Transactions Act ("UVTA").

noting that Supreme Court of Georgia's holdings that "a right of action for injuries arising from fraud cannot be assigned" have never been overruled or questioned).

Plaintiff argues that its negligent misrepresentation claim is assignable because it is a property tort, not a personal tort. Plaintiff relies on *Encompass Indemnity Co. v. Ascend Technologies*, where another judge in this district found that the plaintiff's "particular negligent misrepresentation claim" in that case was assignable. *Encompass Indemnity*, No. 1:13-CV-02668-SCJ, 2015 WL 10582168, at *8 (N.D. Ga. Sept. 29, 2015) (Jones, J.). In *Encompass Indemnity*, after a fire burned down an insured's house, the insurer, as subrogee to the rights of the insured, sued an alarm and sprinkler company, both of which had performed work or had their systems installed in the then-burned down house. The insurer asserted both fraud and negligent misrepresentation claims. With respect to the fraud claim, Judge Jones concluded it was not assignable:

> All of Plaintiff's claims involve a right of property. All of the damages sought in this action are based on the fire and destruction of Miller's home which were allegedly caused, in part, by the fault of Ascend. The second sentence of the statute is clear, however that a right of action for "personal torts" and "for injuries arising from fraud to the assignor may not be assigned." Within its fraud claim, Plaintiff alleges, "[a]s a direct, proximate and foreseeable consequence of Miller's justifiable reliance upon the false representations made by Ascend [ ] regarding the capabilities of the alarm system that it installed in the Miller residence, Miller and Encompass have incurred substantial damages." Doc. No. [1], p. 7. Any injuries Plaintiff incurred as a result of fraud were clearly injuries arising from fraud to the assignor–Miller. This claim may not be assigned under O.C.G.A. § 44–12–24.

*Id.* With respect to the negligent misrepresentation claim, however, Judge Jones explained that:

> Plaintiff states, "[a]s a direct, proximate, and foreseeable result of
> Miller's justifiable reliance upon the false information supplied
> by Defendant Ascend [ ], Miller and Plaintiff Encompass have sustained
> substantial damages." *Id.* at p. 9. Negligent misrepresentation is a
> species of fraud. In fact, the only significant difference between the
> two claims is that fraud requires intent, or scienter, on the part of the
> alleged tortfeasor. But Plaintiff's damages in this action arise out the
> allegedly tortious injury to Miller's real and personal property. "A
> party may assign a cause of action involving a tortious injury to his
> property." *S. Gen. Ins. Co. v. Ross*, 227 Ga.App. 191, 196, 489 S.E.2d
> 53, 57 (1997). Moreover, because Plaintiff seeks only to recover the
> payments it made to Miller through subrogation, its claim of negligent
> misrepresentation cannot be labeled a "personal tort." In other words,
> this particular negligent misrepresentation claim alleges "an injury or
> damage to real or personal property, which is a property tort."
> *Villanueva*, 313 Ga.App. at 168, 721 S.E.2d at 155. Plaintiff's negligent
> misrepresentation claim is, therefore, assignable and not precluded
> by O.C.G.A. § 44–12–24.

*Id.* While acknowledging that: (1) negligent misrepresentation is a species of

fraud; (2) "all of Plaintiff's claims involve a right of property;" and (3) "[a]ll of the

damages sought in this action are based on the fire and destruction of Miller's

home," Judge Jones found, without any basis for distinguishing between the two

claims, that the fraud claim was not assignable but the negligent misrepresentation

was assignable. Respectfully*,* the decision in *Encompass Indemnity* cannot be

squared with the plain language of O.C.G.A. § 44-12-24 or the long-standing

decisions of the Georgia Supreme Court that actions for injuries arising out of fraud

cannot be assigned (unless otherwise expressly provided by statute, such as in the

former/amended UFTA/UVTA).

