IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

JARROD JOHNSON, individually, and
on Behalf of a Class of persons similarly
situated,

          *Plaintiff*,

      v.

3M COMPANY; ALADDIN
MANUFACTURING CORPORATION;
AMERICHEM, INC.; ARROWSTAR,
LLC; CHEM-TECH FINISHERS, INC.;
COLOR EXPRESS, INC.; COLUMBIA
RECYCLING CORP.; CYCLE TEX,
INC.; DAIKIN AMERICA, INC.; THE
CITY OF DALTON, GEORGIA, acting
through its BOARD OF WATER,
LIGHT AND SINKING FUND
COMMISSIONERS, d/b/a DALTON
UTILITIES; DALTON/WHITFIELD
REGIONAL SOLID WASTE
AUTHORITY; DYSTAR, LP; E.I. DU
PONT DE NEMOURS AND
COMPANY;  ENGINEERED FLOORS,
LLC; FIBRO CHEM, LLC; GREEN
VULTURE, LLC; IMACC
CORPORATION; INV
PERFORMANCE SURFACES, LLC;
J&S RUG COMPANY, INC. D/B/A
LOG CABIN COMPANY; JB NSD,
INC.; MFG CHEMICAL, LLC;
MILLIKEN & COMPANY; MOHAWK
CARPET, LLC; MOHAWK
INDUSTRIES, INC.; ORIENTAL

Civil Action No. 4:20-cv-0008-AT

TRIAL BY JURY REQUESTED

Complaint – Class Action

WEAVERS, USA, INC.;                          )
POLYVENTIVE, LLC; SECOA                      )
TECHNOLOGY, LLC; SHAW                        )
INDUSTRIES, INC.; SHAW                       )
INDUSTRIES GROUP, INC.;                      )
TARKETT USA, INC.; THE                       )
CHEMOURS COMPANY; and THE                    )
DIXIE GROUP, INC.,

                 *Defendants*.

## THIRD AMENDED INDVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Jarrod Johnson, individually, and on behalf of a class of other persons similarly situated, files this Third Amended Individual and Class Action Complaint as of right[1] against Defendants, and alleges as follows:

## STATEMENT OF THE CASE

1.     This is an individual action on behalf of Plaintiff Jarrod Johnson, pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1365(a)(1), to address ongoing unlawful pollution of surface waters by discharges of toxic per- and polyfluoroalkyl substances ("PFAS") from Defendant

---

[1] *See* [Doc. # 192]. The purpose of this Third Amended Complaint is to, before the Court's deadline, add Daikin America, Inc. and INV Performance Surfaces, LLC as party Defendants to this matter. Plaintiff also, in the interest of judicial economy: (1) substitutes Polyventive, LLC for previously named Defendant PSG-Functional Materials, LLC due to a name change; (2) adds additional, subsequently noticed violations of the Clean Water Act against Defendants Dalton Utilities and Dalton/Whitfield Regional Solid Waste Authority (*see* Doc. 282, ¶ 10); (3) adds Defendant Dalton Utilities to his claims of Public Nuisance (Count Six) and Abatement and Injunction of Public Nuisance (Count Seven); and (4) adds Defendant Dalton/Whitfield Regional Solid Waste Authority to all of his state law claims (Counts Three through Seven).

The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities") and from industrial users who discharge these chemicals into the Dalton Utilities Publicly Owned Treatment Works ("POTW"). As a result of unauthorized discharges by industrial users, Dalton Utilities has discharged and continues to discharge PFAS from its wastewater collection system and the Riverbend Wastewater Land Application System ("Riverbend LAS" or "LAS") to the Conasauga River and its tributaries without a permit authorizing such discharges in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). One of those industrial users, Defendant Dalton/Whitfield Regional Solid Waste Authority ("DWSWA") has discharged, and continues to discharge, dangerously high levels of PFAS into the Dalton POTW, where these chemicals resist treatment and cause Pass Through resulting in their exit from the Riverbend LAS in violation of Dalton Utilities' Sewer Use Rules and Regulations and Section 307(d) of the Act, 33 U.S.C. § 1317(d). These toxic and persistent chemicals then travel downstream and contaminate the Oostanaula River, the source of the City of Rome, Georgia's domestic water supply, as well as  other surface waters within the Upper Coosa River Basin. Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and an award of costs,

including attorney and expert witness fees, for these Defendants' repeated and ongoing violation of the CWA.

2.      This is a class action on behalf of individual Plaintiff and Class Representative Jarrod Johnson and a class of people similarly situated under Fed. R. Civ. P. 23 and Georgia law who have been damaged and continue to be damaged due to the intentional, willful, wanton, reckless, and negligent discharge of PFAS from Defendants' manufacturing processes and facilities into the Dalton POTW. By such wrongful acts and omissions, Defendants have created and maintained a continuing public nuisance causing harm and injury to the Plaintiff and the Members of the proposed Class.

3.      Plaintiff and Members of the proposed Class are owners and occupants of property in Rome, Georgia (sometimes referred to herein as "Rome") and Floyd County, Georgia, who are provided domestic water service through the Rome Water and Sewer Division ("RWSD") or the Floyd County Water Department ("FCWD"), which purchases water from the City of Rome. Rome uses a water intake on the Oostanaula River as its primary water source, and the water undergoes treatment at the Bruce Hamler Water Treatment Facility prior to distribution to the public. As a direct and proximate result of the past and present discharges of PFAS by Defendants into the Conasauga River and its tributaries, thereby also impacting the

Oostanaula River, Plaintiff and Members of the proposed Class have been, and continue to be, subjected to drinking water contaminated with dangerous levels of PFAS.

4.      Defendants own and/or operate manufacturing or other facilities related to the carpet industry and have in the past and/or currently use PFAS as part of manufacturing processes or otherwise supply PFAS to Defendants' manufacturing facilities. These carpet manufacturing facilities are upstream of Rome's water intake, in or near the City of Dalton, Georgia.  Defendants use PFAS at their manufacturing facilities to impart water, stain, and/or grease resistance to their carpet and other textile products, or otherwise process PFAS at their facilities. Industrial wastewater discharged from Defendants' manufacturing facilities into the City of Dalton's POTW contains high levels of PFAS, which resist degradation during treatment processing at Dalton Utilities' wastewater treatment facilities and thus contaminate the Conasauga River, the Oostanaula River, the Coosa River and other tributaries and watersheds in the Upper Coosa River basin.

5.      Defendants' discharges of PFAS have contaminated surface waters in the Upper Coosa River basin, including, but not limited to, the Conasauga River and the Oostanaula River, which is the source the water that supplies Rome's water intake. Defendants' PFAS cannot be removed adequately from the Oostanaula River

by the existing and/or emergency water treatment processes and technologies in use at the Bruce Hamler Water Treatment Facility in Rome.

6.     As a result of the Defendants' intentional, willful, wanton, reckless, and negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff and Proposed Class Members have suffered damages different in kind and degree from the damage suffered by the public in general as a result of Defendants' discharges of toxic chemicals, including compensatory and consequential damages. Plaintiff and Proposed Class Members are also seeking equitable and injunctive relief to compel the Defendants to remediate and cease the spread of toxic PFAS into the Conasauga and Oostanaula Rivers and their water supplies. In addition, based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiffs are seeking recovery of punitive damages.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the CWA claims set forth in this Amended Complaint pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

8.     Plaintiff has complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff,

on June 24, 2020, mailed a notice of intent to file suit under the CWA to Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners and Dalton Utilities, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Georgia Department of Natural Resources' Environmental Protection Division ("EPD"), and the United States Attorney General [("June Notice") Attached hereto as Exhibit "A" and incorporated by reference herein].  On August 4, 2020, Plaintiff mailed an Addendum to the June Notice to the same entities, detailing additional violations of the CWA by Dalton Utilities [("August Notice") Attached hereto as Exhibit "C" and incorporated by reference herein]. Plaintiff, on June 26, 2020, mailed a notice of intent to file suit under the CWA to Defendant Dalton/Whitfield Regional Solid Waste Authority, the Administrator of the EPA, the Regional Administrator of the EPA, the EPD, and the United States Attorney General [("June Notice") Attached hereto as Exhibit "B" and incorporated by reference herein]. On August 17, 2020, Plaintiff mailed a supplemental notice to the same entities, detailing additional violations of the CWA by DWSWA [("August Notice") Attached hereto as Exhibit "D" and incorporated by reference herein]. These Notices complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A.

More than 60 days have passed since the June and August Notices were  served on Defendant Dalton Utilities, Defendant DWSWA, and these agencies.