Moreover, the Georgia Court of Appeals specifically addressed in *Feeney* the

interplay between the right to assign an action arising from a tort involving a

property right and the prohibition against assigning an action for injuries arising

from fraud, holding that:

> "A right of action is not assignable if it does not involve, directly
> or indirectly, a right of property; hence a right of action for personal
> torts or for injuries arising from fraud to the assignor can not be
> assigned." In *Morehead v. Ayers*, 136 Ga. 488, 71 S. E. 798, it was held
> that "a right of action for injuries arising from fraud cannot be
> assigned." In *Couch v. Crane*, 142 Ga. 22, 29, 82 S. E. 459, 463, it was
> held that the plaintiff "as assignee of her mother, has no right of action
> against the plaintiff on account of the fraud alleged to have been
> practiced on her mother. A right of action for injuries arising from
> fraud cannot be assigned." Neither of these cases has ever been
> overruled or even questioned by the Supreme Court. It is true that "a
> chose in action arising from a tort is assignable where it involves,
> directly or indirectly, a right of property." *Sullivan v. Curling*, 149 Ga.
> 96, 99 S. E. 533, 5 A. L. R. 124.
>
> However, as we have seen, in the instant case there was no right
> of property involved, either directly or indirectly. The fraud was
> perpetrated upon the bank. It had no title to the hay sold by the
> defendants, the proceeds of which they wrongfully kept in their
> pockets, when in good faith they should have turned the same over to
> the bank to reimburse it. It cannot be said that because the money
> advanced to the defendants was the money and property of the bank,
> and that as it was defrauded out of this money by the defendants, a
> right of property was involved, either directly or indirectly. We can
> hardly conceive of a case of fraud wherein the defrauded person did
> not lose something of value by reason of the fraud.

*Feeney*, 170 S.E. at 519. Thus, even though money is considered personal property

under Georgia law such that pecuniary losses resulting from alleged fraud may

result from injury to personal property in the ordinary common law sense,[10] under

---

[10] *See Federal Deposit Insurance Corporation v. Loudermilk*, 826 S.E.2d 116 (Ga. 2019)
(answering certified question from Eleventh Circuit and holding that Georgia's apportionment
statute, O.C.G.A. § 51-12-33, applies to tort claims for purely pecuniary losses against bank
directors and officers, because Georgia's common law definition of "property" includes both
tangible and intangible property).

O.C.G.A. § 44-12-24 an action for purely economic loss arising out of fraud is not assignable.

Accordingly, Defendant's Motion to Dismiss Plaintiff's negligent misrepresentation claim in Count Four is **GRANTED**.

### d. Fraud Claims

Defendant argues that IBM's claims for fraud in the inducement (Count Eight), fraudulent misrepresentation (Count Nine), and negligent misrepresentation (Count Ten) "are barred by the merger clause in the Base Agreement, incorporated by reference into the Statement of Work." (Mot., Doc. 32-1 at 19.)[11]

The Parties' Base Agreement states: "This agreement replaces any prior oral or written agreements between the parties with respect to the subject matter of this Agreement, excluding any confidential disclosure agreements." (Amend. Compl., Ex. B ¶ 15.11.) This merger clause was incorporated into the Statement of Work which "adopts and incorporates by reference the terms and conditions of" the Base Agreement. (Amend. Compl., Ex. B at 1.) The Base Agreement also prohibits amendments to the agreement: "This agreement may only be amended by a writing specifically referencing this Agreement which has been signed by authorized representatives of the Parties." (Amend. Compl., Ex. B ¶ 15.1.)

---

[11] Defendant argues these are barred under Georgia law. Plaintiff argues that New York law applies, and that New York law does not bar these claims. However, the Court has determined that Georgia law applies to Plaintiff's tort claims. *See infra.*

Under Georgia law, where a contract is alleged to have been induced by fraud, the defrauded party may have an action for rescission or an action for damages on either a breach of contract or tort theory. John K. Larkins, Jr., Ga. Contracts: Law and Litigation, § 3:21 (2nd ed., 2011 and Supp. 2018); *Browning v. Stocks*, 596 S.E.2d 641, 645-46 (Ga. Ct. App. 2004) (explaining that a plaintiff may (1) affirm the contract and sue for breach of contract; (2) rescind the contract and sue in tort for fraud; or (3) affirm the contract and sue for damages resulting from the fraud) (citing *City Dodge, Inc. v. Gardner*, 208 S.E.2d 794 (Ga. 1974) (based on general rule applicable to misrepresentation claims) and *Tuttle v. Stovall*, 67 S.E. 806 (Ga. 1910)). As the Georgia Supreme Court stated in *Tuttle v. Stovall* and as reiterated by the Court of Appeals in *Browning*,