9.      Neither EPA nor EPD has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or State to redress the violations of the CWA by Defendant Dalton Utilities or Defendant DWSWA.  In addition, neither EPA nor EPD has commenced an administrative civil penalty action under Section 309(g)(6) of the Act, 33 U.S.C. § 1319(g)(6), or under a comparable Georgia law, to redress the violations of the CWA by Dalton Utilities or DWSWA.  Even if EPD has commenced an administrative action to address these violations, Georgia's water pollution enforcement scheme is not comparable to the provisions of the CWA. *See, e.g., Leakey v. Corridor Materials, LLC,* 839 F.Supp.2d 1340, 1350 (M.D. Ga. 2012).

10.      Plaintiff has also, pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), served notices of intent to file suit under the CWA, as well as supplemental notices, toother Defendants named herein who have discharged industrial wastewater containing PFAS into the Dalton POTW. Plaintiff is considering whether, after further discovery, to add the CWA claims contained in Count Two of this Third Amended Complaint against these Defendants.

11.     Plaintiff will, immediately upon receipt of a file-stamped copy of this Third Amended Complaint, mail a copy to the Administrator of the EPA, the Regional Administrator of the EPA, and the Attorney General of the United States.

12.     Venue is appropriate in the Northern District of Georgia, pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations of the Act alleged herein are located within this judicial district.

13.     This Court has jurisdiction over the state law claims in this action in accordance with 28 U.S.C. § 1332(d)(2)(A), because it is a class action in which any member of a class of plaintiffs is a citizen of a State different from any Defendant, and the amount in controversy exceeds the sum of five million dollars ($5,000,000), exclusive of interest and costs.

14.     Venue is also properly in this Court pursuant to 28 U.S.C. § 1391(b), because Defendants have conducted substantial business in this District, and Defendants have caused harm to Plaintiff and to Class Members residing in this District. In addition, Plaintiff and Class Members reside in this District, and a substantial part of the events or omissions giving rise to their claims occurred in the Northern District of Georgia.

## PARTIES

15.    Plaintiff Jarrod Johnson is a resident of Floyd County, Georgia and resides at 13 South Ivy Ridge Road, Rome, Georgia 30161. Plaintiff is a customer of the RWSD, which uses water from the Oostanaula River as the source of Plaintiff's domestic water supply, which has been and continues to be contaminated with PFAS discharged from Defendants' carpet manufacturing or related processes, including waste disposal operations, and, ultimately, from Dalton Utilities' Riverbend LAS.

16.    Plaintiff receives his domestic water supply and drinking water from the RWSD, and thus has a particular interest in protecting the water quality of the Conasauga River and its tributaries in and around, and downstream from, the Riverbend LAS, as well as that of the downstream Oostanaula River. Plaintiff has been, and will continue to be, directly and substantially injured in his use and enjoyment of his property as a direct result of Dalton Utilities and DWSWA's violations of the Act, and the contamination of the Rome water supply in particular. The relief sought in this case would provide redress for Plaintiff's injuries, and because these injuries are being caused by pollution of waters of the United States, the injuries fall within the zone of interests protected by the CWA.

17.     Plaintiff is a "citizen" within the meaning of 33 U.S.C. §§ 1365(g) and 1365(a).

18.     Defendant 3M Company ("3M") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant 3M has for many years manufactured and supplied PFAS to one or more of the Defendants in this action.

19.     Defendant Aladdin Manufacturing Corporation ("Aladdin") is a foreign corporation authorized to do business in the State of Georgia, and, at all times relevant hereto, has conducted business in this District. Defendant Aladdin is the owner and operator of multiple facilities that manufacture carpet and various floor products, including the Mohawk – Antioch Production Facility located at 2001 Antioch Road, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

20.     Defendant Americhem, Inc. ("Americhem") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Americhem is the owner and operator of a carpet and synthetic fibers manufacturing facility located at 1015

Abutment Road, Dalton, Georgia, 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

21.     Defendant ArrowStar, LLC ("ArrowStar") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant ArrowStar is the owner and operator of multiple facilities that manufacture, distribute, and sell PFAS, including sales and distribution offices located at 1815 Hamilton Street, Dalton, Georgia and 2890 Five Springs, Road, Dalton, Georgia, and which have sold PFAS to one or more Defendants in this action.

22.     Defendant Chem-Tech Finishers, Inc. ("Chem-Tech") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Chem-Tech is the owner and operator of a carpet dying, drying, and finishing facility located at 1904 South Hamilton Street, Dalton, Georgia, 30720, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

23.     Defendant Color Express, Inc. ("Color Express") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Color Express is the owner and operator of a carpet and rug dyeing facility located at 711 North Glenwood Avenue, Dalton, Georgia, 30721,

which has discharged industrial wastewater containing PFAS into the Dalton POTW.

24.     Defendant Columbia Recycling Corp. ("Columbia Recycling") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Columbia Recycling is the owner and operator of a carpet fiber recycling facility locate at 1001 Chattanooga Avenue, Dalton, Georgia, 30720, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

25.     Defendant Cycle Tex, Inc. ("Cycle Tex") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Cycle Tex is the owner and operator of a thermoplastics recycling facility located at 111 West Westcott Way, Dalton, Georgia 30720, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

26.     Defendant Daikin America, Inc. ("Daikin") is a foreign corporation that, at all times relevant hereto, has conducted business within this District. Among other acts and omissions, Defendant Daikin has for many years manufactured and supplied PFAS to one or more of the Defendants in this action, including, but not limited to, Defendants Shaw Industries and The Dixie Group.

27.     Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities") is a municipal corporation organized under the laws of the State of Georgia, owning and operating a municipal utility whose principal office is located at 1200 V.D. Parrot Jr. Parkway, Dalton, Georgia, 30722-0869. Dalton Utilities operates the Dalton POTW, consisting of various wastewater collection and treatment facilities and the associated 9,800-acre Riverbend Wastewater LAS.

28.     Defendant Dalton Utilities is a "person" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

29.     Defendant Dalton/Whitfield Regional Solid Waste Authority ("DWSWA") is an enterprise fund, with the capacity to sue and be sued, created by the City of Dalton and Whitfield County, Georgia in 1994 to manage the solid waste needs of Dalton – Whitfield County.  The DWSWA operates, among other facilities, the Old Dixie Highway Landfill, and a Carpet Landfill, both of which are located at 4189 Old Dixie Highway SE in Dalton, Georgia, 30721. The DWSWA has for many years discharged landfill leachate containing PFAS, which is industrial wastewater, into the Dalton POTW, and in early 2013, the DWSWA installed a forced sewer main to send its landfill leachate  directly to the Dalton POTW.

14

30.     Defendant DWSWA is a "person" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

31.     Defendant Dystar, LP ("Dystar") is a foreign limited partnership authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Dystar is the owner and operator of a textile chemical manufacturing facility located at 2474 Abutment Road, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

32.     Defendant E.I. du Pont de Nemours and Company ("Dupont") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business in this District. Among other acts and omissions, Defendant DuPont has manufactured and supplied PFAS to one or more of the Defendants in this action.

33.     Defendant Engineered Floors, LLC ("Engineered Floors") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Engineered Floors is the owner and operator of multiple carpet manufacturing and finishing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

34.     Defendant Fibro Chem, LLC ("Fibro Chem") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Fibro Chem is the owner and operator of a dye, lubricant, and specialty chemicals formulation and manufacturing facility located at 1521 East Walnut Avenue, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

35.     Defendant Green Vulture, LLC ("Green Vulture") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Green Vulture is the owner and operator of a post-consumer carpet recycling and manufacturing facility located at 1205 Royal Drive, Dalton, Georgia 30720, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

36.     Defendant IMACC Corporation ("IMACC") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant IMACC is the owner and operator of an industrial plastic recycling and reconditioning facility located at 2303 Dalton Industrial Court, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

37.     Defendant INV Performance Surfaces, LLC ("Invista") is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District, including owning and operating a fiber manufacturing facility located at 745 College Street in Dalton. Defendant Invista, which was formerly owned by DuPont, is the owner of the Stainmaster® brand of carpets, and among other acts and omissions, has for many years manufactured and supplied PFAS to one or more of the Defendants in this action, including, but not limited to, Defendants Shaw Industries and Mohawk Industries, Inc.

38.     Defendant JB NSD, Inc. ("JBNSD") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant JBNSD is the owner and operator of a tank washing facility located at 2200 Abutment Road, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

39.     Defendant J&S Rug Company, Inc. d/b/a Log Cabin Company ("Log Cabin" or "J&S") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Log Cabin is the owner and operator of a carpet and rug manufacturing facility located at 1001 Poly Pac Drive,

Dalton, Georgia, 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

40.    Defendant MFG Chemical, LLC ("MFG") is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant MFG is the owner and operator of three (3) chemical manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

41.    Defendant Milliken & Company ("Milliken") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District.  Defendant Milliken is the owner and operator of multiple specialty chemicals, floor covering, and textile manufacturing facilities located in and around Dalton, Georgia.