> A suit for damages by the defrauded party for the fraud committed is not a suit for the violation of the contract, but is one for a tort and involves affirmance of the contract . . . . It cannot be said that merely affirming the contract by the defrauded party will necessarily deprive him of the right to sue for damages for the fraud inducing him to make the contract, as the right to affirm the contract and the right to sue for damages for the fraud coexist.

*Tuttle*, 67 S.E. 806 (Ga. 1910); *Browning*, 596 S.E.2d at 645; s*ee also Am. Family Life Assur. Co. of Columbus v. Intervoice, Inc.*, 659 F. Supp. 2d 1271, 1282-83 (M.D. Ga. 2009) (explaining the three options under Georgia law). When a party chooses to affirm the contract, he "has the right to sue both for breach of the contract and in tort for the fraud (assuming the latter action is not barred by the provisions of the affirmed contract). In such a case, however, the plaintiff would not be entitled to recover duplicative damages for breach of contract and for fraud"

but "would be required to elect remedies following the verdict."  Larkins, Ga. Contracts: Law and Litigation, § 3:21 (citing cases); *Estate of Sam Farkas, Inc. v. Clark*, 517 S.E.2d 826 (Ga. Ct. App. 1999) (referring to both causes of action); *Carpenter v. Curtis*, 395 S.E.2d 653 (Ga. Ct. App. 1990) (physical precedent) ("Affirmance of the contract by the defrauded party does not necessarily deprive him of the right to sue for damages for fraud, as the right to affirm and the right to fraud coexist."); *Tankersley v. Barker*, 651 S.E.2d 435 (Ga. Ct. App. 2007).  Here, IBM has elected to affirm the contract and sue for breach of contract or, alternatively, to sue for damages resulting from the fraud.[12]

Although the alleged defrauded party may sue in tort for damages based on the affirmance of the contract, that party is bound by the contract's terms and is subject to any defenses that may be based on the contract. *Hightower v. Century 21 Farish Realty*, 214 Ga. App. 522, 524 (1994). Having affirmed the contract, IBM is now bound by the contracts' terms, including any merger clauses.

Generally, if the contract is affirmed and contains a merger clause, the plaintiff is not permitted to assert a fraud claim based on a representation that is not contained in the agreement.  Larkins, Ga. Contracts: Law and Litigation, § 3:21 (citing cases); *Novare Grp., Inc. v. Sarif*, 718 S.E.2d 304, 309 (Ga. 2011) ("Where a purchaser affirms a contract that contains a merger or disclaimer provision, he

---

[12] IBM is not required to make an election between contract and tort theories at this stage, but IBM must make such an election prior to entry of judgment.  *See Hines v. Good Housekeeping Shop*, 291 S.E.2d 238 (Ga. Ct. App. 1982); O.C.G.A. § 9-2-4 ("A plaintiff may pursue any number of consistent or inconsistent remedies against the same person or different persons until he shall obtain a satisfaction from some of them.").

is estopped from asserting reliance on a representation that is not part of the contract."); *Ekeledo v. Amporful*, 642 S.E.2d 20, 22 (Ga. 2007) ("[W]here [an] allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentations in entering the agreement and his action for fraud must fail."). "A merger clause typically includes a provision which merges into the agreement any prior representations between the parties." *Meadow River Lumber Co. v. Univ. of Georgia Research Found.*, Inc., 503 S.E.2d 655, 659 (Ga. Ct. App. 1998). "In other words, where the written contract contains an entire agreement or merger clause, all prior or contemporaneous negotiations, understandings, or agreements on the same subject are merged into the final written contract and extinguished." *Browning*, 595 S.E.2d at 646 n.3.