42.    Defendant Mohawk Carpet, LLC ("Mohawk Carpet") is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Mohawk Carpet is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

43.     Defendant Mohawk Industries, Inc. ("Mohawk Industries") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Mohawk Industries is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

44.     Defendant Oriental Weavers U.S.A., Inc. ("Oriental") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Oriental is the owner and operator of multiple carpet and area rug manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

45.     Defendant Polyventive LLC ("Polyventive"), formerly named PSG-Functional Materials, LLC, is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District, including the manufacture and supply of PFAS to one or more of the Defendants in this action. Defendant Polyventive owner and operator of a specialty chemical manufacturing facility located at 1202 Dozier Street, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

46.     Defendant Secoa Technology, LLC ("Secoa") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Secoa is the owner and operator of an industrial coatings and metal finishing manufacturing facility located at 1202 Dozier Street, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

47.     Defendant Shaw Industries, Inc. is a domestic corporation and a wholly-owned subsidiary of Shaw Industries Group, Inc. (collectively, "Shaw Industries") and, at all times relevant hereto, has conducted business within this District. Defendant Shaw Industries is the owner and operator of multiple facilities located in and around Dalton, Georgia, which manufacture, coat, and dye carpets, rugs, and other soft surface products and which have discharged industrial wastewater containing PFAS into the Dalton POTW.

48.     Defendant Tarkett USA, Inc. ("Tarkett USA") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District.  Defendant Tarkett USA is the owner and operator of multiple carpet, fiber, yarn and dye manufacturing, recycling, and finishing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

49.    Defendant The Chemours Company ("Chemours") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant Chemours has manufactured and supplied PFAS to one or more of the Defendants in this action.

50.    Defendant The Dixie Group, Inc. ("Dixie") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Defendant Dixie is the owner and operator of carpet and textile manufacturing facilities located in and around Dalton, Georgia.

## FACTUAL ALLEGATIONS

**Background and Hazards of PFAS**

51.    Over 90% of the world's carpet comes from manufacturing plants in and around Dalton, Georgia—the "Carpet Capital of the World." Most of the Defendants are owners and operators of these carpet manufacturing plants and related facilities, and use and have used PFAS in the manufacturing of carpet and associated processes. Other Defendants are the suppliers of PFAS to these facilities, and Defendants Dalton Utilities and DWSWA receive the PFAS-contaminated waste from the carpet industry in Dalton.

52.    PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable and repel both oil and water and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial and commercial applications, and a large percentage of PFAS produced worldwide are used to treat carpets, rugs, and other home textiles to confer stain, soil, water and/or oil resistance.

53.    The stable carbon-fluorine bonds that make PFAS such pervasive industrial and consumer products also result in their persistence in the environment. There is no known environmental breakdown mechanism for these chemicals, and they are readily absorbed into biota and tend to bioaccumulate with repeated exposure.  PFAS leach from soil to groundwater, are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination, and a major source of human exposure to PFAS is through ingestion of contaminated drinking water.

54.    Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS") are the most studied PFAS chemicals and, while they have been largely phased out by industry, they are  persistent and still remain in the environment,

including at the LAS.  PFOA and PFOS have been replaced by substitute PFAS, including Short-Chain PFAS.

55.    When humans ingest PFAS, they bind to plasma proteins in the blood and are readily absorbed by and distributed throughout the body. The liver and kidneys are important binding and processing sites for PFAS, resulting in physiologic changes to these and other organs. Because of strong carbon-fluorine bonds, PFAS are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body. These toxic chemicals accumulate in the body and cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs. For instance, PFOS crosses the placenta in humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

56.    The human diseases caused by exposure to PFAS include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The association between exposure to these chemicals and certain cancers has been confirmed by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking certain PFAS to diseases based on its research on the Mid-Ohio Valley population exposed to certain PFAS as a result of releases from an E. I. du Pont de Nemours and Company chemical plant.

57.    The C8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley population. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer, and they further suggest associations with prostate and ovarian cancer and non-Hodgkin's lymphoma. Rodent studies also support the link with cancer. Most of an EPA Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans." The C8 Science Panel has also found probable links between exposure to certain PFAS and pregnancy-induced hypertension, ulcerative colitis, and high cholesterol.

58.    The International Agency for Research on Cancer ("IARC") has classified PFOA as a possible human carcinogen, and EPA has concluded that there is suggestive evidence of the carcinogenic potential of PFOA in humans.

59.    PFAS immunotoxicity has been demonstrated in a wide variety of species and models, including humans, in recent years. For instance, in 2016, the U.S. Department of Health and Human Service's National Toxicology Program ("NTP"), after conducting a systematic review of the evidence pertaining to PFAS exposure and immune-related health effects, concluded that PFOA and PFOS constitute a hazard to immune system function in humans.

60.    On May 19, 2016, EPA published lifetime Drinking Water Health Advisories for PFOA and PFOS ("May 2016 EPA Health Advisories" or "Health Advisories"). The Health Advisory for PFOA is 0.07 micrograms per liter ("µg/L"), or 70 ppt.  The Health Advisory for PFOS is also 0.07 µg/L, or 70 ppt. When both PFOA and PFOS are found in drinking water, the combined concentrations should be compared with the 70 ppt level.

61.    The May 2016 EPA Health Advisories are based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects.

62.    The May 2016 EPA Health Advisories state that PFOA and PFOS have "extremely high" persistence in the environment and the human body, and that the developing fetus and newborn are "particularly sensitive" to PFOA and PFOS induced toxicity. According to the Health Advisories, a single exposure to a developmental toxin at a critical time can produce a persistent adverse effect that increases with additional exposure.

63.    The Agency for Toxic Substances and Disease Registry ("ATSDR") issued an updated draft Toxicological Profile for Perfluoroalkyls in 2018, which found, *inter alia,* strong associations between PFAS exposure and several adverse health outcomes, including pregnancy-induced hypertension, liver damage, increased serum lipids, thyroid disease, and immunotoxicity.

64.    ATSDR's updated Toxicological Profile significantly lowered minimum risk levels ("MRLs") for both PFOA and PFOS, and using the methods EPA used to develop its May 2016 EPA Health Advisories, these updated MRLs would translate to drinking water health levels of approximately 7 ppt for PFOA and 11 ppt for PFOS.

65.    Based on concerns that EPA's May 2016 EPA Health Advisories are not protective of human health, numerous states have taken action to pursue stricter guidelines for PFAS in drinking water, including: Vermont, which established a health advisory of 20 ppt for any combination of PFOA, PFOS, PFHxS, PFHpA, and PFNA; New Jersey, which established a MCL for PFNA of 13 ppt, and has proposed a MCL for PFOA of 14 ppt and PFOS of 13 ppt; New York, which has recommended adoption of MCLs of 10 ppt for PFOA and PFOS; and Michigan, where a scientific panel has recommended adoption of health advisory for PFOA of 8 ppt and PFOS of 16 ppt.

66.    Section 7321 of the National Defense Authorization Act for Fiscal Year 2020 ("NDAA") adds 172 PFAS to the list of toxic chemicals covered by the Toxics Release Inventory ("TRI") under Section 313 of the Emergency Planning and Community Right to Know Act ("EPCRA").

**Defendants' Knowledge of Toxicity and Persistence of PFAS**

67.    Defendants have long been aware of the persistence and toxicity of PFAS, and PFOA and PFOS in particular.  Defendants nonetheless knowingly and intentionally discharged and continue to discharge these chemicals into the Dalton POTW, where they inevitably Pass Through the POTW and are discharged from the Riverbend LAS to the Conasauga River and then travel downstream and contaminate the Oostanaula River, which supplies drinking water to the City of Rome and its water subscribers.

68.    Defendants that manufacture PFAS have known for at least 40 years that PFAS chemicals persist in the environment and accumulate in the bodies of humans, fish, and animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught

by the Wheeler Dam (26 miles downstream from the 3M plant in Decatur, Alabama) showed that these chemicals bioaccumulate in fish.

69.     Defendant 3M has also known for at least 40 years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1978 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all the monkeys died as a result of exposure to the fluorochemicals. Twenty-one years later, 3M told the public that a "new study" on these compounds' effect on Rhesus monkeys was one reason 3M pulled one of its consumer products, Scotchgard, off the market.