Even so, the merger clause does not provide a complete bar to IBM's fraud claims. First, a merger clause will not defeat a fraud claim where the representations at issue were made a part of the contract itself. Larkins, Ga. Contracts: Law and Litigation, § 3:21; *Woodhull Corp. v. Saibaba Corp.*, 507 S.E.2d 493, 497 (Ga. Ct. App. 1998) (holding that when a misrepresentation is incorporated into the contract terms, a party electing to affirm the contract may bring a fraud action in tort); *accord Estate of Sam Farkas, Inc.*, 517 S.E.2d 826, 828–29 (stating that a "contract's ' merger' provision would estop a party bound by the terms of the contract from arguing that he or she relied on representations *other than those contained in the contract*") (emphasis added). Further, the

35

existence of "a merger clause is irrelevant to a fraud claim when the alleged fraud concerns active or passive concealment." Larkins, Ga. Contracts: Law and Litigation, § 3:21 (citing *Browning*, 595 S.E.2d at 645-46 ("[T]here are differences between claims based on misrepresentations and those based on fraudulent concealment . . . where a buyer affirms the sales contract and sues claiming, not that the seller made extracontractual oral or written misrepresentations about the purchased property, but that the seller actively or passively concealed damage or defects in the purchased property, there is no basis for using an entire agreement clause in the sales contract as a defense to the suit. It follows that the Stockses were entitled to affirm the sales contract and sue in tort for fraudulent concealment, despite the existence of an entire agreement clause in the contract.")).

IBM's fraud claims are based on a mix of pre-contractual misrepresentations, misrepresentations that are incorporated into the Base Agreement and Statement of Work, and material omissions that IBM asserts led IBM to enter into the contract to its detriment.

In IBM's claim for fraud in the inducement (Count Eight), IBM alleges that it was induced to enter the contract based on discussions leading up to the execution of agreement. (Am. Compl., ¶ 189.) Specifically, IBM asserts that Corning made certain pre-contract representations to persuade the Stadium Developers and IBM to enter into a contract to construct the DAS system using Corning's technology. According to the Complaint, Corning represented that as an industry expert in cellular networking space with superior equipment and

hardware, Corning had the ability and the tools to provide the design, equipment and construction services for a "turn-key" DAS System to the Falcons by "designing the system, providing the necessary equipment, overseeing installation to ensure it complied with the design, as well as testing and optimizing the system to ensure it met the qualitative and quantitative performance requirements that the Falcons, the Prime Contractor, IBM, and ultimately the cellular carriers desired." (*Id.* ¶¶ 25, 31, 36.)   IBM alleges that prior to entering into the contract, Corning misrepresented its capabilities as including: (i) "The proposed DAS is designed to provide enhanced wireless services to the [sic] New Mercedes-Benz Stadium, including bowl, concourses and outdoor plazas," (ii) "The system is designed as a Shared Neutral Host DAS capable of supporting AT&T, VZW, TMobile and Sprint," and (iii) "The system is designed to meet the criteria determined by the Wireless Service Providers." (*Id.* ¶¶ 29, 35.)  IBM further alleges that in inducing the parties to enter into the contract, "Corning made misrepresentations to the Falcons, the Prime Contractor, and IBM as to Corning's ability to satisfy these performance requirements, and that Corning had the ability to design, provide the necessary equipment, oversee installation of, optimize, and commission the Corning ONE DAS System that fulfilled these obligations." (*Id.* ¶ 38.)  "As a result of these misrepresentations, Corning gained the benefit of convincing IBM to initially proceed with, and continue to proceed with, Corning's DAS System." (*Id.* ¶ 207.)

To the extent Corning's pre-contractual representations were not included in the provisions of the parties' ultimate written agreement, any claims for fraud

based on such promises are barred by the merger clause. Here, however, IBM asserts both that Corning omitted/failed to disclose material information regarding known limitations and error rates in technology and that "Corning had the duty to disclose such material information because it had previously made partial or ambiguous statements regarding the same matters and/or it possessed superior knowledge not readily available to IBM." (*Id.* ¶¶ 25, 30, 190-191.) Therefore, to the extent IBM has asserted a claim based on Corning's fraudulent concealment of material facts to induce IBM to enter into the contract, that portion of IBM's fraud claim is not barred by the merger clause.