70.     In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

71.     Defendant 3M has known for at least 30 years that its disposal of PFOA and PFOS and related chemicals through discharge into waterways, such as the Conasauga River or the Oostanaula River, was unsafe. For instance, a Materials Safety Data Sheet ("MSDS") produced by Defendant 3M in 1986 warned that PFOA should be disposed of only through incineration or at specially designed, properly lined landfills for hazardous chemicals, not discharged into rivers and not dumped into the ground.

72.    Defendant 3M has known for at least 40 years that PFOA, PFOS and related chemicals are not effectively treated by conventional wastewater treatment plant processes and are discharged to surface waters in the effluent and accumulate in the sludge from wastewater treatment processes. For example, in 1978, 3M found that the bacteria in wastewater treatment plants would not biodegrade PFOA. In 2001, 3M found high concentrations of these chemicals in samples from the Decatur Utilities WWTP in Decatur, Alabama effluent and sludge as a result of discharges from 3M. These high concentrations were not disclosed to Decatur Utilities or the public.

73.    A 1997 MSDS for a product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

74.    In 1978, DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but did not disclose this to the public or to the EPA. Three years later, DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water

sources resulting from discharges at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded DuPont's own Community Exposure Guideline.

75.     In 1991, DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

76.     In or around December 2005, DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting

that PFOA does not pose any health risks. In 2006 3M agreed to pay a $1.5 million civil penalty for failure to disclose information to EPA about the health risks and environmental persistence of PFAS chemicals.

77.     For decades, 3M manufactured PFOA and supplied it to DuPont for its manufacture of Teflon and other products. Despite DuPont's knowledge of the risks to human health posed by PFOA, in response to the withdrawal of 3M from the market in May of 2000, DuPont opened its own plant to manufacture PFOA to be incorporated into DuPont's products.

78.     In 2015, Dupont spun off its performance chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to Chemours.

79.     Upon information and belief, all Defendants have long been aware of the persistence and toxicity of PFAS, at least as a result of communications with Defendant manufacturers and other users of these chemicals, as well as the EPA, EPD and/or UGA.

80.     Upon information and belief, all Defendants knew or should have known that, in its intended and/or common use, PFAS would very likely cause harm and injury, and/or threaten public health and the environment.

81.    Upon information and belief, all Defendants knew or should have known that PFAS are mobile and persistent, bioaccumulative, biomagnifying and toxic. Defendants nonetheless concealed their knowledge from the public and government agencies.

82.    In 2002, EPA took regulatory action under the Toxic Substances Control Act ("TSCA") to limit the future manufacture of PFOA, PFOS, and related chemicals. In response, Defendants 3M and DuPont undertook to develop and manufacture and supply to other Defendants "Short-Chain" PFAS; that is, PFAS with six or fewer carbons, such as GenX. Defendants are aware that these Short-Chain PFAS are, like PFOA and PFOS, persistent and not subject to biodegradation, and that they accumulate in human blood. Likewise, Defendants are aware that Short-Chain PFAS are toxic and known to cause cancer in animal studies.

**Contamination of Upper Coosa River Basin with PFAS**

83.    Defendants discharge PFAS in their industrial wastewater into the City of Dalton, Georgia's POTW, operated by Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities").

84.    Dalton Utilities operates the Riverbend, Loopers Bend, and Abutment Road Water Pollution Control Plants ("WPCPs"), which treat this wastewater before

it is pumped to the approximate 9,800-acre Riverbend LAS for land application using approximately 19,000 sprayheads. According to the EPA, approximately 90% of the wastewater which enters these treatment facilities for ultimate disposal at the LAS originates from industrial sources, primarily carpet manufacturers.

85.    The operation of Dalton Utilities' wastewater collection and disposal system, which is a "no discharge" system and includes the Riverbend, Loopers Bend, and Abutment Road WPCPs, as well as the LAS, is governed by the terms and conditions of Land Application System Permit No. GAJ020056 ("LAS permit"). The LAS permit authorizes Dalton Utilities to discharge up to 30 million gallons per day ("MGD") of wastewater effluent to the LAS.  However, among other things, the LAS permit expressly prohibits any discharge from the LAS to surface waters. Despite this prohibition, EPA has found that a "significant amount" of the wastewater effluent sprayed onto the LAS by Dalton Utilities "leaves [the LAS] via surface waters and enters the Conasauga River."

86.    The LAS is also covered by and subject to the National Pollutant Discharge Elimination System ("NPDES") Industrial General Stormwater Permit GAR050000 ("2017 IGP" or "NPDES Permit"), which authorizes certain stormwater discharges from the LAS.  However, Part 1.1.4 of the NPDES Permit expressly prohibits discharges of stormwater mixed with non-stormwater, which

include discharges of "process wastewater, industrial wastewater, and contaminated stormwater." *Id.;* Part 8.L.3.1; Part 8.T.3.

87.    Defendants' PFAS resist degradation during the treatment process at these mechanical preapplication WPCPs and further increase in concentration as these toxic chemicals accumulate in the LAS.  Defendants have known for decades that PFAS cannot be removed from their industrial wastewater discharges sent to the Dalton POTW, and Dalton Utilities has known for years that its conventional treatment processes and land application will not remove these chemicals prior to discharge to the Conasauga River and its tributaries in and around the LAS.

88.    Despite this knowledge, the LAS Permit, which sets forth the terms and conditions governing Defendant Dalton Utilities' approved industrial pretreatment program for discharges of industrial wastewater into the Dalton POTW, in no way authorizes Defendants' discharges of PFAS into the Dalton POTW. Likewise, Defendants' industrial user wastewater discharge permits issued by Dalton Utilities do not authorize discharges of PFAS into the Dalton POTW.

89.    PFAS have been detected in dangerously high levels in the soil, compost, sewage sludge, groundwater, and wastewater effluent at the LAS, which borders and is hydrologically connected to the Conasauga River and its tributaries, some of which flow through the LAS.  Historical applications of PFAS at the LAS

continue to be discharged from the LAS to the Conasauga River or its tributaries, having the same net polluting effect on these surface waters for decades, if not longer, after their initial deposit. Stormwater discharges contaminated with PFAS also pollute the Conasauga River or its tributaries as they flow past/through the LAS, as do discharges of PFAS contaminated groundwater.

90.    EPA, the University of Georgia ("UGA"), and the Georgia Environmental Protection Division ("EPD") have identified industrial wastewater originating from Defendants' manufacturing facilities, and ultimately discharged from the Riverbend LAS, as the source of PFAS contamination in the Conasauga River, the Oostanaula River, the City of Rome's water supply, and the Coosa River.

91.    UGA conducted surface water sampling in March of 2006 to determine the presence and distribution of PFAS in the Conasauga River above and below the LAS near Dalton ("UGA Study"). Based on extremely high concentrations of PFAS downstream of the LAS, including PFOA at levels as high as 1150 parts per trillion ("ppt") and PFOS as high as 318 ppt, the UGA study concluded that the LAS is an "important point source of [PFAS] contamination." The UGA Study further found these concentrations of PFAS were among the "highest ever recorded in surface waters."

92.    The United Steelworkers Union sampled surface waters downstream from the Riverbend LAS in August and October of 2006, and analytical results from this sampling showed concentrations of PFOA of up to 526 ppt in the Conasauga River and PFOS as high as 923 ppt.

93.    Sampling conducted by Dalton Utilities between July 2009 and August 2010 showed, *inter alia,* PFOA levels as high as 400 ppt and PFOS levels as high as 1200 ppt in the Conasauga River or its tributaries, including Holly Creek, downstream of the LAS. Elevated levels of PFAS were also consistently found in Dalton Utilities' compost, sewage sludge, as well as soil and groundwater at the LAS.

94.    In July of 2012, EPA conducted a "Conasauga River [PFAS] Study," consisting of surface water sampling in the Conasauga River and its tributaries in and around the LAS, as well as the Oostanaula and Coosa Rivers downstream. Analytical results from this sampling showed elevated levels of PFAS in all surface water samples downstream of the LAS as compared to upstream samples, including PFOA as high as 210 ppt and PFOS as high as 180 ppt in the Conasauga River. The Oostanaula River downstream of its confluence with the Conasauga was also contaminated with PFOA and PFOS at unsafe levels.

95.     Additional sampling of surface waters within the Upper Coosa River Basin, including in the Conasauga and Oostanaula Rivers, , at the specific locations set out in the June and August Notices attached hereto as Exhibits "A" and "C" and incorporated by reference herein, demonstrates that Defendant Dalton Utilities discharged PFAS from the LAS to the Conasauga River or its tributaries, thereby also contaminating the Oostanaula River with PFAS, on at least the following occasions: June 19, 2016; June 20, 2016; June 21, 2016; June 22, 2016; June 23, 2016; June 24, 2016; July 20, 2016; July 21, 2016; September 16, 2019; September 17, 2019; November 20, 2019; November 21, 2019; and June 18, 2020.