Finally, in its claims for fraudulent and negligent misrepresentation IBM asserts that there are express misrepresentations within the contract itself. Specially, IBM alleges that "Corning repeated specific misrepresentations within the IBM-Corning [Statement of Work] concerning the DAS System's ability to satisfy the [Key Performance Indicators] KPIs" – i.e. the required performance measurements of cellular signal strength and quality throughout Mercedes-Benz Stadium included in the contract.[13]   (*Id.* ¶¶ 41-44, 50, 192, 200, 205, 211.) According to the Amended Complaint, in the IBM-Corning SOW, Corning, agreed to and represented that:

---

[13] According to the Amended Complaint, "[t]he KPIs were broken out by specific carrier (AT&T, Verizon, etc.) and were based on two different RF measurements: reference signal received power ("RSRP") and signal-to-noise-plus-interference ratio ("SNIR"). RSRP is a measure of Long Term Evolution ("LTE") signal strength, and SNIR is a measure of LTE signal quality. Corning agreed and represented that its DAS System would meet a minimum SNIR signal quality measurement of 8 dB on the 700/850 MHz frequencies for 50% of all areas and a less than 0 dB measurement for no more than 5% of all areas." (Am. Compl. ¶¶ 42-44.)

a. Corning's DAS System would satisfy the performance requirements set forth in the KPIs outlined above, which were referred to as "DAS Design Targets" in the IBM-Corning SOW and contained in Table 2 and Appendix C to the IBM-Corning SOW;

b. Corning would "meet the adjusted DAS Design Targets," which were contemplated in Section 3.3 of the IBM-Corning SOW to be updated and revised for each carrier;

c. Corning would be responsible for commissioning the DAS System "to verify that the active DAS components are operating in accordance to their specifications and to prepare the DAS for Operational service including alarming and live traffic," as detailed in Section 4.1 of the IBM-Corning SOW;

d. Corning would conduct continuous wave testing to "validate the design assumptions and propagation predictions from the Cellular/Public Sector design to validate/optimize the iBwave design," as provided in Section 3.9 of the IBM-Corning SOW, and to "insure the cabling and antenna infrastructure (including connections) and antenna alignments meet the performance target and standard criteria as set forth in Appendix C – 'ATL MBS – Carrier DAS Design Targets' and 'ATL MBS – Fiber & Coax Testing Standards 060916,' as set forth in Section 4.1.2.9 of the IBM-Corning SOW;

e. Corning would "integrate the WSP [Wireless Service Provider] signal sources with the DAS headend to configure the proper power per channel/technology/band/WSP at the RAU external antenna port as defined in the approved iBwave design," as provided for in Section 4.1.3 of the IBM-Corning SOW;

f. Corning would "[p]erform Data Collection walk testing of the entire DAS System to validate system design and performance based on Carrier specified KPIs," as provided in Section 4.1.3.7 of the IBM-Corning SOW; and

g. Corning would complete acceptance testing for the implementation of the DAS as provided in Section 4.1.6 of the IBM-Corning SOW and commission the system as set forth in Section 4 of the IBM-Corning SOW.

(*Id.* ¶ 49); (*Id.* ¶ 50) ("Many of Corning's representations were expressly incorporated into the IBM-Corning SOW, which includes affirmative representations by Corning that the DAS System would meet the KPIs set forth in Appendix C (referred to as the "Carrier DAS Design Targets")). Such express promises are not merged. *See Woodhull Corp. v. Saibaba Corp.*, 507 S.E.2d 493, 497 (Ga. Ct. App. 1998) (citations omitted) (finding no merger when a defendant's false promise to assume a motel mortgage, inducing plaintiff to refinance under disadvantageous terms, entered the terms of the purchase agreement).

Thus, while IBM is bound by the merger clause regarding the alleged promises made by Corning in discussions leading up to the IBM-Corning Base Agreement and the IBM-Corning Statement of Work, IBM's claims based on Corning's representations in the contract and Corning's alleged fraudulent omissions are not barred. Accordingly, Defendant's Motion to Dismiss Counts Eight-Ten is **GRANTED IN PART** and **DENIED IN PART**.