96.     Defendant Dalton Utilities has also discharged PFAS from its wastewater collection system via "Spills," which are defined as any unpermitted discharge of untreated or raw sewage to waters of the State,  in the specific amounts and locations as set out in the August Notice attached hereto as Exhibit "C" and incorporated by reference herein. Specifically, Defendant Dalton Utilities has discharged raw sewage containing PFAS from its collection system to waters of the State and United States on at least the following occasions: December 2, 2015; February 21, 2016; February 24, 2016; March 29, 2016; July 15, 2016; November 8, 2016; December 18, 2016; December 23, 2016; April 3, 2017; June 15, 2017; June 21, 2017; September 22, 2017; December 20, 2017; April 16, 2018; August 4, 2018;

August 22, 2018, February 22, 2019; May 11, 2019; September 3, 2019; October 30, 2019; October 31, 2019; November 9, 2019; January 1, 2020; June 17, 2020.

**PFAS Contamination of Rome Water Supply**

97.     In March of 2009, several public drinking water supplies downstream from the LAS, including Rome's, were sampled for the presence of PFAS, and Rome's water supply was tested again in January of 2010. The results of this sampling showed that Rome's drinking water supply was contaminated with PFAS, and PFOA and PFOS in particular, at dangerously high levels.

98.     Leading up to the issuance of the May 2016 EPA Health Advisories, Rome began regular testing for PFOA and PFOS in its water supply, and has consistently found PFOA and PFOS levels that combine to exceed EPA's 70 ppt limit. Rome has also found other Long-Chain as well as Short-Chain PFAS in the water supply.

99.     In 2016, Rome's then- existing water treatment filtration system was not capable of removing or reducing levels of PFAS including, but not limited to, PFOA and PFOS. Upon being informed that the May 2016 EPA Health Advisories would set lifetime safe PFOA and PFOS levels drastically lower than the 2009 provisional drinking water health advisories for short-term exposure, Rome took emergency precautions and implemented an emergency temporary filtration process

38

by installing granular activated carbon in existing filter beds to remove non-Short-Chain PFAS. Rome also drew additional water from the Etowah River for purposes of blending that water with water drawn from the primary source, the Oostanaula River.

100.   Due to the high levels of PFOA and PFOS found in its water supply, and due to the presence of Short-Chain PFAS, the City's water supply requires a new and permanent filtration system, which is necessary to provide a safe, long-term supply of water which will meet the EPA health advisories and provide safe water for the public.

101.   These emergency efforts have cost, and will continue to cost, Rome millions of dollars to implement, and the City was forced to implement a surcharge upon all customer rate payers to recoup its costs.  Additionally, implementation of the new, permanent filtration system will increase the future costs the City must incur to provide a safe, long-term supply of water which will meet the EPA health advisories and provide safe water for the public.  Such increased costs will be passed on to all customer rate payers to recoup them through additional and increased surcharges.  The City estimates that water subscribers/ratepayers will likely see a minimum 2.5% rate increase each year for the foreseeable future to address PFAS contamination.

102.    On November 4, 2019, the City of Rome's City Commission enacted a "Resolution Regarding City of Rome Water Supply," finding, *inter alia,* that the PFAS contamination of the Oostanaula River and Rome's water supply constituted a public nuisance that threatens the health and safe of the community and the long-term sustainability of the City of Rome's water supply.

103.    Sampling of the Oostanaula River at Rome's water intake on November 20, 2019 showed, in addition to other elevated PFAS, PFOA at 57 ppt and PFOS at 71 ppt, far in excess of EPA's 2016 Health Advisories' limit of 70 ppt.

104.    As a direct and proximate result of Defendants' contamination of the RWSD and FCWD water supplies with PFAS, Plaintiff and the Proposed Class Members have suffered damages, including, but not limited to, property damage and losses for the payment of surcharges to filter and remove PFAS from the Rome and Floyd County water supply, and other compensatory damages to be proven at trial.

## COUNT ONE:
## DISCHARGE OF POLLUTANTS TO SURFACE WATERS WITHOUT AN NPDES PERMIT IN VIOLATION OF THE CLEAN WATER ACT
### (Defendant Dalton Utilities)

105.    Plaintiff incorporates by reference paragraphs 1 through 104 as if restated herein.

106.    Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United

States unless the discharge is in compliance with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. Each discharge not authorized by a permit, and each violation of a permit, is a violation of the CWA.

107.   The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b). EPD is the state water pollution control agency for purposes of the CWA, and administers statutory and regulatory implementing the CWA's permitting programs within the State of Georgia. *See, e.g.,* O.C.G.A. § 12-5-30.

108.   A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for the discharge of pollutants into waters of the United States without a permit in violation of Section 301 of the CWA. 33 U.S.C. § 1365(f). There is also CWA jurisdiction where pollutants are discharged from a point source to navigable surface waters through hydrologically connected ground water, where the discharge is the "functional equivalent" of a direct discharge to navigable waters. *County of Maui v. Hawaii Wildlife, Fund,* 140 S. Ct. 1462, 1476 (2020).

109.   Defendant Dalton Utilities' discharges of PFAS from the LAS, the sprayheads located thereon, and/or ditches and drainage channels that flow from the LAS, into the Conasauga River or its tributaries, constitute the discharge of a pollutant from a point source requiring an NPDES Permit authorizing such discharge.

110.   Defendant Dalton Utilities' discharges of PFAS from the LAS, the sprayheads located thereon, and/or ditches and drainage channels that flow from the LAS, into the Conasauga River or its tributaries through hydrologically connected groundwater beneath the LAS, constitute the "functional equivalent" of a direct discharge to these surface waters requiring an NPDES Permit authorizing such discharges.

111.   Per- and polyfluoroalkyl substances ("PFAS") are "pollutants" within the meaning of the CWA.  33 U.S.C. § 1362(6).

112.   The LAS, the sprayheads located thereon, and ditches and drainage channels that flow from the LAS to the Conasauga River and/or tributaries thereto are all "point sources" within the meaning of the CWA.  33 U.S.C. § 1362(14).

113.   The Conasauga River and its tributaries are waters of the State of Georgia and waters of the United States as that term is used in the CWA and as it has been interpreted by the federal courts.

114.   The requirement for an NPDES permit authorizing these discharges arose when at the time that Dalton Utilities first knew or should have known that PFAS was being discharged from the LAS into surface waters.  Each day since that time is a violation of the CWA, and these violations are continuing as of the date of this Amended Complaint.

115.   Since as early as 2006, and every day since June of 2015, and on at least the specific occasions set forth in Paragraph 95 and the June and August Notices, attached hereto as Exhibits "A" and "C" and incorporated by reference herein, Dalton Utilities has violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging PFAS from the LAS into the Conasauga River and/or its tributaries, directly or through hydrologically connected groundwater beneath the LAS, without an NPDES Permit authorizing such discharges.

116.   On at least the specific occasions set forth in Paragraph 96 and the August Notice attached hereto as Exhibit "C" and incorporated by reference herein, Dalton Utilities has violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging raw sewage containing PFAS from its collection system to waters of the State and United States without an NPDES Permit authorizing such discharges.

117.   Defendant Dalton Utilities should be subject to an enforcement order or injunction order Dalton Utilities to cease its discharges of PFAS from the LAS

and its collection system into the Conasauga River or its tributaries without an NPDES Permit authorizing such discharges.

118.   Defendant Dalton Utilities should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

119.   For the purpose of assessing the maximum civil penalty for which Defendant Dalton Utilities is liable, each day that Dalton Utilities has discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Third Amended Complaint.

**COUNT TWO:**
**INDUSTRIAL USER PASS THROUGH DISCHARGES OF POLLUTANTS IN VIOLATION OF FEDERAL PROHIBITIONS, DALTON UTITLITIES' SEWER USE RULES AND REGULATIONS, AND THE CLEAN WATER ACT**
**(Defendant Dalton/Whitfield Regional Solid Waste Authority)**

120.   Plaintiff incorporates by reference paragraphs 1 through 119 as if restated herein.

121.   Section 307(b) through (e) of the CWA, 33 U.S.C. §§ 1317(a)-(e), establish the federal pretreatment program for regulation of discharges from industrial facilities into publicly owned treatment works.  Section 307(d) of the Act,

33 U.S.C. § 1317(d), prohibits the operation of any source of discharge of pollutants into a publicly owned treatment works in violation of, amongst other things, prohibitions on discharges.

122.   EPA has adopted pretreatment standards for industrial dischargers to publicly owned treatment works at 40 C.F.R. Parts 404 through 471, including both general regulations and categorical regulations for specific industrial categories.