### e. *Non-Actionable Puffery*

Defendant also argues that Plaintiff's fraud claims focused on Corning's representations regarding its skills and expertise relating to the DAS constitute non-actionable puffery.[14]

Corning is correct that under Georgia law, representations regarding a party's experience, knowledge, skill, or expertise in its area of business may

---

[14] Plaintiff only analyzes this argument under New York law. (Resp., Doc. 34 at 24-26.) Again, as discussed, this claim is governed by Georgia law.

constitute mere opinions and statements of commendation, or "puffing" and that such puffery would not form the basis of an actionable fraud claim. (Mot. at 22) (citing *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1364 (N.D. Ga. 2006) (Thrash, J.)). "A party is expected to profess competency in its area of business. Thus, such expressions of experience and skill are considered puffery upon which a plaintiff cannot justifiably rely." *Am. Casual Dining, L.P.,* 426 F. Supp. 2d at 1364; *see also IBEW Loc. 595 Pension and Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016) (describing a stock repurchase plan as "thoughtful," "effective," and "optimal" constituted nonactionable corporate puffery); *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1029 (11th Cir. 2003) (characterizing the term "strong performance" as nonactionable mere puffery).

However, "[a] statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available." *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002). Thus, whether IBM's specific allegations may ultimately support a fraud claim is a question for summary judgment. *Am. Casual Dining, L.P.,* 426 F. Supp. 2d at 1364 (analyzing whether alleged misrepresentations that "Moe's had the experience, knowledge, and expertise necessary to estimate the "initial investment" costs [associated with developing and opening a restaurant] accurately" and that "Moe's had perfected a system of opening and operating its restaurants" could form the basis of a fraud

claim and concluding that "[t]he Court cannot, however, at the pleading stage say that these claims fail as a matter of law. The issue may be revisited at the summary judgment stage.").

The Court cannot say at this juncture that all of Corning's alleged representations regarding its DAS system are too vague to support a fraud claim or that the representations are not subject to any sort of objective verification. *See Amalgamated Bank v. Coca-Cola Co.*, CIV.A. 1:05-CV-1226-RWS, 2006 WL 2818973, at *3 (N.D. Ga. Sept. 29, 2006) (stating that to survive the puffery analysis, "the alleged fraud must be based upon a statement capable of 'empirical verification' and not a statement of 'opinion or expectation.'" (quoting *Next Century*, 318 F.3d at 1028)).

Accordingly, Defendant's Motion to Dismiss Plaintiff's claims (Count Eight, Nine, and Ten) is **DENIED**.

### f. Attorney's Fees

Corning argues that that because the Parties' contract contains a choice of law provision[15] indicating that New York law will apply to the Base Agreement, Plaintiffs are precluded from invoking a Georgia law, O.C.G.A. § 13-6-11, as a basis to recover attorney's fees and litigation expenses in connection with the alleged breach. (Mot., Doc. 32-1 at 23-24.) Corning also argues that O.C.G.A. § 13-6-11 is limited to recovery for contracting parties. Thus, since no contract is alleged to

---

[15] The Agreement states "this agreement and any dispute or controversy arising from or relating to this Agreement will be governed by the laws of the State of New York applicable to contracts executed in and performed entirely within that State." (Am. Compl., Ex. B ¶ 15.3.5.)

exist between Corning and the Prime Contractor, or the Falcons, IBM cannot bring that claim either. (*Id.*)

In Georgia, under the rule of *lex fori*, procedural or remedial questions are governed by the law of the forum, the state in which the action is brought. *Brinson v. Martin,* 469 S.E.2d 537 (Ga. Ct. App. 1996); *see also Bunker Hill Intl. v. Nationsbuilder Ins. Svcs.,* 710 S.E.2d 662 (Ga. Ct. App. 2011); *Coca–Cola Bottlers' Sales and Servs. Co. LLC v. Novelis Corp.*, 715 S.E.2d 692 (Ga. Ct. App. 2011) ("under the rule of lex fori, procedural or remedial questions are governed by the law of the forum, the state in which the action is brought.").