123.   The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the pretreatment program for industrial discharges into wastewater facilities, pursuant to 33 U.S.C. § 1342(b). EPD is the state water pollution control agency for purposes of the CWA, and administers statutory and regulatory implementing the CWA's permitting programs within the State of Georgia.  *See, e.g.,* GA. COMP. R. & REGS. §§ 391-3-6-0(8), 391-3-6-0(9).

124.   Both the EPA and EPD rules prohibit the discharge into a POTW of "any pollutant(s) which cause Pass Through or Interference."  40 C.F.R. § 403.5(a); GA. COMP. R. & REGS. §§ 391-3-6-0(8)(3)(a)(2).

125.   Dalton Utilities has enacted Sewer Use Rules and Regulations ("SURR"), which incorporate federal and state pretreatment standards for discharges of industrial wastes into the Dalton POTW, so that Defendant Dalton Utilities can

"comply with all State and Federal laws, including the Clean Water Act, the General Pretreatment Regulations, the Georgia Water Quality Control Act, and Georgia Department of Natural Resources Rules."

126.   A citizen suit may be brought for violations of pretreatment standards under Section 307 of the CWA, including violations of local limits like the SURR. 33 U.S.C. § 1365(f).

127.   Section 2.4.1 of the SURR provides that "No User shall contribute or cause to be contributed directly or indirectly to the POTW any Pollutant or Wastewater that causes Pass Through or Interference." Section 1.4 of the SURR defines "Pass Through" as:

> A discharge that exits any point from the Wastewater Treatment Plants into the waters of the State of Georgia containing quantities or concentrations, which, alone, or in conjunction with a discharge or discharges from other sources, are a cause of a violation of any requirement of Dalton Utilities' LAS Permit including an increase in the magnitude or duration of a violation.

128.   Sampling of Defendant DWSWA's industrial discharge to the Dalton POTW on June 21, 2016 showed the presence of numerous PFAS at dangerously high levels: PFPA (780 ppt); PFBA (6,000 ppt); PFHpA (4,200 ppt); PFNA (200 ppt); PFOA (4,500 ppt); PFOS (170 ppt); PFDA (100 ppt); PFHxS (450 ppt); and PFHxA (10,000 ppt).

129.   Since at least June of 2015, and on at least the dates specified in Paragraph 125 above and the June Notice attached hereto as Exhibit "B" and incorporated by reference herein, the DWSWA has violated Section 2.4.1 of the SURR and Section 307(d) of the CWA, 33 U.S.C. § 1317(d), by discharging PFAS into the Dalton POTW where these chemicals Pass Through and are discharged into the Conasauga River or its tributaries, causing violations of Dalton Utilities' LAS permit.  These discharges of PFAS by Defendant DWSWA to the Dalton POTW are ongoing and/or are likely to recur into the future.

130.   On the same dates referenced in Paragraph 128 above, as set out in the August Notice attached hereto as Exhibit "D" and incorporated by reference herein, DWSWA has violated 40 C.F.R. § 403.5(a) and Section 307(d) of the CWA, 33 U.S.C. § 1317(d), by discharging PFAS into the Dalton POTW where these chemicals Pass Through and are discharged into the Conasauga River or its tributaries along with stormwater. These non-stormwater discharges of industrial/process wastewater containing PFAS, which are ongoing and/or likely to recur into the future, have caused violations of Part 1.1.4 of Dalton Utilities' NPDES Permit, which prohibits such "non-stormwater" discharges.

131.   Defendant DWSWA should be subject to an enforcement order or injunction ordering Defendant DWSWA to cease its violations of pretreatment requirements and standards.

132.   Defendant DWSWA should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

133.   For the purpose of assessing the maximum civil penalty for which Defendant DWSWA is liable, each instance of Defendant DWSWA's violation of pretreatment requirements and standards constitutes a separate violation of Section 307(d) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Third Amended Complaint.

## CLASS ALLEGATIONS

134.   Plaintiff incorporates by reference paragraphs 1 through 130 as if restated herein.

135.   Plaintiff brings this action pursuant to the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as a Class Action on his own behalf and on behalf of all other persons similarly situated.   This action satisfies the

numerosity, commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

136.   Plaintiff and the Proposed Class Members are water subscribers and ratepayers with the RWSD and/or the FCWD who have been in the past, and will be in the future, harmed, injured, and damaged through the contamination of their drinking water with PFAS and the payment of surcharges to recoup the costs of removing this contamination.

137.   Plaintiff brings this Class action on behalf of a proposed Class as set forth below:

**All water subscribers (ratepayers) with the Rome Water and Sewer Division and/or the Floyd County Water Department.**

138.   Excluded from the proposed Class are:

a.      Defendants, their employees, and any entities in which Defendants have a controlling interest;

b.      Any of the legal representatives, heirs, successors, or assigns of Defendants;

c.      The Judge to whom this case is assigned and any Member of the Judge's immediate family and any other judicial officer assigned to this case;

d.      Any attorneys, or their immediate family, representing the Plaintiff or Members of the proposed Class; and

e.      All persons or entities that properly execute and timely file a request for exclusion from the Proposed Class.

139.   Plaintiff reserves the right to modify or amend the definition of the Proposed Class if, prior to the Court's determination on whether certification is appropriate, discovery and further information reveals that the Class should be modified or amended in any way.

## Numerosity

140.   The Proposed Class Members are so numerous that separate joinder of each Member is impractical. Although the exact number of proposed Class Members will be established after Class notification, upon information and belief, the number of proposed Class Members probably exceeds 30,000 people. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

141.   Putative Class Members are readily identifiable through records of the RWSD and FCWD and through publicly available property records and may be given any required notices by regular mail, supplemented, if necessary and required by the Court, by published notice.

## Typicality

142.   Plaintiff's claims are typical of the claims to be advanced by Members of the Class, and their claims encompass those of the other Class Members, in that the facts and circumstances giving rise to liability are the same, the claims are based

on the same legal theories, and the damages suffered by Plaintiff are the same kinds of damages suffered by Members of the Class.

## Adequate Representation

143.   Plaintiff will fairly and adequately protect and represent the interests of each Proposed Class Member, as their interests do not conflict, their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories, they are members of the same communities, they are similarly damaged and are seeking the same remedies, and they intend to prosecute this action vigorously.

144.   Plaintiff has retained counsel competent and experienced in complex Class action and toxic tort litigation, including actions like this one.  Plaintiff's counsel also intend to prosecute this action vigorously.

## Predominance of Common Questions of Law and Fact

145.   Common questions of fact and law among the Representative Plaintiffs and Proposed Class Members predominate over questions affecting only individual Class Members. There are numerous questions of law and fact common to the Class, including:

(a)   The factual history of the use, development, and distribution of PFAS and related chemicals manufactured and used by the Defendants at their Rome, Georgia, and Floyd County facilities;

(b)     When the Defendants knew of the harmful effects of PFAS and related chemicals;

(c)     Whether the Defendants failed to disclose the harmful effects of PFAS and related chemicals being released from their plants in Rome, Georgia, and Floyd County;

(d)     The extent of the contamination at the Defendants' plant sites in Dalton, Georgia, and the migration of that contamination into the Conasauga, Oostanaula, and Coosa Rivers;

(e)     Whether the water supplied to Plaintiff and the Proposed Class Members has been and continues to be contaminated with PFAS and related chemicals;

(f)     Whether Plaintiff and the Proposed Class Members paid more for their contaminated water than they should have;

(g)     Whether the Defendants' conduct was intentional, willful, wanton, reckless, and negligent, and constitutes a nuisance;

(h)     Whether the Plaintiff and the Proposed Class Members should be awarded their reasonable attorney's fees and expenses of litigation;

(i)     Whether punitive damages should be imposed on the Defendants in an amount sufficient to punish, penalize, or deter their intentional, willful, wanton, and reckless, malicious, and oppressive acts and omissions that have created and maintained a continuing public nuisance.

(j)     The necessary remedial actions to abate the claimed nuisance and clean Defendants' chemicals from the Plaintiff's and the Proposed Class Members' water supplies and properties;

(k)     Whether and to what extent injunctive relief is appropriate to require Defendants to abate the claimed nuisance and prevent Defendants' chemicals from invading the Plaintiff's and the Proposed Class Members' water supplies and properties.

146.   The questions of law and fact common to Proposed Class Members predominate over any questions affecting only individual Members, and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual Proposed Class Members would create a risk of (a) inconsistent or varying adjudications with respect to individual Proposed Class Members, which would establish incompatible standards of conduct for the Defendants and/or (b) adjudications with respect to individual Proposed Class Members which would as a practical matter be dispositive of the Members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## Fed. R. Civ. P. 23(a) and 23(b)(2) Injunctive or Declaratory Relief

147.   In addition to the above, Plaintiff brings this Class action under Fed. R. Civ. P. 23(a) and 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to all Members of the proposed Class, making final declaratory and injunctive relief appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to an injunction to require remediation of the PFAS contaminated LAS, including contaminated soils and the groundwater aquifer beneath the LAS.