The Georgia Court of Appeals allows claims for attorney's fees pursuant to O.C.G.A. § 13–6–11 even if the substance of the contract is controlled by another state's law. *See Novelis Corp.*, 715 S.E.2d at 697; *Rigby*, 755 S.E.2d at 926; *Gore*, 389S.E.2d at 261.  Thus, while the contract in this case should be construed according to New York law, the claim for attorney's fees under O.C.G.A. § 13–6–11 is remedial and available to IBM in this case. *See Renaissance Recovery Sols., LLC v. Monroe Guar. Ins. Co.*, No. CV 114-102, 2016 WL 3866564, at *10 (S.D. Ga. July 13, 2016), *aff'd,* 770 F. App'x 527 (11th Cir. 2019) ("Georgia courts would apply § 13-6-11 as a remedial measure under the rule of *lex fori* even though Michigan law governs the substance of the contract."); *Wells Fargo Bank, N.A.*, No. 1:13-CV-2890-TWT, 2014 WL 5382551, at *2 (N.D. Ga. Oct. 22, 2014) (Thrash, J.) (explaining that "[t]he Georgia Court of Appeals has recognized that Georgia law governs attorney's fees in contract actions in Georgia, even when the substance of

the contract is controlled by another state's law."); *see also Coca–Cola Bottlers' Sales and Servs. Co. LLC v. Novelis Corp.*, 715 S.E.2d 692 (Ga. Ct. App. 2011) (reversing grant of summary judgment to defendant on claim of attorney's fees under 13-6-11 despite New York law applying to the parties' contract).

Further, "Georgia applies its attorneys' fees statute to contract claims, as well as tort claims." *LaRoche Indus., Inc. v. AIG Risk Mgmt., Inc.*, 959 F.2d 189, 193 (11th Cir. 1992); *see also Windermere, Ltd. v. Bettes*, 438 S.E.2d 406, 408 (Ga. Ct. App. 1993) ("the absence of an intentional tort is not fatal to appellees' claim for O.C.G.A. § 13–6–11 bad faith attorney fees."); *Nash v. Reed*, 825 S.E.2d 853, 856 (Ga. Ct. App. 2019) (no "authority in this area limits the recovery of bad faith attorney fees to intentional torts"); *Tanisha Sys., Inc. v. Chandra*, No. 1:15–CV–2644-AT, 2015 WL 10550967, at *10 (N.D. Ga. Dec. 4, 2015) (Totenberg, J.); *Bunch v. Byington*, 664 S.E.2d 842, 848 (Ga. Ct. App. 2008).

Accordingly, Defendant's Motion to Dismiss Plaintiff's claim for attorney's fees (Count Five) is **DENIED**.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Amended Complaint [Doc. 32] is **GRANTED IN PART** and **DENIED IN PART**.

The Court **GRANTS** Corning's Motion to Dismiss IBM's Negligent Misrepresentation, as assignee of the Stadium Developers claim (Count Four) and **GRANTS IN PART** Corning's Motion to Dismiss IBM's claims for Fraud in the Inducement (Count Eight), Fraudulent Misrepresentation (Count Nine), and

Negligent Misrepresentation (Count Ten) to the extent they are based on alleged representations made by Corning in discussions leading up to the IBM-Corning Base Agreement and the IBM-Corning Statement of Work.

The Court **DENIES** Corning's Motion to Dismiss IBM's claims for Negligent Design and Construction (Count One), Grossly Negligent Design and Construction (Counts Two and Seven), Professional Negligence (Count Three), and Attorney's Fees and Costs (Count Five). The Court **DENIES IN PART** Corning's Motion to Dismiss IBM's claims for Fraud in the Inducement (Count Eight), Fraudulent Misrepresentation (Count Nine), and Negligent Misrepresentation (Count Ten) to the extent they are based on (i) alleged representations that were expressly incorporated into the IBM-Corning Base Agreement and the IBM-Corning Statement of Work, or (ii) alleged fraudulent omissions.

**IT IS SO ORDERED** this 11th day of September, 2019.

AMY TOTENBERG
UNITED STATES DISTRICT JUDGE