148.   Common questions of fact and law among the Representative Plaintiffs and Proposed Class Members predominate over questions affecting only individual Class Members. Some of the common issues are set forth in Paragraph 139 above.

## Superiority

149.   Additionally, Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. Certification would be proper in that, among other things: there is no interest by Proposed Class Members in individually controlling the prosecution of separate actions; the expense of prosecuting individual claims for the matters for which Class certification is sought would be prohibitive in light of the typical claimant's injuries; neither Plaintiff nor Members of the proposed Class have filed or are parties to any litigation in which the legal and factual issues raised herein are to be adjudicated; and it is desirable to concentrate the litigation of claims in a single proceeding so as to avoid unnecessary and expensive duplication of actions and to provide for judicial economy. Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

150.   Class action treatment is preferable to other available methods in providing a fair and efficient method for the adjudication of the controversy described herein, which has affected a large number of persons. The Class action

provides an effective method whereby the enforcement of the rights of the Plaintiffs can be fairly managed without unnecessary expense or duplication.

## COUNT THREE:
## WILLFUL, WANTON, RECKLESS, OR NEGLIGENT MISCONDUCT
### (All Defendants Except Dalton Utilities)

151. Plaintiff and Proposed Class Members incorporate by reference paragraphs 1 through 150 as if restated herein.

152. As manufacturers, distributors, suppliers, handlers, transporters, users and/or dischargers of PFAS, Defendants owed a duty to Plaintiff and Proposed Class Members and any other persons who might be foreseeably harmed  to exercise due and reasonable care to prevent the discharge of toxic PFAS chemicals into waters of the State and waters of the United States, and the Conasauga and Oostanaula Rivers in particular, thereby contaminating the RWSD and FCWD water supply.

153. Plaintiff and Proposed Class Members have a reasonable expectation that Defendants will not contaminate surface waters or their domestic water supplies with PFAS.

154. Defendants knowingly breached this duty owed to Plaintiff and Proposed Class Members, and under the circumstances, Defendants' breach constitutes willful, wanton, reckless, and/or negligent misconduct.

155.   Defendants knew or should have known that their discharge of toxic PFAS chemicals would result in contaminated surface waters, primarily the Conasauga and Oostanaula Rivers, and domestic water supplies thereby endangering human health and the environment.

156.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff and Proposed Class Members who are owners and occupants of residential real property and water subscribers/ratepayers with the RWSD and/or the FCWD have been caused to suffer, and will continue to suffer damage to property and losses for the surcharges incurred as ratepayers for the costs of filtering PFAS from their drinking water and other damages to be proved trial.

## COUNT FOUR:
## NEGLIGENCE PER SE
### (All Defendants Except Dalton Utilities, 3M, DuPont, & Chemours)

157.   Plaintiff and Proposed Class Members incorporate by reference paragraphs 1 through 156 as if restated herein.

158.   Defendants owed a duty to Plaintiff and Proposed Class Members under Sections 301(a) and 307(d) of the CWA, 33 U.S.C. §§ 1311(a) and 1317(d), to not discharge pollutants into waters of the United States without a valid permit and to

operate their facilities in such a manner as to ensure their industrial discharges into the Dalton POTW did not cause Pass Through or Interference.

159.   Defendants owed duties to Plaintiff and Proposed Class Members under the Georgia Water Quality Control Act ("GWQCA"), O.C.G.A. §§ 12-5-20, *et seq.*, and its implementing regulations to, among other things: not use any waters of the State for the disposal of sewage, industrial wastes, or other wastes, O.C.G.A. § 12-5-29(a); to obtain an NPDES permit for a facility of any type that will result in the discharge of pollutants into waters of the State, O.C.G.A. § 12-5-30; to immediately notify EPD of the location and nature of PFAS discharges into waters of the State and immediately take all reasonable steps to prevent injury to the health or property of downstream users of waters of the State, O.C.G.A. § 12-5-30.4; keep waters of the State free from "industrial wastes or other discharges in amounts sufficient to … interfere with the designated use of the water body," Ga. Comp. R. & Regs. § 391-3-6-.03(5)(b); keep waters of the State free from "industrial or other discharges which … interfere with the designated use of the water body," *id.* at § 391-3-6-.03(5)(c); and to keep waters of the State free from "toxic … substances discharged from … industries or other sources … in amounts, concentrations or combinations which are harmful to humans, animals or aquatic life[.]" *Id*. at § 391-3-6-.03(5)(e).

160.   Plaintiff and Proposed Class Members are within the class of persons that the CWA and the GWQCA and its implanting regulations were designed to protect, and the harm sustained is the type of harm that these statutes and regulations are designed to prevent.

161.   Defendants breached these duties owed to Plaintiff and Proposed Class Members, and pursuant to O.C.G.A. § 51-1-6, under the circumstances, Defendants' breaches constitute negligence per se.

162.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Plaintiff and Proposed Class Members who are owners and occupants of residential real property and water subscribers/ratepayers with the RWSD and/or the FCWD have been caused to suffer, and will continue to suffer damage to property and losses for the surcharges incurred as ratepayers for the costs of filtering PFAS from their drinking water and other damages to be proved trial.

## COUNT FIVE:
## PUNITIVE DAMAGES
### (All Defendants Except Dalton Utilities)

163.   Plaintiff and Proposed Class Members incorporate by reference paragraphs 1- 162 as if restated herein.

164.   As manufacturers, distributors, suppliers, handlers, transporters, users and/or dischargers of PFAS, Defendants owed a duty to Plaintiff and Proposed Class Members and any other persons who might be foreseeably harmed to exercise due and reasonable care to prevent the discharge of toxic PFAS chemicals into waters of the State and the United States thereby contaminating the RWSD and FCWD water supply.

165.   Plaintiff and Proposed Class Members have a reasonable expectation that Defendants will not contaminate surface waters or their domestic water supplies with PFAS.

166.   In breaching these duties and performing the other tortious acts and omissions described above, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

167.   Defendants knew or should have known that their discharge of toxic PFAS chemicals would result in contaminated surface waters and domestic water supplies thereby endangering human health and the environment.

168.   Defendants acted, or failed to act, with the specific intent to cause harm, and did, and continue to, cause harm and injury to the Plaintiff and Proposed Class Members.

169.   Defendants acted, or failed to act, knowingly and willfully with conscious disregard and indifference to the rights and safety of others with knowledge that the actions and inactions would cause injury ad harm to the Plaintiff and Proposed Class Members.

170.   Punitive damages should be imposed on Defendants in an amount sufficient to punish, penalize and deter them from repeating such wrongful conduct.

171.   Because the Defendants have acted in bad faith in the underlying transactions or occurrences, have been stubbornly litigious, and have put the Plaintiff and Proposed Class Members to unnecessary trouble and expense, they are subject to liability for reasonable attorney's fees and expenses of litigation as a part of damages recoverable by the Plaintiff and Proposed Class Members.

## COUNT SIX:
## PUBLIC NUISANCE

172.   Plaintiff and Proposed Class Members incorporate by reference paragraphs 1- 171 as if restated herein.

173.   Plaintiff and Proposed Class Members own and occupy residential properties supplied with drinking water by the RWSD and/or the FCWD and are forced to pay surcharges that allow the City to filter PFAS from the water supply.

174.   Defendants have created a continuous, public nuisance by their discharge of PFAS including, but not limited to PFOA, PFOS, and related chemicals

into the Conasauga, Oostanaula, and Coosa Rivers and related tributaries and watersheds, which has caused, and continues to cause, contamination of these waters and Plaintiff's and Proposed Class Members' water supplies, thereby proximately causing the public and Plaintiff and Proposed Class Members past, present, and future harm, injury, inconvenience, and increased water rates and surcharges.

175.   As set out in the June and August Notices attached hereto as Exs. "A" and "C" and incorporated by reference herein, and in Paragraphs 95 and 96, Defendant Dalton Utilities has, since as early as 2006, and every day since at least of June of 2015, discharged PFAS from the LAS into the Conasauga River and its tributaries, and has also discharged raw sewage containing PFAS from its collection system into these waters on numerous occasions. Defendant Dalton Utilities has long known of these dangerous discharges of toxic chemicals, yet has taken no action whatsoever to address them but instead has continued to operate and maintain the Dalton POTW and the LAS in a manner where PFAS cannot be treated or removed, allowing these illegal discharges to be continuous and ongoing. As a result, Defendant Dalton Utilities has created and maintained a public nuisance and should be subject to the injunctive relief requested in Count Seven of this Third Amended Complaint.

176.   The PFAS contamination caused by the Defendants has unreasonably interfered, and continues to interfere, with a right common to the general public— i.e., safe drinking water—and has unreasonably interfered, and continues to interfere, with public health.

177.   All who come into contact with the PFAS released and discharged by Defendants are hurt, inconvenienced, or damaged by, among other things, being exposed to the harmful effects of PFAS. The harm caused by Defendants' conduct is not fanciful, or such as would affect only one of fastidious taste; rather, Defendants' conduct is such that it affects all ordinary, reasonable persons who purchase, use, or otherwise come into contact with the PFAS contaminated water. *See* O.C.G.A. § 41-1-1.

178.   The levels of toxic chemical contamination found in the RWSD and/or the FCWD water supply, directly caused by the Defendants' pollution, has created a condition that has threatened, and continues to threaten, the health and well-being of the Plaintiff, and Proposed Class Members, and everyone who consumes PFAS contaminated drinking water supplied by the RWSD and/or the FCWD. This ingestion of PFAS causes concern, inconvenience, and harm to the Plaintiff, Proposed Class Members, and everyone who consumes drinking water supplied by the RWSD and/or the FCWD —as it would to any other person. It was reasonably

foreseeable, and in fact known to the Defendants, that their actions would cause interference with the property rights of Plaintiff and Proposed Class Members and would place, have placed, and continue to place, them at increased risk of physical harm, as well as cause them to incur additional, otherwise unnecessary expense to acquire drinking water for themselves and their families.

179.   Plaintiff and Proposed Class Members have suffered, and will continue to suffer, special damages from Defendants' discharge of PFAS into the Conasauga River, because Plaintiff and Proposed Class Members consume and have consumed drinking water provided by the RWSD and/or FCWD and must also pay the added costs of attempting to remove the PFAS contamination by way of increased rates and surcharges they incur as ratepayers.

180.   The nuisance created by Defendants' wrongful conduct is continuing, because Defendants' discharges and releases of PFAS into the Conasauga River are continuing. In addition, the past discharges of PFAS and have caused contamination of sediments in the river, which provide a continuing source of contamination of the water.

181.   As a result of the public nuisance caused by Defendants, Plaintiff and Proposed Class Members, who are owners and occupants of residential real property and ratepayers with the RWSD and/or the FCWD, have been caused to suffer, and

will continue to suffer, losses for the increased rates and surcharges incurred as ratepayers for the costs of filtering PFAS from their drinking water, and other damages to be proved at trial.

182.   As a result of the public nuisance caused by Defendants, Plaintiff and Proposed Class Members have been caused to suffer, and will continue to suffer, economic damage caused by Defendants' actions/inactions, including their role in the toxic PFAS contamination of the public drinking water.

**COUNT SEVEN:**
**CLAIMS FOR ABATEMENT**
**AND INJUNCTION OF PUBLIC NUISANCE**

183.   Plaintiff and Proposed Class Members incorporate paragraphs 1 through 182 as if restated herein.

184.   Pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2, Plaintiff and Proposed Class Members have the right to bring an action to abate the nuisance caused by Defendants' manufacture, supply, and discharge of PFOA, PFOS, and related chemicals, which has caused and continues to cause contamination of their water supply.

185.   In addition to their claims for damages, Plaintiff and Proposed Class Members are entitled to an injunction to abate the nuisance created and maintained by Defendants.

186.   Plaintiff and Proposed Class Members request this Court to issue an order and decree requiring Defendants to remove their chemicals and toxins from the water supplies of Plaintiff and Proposed Class Members and/or fund the measures necessary to prevent these chemicals and toxins from continuing to contaminate Plaintiff's and Proposed Class Members' water supply, based on the continuing irreparable injury to them posed by the continuing nuisance, for which there is no adequate remedy at law.

187.   Plaintiff and Proposed Class Members further request that this Court enter an order and decree permanently enjoining Defendants from continuing the conduct described herein, and requiring Defendants to take all steps necessary to remove their chemicals from Plaintiff's and Proposed Class Members' water supplies and properties.

188.   There is continuing irreparable injury to Plaintiff and Proposed Class Members—and, indeed, all consumers of drinking water supplied by the RWSD and/or the FCWD—if an injunction does not issue, as Defendants' PFAS in Rome's water supplies pose a continuing threat, and there is no adequate remedy at law.

**WHEREFORE,** Plaintiff and Proposed Class Members demand trial by jury, and respectfully request that the Court grant the following relief:

(a)    Enter a declaratory judgment that Defendant Dalton Utilities has violated and is in violation of the CWA, 33 U.S.C. § 1311;

(b)    Order or Enjoin Defendant Dalton Utilities to cease and abate the discharge of pollutants from the LAS into waters of the United States without an NPDES permit, including the full remediation and elimination of the LAS and construction of a wastewater treatment facility that is capable of removing all PFAS from wastewater discharged into the Dalton POTW prior to release into the Conasauga River or its tributaries;

(c)    Order or Enjoin Defendant Dalton Utilities to cease and abate the discharge of pollutants from its wastewater collection system into waters of the United States without an NPDES permit;

(d)    Enter an enforcement order or an injunction under the CWA ordering Defendant Dalton Utilities to fully investigate and remediate the PFAS contamination in and around the LAS, including in soils and sediments, as well as the groundwater aquifer beneath the LAS;

(e)    Enter a declaratory judgment that Defendant DWSWA has violated and is in violation of the CWA, 33 U.S.C. §§ 1311 and 1317;

(f)     Order or Enjoin Defendant DWSWA to cease discharge of wastewater containing PFAS into the Dalton POTW in violation of industrial pretreatment requirements and standards, including federal prohibitions and Dalton Utilities' Sewer Use Rules and Regulations;

(g)     Order Defendants Dalton Utilities and DWSWA to pay civil penalties of up to fifty-five thousand eight hundred dollars  ($55,800) per day for each day of each violation of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a);

(h)     Award Plaintiff his costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d);

(i)     That this case be certified as a Class action as proposed, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(j)     Enter a judgment and decree against all Defendants enjoining them from maintaining the nuisance they have cased, created, and maintained;

(k)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(l)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to cease the discharge or release of any kind of PFAS

chemicals into rivers, streams, and/or tributaries where they contaminate the RWSD's and FCWD's water system and the water supplies of Plaintiff and the Proposed Class Members;

(m)   Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFAS chemicals from the RWSD and FCWD water system and the water supplies of Plaintiff and the Proposed Class Members;

(n)   Enter a judgment and decree against all Defendants, jointly and severally, requiring them to prevent any kind of PFAS chemicals from being released into rivers, streams, and tributaries where they contaminate the RWSD's and FCWD's water system and the water supplies of Plaintiff and the Proposed Class Members;

(o)   Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows them to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, if applicable, in an amount sufficient to punish and penalize them, and deter them from repeating their wrongful conduct, and all costs; and

(p)    Award such other relief and further relief as this Court deems just, proper, and equitable.

Respectfully submitted,

*Attorneys for Plaintiffs:*

**DAVIS & WHITLOCK, P.C.**

By: **/s/ James S. Whitlock**
James S. Whitlock
N.C. Bar No. 34304  (*pro hac vice*)
By: **/s/ Gary A. Davis**
Gary A. Davis
N.C. Bar No. 25976 (*pro hac vice*)

21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Phone: 828-622-0044
Fax: 828-398-0435
G. Davis email: gadavis@enviroattorney.com
J. Whitlock email: jwhitlock@enviroattorney.com

**THE STONE LAW GROUP –
TRIAL LAWYERS, LLC**
Ryals D. Stone
William S. Stone

5229 Roswell Road NE
Atlanta, Georgia 30342
Phone:      404-239-0305
Fax:   404-445-8003
R. Stone email:  ryals@stonelaw.com
B. Stone email:  billstone@stonelaw.com

**CORY WATSON, P.C.**
Hirlye R. "Ryan" Lutz, III
F. Jerome Tapley
Brett C. Thompson

2131 Magnolia Avenue South
Birmingham, AL 35205
Phone: 205-328-2200
Fax:    205-324-7896
R. Lutz email: rlutz@corywatson.com
J. Tapley email: jtapley@corywatson.com
B. Thompson email: bthompson@corywatson.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Norther District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **THIRD AMENDED INDVIDUAL AND CLASS ACTION COMPLAINT** has been filed electronically with the Clerk of Court by using the CM/ECF system which will automatically email all counsel of record.

This the 14th day of December, 2020.

*/s/ James S. Whitlock*
James S. Whitlock
N.C. Bar No. 34304  (*pro hac vice*)