IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| JARROD JOHNSON, individually, and on Behalf of a Class of persons similarly situated, | ) ) ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 4:20-cv-0008-AT |
| 3M COMPANY; ALADDIN | ) | |
| MANUFACTURING CORPORATION; | ) | TRIAL BY JURY REQUESTED |
| AMERICHEM, INC.; ARROWSTAR, | ) | |
| LLC; CHEM-TECH FINISHERS, INC.; | ) | |
| COLOR EXPRESS, INC.; COLUMBIA | ) | |
| RECYCLING CORP.; CYCLE TEX, | ) | |
| INC.; DAIKIN AMERICA, INC.; THE | ) | |
| CITY OF DALTON, GEORGIA, acting | ) | |
| through its BOARD OF WATER, | ) | |
| LIGHT AND SINKING FUND | ) | |
| COMMISSIONERS, d/b/a DALTON | ) | |
| UTILITIES; DALTON/WHITFIELD | ) | |
| REGIONAL SOLID WASTE | ) | |
| AUTHORITY; DYSTAR, LP; E.I. DU | ) | |
| PONT DE NEMOURS AND | ) | |
| COMPANY; ENGINEERED FLOORS, | ) | |
| LLC; FIBRO CHEM, LLC; GREEN | ) | |
| VULTURE, LLC; IMACC | ) | |
| CORPORATION; INV | ) | |
| PERFORMANCE SURFACES, LLC; | ) | |
| J&S RUG COMPANY, INC. D/B/A | ) | |
| LOG CABIN COMPANY; JB NSD, | ) | |
| INC.; MFG CHEMICAL, LLC; | ) | |
| MILLIKEN & COMPANY; MOHAWK | ) | |
| CARPET, LLC; MOHAWK | ) | |
| INDUSTRIES, INC.; ORIENTAL | ) | |
| WEAVERS, USA, INC.; | ) | |
| POLYVENTIVE, LLC; SECOA | ) | |

TECHNOLOGY, LLC; SHAW   )
INDUSTRIES, INC.; SHAW   )
INDUSTRIES GROUP, INC.;   )
TARKETT USA, INC.; THE   )
CHEMOURS COMPANY; and THE )
DIXIE GROUP, INC.,    )
           )
  *Defendants.*      )

## ANSWER OF THE DIXIE GROUP, INC. TO PLAINTIFFS' FOURTH AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT

COMES NOW Defendant The Dixie Group, Inc. ("Dixie") and submits this Answer to the Fourth Amended Complaint filed by Plaintiff Jarrod Johnson ("Plaintiff").

### FIRST DEFENSE

Plaintiff's claims against Dixie are barred, in whole or in part, because they fail to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiff's claims are barred by the doctrines of waiver, estoppel, laches, unclean hands, and other principles of equity.

### THIRD DEFENSE

Plaintiff's claims fail, in whole or in part, because neither Plaintiff's person nor property has been damaged, and because they are barred under the economic injury-loss doctrine.

2

## FOURTH DEFENSE

Dixie asserts the defense of comparative negligence based on the actions of Plaintiff, the other Defendants, and parties yet to be named or identified.

## FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's own conduct.

## SIXTH DEFENSE

Dixie denies it has caused any harm to Plaintiff whatsoever.

## SEVENTH DEFENSE

Dixie denies it has discharged any per- or polyfluoroalkyl substances or any other chemicals into any water source that has caused any harm to Plaintiff.

## EIGHTH DEFENSE

Dixie denies it has caused any harmful and/or illegal contamination of Plaintiff's water supply.

## NINTH DEFENSE

Dixie denies that it has placed Plaintiff at risk of harm and alleges that any such alleged risk was reasonably foreseeable by Plaintiff.

## TENTH DEFENSE

Dixie has always exercised due and reasonable care in its manufacturing operations in all ways relevant to this lawsuit and has complied with all state and

federal laws. Dixie has also never acted in a negligent, wanton, willful, and/or reckless manner with regard to any matter relevant to this lawsuit.

## ELEVENTH DEFENSE

Any alleged harm to Plaintiff was caused by reasons that were unknown and/or not reasonably foreseeable by Dixie.

## TWELFTH DEFENSE

Plaintiff's claims and alleged damages are barred, in whole or in part, by the applicable statutes of limitations and statutes of repose.

## THIRTEENTH DEFENSE

Plaintiff failed to mitigate properly and reasonably any damages he claims to have suffered.

## FOURTEENTH DEFENSE

Any loss or damage shown to have been incurred by Plaintiff was not the proximate result of any actionable conduct on the part of Dixie, nor was any loss, if shown, caused in fact by any act or conduct of Dixie. Any damages allegedly sustained by Plaintiff were caused by the acts, omissions, or conduct of others over whom Dixie has no control, and for whom Dixie is not liable.

## FIFTEENTH DEFENSE

Dixie asserts the affirmative defense of assumption of risk.

## SIXTEENTH DEFENSE

Plaintiff's damages, if any, and/or any damages assessed against Dixie, if any, must be reduced by any amount received by Plaintiff in settlement of related claims with other parties, so as to prevent unjust enrichment and double recovery.

## SEVENTEENTH DEFENSE

Dixie denies each and every allegation, claim, and thing contained in the Fourth Amended Complaint, except as expressly admitted, qualified, or explained herein.

## EIGHTEENTH DEFENSE

Plaintiff is not entitled to any damages from or any injunctive relief from Dixie.

## NINETEENTH DEFENSE

Plaintiff's claims fail, in whole or in part, to the extent they are preempted and/or barred by the Clean Water Act (also known as the Federal Water Pollution Prevention and Control Act) (33 U.S.C. § 1251, *et seq.*), the Safe Drinking Water Act (42 U.S.C. § 300f, *et seq.*), or other federal law or interstate law.

## TWENTIETH DEFENSE

Plaintiff has failed to exhaust its administrative remedies and provide notice as required to assert federal claims under any applicable statute.

20798687v1

## TWENTY-FIRST DEFENSE

Dixie did not violate any duty of care it may have had to Plaintiff.

## TWENTY-SECOND DEFENSE

Plaintiff's claims against Dixie are barred, in whole or in part, because Plaintiff has failed to include a necessary or indispensable party or parties to this litigation, including without limitation parties from other industries that use or otherwise handle per- or polyfluoroalkyl substances and may have contributed to the presence of such substances in the bodies of water relevant to this lawsuit.

## TWENTY-THIRD DEFENSE

Pursuant to O.G.C.A. § 51-12-33 and/or applicable law, Dixie will seek to attribute fault to parties and non-parties and to have the jury allocate such fault for purposes of apportioning damages, if any, among the Defendants who remain at verdict in this case, other former parties, and non-parties or other entities. Specifically, Dixie states that alleged fault on its part, if any, is minimal compared to the other parties to this case, the suppliers of the products and chemicals at issue that allegedly contain per- or polyfluoroalkyl substances, and the entities involved in the wide variety of other industries that use per- or polyfluoroalkyl substances, including but not limited to the manufacturers, distributors, others in the chain of commerce, and end users that cause or contribute to causing per- or polyfluoroalkyl substances to enter the waterways that Plaintiff uses as raw water sources, whether

6

or not related to the carpet industry. Dixie reserves the right to make determinations of fault through discovery of this lawsuit and to amend its Answer accordingly or file a notice of non-party fault.

## TWENTY-FOURTH DEFENSE

Dixie is not a joint tortfeasor with any other Defendant and cannot be jointly and severally liable for any alleged harm not caused or contributed to by Dixie.

## TWENTY-FIFTH DEFENSE

Plaintiff is not entitled to fees and expenses of litigation under any applicable law or any other source.

## TWENTY-SIXTH DEFENSE

Plaintiff is not entitled to punitive damages because Plaintiff is not entitled to recover against Dixie in tort or otherwise, because Dixie has not acted in a wanton, willful, reckless, or negligent manner, and because the imposition of any such award would constitute a violation of the Georgia Constitution and the United States Constitution, including but not limited to each Constitution's Due Process Clause, Equal Protection Clause, and/or the right to equal protection under the law.

## TWENTY-SEVENTH DEFENSE

Plaintiff's claim for punitive damages is subject to the limitations, cap, and protections under O.C.G.A. § 51-12-1, *et. seq.* and other applicable law.

## TWENTY-EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because any alleged damage was caused by an intervening cause.

## TWENTY-NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks standing to bring those claims and/or recover for the damages alleged in the Fourth Amended Complaint under federal and/or state constitutions, statutory law, and common law.

## THIRTIETH DEFENSE

Plaintiff's claims against Dixie are barred, in whole or in part, because Dixie's conduct was in accordance with the applicable standards of care under all laws, regulations, and industry practice. Dixie acted in a reasonable manner and in good faith.

## THIRTY-FIRST DEFENSE

Plaintiff's claims against Dixie are barred, in whole or in part, because Dixie owes no duty to Plaintiff. Even if Dixie owed a duty to Plaintiff, that duty was not breached by Dixie.

## THIRTY-SECOND DEFENSE

Plaintiff's claims against Dixie are barred because Dixie does not manufacture or use any per- or polyfluoroalkyl substances or any other chemicals in the manner set forth in the Fourth Amended Complaint.

## THIRTY-THIRD DEFENSE

Plaintiff's claims for nuisance against Dixie are barred because Dixie did not conduct itself in an illegal manner, and instead, conducted itself in a lawful and proper manner.

## THIRTY-FOURTH DEFENSE

Plaintiff's claims for nuisance against Dixie are barred because Plaintiff cannot show injury, inconvenience, or damage.

## THIRTY-FIFTH DEFENSE

Plaintiff's claims for nuisance against Dixie are barred because Dixie is not liable for the maintenance of a nuisance caused by another.

## THIRTY-SIXTH DEFENSE

Plaintiff's claim for injunctive relief is barred because Plaintiff is not entitled to injunctive relief against Dixie and because Plaintiff cannot show an irreparable injury if an injunction does not issue, a likelihood of success on the merits, or the lack of an adequate remedy of law.

## THIRTY-SEVENTH DEFENSE

Plaintiff's claims against Dixie are barred because Dixie had a legal right to provide industrial wastewater discharge to utility companies and/or other service providers pursuant to permits.

## THIRTY-EIGHTH DEFENSE

Plaintiff has not suffered any compensable injury for which it can seek damages from Dixie.

## THIRTY-NINTH DEFENSE

Dixie asserts the defense of lack of personal jurisdiction and the lack of subject-matter jurisdiction.

## FORTIETH DEFENSE

Plaintiff's claims do not and cannot meet the requirements for class certification under Federal Rule of Civil Procedure 23, O.C.G.A. § 9-11-23, and/or other applicable law.

## FORTY-FIRST DEFENSE

The class action allegations pled in the Fourth Amended Complaint are barred because: (i) there are not sufficiently numerous individuals within the class definition(s); (ii) the named Plaintiff's claims are not typical of claims by the entire class; (iii) the named Plaintiff will not fairly and adequately protect the interests of the purported class; (iv) facts unique to each class member predominate over facts

10

common to the entire class; and (v) a class action is not a superior method for the fair and efficient adjudication of the controversy.

## FORTY-SECOND DEFENSE

The class action allegations in the Fourth Amended Complaint fail because Plaintiff cannot be an adequate representative of the class(es), as defined in the Fourth Amended Complaint, because members of the defined class(es) are subject to unique defenses including, but not limited to, voluntary consent and/or payment.

## FORTY-THIRD DEFENSE

Any adjudication of Plaintiff's claims and those of the purported class members through generalized class-wide proof would violate Dixie's rights to Due Process and Trial by Jury under the United States Constitution and the Georgia Constitution.

## FORTY-FOURTH DEFENSE

Plaintiff fails to specifically state items of special damages sought in this case as required by O.C.G.A. § 9-11-9(g), which renders Plaintiff's claims for such damages to the extent he seeks them, invalid and subject to dismissal.

## FORTY-FIFTH DEFENSE

Dixie adopts and incorporates herein by reference any applicable affirmative defense asserted by any other Defendant in this action.

## FORTY-SIXTH DEFENSE

Dixie reserves the right to amend, add, or assert any additional defenses or affirmative defenses based on facts later discovered, plead, or offered.

## FORTY-SEVENTH DEFENSE

The claims of Plaintiff and the purported class are barred by the Public Services Doctrine.

## FORTY-EIGHTH DEFENSE

The claims of Plaintiff and the purported class are barred by the doctrine of primary jurisdiction.

## FORTY-NINTH DEFENSE

Should this Court find Plaintiff has sustained damages for which Dixie is responsible, which is expressly denied, Dixie is entitled to a set-off for any collateral source payments paid or payable to Plaintiff and/or the purported class.

## FIFTIETH DEFENSE

The damages sought by Plaintiff are too speculative or remote.

## FIFTY-FIRST DEFENSE

Plaintiff uses the terms "Defendants" and "Named and Fictitious Defendants" throughout the Fourth Amended Complaint to refer collectively to all named and hypothetical Defendants, including Dixie. Dixie lacks knowledge or information sufficient to form a belief about the truth of the allegations that pertain to other

12

Defendants and, therefore, such allegations are denied. Subject to and without waiving or in any way limiting the foregoing defenses, Dixie responds to the individually numbered paragraphs contained in the Fourth Amended Complaint only on behalf of itself as follows:

## STATEMENT OF THE CASE

1.      This is an individual action on behalf of Plaintiff Jarrod Johnson, pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1365(a)(1), to address ongoing unlawful pollution of surface waters by discharges of toxic per- and polyfluoroalkyl substances ("PFAS") from Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities") and from industrial users who discharge these chemicals into the Dalton Utilities Publicly Owned Treatment Works ("POTW"). As a result of unauthorized discharges by industrial users, Dalton Utilities has discharged and continues to discharge PFAS from its wastewater collection system and the Riverbend Wastewater Land Application System ("Riverbend LAS" or "LAS") to the Conasauga River and its tributaries without a permit authorizing such discharges in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). One of those industrial users, Defendant Dalton/Whitfield Regional Solid Waste Authority ("DWSWA") has discharged, and continues to discharge, dangerously high levels of PFAS into the Dalton POTW,

13

where these chemicals resist treatment and cause Pass Through resulting in their exit from the Riverbend LAS in violation of Dalton Utilities' Sewer Use Rules and Regulations and Section 307(d) of the Act, 33 U.S.C. § 1317(d). These toxic and persistent chemicals then travel downstream and contaminate the Oostanaula River, the source of the City of Rome, Georgia's domestic water supply, as well as other surface waters within the Upper Coosa River Basin. Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and an award of costs, including attorney and expert witness fees, for these Defendants' repeated and ongoing violation of the CWA.

**ANSWER:** Dixie denies the allegations of Paragraph 1 of the Fourth Amended Complaint to the extent they are directed toward Dixie. Dixie is without sufficient information to admit or deny the allegations of Paragraph 1 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

2.     This is a class action on behalf of individual Plaintiff and Class Representative Jarrod Johnson and a class of people similarly situated under Fed. R. Civ. P. 23 and Georgia law who have been damaged and continue to be damaged due to the intentional, willful, wanton, reckless, and negligent discharge of PFAS from Defendants' manufacturing processes and facilities into the Dalton POTW. By such wrongful acts and omissions, Defendants have created and maintained a

14

continuing public nuisance causing harm and injury to the Plaintiff and the Members of the proposed Class.

**ANSWER:** Dixie denies the allegations of Paragraph 2 of the Fourth Amended Complaint to the extent they are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

3.    Plaintiff and Members of the proposed Class are owners and occupants of property in Rome, Georgia (sometimes referred to herein as "Rome") and Floyd County, Georgia, who are provided domestic water service through the Rome Water and Sewer Division ("RWSD") or the Floyd County Water Department ("FCWD"), which purchases water from the City of Rome. Rome uses a water intake on the Oostanaula River as its primary water source, and the water undergoes treatment at the Bruce Hamler Water Treatment Facility prior to distribution to the public. As a direct and proximate result of the past and present discharges of PFAS by Defendants into the Conasauga River and its tributaries, thereby also impacting the Oostanaula River, Plaintiff and Members of the proposed Class have been, and continue to be, subjected to drinking water contaminated with dangerous levels of PFAS.

20798687v1

**ANSWER:** The allegations of Paragraph 3 of the Fourth Amended Complaint are denied to the extent they are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3 to the extent that are directed toward any other Defendant, and those allegations are therefore denied.

4.      Defendants own and/or operate manufacturing or other facilities related to the carpet industry and have in the past and/or currently use PFAS as part of manufacturing processes or otherwise supply PFAS to Defendants' manufacturing facilities. These carpet manufacturing facilities are upstream of Rome's water intake, in or near the City of Dalton, Georgia. Defendants use PFAS at their manufacturing facilities to impart water, stain, and/or grease resistance to their carpet and other textile products, or otherwise process PFAS at their facilities. Industrial wastewater discharged from Defendants' manufacturing facilities into the City of Dalton's POTW contains high levels of PFAS, which resist degradation during treatment processing at Dalton Utilities' wastewater treatment facilities and thus contaminate the Conasauga River, the Oostanaula River, the Coosa River and other tributaries and watersheds in the Upper Coosa River basin.

**ANSWER:** Dixie denies the allegations of Paragraph 4 of the Fourth Amended Complaint to the extent they are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations

16

of Paragraph 4 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

5.      Defendants' discharges of PFAS have contaminated surface waters in the Upper Coosa River basin, including, but not limited to, the Conasauga River and the Oostanaula River, which is the source the water that supplies Rome's water intake. Defendants' PFAS cannot be removed adequately from the Oostanaula River by the existing and/or emergency water treatment processes and technologies in use at the Bruce Hamler Water Treatment Facility in Rome.

**ANSWER:** Dixie denies the allegations of Paragraph 5 of the Fourth Amended Complaint to the extent they are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5 to the extent they are directed toward any other Defendant, and those allegations are therefore denied. Any remaining allegations of Paragraph 5 are denied.

6.      As a result of the Defendants' intentional, willful, wanton, reckless, and negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff and Proposed Class Members have suffered damages different in kind and degree from the damage suffered by the public in general as a result of Defendants' discharges of toxic chemicals, including compensatory and consequential damages. Plaintiff and Proposed Class Members are also seeking

equitable and injunctive relief to compel the Defendants to remediate and cease the spread of toxic PFAS into the Conasauga and Oostanaula Rivers and their water supplies. In addition, based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiffs are seeking recovery of punitive damages.

**ANSWER:** Dixie denies the allegations of Paragraph 6 of the Fourth Amended Complaint to the extent they are directed toward Dixie and denies Plaintiff is entitled to relief sought in Paragraph 6. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6 to the extent they are directed toward any other Defendant, and those allegations are therefore denied. Any remaining allegations of Paragraph 6 are denied.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the CWA claims set forth in this Amended Complaint pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

**ANSWER:** In response to the allegations of Paragraph 7 of the Fourth Amended Complaint, Dixie admits that jurisdiction is proper in the United States District Court for the Northern District of Georgia. Any inconsistent allegations of Paragraph 7 are denied.

18

8.     Plaintiff has complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff, on June 24, 2020, mailed a notice of intent to file suit under the CWA to Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners and Dalton Utilities, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Georgia Department of Natural Resources' Environmental Protection Division ("EPD"), and the United States Attorney General [("June Notice") Attached hereto as Exhibit "A" and incorporated by reference herein]. On August 4, 2020, Plaintiff mailed an Addendum to the June Notice to the same entities, detailing additional violations of the CWA by Dalton Utilities [("August Notice") Attached hereto as Exhibit "C" and incorporated by reference herein]. On September 3, 2021, Plaintiff mailed a Second Addendum to the June Notice to the same entities, detailing additional violations of the CWA by Dalton Utilities [("September Notice") Attached hereto as Exhibit "E" and incorporated by reference herein]. Plaintiff further, on June 26, 2020, mailed a notice of intent to file suit under the CWA to Defendant Dalton/Whitfield Regional Solid Waste Authority, the Administrator of the EPA, the Regional Administrator of the EPA, the EPD, and the United States Attorney General [("June Notice") Attached hereto as Exhibit "B" and incorporated by reference herein]. On August 17, 2020, Plaintiff mailed a supplemental notice to

19

the same entities, detailing additional violations of the CWA by DWSWA [("August Notice") Attached hereto as Exhibit "D" and incorporated by reference herein]. These Notices complied with 33 U.S.C. § 1365(b)(1)(A) and with 40 C.F.R. Part 135, Subpart A. More than 60 days have passed since these Notices were served on Defendant Dalton Utilities, Defendant DWSWA, and these agencies.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 8 of the Fourth Amended Complaint are legal conclusions, no response is required.  Therefore, the allegations of Paragraph 8 are denied.

9.    Neither EPA nor EPD has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or State to redress the violations of the CWA by Defendant Dalton Utilities or Defendant DWSWA. In addition, neither EPA nor EPD has commenced an administrative civil penalty action under Section 309(g)(6) of the Act, 33 U.S.C. § 1319(g)(6), or under a comparable Georgia law, to redress the violations of the CWA by Dalton Utilities or DWSWA. Even if EPD has commenced an administrative action to address these violations, Georgia's water pollution enforcement scheme is not comparable to the provisions of the CWA. See, e.g., Leakey v. Corridor Materials, LLC, 839 F.Supp.2d 1340, 1350 (M.D. Ga. 2012).

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 9 of the Fourth Amended Complaint are legal conclusions, no response is required. Therefore, the allegations of Paragraph 9 are denied.

10.     Plaintiff has also, pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), served notices of intent to file suit under the CWA, as well as supplemental notices, to other Defendants named herein who have discharged industrial wastewater containing PFAS into the Dalton POTW. Plaintiff is considering whether, after further discovery, to add the CWA claims contained in Count Three of this Fourth Amended Complaint against these Defendants.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 10 of the Fourth Amended Complaint are legal conclusions, no response is required. Therefore, the allegations of Paragraph 10 are denied.

11.     Plaintiff will, immediately upon receipt of a file-stamped copy of this Fourth Amended Complaint, mail a copy to the Administrator of the EPA, the Regional Administrator of the EPA, and the Attorney General of the United States.

20798687v1

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11 of the Fourth Amended Complaint, which allegations are therefore denied.

12.     Venue is appropriate in the Northern District of Georgia, pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations of the Act alleged herein are located within this judicial district.

**ANSWER:** Dixie admits that venue is proper in the Northern District of Georgia but denies the remaining allegations of Paragraph 12 of the Fourth Amended Complaint.

13.     This Court has jurisdiction over the state law claims in this action in accordance with 28 U.S.C. § 1332(d)(2)(A), because it is a class action in which any member of a class of plaintiffs is a citizen of a State different from any Defendant, and the amount in controversy exceeds the sum of five million dollars ($5,000,000), exclusive of interest and costs.

**ANSWER:** Dixie admits that this Court has jurisdiction over Plaintiff's state law claims.  The remaining allegations of Paragraph 13 are denied as stated.

14.     Venue is also properly in this Court pursuant to 28 U.S.C. § 1391(b), because Defendants have conducted substantial business in this District, and Defendants have caused harm to Plaintiff and to Class Members residing in this District. In addition, Plaintiff and Class Members reside in this District, and a

22

substantial part of the events or omissions giving rise to their claims occurred in the Northern District of Georgia.

**ANSWER:** Dixie admits that this Court has jurisdiction over Plaintiff's state law claims.  The remaining allegations of Paragraph 14 are denied as stated.

## PARTIES

15.    Plaintiff Jarrod Johnson is a resident of Floyd County, Georgia and resides at 13 South Ivy Ridge Road, Rome, Georgia 30161. Plaintiff is a customer of the RWSD, which uses water from the Oostanaula River as the source of Plaintiff's domestic water supply, which has been and continues to be contaminated with PFAS discharged from Defendants' carpet manufacturing or related processes, including waste disposal operations, and, ultimately, from Dalton Utilities' Riverbend LAS.

**ANSWER:** Dixie denies the allegations of Paragraph 15 of the Fourth Amended Complaint to the extent they are directed toward Dixie. Dixie is without sufficient knowledge or information to form a belief about the truth of the allegations of Paragraph 15 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

16.    Plaintiff receives his domestic water supply and drinking water from the RWSD, and thus has a particular interest in protecting the water quality of the Conasauga River and its tributaries in and around, and downstream from, the

Riverbend LAS, as well as that of the downstream Oostanaula River. Plaintiff has been, and will continue to be, directly and substantially injured in his use and enjoyment of his property as a direct result of Dalton Utilities and DWSWA's violations of the Act, and the contamination of the Rome water supply in particular. The relief sought in this case would provide redress for Plaintiff's injuries, and because these injuries are being caused by pollution of waters of the United States, the injuries fall within the zone of interests protected by the CWA.

**ANSWER:** Dixie denies the allegations of Paragraph 16 of the Fourth Amended Complaint to the extent they are directed toward Dixie. Dixie is without sufficient knowledge or information to form a belief about the truth of the allegations of Paragraph 16 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

17.     Plaintiff is a "citizen" within the meaning of 33 U.S.C. §§ 1365(g) and 1365(a).

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 17 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 17 of the Fourth Amended Complaint are legal conclusions, no response is required. Therefore, the allegations of Paragraph 17 are denied.

18.     Defendant 3M Company ("3M") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant 3M has for many years manufactured and supplied PFAS to one or more of the Defendants in this action.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18, and those allegations are therefore denied.

19.     Defendant Aladdin Manufacturing Corporation ("Aladdin") is a foreign corporation authorized to do business in the State of Georgia, and, at all times relevant hereto, has conducted business in this District. Defendant Aladdin is the owner and operator of multiple facilities that manufacture carpet and various floor products, including the Mohawk – Antioch Production Facility located at 2001 Antioch Road, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19, and those allegations are therefore denied.

20.     Defendant Americhem, Inc. ("Americhem") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto,

has conducted business within this District. Defendant Americhem is the owner and operator of a carpet and synthetic fibers manufacturing facility located at 1015 Abutment Road, Dalton, Georgia, 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20, and those allegations are therefore denied.

21.    Defendant ArrowStar, LLC ("ArrowStar") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant ArrowStar is the owner and operator of multiple facilities that manufacture, distribute, and sell PFAS, including sales and distribution offices located at 1815 Hamilton Street, Dalton, Georgia and 2890 Five Springs, Road, Dalton, Georgia, and which have sold PFAS to one or more Defendants in this action.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21, and those allegations are therefore denied.

22.    Defendant Chem-Tech Finishers, Inc. ("Chem-Tech") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Chem-Tech is the owner and operator of a carpet dying, drying,

and finishing facility located at 1904 South Hamilton Street, Dalton, Georgia, 30720, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22, and those allegations are therefore denied.

23.     Defendant Color Express, Inc. ("Color Express") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Color Express is the owner and operator of a carpet and rug dyeing facility located at 711 North Glenwood Avenue, Dalton, Georgia, 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23, and those allegations are therefore denied.

24.     Defendant Columbia Recycling Corp. ("Columbia Recycling") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Columbia Recycling is the owner and operator of a carpet fiber recycling facility locate at 1001 Chattanooga Avenue, Dalton, Georgia, 30720,

27

which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24, and those allegations are therefore denied.

25.     Defendant Cycle Tex, Inc. ("Cycle Tex") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Cycle Tex is the owner and operator of a thermoplastics recycling facility located at 111 West Westcott Way, Dalton, Georgia 30720, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

Defendant Daikin America, Inc. ("Daikin") is a foreign corporation that, at all times relevant hereto, has conducted business within this District. Among other acts and omissions, Defendant Daikin has for many years manufactured and supplied PFAS to one or more of the Defendants in this action, including, but not limited to, Defendants Shaw Industries and The Dixie Group.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25 concerning Defendant Cycle Tex, Inc., and those allegations are therefore denied. Upon information and belief, Dixie admits that it previously purchased one or more products from Daikin America, Inc. that contained per- or polyfluoroalkyl substances. Dixie is without

28

knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 25 of the Fourth Amended Complaint, which allegations are therefore denied.

26.     Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities") is a municipal corporation organized under the laws of the State of Georgia, owning and operating a municipal utility whose principal office is located at 1200 V.D. Parrot Jr. Parkway, Dalton, Georgia, 30722-0869. Dalton Utilities operates the Dalton POTW, consisting of various wastewater collection and treatment facilities and the associated 9,800-acre Riverbend Wastewater LAS.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 26 of the Fourth Amended Complaint, which allegations are therefore denied.

27.     Defendant Dalton Utilities is a "person" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 27 of the Fourth Amended Complaint are legal conclusions, no response is required. Therefore, the allegations of Paragraph 28 are denied.

29

28.     Defendant   Dalton/Whitfield   Regional   Solid   Waste   Authority ("DWSWA") is an enterprise fund, with the capacity to sue and be sued, created by the City of Dalton and Whitfield County, Georgia in 1994 to manage the solid waste needs of Dalton – Whitfield County. The DWSWA operates, among other facilities, the Old Dixie Highway Landfill, and a Carpet Landfill, both of which are located at 4189 Old Dixie Highway SE in Dalton, Georgia, 30721. The DWSWA has for many years discharged landfill leachate containing PFAS, which is industrial wastewater, into the Dalton POTW, and in early 2013, the DWSWA installed a forced sewer main to send its landfill leachate directly to the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28 of the Fourth Amended Complaint, which allegations are therefore denied.

29.     Defendant DWSWA is a "person" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 29 of the Fourth Amended Complaint are legal conclusions, no response is required. Therefore, the allegations of Paragraph 29 are denied.

20798687v1

30.    Defendant Dystar, LP ("Dystar") is a foreign limited partnership authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Dystar is the owner and operator of a textile chemical manufacturing facility located at 2474 Abutment Road, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30, and those allegations are therefore denied.

31.    Defendant E.I. du Pont de Nemours and Company ("Dupont") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business in this District. Among other acts and omissions, Defendant DuPont has manufactured and supplied PFAS to one or more of the Defendants in this action.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31, and those allegations are therefore denied.

32.    Defendant Engineered Floors, LLC ("Engineered Floors") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Engineered Floors is the owner and operator

31

of multiple carpet manufacturing and finishing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 32, and those allegations are therefore denied.

33. Defendant Fibro Chem, LLC ("Fibro Chem") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Fibro Chem is the owner and operator of a dye, lubricant, and specialty chemicals formulation and manufacturing facility located at 1521 East Walnut Avenue, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 33, and those allegations are therefore denied.

34. Defendant Green Vulture, LLC ("Green Vulture") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Green Vulture is the owner and operator of a post-consumer carpet recycling and manufacturing facility located at 1205 Royal Drive, Dalton,

32

Georgia 30720, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34, and those allegations are therefore denied.

35.     Defendant IMACC Corporation ("IMACC") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant IMACC is the owner and operator of an industrial plastic recycling and reconditioning facility located at 2303 Dalton Industrial Court, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 35, and those allegations are therefore denied.

36.     Defendant INV Performance Surfaces, LLC ("Invista") is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District, including owning and operating a fiber manufacturing facility located at 745 College Street in Dalton. Defendant Invista, which was formerly owned by DuPont, is the owner of the Stainmaster® brand of carpets, and among other acts and omissions, has for

33

many years manufactured and supplied PFAS to one or more of the Defendants in this action, including, but not limited to, Defendants Shaw Industries and Mohawk Industries, Inc.

**ANSWER:** Upon information and belief, Dixie admits that Invista has previously supplied one or more products that contained per- or polyfluoroalkyl substances to one or more Defendants in this action. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 36, and those allegations are therefore denied.

37.    Defendant JB NSD, Inc. ("JBNSD") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant JBNSD is the owner and operator of a tank washing facility located at 2200 Abutment Road, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37, and those allegations are therefore denied.

38.    Defendant J&S Rug Company, Inc. d/b/a Log Cabin Company ("Log Cabin" or "J&S") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Log Cabin is the owner and operator of a carpet and rug manufacturing facility located at 1001 Poly Pac Drive,

34

Dalton, Georgia, 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 38, and those allegations are therefore denied.

39.    Defendant MFG Chemical, LLC ("MFG") is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant MFG is the owner and operator of three (3) chemical manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39, and those allegations are therefore denied.

40.    Defendant Milliken & Company ("Milliken") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Milliken is the owner and operator of multiple specialty chemicals, floor covering, and textile manufacturing facilities located in and around Dalton, Georgia.

35

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40, and those allegations are therefore denied.

41.     Defendant Mohawk Carpet, LLC ("Mohawk Carpet") is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Mohawk Carpet is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 41, and those allegations are therefore denied.

42.     Defendant Mohawk Industries, Inc. ("Mohawk Industries") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Mohawk Industries is the owner and operator of multiple floor covering and carpet manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

20798687v1

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42, and those allegations are therefore denied.

43.    Defendant Oriental Weavers U.S.A., Inc. ("Oriental") is a domestic corporation that, at all times relevant hereto, has conducted business within this District. Defendant Oriental is the owner and operator of multiple carpet and area rug manufacturing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 43, and those allegations are therefore denied.

44.    Defendant Polyventive LLC ("Polyventive"), formerly named PSG-Functional Materials, LLC, is a foreign limited liability company authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District, including the manufacture and supply of PFAS to one or more of the Defendants in this action. Defendant Polyventive owner and operator of a specialty chemical manufacturing facility located at 1202 Dozier Street, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

20798687v1

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44, and those allegations are therefore denied.

45.    Defendant Secoa Technology, LLC ("Secoa") is a domestic limited liability company that, at all times relevant hereto, has conducted business within this District. Defendant Secoa is the owner and operator of an industrial coatings and metal finishing manufacturing facility located at 1202 Dozier Street, Dalton, Georgia 30721, which has discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45, and those allegations are therefore denied.

46.    Defendant Shaw Industries, Inc. is a domestic corporation and a wholly-owned subsidiary of Shaw Industries Group, Inc. (collectively, "Shaw Industries") and, at all times relevant hereto, has conducted business within this District. Defendant Shaw Industries is the owner and operator of multiple facilities located in and around Dalton, Georgia, which manufacture, coat, and dye carpets, rugs, and other soft surface products and which have discharged industrial wastewater containing PFAS into the Dalton POTW.

38

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46, and those allegations are therefore denied.

47.    Defendant Tarkett USA, Inc. ("Tarkett USA") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, has conducted business within this District. Defendant Tarkett USA is the owner and operator of multiple carpet, fiber, yarn and dye manufacturing, recycling, and finishing facilities located in and around Dalton, Georgia, which have discharged industrial wastewater containing PFAS into the Dalton POTW.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47, and those allegations are therefore denied.

48.    Defendant The Chemours Company ("Chemours") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant Chemours has manufactured and supplied PFAS to one or more of the Defendants in this action.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48, and those allegations are therefore denied.

20798687v1

49.     Defendant The Dixie Group, Inc. ("Dixie") is a foreign corporation authorized to do business in the State of Georgia and, at all times relevant hereto, was conducting business in this District. Defendant Dixie is the owner and operator of carpet and textile manufacturing facilities located in and around Dalton, Georgia.

**ANSWER:** Dixie admits that it is a foreign corporation qualified to do business in the State of Georgia and that it is the owner and operator of carpet manufacturing facilities in Calhoun, Georgia. The reaming allegations of Paragraph 49 of the Fourth Amended Complaint are denied.

## FACTUAL ALLEGATIONS

**Background and Hazards of PFAS**

50.     Over 90% of the world's carpet comes from manufacturing plants in and around Dalton, Georgia—the "Carpet Capital of the World." Most of the Defendants are owners and operators of these carpet manufacturing plants and related facilities, and use and have used PFAS in the manufacturing of carpet and associated processes. Other Defendants are the suppliers of PFAS to these facilities, and Defendants Dalton Utilities and DWSWA receive the PFAS-contaminated waste from the carpet industry in Dalton.

**ANSWER:** Dixie denies the allegations in Paragraph 50 of the Fourth Amended Complaint as stated to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the

40

truth of the remaining allegations of Paragraph 50, and those allegations are therefore denied.

51.    PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable and repel both oil and water and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial and commercial applications, and a large percentage of PFAS produced worldwide are used to treat carpets, rugs, and other home textiles to confer stain, soil, water and/or oil resistance.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 51 of the Fourth Amended Complaint, and those allegations are therefore denied.

52.    The stable carbon-fluorine bonds that make PFAS such pervasive industrial and consumer products also result in their persistence in the environment. There is no known environmental breakdown mechanism for these chemicals, and they are readily absorbed into biota and tend to bioaccumulate with repeated exposure. PFAS leach from soil to groundwater, are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination, and a major source of human exposure to PFAS is through ingestion of contaminated drinking water.

41

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 52 of the Fourth Amended Complaint, and those allegations are therefore denied.

53.     Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS") are the most studied PFAS chemicals and, while they have been largely phased out by industry, they are persistent and still remain in the environment, including at the LAS. PFOA and PFOS have been replaced by substitute PFAS, including Short-Chain PFAS.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 53 of the Fourth Amended Complaint, and those allegations are therefore denied.

54.     When humans ingest PFAS, they bind to plasma proteins in the blood and are readily absorbed by and distributed throughout the body. The liver and kidneys are important binding and processing sites for PFAS, resulting in physiologic changes to these and other organs. Because of strong carbon-fluorine bonds, PFAS are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body. These toxic chemicals accumulate in the body and cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs. For instance, PFOS crosses the placenta in

42

humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 54 of the Fourth Amended Complaint, and those allegations are therefore denied.

55.     The human diseases caused by exposure to PFAS include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The association between exposure to these chemicals and certain cancers has been confirmed by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking certain PFAS to diseases based on its research on the Mid-Ohio Valley population exposed to certain PFAS as a result of releases from an E. I. du Pont de Nemours and Company chemical plant.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 55 of the Fourth Amended Complaint, and those allegations are therefore denied.

56.     The C8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley population. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer, and they further suggest associations with prostate and ovarian cancer and non-Hodgkin's

lymphoma. Rodent studies also support the link with cancer. Most of an EPA Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans." The C8 Science Panel has also found probable links between exposure to certain PFAS and pregnancy-induced hypertension, ulcerative colitis, and high cholesterol.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 56 of the Fourth Amended Complaint, and those allegations are therefore denied.

57.    The International Agency for Research on Cancer ("IARC") has classified PFOA as a possible human carcinogen, and EPA has concluded that there is suggestive evidence of the carcinogenic potential of PFOA in humans.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 57 of the Fourth Amended Complaint, and those allegations are therefore denied.

58.    PFAS immunotoxicity has been demonstrated in a wide variety of species and models, including humans, in recent years. For instance, in 2016, the U.S. Department of Health and Human Service's National Toxicology Program ("NTP"), after conducting a systematic review of the evidence pertaining to PFAS exposure and immune-related health effects, concluded that PFOA and PFOS constitute a hazard to immune system function in humans.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 58 of the Fourth Amended Complaint, and those allegations are therefore denied.

59.    On May 19, 2016, EPA published lifetime Drinking Water Health Advisories for PFOA and PFOS ("May 2016 EPA Health Advisories" or "Health Advisories"). The Health Advisory for PFOA is 0.07 micrograms per liter ("μg/L"), or 70 ppt. The Health Advisory for PFOS is also 0.07 μg/L, or 70 ppt. When both PFOA and PFOS are found in drinking water, the combined concentrations should be compared with the 70 ppt level.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 59 of the Fourth Amended Complaint, and those allegations are therefore denied.

60.    The May 2016 EPA Health Advisories are based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicate that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 60 of the Fourth Amended Complaint, and those allegations are therefore denied.

61.     The May 2016 EPA Health Advisories state that PFOA and PFOS have "extremely high" persistence in the environment and the human body, and that the developing fetus and newborn are "particularly sensitive" to PFOA and PFOS induced toxicity. According to the Health Advisories, a single exposure to a developmental toxin at a critical time can produce a persistent adverse effect that increases with additional exposure.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 61 of the Fourth Amended Complaint, and those allegations are therefore denied.

62.     The Agency for Toxic Substances and Disease Registry ("ATSDR") issued an updated draft Toxicological Profile for Perfluoroalkyls in 2018, which found, inter alia, strong associations between PFAS exposure and several adverse health outcomes, including pregnancy-induced hypertension, liver damage, increased serum lipids, thyroid disease, and immunotoxicity.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 62 of the Fourth Amended Complaint, and those allegations are therefore denied.

46

63.     ATSDR's updated Toxicological Profile significantly lowered minimum risk levels ("MRLs") for both PFOA and PFOS, and using the methods EPA used to develop its May 2016 EPA Health Advisories, these updated MRLs would translate to drinking water health levels of approximately 7 ppt for PFOA and 11 ppt for PFOS.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 63 of the Fourth Amended Complaint, and those allegations are therefore denied.

64.     Based on concerns that EPA's May 2016 EPA Health Advisories are not protective of human health, numerous states have taken action to pursue stricter guidelines for PFAS in drinking water, including: Vermont, which established a health advisory of 20 ppt for any combination of PFOA, PFOS, PFHxS, PFHpA, and PFNA; New Jersey, which established a MCL for PFNA of 13 ppt, and has proposed a MCL for PFOA of 14 ppt and PFOS of 13 ppt; New York, which has recommended adoption of MCLs of 10 ppt for PFOA and PFOS; and Michigan, where a scientific panel has recommended adoption of health advisory for PFOA of 8 ppt and PFOS of 16 ppt.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 64 of the Fourth Amended Complaint, and those allegations are therefore denied.

47

65.     Section 7321 of the National Defense Authorization Act for Fiscal Year 2020 ("NDAA") adds 172 PFAS to the list of toxic chemicals covered by the Toxics Release Inventory ("TRI") under Section 313 of the Emergency Planning and Community Right to Know Act ("EPCRA").

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 65 of the Fourth Amended Complaint, and those allegations are therefore denied.

**Defendants' Knowledge of Toxicity and Persistence of PFAS**

66.     Defendants have long been aware of the persistence and toxicity of PFAS, and PFOA and PFOS in particular. Defendants nonetheless knowingly and intentionally discharged and continue to discharge these chemicals into the Dalton POTW, where they inevitably Pass Through the POTW and are discharged from the Riverbend LAS to the Conasauga River and then travel downstream and contaminate the Oostanaula River, which supplies drinking water to the City of Rome and its water subscribers.

**ANSWER:** Dixie denies the allegations in Paragraph 66 of the Fourth Amended Complaint as stated to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 66 to the extent they are directed to any other Defendant, and those allegations are therefore denied.

48

67.    Defendants that manufacture PFAS have known for at least 40 years that PFAS chemicals persist in the environment and accumulate in the bodies of humans, fish, and animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the Wheeler Dam (26 miles downstream from the 3M plant in Decatur, Alabama) showed that these chemicals bioaccumulate in fish.

**ANSWER:** Dixie denies the allegations in Paragraph 67 of the Fourth Amended Complaint as stated to the extent those allegations are directed toward Dixie. Dixie is without sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 67 to the extent they are directed to any other Defendant, and those allegations are therefore denied.

68.    Defendant 3M has also known for at least 40 years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1978 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all the monkeys died as a result of exposure to the fluorochemicals. Twenty-one years later, 3M told the public that a "new study" on these compounds' effect

49

on Rhesus monkeys was one reason 3M pulled one of its consumer products, Scotchgard, off the market.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 68 of the Fourth Amended Complaint, and those allegations are therefore denied.

69.    In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 69 of the Fourth Amended Complaint, and those allegations are therefore denied.

70.    Defendant 3M has known for at least 30 years that its disposal of PFOA and PFOS and related chemicals through discharge into waterways, such as the Conasauga River or the Oostanaula River, was unsafe. For instance, a Materials Safety Data Sheet ("MSDS") produced by Defendant 3M in 1986 warned that PFOA should be disposed of only through incineration or at specially designed, properly lined landfills for hazardous chemicals, not discharged into rivers and not dumped into the ground.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 70 of the Fourth Amended Complaint, and those allegations are therefore denied.

71.     Defendant 3M has known for at least 40 years that PFOA, PFOS and related chemicals are not effectively treated by conventional wastewater treatment plant processes and are discharged to surface waters in the effluent and accumulate in the sludge from wastewater treatment processes. For example, in 1978, 3M found that the bacteria in wastewater treatment plants would not biodegrade PFOA. In 2001, 3M found high concentrations of these chemicals in samples from the Decatur Utilities WWTP in Decatur, Alabama effluent and sludge as a result of discharges from 3M. These high concentrations were not disclosed to Decatur Utilities or the public.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 71 of the Fourth Amended Complaint, and those allegations are therefore denied.

72.     A 1997 MSDS for a product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 72 of the Fourth Amended Complaint, and those allegations are therefore denied.

73.     In 1978, DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but did not disclose this to the public or to the EPA. Three years later, DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded DuPont's own Community Exposure Guideline.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 73 of the Fourth Amended Complaint, and those allegations are therefore denied.

74.     In 1991, DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, DuPont

20798687v1

chose not to conduct the follow-up study, instead postponing it until after it was sued.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 74 of the Fourth Amended Complaint, and those allegations are therefore denied.

75.    In or around December 2005, DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks. In 2006 3M agreed to pay a $1.5 million civil penalty for failure to disclose information to EPA about the health risks and environmental persistence of PFAS chemicals.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 75 of the Fourth Amended Complaint, and those allegations are therefore denied.

76.     For decades, 3M manufactured PFOA and supplied it to DuPont for its manufacture of Teflon and other products. Despite DuPont's knowledge of the risks to human health posed by PFOA, in response to the withdrawal of 3M from the market in May of 2000, DuPont opened its own plant to manufacture PFOA to be incorporated into DuPont's products.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 76 of the Fourth Amended Complaint, and those allegations are therefore denied.

77.     In 2015, Dupont spun off its performance chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to Chemours.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 77 of the Fourth Amended Complaint, and those allegations are therefore denied.

78.     Upon information and belief, all Defendants have long been aware of the persistence and toxicity of PFAS, at least as a result of communications with

Defendant manufacturers and other users of these chemicals, as well as the EPA, EPD and/or UGA.

**ANSWER:** Dixie denies the allegations in Paragraph 78 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 78 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

79.    Upon information and belief, all Defendants knew or should have known that, in its intended and/or common use, PFAS would very likely cause harm and injury, and/or threaten public health and the environment.

**ANSWER:** Dixie denies the allegations in Paragraph 79 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 79 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

80.    Upon information and belief, all Defendants knew or should have known that PFAS are mobile and persistent, bioaccumulative, biomagnifying and toxic. Defendants nonetheless concealed their knowledge from the public and government agencies.

**ANSWER:** Dixie denies the allegations in Paragraph 80 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 80 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

81.    In 2002, EPA took regulatory action under the Toxic Substances Control Act ("TSCA") to limit the future manufacture of PFOA, PFOS, and related chemicals. In response, Defendants 3M and DuPont undertook to develop and manufacture and supply to other Defendants "Short-Chain" PFAS; that is, PFAS with six or fewer carbons, such as GenX. Defendants are aware that these Short-Chain PFAS are, like PFOA and PFOS, persistent and not subject to biodegradation, and that they accumulate in human blood. Likewise, Defendants are aware that Short-Chain PFAS are toxic and known to cause cancer in animal studies.

**ANSWER:** Dixie denies the allegations in Paragraph 81 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 81 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

20798687v1

**Contamination of Upper Coosa River Basin with PFAS**

82.     Defendants discharge PFAS in their industrial wastewater into the City of Dalton, Georgia's POTW, operated by Defendant The City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities").

**ANSWER:** Dixie denies the allegations in Paragraph 82 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 82 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

83.     Dalton Utilities operates the Riverbend, Loopers Bend, and Abutment Road Water Pollution Control Plants ("WPCPs"), which treat this wastewater before it is pumped to the approximate 9,800-acre Riverbend LAS for land application using approximately 19,000 sprayheads. According to the EPA, approximately 90% of the wastewater which enters these treatment facilities for ultimate disposal at the LAS originates from industrial sources, primarily carpet manufacturers.

**ANSWER:** Dixie is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 83, and those allegations are therefore denied.

84.   The operation of Dalton Utilities' wastewater collection and disposal system, which is a "no discharge" system and includes the Riverbend, Loopers Bend, and Abutment Road WPCPs, as well as the LAS, is governed by the terms and conditions of Land Application System Permit No. GAJ020056 ("LAS permit"). The LAS permit authorizes Dalton Utilities to discharge up to 30 million gallons per day ("MGD") of wastewater effluent to the LAS. However, among other things, the LAS permit expressly prohibits any discharge from the LAS to surface waters. Despite this prohibition, EPA has found that a "significant amount" of the wastewater effluent sprayed onto the LAS by Dalton Utilities "leaves [the LAS] via surface waters and enters the Conasauga River."

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 84 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 84 of the Fourth Amended Complaint are legal conclusions, no response is required. Therefore, the allegations of Paragraph 84 are denied.

85.   The LAS is also covered by and subject to the National Pollutant Discharge Elimination System ("NPDES") Industrial General Stormwater Permit GAR050000 ("2017 IGP" or "NPDES Permit"), which authorizes certain stormwater discharges from the LAS. However, Part 1.1.4 of the NPDES General Stormwater Permit expressly prohibits "non-stormwater discharges," as well as

58

discharges of stormwater mixed with non-stormwater, which include discharges of "process wastewater, industrial wastewater, and contaminated stormwater." *Id.*; Part 8.L.3.1; Part 8.T.3.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 85 of the Fourth Amended Complaint. Additionally, to the extent the allegations in Paragraph 85 of the Fourth Amended Complaint are legal conclusions, no response is required. Therefore, the allegations of Paragraph 85 are denied.

86.    Defendants' PFAS resist degradation during the treatment process at these mechanical preapplication WPCPs and further increase in concentration as these toxic chemicals accumulate in the LAS. Defendants have known for decades that PFAS cannot be removed from their industrial wastewater discharges sent to the Dalton POTW, and Dalton Utilities has known for years that its conventional treatment processes and land application will not remove these chemicals prior to discharge to the Conasauga River and its tributaries in and around the LAS.

**ANSWER:** Dixie denies the allegations in Paragraph 86 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 86 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

87.     Despite this knowledge, the LAS Permit, which sets forth the terms and conditions governing Defendant Dalton Utilities' approved industrial pretreatment program for discharges of industrial wastewater into the Dalton POTW, in no way authorizes Defendants' discharges of PFAS into the Dalton POTW. Likewise, Defendants' industrial user wastewater discharge permits issued by Dalton Utilities do not authorize discharges of PFAS into the Dalton POTW.

**ANSWER:** Dixie denies the allegations of Paragraph 87 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 87 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

88.     PFAS have been detected in dangerously high levels in the soil, compost, sewage sludge, groundwater, and wastewater effluent at the LAS, which borders and is hydrologically connected to the Conasauga River and its tributaries, some of which flow through the LAS. Historical applications of PFAS at the LAS continue to be discharged from the LAS to the Conasauga River or its tributaries, having the same net polluting effect on these surface waters for decades, if not longer, after their initial deposit. Stormwater discharges contaminated with PFAS also pollute the Conasauga River or its tributaries as they flow past/through the LAS, as do discharges of PFAS contaminated groundwater.

**ANSWER:** Dixie is without sufficient knowledge or information to form a belief about the truth of the allegations asserted in Paragraph 88, and those allegations are therefore denied.

89.    EPA, the University of Georgia ("UGA"), and the Georgia Environmental Protection Division ("EPD") have identified industrial wastewater originating from Defendants' manufacturing facilities, and ultimately discharged from the Riverbend LAS, as the source of PFAS contamination in the Conasauga River, the Oostanaula River, the City of Rome's water supply, and the Coosa River.

**ANSWER:** Dixie denies as stated the allegations of Paragraph of 89 of the Fourth Amended Complaint.

90.    UGA conducted surface water sampling in March of 2006 to determine the presence and distribution of PFAS in the Conasauga River above and below the LAS near Dalton ("UGA Study"). Based on extremely high concentrations of PFAS downstream of the LAS, including PFOA at levels as high as 1150 parts per trillion ("ppt") and PFOS as high as 318 ppt, the UGA study concluded that the LAS is an "important point source of [PFAS] contamination." The UGA Study further found these concentrations of PFAS were among the "highest ever recorded in surface waters."

**ANSWER:** Dixie admits that the University of Georgia previously conducted a study of the general nature state above, which study speaks for itself.

Dixie is without knowledge or information sufficient to form a belief as to the accuracy of the study's findings or its methodology. Any remaining allegations in paragraph 90 of the Fourth Amended Complaint are denied.

91.   The United Steelworkers Union sampled surface waters downstream from the Riverbend LAS in August and October of 2006, and analytical results from this sampling showed concentrations of PFOA of up to 526 ppt in the Conasauga River and PFOS as high as 923 ppt.

**ANSWER:** Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 91 of the Fourth Amended Complaint, which allegations are therefore denied.

92.   Sampling conducted by Dalton Utilities between July 2009 and August 2010 showed, inter alia, PFOA levels as high as 400 ppt and PFOS levels as high as 1200 ppt in the Conasauga River or its tributaries, including Holly Creek, downstream of the LAS. Elevated levels of PFAS were also consistently found in Dalton Utilities' compost, sewage sludge, as well as soil and groundwater at the LAS.

**ANSWER:** Upon information and belief, Dixie admits that Dalton Utilities previously conducted sampling of the general nature stated above. Dixie is without knowledge or information sufficient to form a belief as to the accuracy or conclusions of the sampling. Dixie is without knowledge or information sufficient

to form a belief as to any of the remaining allegations in paragraph 92 of the Fourth Amended Complaint, which allegations are therefore denied.

93.    In July of 2012, EPA conducted a "Conasauga River [PFAS] Study," consisting of surface water sampling in the Conasauga River and its tributaries in and around the LAS, as well as the Oostanaula and Coosa Rivers downstream. Analytical results from this sampling showed elevated levels of PFAS in all surface water samples downstream of the LAS as compared to upstream samples, including PFOA as high as 210 ppt and PFOS as high as 180 ppt in the Conasauga River. The Oostanaula River downstream of its confluence with the Conasauga was also contaminated with PFOA and PFOS at unsafe levels.

**ANSWER:** Upon information and belief, Dixie admits that EPA previously conducted sampling of the general nature stated above. Dixie is without knowledge or information sufficient to form a belief as to the accuracy or conclusions of the sampling. Dixie is without knowledge or information sufficient to form a belief as to any of the remaining allegations in paragraph 93 of the Fourth Amended Complaint, which allegations are therefore denied.

94.    Additional sampling of surface waters within the Upper Coosa River Basin, including in the Conasauga and Oostanaula Rivers, at the specific locations set out in the June and August Notices attached hereto as Exhibits "A" and "C" and incorporated by reference herein, demonstrates that Defendant Dalton Utilities

63

discharged PFAS from the LAS to the Conasauga River or its tributaries, thereby also contaminating the Oostanaula River with PFAS, on at least the following occasions: June 19, 2016; June 20, 2016; June 21, 2016; June 22, 2016; June 23, 2016; June 24, 2016; July 20, 2016; July 21, 2016; September 16, 2019; September 17, 2019; November 20, 2019; November 21, 2019; and June 18, 2020.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 94 of the Fourth Amended Complaint, which allegations are therefore denied.

95.     Sampling conducted on May 20, 2021 of ditches, drainage channels and similar conveyances at the LAS, at the specific locations set out in the September Notice attached hereto as Exhibit "E" and incorporated by reference herein, demonstrates that Dalton Utilities had discharged, and continues to discharge, PFAS from the LAS directly to the Conasauga River and/or its tributaries. As set out below, analytical results of this sampling showed extremely high levels of PFOA, PFOS and other PFAS pollutants:

| Sample ID | Location | PFOA (ppt) | PFOS (ppt) | Total PFAS (ppt) |
|-----------|----------|------------|------------|------------------|
| SW-01 | 34.71464, -84.93105 | 3,820 | 5,710 | 19,190 |
| SW-02 | 34.719291, -84.91393 | 301 | 431 | 4,090 |

| SW-03 | 34.719325, -84.91389 | 3,970 | 7,300 | 19,820 |
|---|---|---|---|---|
| SW-04 | 34.702714, -84.92508 | 26,700 | 18,100 | 180,800 |
| SW-05 | 34.695758, -84.91291 | 771/759 | 1,460/1,550 | 10,230/10,210 |
| SW-06 | 34.708247, -84.90243 | 1,170 | 3,540 | 16,630 |
| SW-07 | 34.698083, -84.88613 | 1,100 | 5,190 | 18,540 |
| SW-08 | 34.683239, -84.86352 | 2,100 | 8,270 | 29,240 |
| SW-09 | 34.683054, -84.86365 | 1,750 | 6,650 | 23,480 |
| SW-10 | 34.683008, -84.85779 | 1,860 | 6,490 | 23,160 |
| SW-11 | 34.679399, -84.84922 | 1,970 | 7,580 | 22,220 |
| SW-12 | 34.68079, -84.8497 | 1,830 | 7,170 | 20,860 |
| SW-13 | 34.670432, -84.83752 | 1,320/1,340 | 3,230/2,990 | 16,320/16,370 |
| SW-14 | 34.669904, -84.83761 | 1,520 | 4,030 | 20,710 |
| SW-15 | 34.646288, -84.8557 | 1,640 | 4,810 | 25,820 |
| SW-16 | 34.646024, -84.86596 | 2,530 | 7,350 | 38,700 |

| SW-17 | 34.646067, -84.87633 | 1,200 | 3,470 | 19,680 |
|---|---|---|---|---|

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 95 of the Fourth Amended Complaint, which allegations are therefore denied.

96.   Sampling conducted on May 19, 2021 of shallow groundwater monitoring wells at the LAS along the banks of the Conasauga River demonstrates that Dalton Utilities had discharged, and continues to discharge, PFAS from the LAS to the Conasauga River and/or its tributaries indirectly through groundwater in a manner that is functionally equivalent to a direct discharge. Due to the geography and hydrogeology of the LAS, PFAS contaminated effluent enters the groundwater and flows rapidly through porous material and enters the Conasauga River and its tributaries through both diffuse and channelized flows all along the banks of these waters. As set out below and in the September Notice attached hereto as Exhibit "E' and incorporated by reference herein, analytical results of sampling of the following groundwater monitoring wells showed extremely high levels of PFOA, PFOS and other PFAS pollutants:

| Sample ID | Sample Location | PFOA (ppt) | PFOS (ppt) | Total PFAS (ppt) |
|---|---|---|---|---|
| GW-01 | MW-21-D2 | 2,710 | 5,420 | 16,220 |

| GW-01 | MW-7A-U2 | 2,500 | 616 | 24,050 |
| GW-03 | MW-10-D4 | 4,150/3,880 | 4,790/4,490 | 33,600/32,000 |
| GW-04 | MW-15B-D13 | 5,380 | 15,000 | 32,800 |
| GW-05 | MW-13A-D8 | 4,070 | 8,710 | 34,590 |

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 96 of the Fourth Amended Complaint, which allegations are therefore denied.

97.     Sampling conducted on May 20, 2021 of stormwater outfalls at the LAS during normal operation of the LAS and at a time when precipitation had not recently occurred demonstrates that Dalton Utilities has discharged, and continues to discharge, non-stormwater containing PFAS from certain stormwater outfalls to the Conasauga River and/or its tributaries. As set out below and in the September Notice attached hereto as Exhibit "E" and incorporated by reference herein, analytical results of these discharges showed extremely high levels of PFOA, PFOS, and other PFAS pollutants:

| Sample ID | Sample Location (SW Outfall) | PFOA (ppt) | PFOS (ppt) | Total PFAS (ppt) |
| SW-01 | 34.71464, -84.93105 (34A) | 3,820 | 5,710 | 19,190 |
| SW-05 | 34.695758, -84.91291 | 771/759 | 1,460/1,550 | 10,230/10,210 |

| | (29C) | | | |
|---|---|---|---|---|
| SW-06 | 34.708247, -84.90243 (5C) | 1,170 | 3,540 | 16,630 |
| SW-08 | 34.683239, -84.86352 (14D) | 2,100 | 8,270 | 29,240 |
| SW-09 | 34.683054, -84.86365 (14D) | 1,750 | 6,650 | 23,480 |
| SW-15 | 34.646288, -84.8557 (22B) | 1,640 | 4,810 | 25,820 |
| SW-16 | 34.646024, -84.86596 (23B) | 2,530 | 7,350 | 38,700 |
| SW-17 | 34.646067, -84.87633 (27A) | 1,200 | 3,470 | 19,680 |

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 97 of the Fourth Amended Complaint, which allegations are therefore denied.

98.     Defendant Dalton Utilities has also discharged PFAS from its wastewater collection system via "Spills," which are defined as any unpermitted discharge of untreated or raw sewage to waters of the State, in the specific amounts and locations as set out in the August Notice attached hereto as Exhibit "C" and

incorporated by reference herein. Specifically, Defendant Dalton Utilities has discharged raw sewage containing PFAS from its collection system to waters of the State and United States on at least the following occasions: December 2, 2015; February 21, 2016; February 24, 2016; March 29, 2016; July 15, 2016; November 8, 2016; December 18, 2016; December 23, 2016; April 3, 2017; June 15, 2017; June 21, 2017; September 22, 2017; December 20, 2017; April 16, 2018; August 4, 2018; August 22, 2018, February 22, 2019; May 11, 2019; September 3, 2019; October 30, 2019; October 31, 2019; November 9, 2019; January 1, 2020; June 17, 2020.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 98 of the Fourth Amended Complaint, which allegations are therefore denied.

**PFAS Contamination of Rome Water Supply**

99.     In March of 2009, several public drinking water supplies downstream from the LAS, including Rome's, were sampled for the presence of PFAS, and Rome's water supply was tested again in January of 2010. The results of this sampling showed that Rome's drinking water supply was contaminated with PFAS, and PFOA and PFOS in particular, at dangerously high levels.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 99 of the Fourth Amended Complaint, which allegations are therefore denied.

100.   Leading up to the issuance of the May 2016 EPA Health Advisories, Rome began regular testing for PFOA and PFOS in its water supply, and has consistently found PFOA and PFOS levels that combine to exceed EPA's 70 ppt limit. Rome has also found other Long-Chain as well as Short-Chain PFAS in the water supply.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 100 of the Fourth Amended Complaint, which allegations are therefore denied.

101.   In 2016, Rome's then- existing water treatment filtration system was not capable of removing or reducing levels of PFAS including, but not limited to, PFOA and PFOS. Upon being informed that the May 2016 EPA Health Advisories would set lifetime safe PFOA and PFOS levels drastically lower than the 2009 provisional drinking water health advisories for short-term exposure, Rome took emergency precautions and implemented an emergency temporary filtration process by installing granular activated carbon in existing filter beds to remove non-Short-Chain PFAS. Rome also drew additional water from the Etowah River for purposes of blending that water with water drawn from the primary source, the Oostanaula River.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 101 of the Fourth Amended Complaint, which allegations are therefore denied

102.   Due to the high levels of PFOA and PFOS found in its water supply, and due to the presence of Short-Chain PFAS, the City's water supply requires a new and permanent filtration system, which is necessary to provide a safe, long-term supply of water which will meet the EPA health advisories and provide safe water for the public.

**ANSWER:** Dixie is without sufficient information to admit or deny the allegations of Paragraph 102 of the Fourth Amended Complaint, and those allegations are therefore denied.

103.   These emergency efforts have cost, and will continue to cost, Rome millions of dollars to implement, and the City was forced to implement a surcharge upon all customer rate payers to recoup its costs. Additionally, implementation of the new, permanent filtration system will increase the future costs the City must incur to provide a safe, long-term supply of water which will meet the EPA health advisories and provide safe water for the public. Such increased costs will be passed on to all customer rate payers to recoup them through additional and increased surcharges. The City estimates that water subscribers/ratepayers will likely see a

71

minimum 2.5% rate increase each year for the foreseeable future to address PFAS contamination.

**ANSWER:** Dixie is without sufficient information to admit or deny the allegations of Paragraph 103 of the Fourth Amended Complaint, and those allegations are therefore denied.

104.   On November 4, 2019, the City of Rome's City Commission enacted a "Resolution Regarding City of Rome Water Supply," finding, *inter alia*, that the PFAS contamination of the Oostanaula River and Rome's water supply constituted a public nuisance that threatens the health and safe of the community and the long-term sustainability of the City of Rome's water supply.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 104 of the Fourth Amended Complaint, which allegations are therefore denied.

105.   Sampling of the Oostanaula River at Rome's water intake on November 20, 2019 showed, in addition to other elevated PFAS, PFOA at 57 ppt and PFOS at 71 ppt, far in excess of EPA's 2016 Health Advisories' limit of 70 ppt.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 105 of the Fourth Amended Complaint, which allegations are therefore denied.

72

106.   As a direct and proximate result of Defendants' contamination of the RWSD and FCWD water supplies with PFAS, Plaintiff and the Proposed Class Members have suffered damages, including, but not limited to, property damage and losses for the payment of surcharges to filter and remove PFAS from the Rome and Floyd County water supply, and other compensatory damages to be proven at trial.

**ANSWER:** Dixie denies the allegations in Paragraph 106 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 106 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

## COUNT ONE:
## DISCHARGE OF POLLUTANTS TO SURFACE WATERS WITHOUT AN NPDES PERMIT IN VIOLATION OF THE CLEAN WATER ACT
### (Defendant Dalton Utilities)

107.   Plaintiff incorporates by reference paragraphs 1 through 107 as if restated herein.

**ANSWER:**  Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

108.   Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge is in compliance with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by,

or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. Each discharge not authorized by a permit, and each violation of a permit, is a violation of the CWA.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 108 of the Fourth Amended Complaint is required.  To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

109.   The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b). EPD is the state water pollution control agency for purposes of the CWA, and administers statutory and regulatory implementing the CWA's permitting programs within the State of Georgia. *See, e.g.*, O.C.G.A. § 12-5-30.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 109 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

110.   A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for the discharge of pollutants into waters of the United States without a permit in violation of Section 301 of the CWA. 33 U.S.C. § 1365(f). There is also CWA

74

jurisdiction where pollutants are discharged from a point source to navigable surface waters through hydrologically connected ground water, where the discharge is the "functional equivalent" of a direct discharge to navigable waters. *County of Maui v. Hawaii Wildlife, Fund*, 140 S. Ct. 1462, 1476 (2020).

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 110 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

111.   Defendant Dalton Utilities' discharges of PFAS from the LAS, the sprayheads located thereon, and/or ditches and drainage channels that flow from the LAS, into the Conasauga River or its tributaries, constitute the discharge of a pollutant from a point source requiring an NPDES Permit authorizing such discharge.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 111 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

112.   Defendant Dalton Utilities' discharges of PFAS from the LAS, the sprayheads located thereon, and/or ditches and drainage channels that flow from the LAS, into the Conasauga River or its tributaries through hydrologically connected

groundwater beneath the LAS, constitute the "functional equivalent" of a direct discharge to these surface waters requiring an NPDES Permit authorizing such discharges.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 112 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

113.   Per- and polyfluoroalkyl substances ("PFAS") are "pollutants" within the meaning of the CWA. 33 U.S.C. § 1362(6).

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 113 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

114.   The LAS, the sprayheads located thereon, and ditches and drainage channels that flow from the LAS to the Conasauga River and/or tributaries thereto are all "point sources" within the meaning of the CWA. 33 U.S.C. § 1362(14).

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 114 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

20798687v1

115.   The Conasauga River and its tributaries are waters of the State of Georgia and waters of the United States as that term is used in the CWA and as it has been interpreted by the federal courts.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 115 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

116.   The requirement for an NPDES permit authorizing these discharges arose when at the time that Dalton Utilities first knew or should have known that PFAS was being discharged from the LAS into surface waters. Each day since that time is a violation of the CWA, and these violations are continuing as of the date of this Amended Complaint.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 116 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

117.   Since as early as 2006, and every day since June of 2015, and on at least the specific occasions set forth in Paragraphs 95, 96, and 97 and the June, August, and September Notices, attached hereto as Exhibits "A," "C," and "E" and incorporated by reference herein, Dalton Utilities has violated Section 301(a) of the

CWA, 33 U.S.C. § 1311(a), by discharging PFAS from the LAS into the Conasauga River and/or its tributaries, directly or indirectly through hydrologically connected groundwater beneath the LAS, without an NPDES Permit authorizing such discharges.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 117 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

118.   On at least the specific occasions set forth in Paragraph 99 and the August Notice attached hereto as Exhibit "C" and incorporated by reference herein, Dalton Utilities has violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging raw sewage containing PFAS from its collection system to waters of the State and United States without an NPDES Permit authorizing such discharges.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 118 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

119.   Defendant Dalton Utilities should be subject to an enforcement order or injunction order Dalton Utilities to cease its discharges of PFAS from the LAS

78

and its collection system into the Conasauga River or its tributaries without an NPDES Permit authorizing such discharges.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 119 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

120.   Defendant Dalton Utilities should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 120 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

121.   For the purpose of assessing the maximum civil penalty for which Defendant Dalton Utilities is liable, each day that Dalton Utilities has discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Fourth Amended Complaint.

**ANSWER:** As Count One of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 121 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

## COUNT TWO:
## DISCHARGES OF NON-STORMWATER CONTAINING PFAS IN VIOLATION OF NPDES GENERAL STORMWATER PERMIT

122.   [SKIPPED]

**ANSWER:** No answer to Paragraph 122 is required, but to the extent a response is required, any allegations are denied.

123.   Plaintiff incorporates by reference paragraphs 1 through 122 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

124.   Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge is in compliance with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

20798687v1

**ANSWER:** The allegations of Paragraph contain legal conclusions for which no response is required, but to the extent a response is required, the allegations of Paragraph 124 are denied.

125. The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b). EPD is the state water pollution control agency for purposes of the CWA, and administers statutes and regulations implementing the CWA's permitting programs within the State of Georgia. *See, e.g.,* O.C.G.A. § 12-5-30.

**ANSWER:** The allegations of Paragraph contain legal conclusions for which no response is required, but to the extent a response is required, the allegations of Paragraph 125 are denied.

126. A violation of an NPDES permit issued by EPD is a violation of the federal CWA, and a citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for violation of the terms and conditions of NPDES permits. 33 U.S.C. § 1365(f)(7).

**ANSWER:** The allegations of Paragraph contain legal conclusions for which no response is required, but to the extent a response is required, the allegations of Paragraph 126 are denied.

127. On at least the occasions listed in paragraph 98 and the September Notice attached hereto as Exhibit "E" and incorporated herein by reference, Dalton

Utilities has violated Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, by discharging non-stormwater containing PFAS from stormwater outfalls at the LAS in violation of Parts 1.1.4, 8.L.3.1, and 8.T.3 of the NDPES General Stormwater Permit. These violations are continuing and ongoing, or are likely to recur, as of the date this Fourth Amended Complaint is being filed.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the factual allegations of Paragraph 127 of the Fourth Amended Complaint, which allegations are therefore denied.  The remaining allegations of this Paragraph contain legal conclusions for which no response is required, but to the extent a response is required, those allegations are denied.

128.   Defendant Dalton Utilities should be subject to an enforcement order or injunction ordering Dalton Utilities to cease its violations of the NPDES General Stormwater Permit.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the factual allegations of Paragraph 128 of the Fourth Amended Complaint, which allegations are therefore denied.

129.   Defendant Dalton Utilities should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the factual allegations of Paragraph 129 of the Fourth Amended Complaint, which allegations are therefore denied.

130.   For the purpose of assessing the maximum civil penalty for which Defendant Dalton Utilities is liable, each day that Dalton Utilities has violated the terms and conditions of its NPDES Permit constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Fourth Amended Complaint.

**ANSWER:** Dixie lacks knowledge or information sufficient to form a belief as to the truth of the factual allegations of Paragraph 130 of the Fourth Amended Complaint, which allegations are therefore denied.

## COUNT THREE:
## INDUSTRIAL USER PASS THROUGH DISCHARGES OF POLLUTANTS IN VIOLATION OF FEDERAL PROHIBITIONS, DALTON UTILITIES' SEWER USE RULES AND REGULATIONS, AND THE CLEAN WATER ACT
### (Defendant Dalton/Whitfield Regional Solid Waste Authority)

131.   Plaintiff incorporates by reference paragraphs 1 through 130 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

83

132.   Section 307(b) through (e) of the CWA, 33 U.S.C. §§ 1317(a)-(e), establish the federal pretreatment program for regulation of discharges from industrial facilities into publicly owned treatment works. Section 307(d) of the Act, 33 U.S.C. § 1317(d), prohibits the operation of any source of discharge of pollutants into a publicly owned treatment works in violation of, amongst other things, prohibitions on discharges.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 132 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

133.   Section 307(b) through (e) of the CWA, 33 U.S.C. §§ 1317(a)-(e), establish the federal pretreatment program for regulation of discharges from industrial facilities into publicly owned treatment works. Section 307(d) of the Act, 33 U.S.C. § 1317(d), prohibits the operation of any source of discharge of pollutants into a publicly owned treatment works in violation of, amongst other things, prohibitions on discharges.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 133 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

20798687v1

134.   EPA has adopted pretreatment standards for industrial dischargers to publicly owned treatment works at 40 C.F.R. Parts 404 through 471, including both general regulations and categorical regulations for specific industrial categories.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 134 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

135.   The State of Georgia has been delegated authority to implement the permitting programs of the Act by EPA, including the pretreatment program for industrial discharges into wastewater facilities, pursuant to 33 U.S.C. § 1342(b). EPD is the state water pollution control agency for purposes of the CWA, and administers statutory and regulatory implementing the CWA's permitting programs within the State of Georgia. *See, e.g.*, GA. COMP. R. & REGS. §§ 391-3-6-0(8), 391-3-6-0(9).

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 135 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

20798687v1

136.   Both the EPA and EPD rules prohibit the discharge into a POTW of "any pollutant(s) which cause Pass Through or Interference." 40 C.F.R. § 403.5(a); GA. COMP. R. & REGS. §§ 391-3-6-0(8)(3)(a)(2).

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 136 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

137.  Dalton Utilities has enacted Sewer Use Rules and Regulations ("SURR"), which incorporate federal and state pretreatment standards for discharges of industrial wastes into the Dalton POTW, so that Defendant Dalton Utilities can "comply with all State and Federal laws, including the Clean Water Act, the General Pretreatment Regulations, the Georgia Water Quality Control Act, and Georgia Department of Natural Resources Rules."

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 137 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

138.   A citizen suit may be brought for violations of pretreatment standards under Section 307 of the CWA, including violations of local limits like the SURR. 33 U.S.C. § 1365(f).

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 138 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

139.   Section 2.4.1 of the SURR provides that "No User shall contribute or cause to be contributed directly or indirectly to the POTW any Pollutant or Wastewater that causes Pass Through or Interference." Section 1.4 of the SURR defines "Pass Through" as:

A discharge that exits any point from the Wastewater Treatment Plants into the waters of the State of Georgia containing quantities or concentrations, which, alone, or in conjunction with a discharge or discharges from other sources, are a cause of a violation of any requirement of Dalton Utilities' LAS Permit including an increase in the magnitude or duration of a violation.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 139 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

140.   Sampling of Defendant DWSWA's industrial discharge to the Dalton POTW on June 21, 2016 showed the presence of numerous PFAS at dangerously high levels: PFPA (780 ppt); PFBA (6,000 ppt); PFHpA (4,200 ppt); PFNA (200 ppt); PFOA (4,500 ppt); PFOS (170 ppt); PFDA (100 ppt); PFHxS (450 ppt); and PFHxA (10,000 ppt).

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 140 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

141.   Since at least June of 2015, and on at least the dates specified in Paragraph 140 above and the June Notice attached hereto as Exhibit "B" and incorporated by reference herein, the DWSWA has violated Section 2.4.1 of the SURR and Section 307(d) of the CWA, 33 U.S.C. § 1317(d), by discharging PFAS into the Dalton POTW where these chemicals Pass Through and are discharged into the Conasauga River or its tributaries, causing violations of Dalton Utilities' LAS permit. These discharges of PFAS by Defendant DWSWA to the Dalton POTW are ongoing and/or are likely to recur into the future.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 141 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

142.   On the same dates referenced in Paragraph 128 above, as set out in the August Notice attached hereto as Exhibit "D" and incorporated by reference herein, DWSWA has violated 40 C.F.R. § 403.5(a) and Section 307(d) of the CWA, 33 U.S.C. § 1317(d), by discharging PFAS into the Dalton POTW where these

chemicals Pass Through and are discharged into the Conasauga River or its tributaries along with stormwater. These non-stormwater discharges of industrial/process wastewater containing PFAS, which are ongoing and/or likely to recur into the future, have caused violations of Part 1.1.4 of Dalton Utilities' NPDES Permit, which prohibits such "non-stormwater" discharges.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 142 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

143.   Defendant DWSWA should be subject to an enforcement order or injunction ordering Defendant DWSWA to cease its violations of pretreatment requirements and standards.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 143 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

144.   Defendant DWSWA should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 144 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

145.   For the purpose of assessing the maximum civil penalty for which Defendant DWSWA is liable, each instance of Defendant DWSWA's violation of pretreatment requirements and standards constitutes a separate violation of Section 307(d) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d), for each day on which it has occurred or will occur after the filing of this Fourth Amended Complaint.

**ANSWER:** As Count Three of the Fourth Amended Complaint is not directed to Dixie, no response to the allegations of Paragraph 145 of the Fourth Amended Complaint is required. To the extent any of the allegations of this Paragraph are directed toward Dixie, those allegations are denied.

## CLASS ALLEGATIONS

146.   Plaintiff incorporates by reference paragraphs 1 through 145 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

90

147.   Plaintiff brings this action pursuant to the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as a Class Action on his own behalf and on behalf of all other persons similarly situated. This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

**ANSWER:** Dixie denies that a class action is appropriate and denies the allegations of Paragraph 147 of the Fourth Amended Complaint.

148.   Plaintiff and the Proposed Class Members are water subscribers and ratepayers with the RWSD and/or the FCWD who have been in the past, and will be in the future, harmed, injured, and damaged through the contamination of their drinking water with PFAS and the payment of surcharges to recoup the costs of removing this contamination.

**ANSWER:** In response to the allegations of Paragraph 136 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 148, and those allegations are therefore denied.

149.   Plaintiff brings this Class action on behalf of a proposed Class as set forth below:

**All water subscribers (ratepayers) with the Rome Water and Sewer Division and/or the Floyd County Water Department.**

**ANSWER:** In response to the allegations of Paragraph 149 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 149, and those allegations are therefore denied.

150.   Excluded from the proposed Class are:

a.      Defendants, their employees, and any entities in which Defendants have a controlling interest;

b.      Any of the legal representatives, heirs, successors, or assigns of Defendants;

c.      The Judge to whom this case is assigned and any Member of the Judge's immediate family and any other judicial officer assigned to this case;

d.      Any attorneys, or their immediate family, representing the Plaintiff or Members of the proposed Class; and

e.      All persons or entities that properly execute and timely file a request for exclusion from the Proposed Class.

**ANSWER:** In response to the allegations of Paragraph 150 of the Fourth Amended Complaint, Dixie agrees that excluding these individuals from the Proposed Class is appropriate and reserves the right to assert that other groups of individuals must also be excluded. Any remaining allegations of Paragraph 150 are denied.

151.   Plaintiff reserves the right to modify or amend the definition of the Proposed Class if, prior to the Court's determination on whether certification is

appropriate, discovery and further information reveals that the Class should be modified or amended in any way.

**ANSWER:** Dixie asserts that no response to Paragraph 151 of the Fourth Amended Complaint is required, as Paragraph 151 does not contain any factual allegations.  To the extent this Paragraph directs factual allegations toward Dixie, those allegations are denied.

## Numerosity

152.   The Proposed Class Members are so numerous that separate joinder of each Member is impractical. Although the exact number of proposed Class Members will be established after Class notification, upon information and belief, the number of proposed Class Members probably exceeds 30,000 people. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

**ANSWER:** In response to the allegations of Paragraph 152 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 152, and those allegations are therefore denied.

153.   Putative Class Members are readily identifiable through records of the RWSD and FCWD and through publicly available property records and may be

given any required notices by regular mail, supplemented, if necessary and required by the Court, by published notice.

**ANSWER:** In response to the allegations of Paragraph 153 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 153, and those allegations are therefore denied.

## Typicality

154.   Plaintiff's claims are typical of the claims to be advanced by Members of the Class, and their claims encompass those of the other Class Members, in that the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by Plaintiff are the same kinds of damages suffered by Members of the Class.

**ANSWER:** In response to the allegations of Paragraph 154 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 154, and those allegations are therefore denied.

## Adequate Representation

155.   Plaintiff will fairly and adequately protect and represent the interests of each Proposed Class Member, as their interests do not conflict, their interests are co-extensive with common rights of recovery based on the same essential facts and legal

theories, they are members of the same communities, they are similarly damaged and are seeking the same remedies, and they intend to prosecute this action vigorously.

**ANSWER:** In response to the allegations of Paragraph 155 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 155, and those allegations are therefore denied.

156.   Plaintiff has retained counsel competent and experienced in complex Class action and toxic tort litigation, including actions like this one. Plaintiff's counsel also intend to prosecute this action vigorously.

**ANSWER:** In response to the allegations of Paragraph 156 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 156, and those allegations are therefore denied.

## **Predominance of Common Questions of Law and Fact**

157.   Common questions of fact and law among the Representative Plaintiffs and Proposed Class Members predominate over questions affecting only individual Class Members. There are numerous questions of law and fact common to the Class, including:

95

(a)     The factual history of the use, development, and distribution of PFAS and related chemicals manufactured and used by the Defendants at their Rome, Georgia, and Floyd County facilities;

(b)     When the Defendants knew of the harmful effects of PFAS and related chemicals;

(c)     Whether the Defendants failed to disclose the harmful effects of PFAS and related chemicals being released from their plants in Rome, Georgia, and Floyd County;

(d)     The extent of the contamination at the Defendants' plant sites in Dalton, Georgia, and the migration of that contamination into the Conasauga, Oostanaula, and Coosa Rivers;

(e)     Whether the water supplied to Plaintiff and the Proposed Class Members has been and continues to be contaminated with PFAS and related chemicals;

(f)     Whether Plaintiff and the Proposed Class Members paid more for their contaminated water than they should have;

(g)     Whether the Defendants' conduct was intentional, willful, wanton, reckless, and negligent, and constitutes a nuisance;

(h)     Whether the Plaintiff and the Proposed Class Members should be awarded their reasonable attorney's fees and expenses of litigation;

(i)     Whether punitive damages should be imposed on the Defendants in an amount sufficient to punish, penalize, or deter their intentional, willful, wanton, and reckless, malicious, and oppressive acts and omissions that have created and maintained a continuing public nuisance.

(j)     The necessary remedial actions to abate the claimed nuisance and clean Defendants' chemicals from the Plaintiff's and the Proposed Class Members' water supplies and properties;

(k)     Whether and to what extent injunctive relief is appropriate to require Defendants to abate the claimed nuisance and prevent Defendants' chemicals from invading the Plaintiff's and the Proposed Class Members' water supplies and properties.

**ANSWER:** Dixie denies the allegations of Paragraph 157 of the Fourth Amended Complaint to the extent they are directed toward Dixie and further denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 157, and those allegations are therefore denied.

158.   The questions of law and fact common to Proposed Class Members predominate over any questions affecting only individual Members, and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual Proposed Class Members would create a risk of (a) inconsistent or varying adjudications with respect to individual Proposed Class Members, which would establish incompatible standards of conduct for the Defendants and/or (b) adjudications with respect to individual Proposed Class Members which would as a practical matter be dispositive of the Members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

**ANSWER:** In response to the allegations of Paragraph 158 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 158, and those allegations are therefore denied.

20798687v1

**Fed. R. Civ. P. 23(a) and 23(b)(2) Injunctive or Declaratory Relief**

159.   In addition to the above, Plaintiff brings this Class action under Fed. R. Civ. P. 23(a) and 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to all Members of the proposed Class, making final declaratory and injunctive relief appropriate with respect to the Class as a whole. Such injunctive relief includes, but is not limited to, an injunction to require remediation of the PFAS contaminated LAS, including contaminated soils and the groundwater aquifer beneath the LAS.

**ANSWER:** Dixie denies the allegations of Paragraph 159 of the Fourth Amended Complaint to the extent they are directed toward Dixie and further denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 159, and those allegations are therefore denied.

160.   Common questions of fact and law among the Representative Plaintiffs and Proposed Class Members predominate over questions affecting only individual Class Members. Some of the common issues are set forth in Paragraph 139 above.

**ANSWER:** In response to the allegations of Paragraph 160 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 160, and those allegations are therefore denied.

## **Superiority**

161.   Additionally, Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. Certification would be proper in that, among other things: there is no interest by Proposed Class Members in individually controlling the prosecution of separate actions; the expense of prosecuting individual claims for the matters for which Class certification is sought would be prohibitive in light of the typical claimant's injuries; neither Plaintiff nor Members of the proposed Class have filed or are parties to any litigation in which the legal and factual issues raised herein are to be adjudicated; and it is desirable to concentrate the litigation of claims in a single proceeding so as to avoid unnecessary and expensive duplication of actions and to provide for judicial economy. Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

**ANSWER:** In response to the allegations of Paragraph 161 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 161, and those allegations are therefore denied.

162.   Class action treatment is preferable to other available methods in providing a fair and efficient method for the adjudication of the controversy described herein, which has affected a large number of persons. The Class action

provides an effective method whereby the enforcement of the rights of the Plaintiffs can be fairly managed without unnecessary expense or duplication.

**ANSWER:** In response to the allegations of Paragraph 162 of the Fourth Amended Complaint, Dixie denies that a class action is appropriate. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 162, and those allegations are therefore denied.

## COUNT FOUR:
## WILLFUL, WANTON, RECKLESS, OR NEGLIGENT MISCONDUCT
### (All Defendants Except Dalton Utilities, Invista, 3M, Daikin, DuPont, & Chemours)

163. Plaintiff and Proposed Class Members incorporate by reference paragraphs 1 through 162 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

164. As manufacturers, distributors, suppliers, handlers, transporters, users and/or dischargers of PFAS, Defendants owed a duty to Plaintiff and Proposed Class Members and any other persons who might be foreseeably harmed to exercise due and reasonable care to prevent the discharge of toxic PFAS chemicals into waters of the State and waters of the United States, and the Conasauga and Oostanaula Rivers in particular, thereby contaminating the RWSD and FCWD water supply.

**ANSWER:** Dixie denies as stated the allegations in Paragraph 164 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie.

100

Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 164 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

165.   Plaintiff and Proposed Class Members have a reasonable expectation that Defendants will not contaminate surface waters or their domestic water supplies with PFAS.

**ANSWER:** Dixie denies as stated the allegations in Paragraph 165 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 165 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

166.   Defendants knowingly breached this duty owed to Plaintiff and Proposed Class Members, and under the circumstances, Defendants' breach constitutes willful, wanton, reckless, and/or negligent misconduct.

**ANSWER:** Dixie denies the allegations in Paragraph 166 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 166 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

20798687v1

167.   Defendants knew or should have known that their discharge of toxic PFAS chemicals would result in contaminated surface waters, primarily the Conasauga and Oostanaula Rivers, and domestic water supplies thereby endangering human health and the environment.

**ANSWER:** Dixie denies the allegations in Paragraph 167 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 167 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

168.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff and Proposed Class Members who are owners and occupants of residential real property and water subscribers/ratepayers with the RWSD and/or the FCWD have been caused to suffer, and will continue to suffer damage to property and losses for the surcharges incurred as ratepayers for the costs of filtering PFAS from their drinking water and other damages to be proved trial.

**ANSWER:** Dixie denies the allegations in Paragraph 168 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 168 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

## COUNT FIVE:
## NEGLIGENCE PER SE
### (All Defendants Except Dalton Utilities, 3M, DuPont, Chemours, Invista, & Daikin)

169.   Plaintiff and Proposed Class Members incorporate by reference paragraphs 1 through 168 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

170.   Defendants owed a duty to Plaintiff and Proposed Class Members under Sections 301(a) and 307(d) of the CWA, 33 U.S.C. §§ 1311(a) and 1317(d), to not discharge pollutants into waters of the United States without a valid permit and to operate their facilities in such a manner as to ensure their industrial discharges into the Dalton POTW did not cause Pass Through or Interference.

**ANSWER:** Dixie denies the allegations in Paragraph 170 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 170 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

171.   Defendants owed duties to Plaintiff and Proposed Class Members under the Georgia Water Quality Control Act ("GWQCA"), O.C.G.A. §§ 12-5-20, *et seq.*,

103

and its implementing regulations to, among other things: not use any waters of the State for the disposal of sewage, industrial wastes, or other wastes, O.C.G.A. § 12-5-29(a); to obtain an NPDES permit for a facility of any type that will result in the discharge of pollutants into waters of the State, O.C.G.A. § 12-5-30; to immediately notify EPD of the location and nature of PFAS discharges into waters of the State and immediately take all reasonable steps to prevent injury to the health or property of downstream users of waters of the State, O.C.G.A. § 12-5-30.4; keep waters of the State free from "industrial wastes or other discharges in amounts sufficient to … interfere with the designated use of the water body," Ga. Comp. R. & Regs. § 391-3-6-.03(5)(b); keep waters of the State free from "industrial or other discharges which … interfere with the designated use of the water body," *id.* at § 391-3-6-.03(5)(c); and to keep waters of the State free from "toxic … substances discharged from … industries or other sources … in amounts, concentrations or combinations which are harmful to humans, animals or aquatic life[.]" *Id.* at § 391-3-6-.03(5)(e).

**ANSWER:** Dixie denies the allegations in Paragraph 171 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 171 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

104

172.   Plaintiff and Proposed Class Members are within the class of persons that the CWA and the GWQCA and its implanting regulations were designed to protect, and the harm sustained is the type of harm that these statutes and regulations are designed to prevent.

**ANSWER:** Dixie denies the allegations in Paragraph 172 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 172 to the extent they are directed toward any other Defendant, which are therefore denied.

173.   Defendants breached these duties owed to Plaintiff and Proposed Class Members, and pursuant to O.C.G.A. § 51-1-6, under the circumstances, Defendants' breaches constitute negligence per se.

**ANSWER:** Dixie denies the allegations in Paragraph 173 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie further states that the allegations of Paragraph 173 are legal conclusions that require no response. To the extent any further response is required, Dixie denies the remaining allegations of Paragraph 173.

174.   As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and inactions, Plaintiff and Proposed Class Members who are owners and occupants of residential real property and water subscribers/ratepayers

with the RWSD and/or the FCWD have been caused to suffer, and will continue to

suffer damage to property and losses for the surcharges incurred as ratepayers for

the costs of filtering PFAS from their drinking water and other damages to be proved

trial.

**ANSWER:** Dixie denies the allegations in Paragraph 174 of the Fourth

Amended Complaint to the extent those allegations are directed toward Dixie. Dixie

is without knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 174 to the extent they are directed toward any other

Defendant, and those allegations are therefore denied.

**COUNT SIX:**
**PUNITIVE DAMAGES**
**(All Defendants Except Dalton Utilities)**

175.   Plaintiff and Proposed Class Members incorporate by reference

paragraphs 1- 174 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all

prior Paragraphs as if fully set forth herein.

176.   As manufacturers, distributors, suppliers, handlers, transporters, users

and/or dischargers of PFAS, Defendants owed a duty to Plaintiff and Proposed Class

Members and any other persons who might be foreseeably harmed to exercise due

and reasonable care to prevent the discharge of toxic PFAS chemicals into waters of

106

the State and the United States thereby contaminating the RWSD and FCWD water supply.

**ANSWER:** Dixie denies as stated the allegations in Paragraph 176 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 176 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

177.   Plaintiff and Proposed Class Members have a reasonable expectation that Defendants will not contaminate surface waters or their domestic water supplies with PFAS.

**ANSWER:** Dixie denies as stated the allegations in Paragraph 177 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations to the extent they apply to any other Defendant, which are therefore denied.

178.   In breaching these duties and performing the other tortious acts and omissions described above, Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

**ANSWER:** Dixie denies the allegations in Paragraph 178 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 178 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

179.   Defendants knew or should have known that their discharge of toxic PFAS chemicals would result in contaminated surface waters and domestic water supplies thereby endangering human health and the environment.

**ANSWER:** Dixie denies the allegations in Paragraph 179 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 179 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

180.   Defendants acted, or failed to act, with the specific intent to cause harm, and did, and continue to, cause harm and injury to the Plaintiff and Proposed Class Members.

**ANSWER:** Dixie denies the allegations in Paragraph 180 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 180 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

181.   Defendants acted, or failed to act, knowingly and willfully with conscious disregard and indifference to the rights and safety of others with knowledge that the actions and inactions would cause injury ad harm to the Plaintiff and Proposed Class Members.

**ANSWER:** Dixie denies the allegations in Paragraph 181 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 181 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

182.   Punitive damages should be imposed on Defendants in an amount sufficient to punish, penalize and deter them from repeating such wrongful conduct.

**ANSWER:** Dixie denies the allegations in Paragraph 182 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without sufficient information to admit or deny the allegations of Paragraph 182 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

183.   Because the Defendants have acted in bad faith in the underlying transactions or occurrences, have been stubbornly litigious, and have put the Plaintiff

and Proposed Class Members to unnecessary trouble and expense, they are subject to liability for reasonable attorney's fees and expenses of litigation as a part of damages recoverable by the Plaintiff and Proposed Class Members.

**ANSWER:** Dixie denies the allegations in Paragraph 183 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without sufficient knowledge or information to admit or deny the allegations of Paragraph 183 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

### COUNT SEVEN:
### PUBLIC NUISANCE
### (All Defendants Except Dalton Utilities)

184. Plaintiff and Proposed Class Members incorporate by reference paragraphs 1- 183 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

185. Plaintiff and Proposed Class Members own and occupy residential properties supplied with drinking water by the RWSD and/or the FCWD and are forced to pay surcharges that allow the City to filter PFAS from the water supply.

**ANSWER:** Dixie is without sufficient knowledge or information to admit or deny the allegations of Paragraph 185, and those allegations are therefore denied.

20798687v1

186.   Defendants have created a continuous, public nuisance by their discharge of PFAS including, but not limited to PFOA, PFOS, and related chemicals into the Conasauga, Oostanaula, and Coosa Rivers and related tributaries and watersheds, which has caused, and continues to cause, contamination of these waters and Plaintiff's and Proposed Class Members' water supplies, thereby proximately causing the public and Plaintiff and Proposed Class Members past, present, and future harm, injury, inconvenience, and increased water rates and surcharges.

**ANSWER:** Dixie denies the allegations in Paragraph 186 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 186 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

187.   The PFAS contamination caused by the Defendants has unreasonably interfered, and continues to interfere, with a right common to the general public— i.e., safe drinking water—and has unreasonably interfered, and continues to interfere, with public health.

**ANSWER:** Dixie denies the allegations in Paragraph 187 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 187 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

188.   All who come into contact with the PFAS released and discharged by Defendants are hurt, inconvenienced, or damaged by, among other things, being exposed to the harmful effects of PFAS. The harm caused by Defendants' conduct is not fanciful, or such as would affect only one of fastidious taste; rather, Defendants' conduct is such that it affects all ordinary, reasonable persons who purchase, use, or otherwise come into contact with the PFAS contaminated water. *See* O.C.G.A. § 41-1-1.

**ANSWER:** Dixie denies the allegations in Paragraph 188 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 188 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

189.   The levels of toxic chemical contamination found in the RWSD and/or the FCWD water supply, directly caused by the Defendants' pollution, has created a condition that has threatened, and continues to threaten, the health and well-being of the Plaintiff, and Proposed Class Members, and everyone who consumes PFAS contaminated drinking water supplied by the RWSD and/or the FCWD. This ingestion of PFAS causes concern, inconvenience, and harm to the Plaintiff,

20798687v1

Proposed Class Members, and everyone who consumes drinking water supplied by the RWSD and/or the FCWD —as it would to any other person. It was reasonably foreseeable, and in fact known to the Defendants, that their actions would cause interference with the property rights of Plaintiff and Proposed Class Members and would place, have placed, and continue to place, them at increased risk of physical harm, as well as cause them to incur additional, otherwise unnecessary expense to acquire drinking water for themselves and their families.

**ANSWER:** Dixie denies the allegations in Paragraph 189 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 189 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

190.   Plaintiff and Proposed Class Members have suffered, and will continue to suffer, special damages from Defendants' discharge of PFAS into the Conasauga River, because Plaintiff and Proposed Class Members consume and have consumed drinking water provided by the RWSD and/or FCWD and must also pay the added costs of attempting to remove the PFAS contamination by way of increased rates and surcharges they incur as ratepayers.

**ANSWER:** Dixie denies the allegations in Paragraph 190 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie

20798687v1

is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 190 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

191.   The nuisance created by Defendants' wrongful conduct is continuing, because Defendants' discharges and releases of PFAS into the Conasauga River are continuing. In addition, the past discharges of PFAS and have caused contamination of sediments in the river, which provide a continuing source of contamination of the water.

**ANSWER:** Dixie denies the allegations in Paragraph 191 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 191 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

192.   As a result of the public nuisance caused by Defendants, Plaintiff and Proposed Class Members, who are owners and occupants of residential real property and ratepayers with the RWSD and/or the FCWD, have been caused to suffer, and will continue to suffer, losses for the increased rates and surcharges incurred as ratepayers for the costs of filtering PFAS from their drinking water, and other damages to be proved at trial.

**ANSWER:** Dixie denies the allegations in Paragraph 192 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 192 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

193.   As a result of the public nuisance caused by Defendants, Plaintiff and Proposed Class Members have been caused to suffer, and will continue to suffer, economic damage caused by Defendants' actions/inactions, including their role in the toxic PFAS contamination of the public drinking water.

**ANSWER:** Dixie denies the allegations in Paragraph 193 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 193 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

**COUNT EIGHT:**
**CLAIMS FOR ABATEMENT**
**AND INJUNCTION OF PUBLIC NUISANCE**

194.   Plaintiff and Proposed Class Members incorporate paragraphs 1 through 193 as if restated herein.

**ANSWER:** Dixie re-alleges and incorporates by reference its responses to all prior Paragraphs as if fully set forth herein.

115

195.   Pursuant to O.C.G.A. §§ 41-2-1 and 41-2-2, Plaintiff and Proposed Class Members have the right to bring an action to abate the nuisance caused by Defendants' manufacture, supply, and discharge of PFOA, PFOS, and related chemicals, which has caused and continues to cause contamination of their water supply.

**ANSWER:** Dixie denies the allegations in Paragraph 195 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 195 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

196.   As set out in the Notices attached hereto as Exs. "A," "C," and "E" and incorporated by reference herein, and in Paragraphs 95 through 99, Defendant Dalton Utilities has, since as early as 2006, and every day since at least of June of 2015, discharged PFAS from the LAS into the Conasauga River and its tributaries, and has also discharged raw sewage containing PFAS from its collection system into these waters on numerous occasions. Defendant Dalton Utilities has long known of these dangerous discharges of toxic chemicals, yet has taken no action whatsoever to address them but instead has continued to operate and maintain the Dalton POTW and the LAS in a manner where PFAS cannot be treated or removed, allowing these illegal discharges to be continuous and ongoing.

116

**ANSWER:**  Dixie lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 196 of the Fourth Amended Complaint. Therefore, the allegations of Paragraph 196 are denied.

197.   In addition to their claims for damages, Plaintiff and Proposed Class Members are entitled to an injunction to abate the nuisance created and maintained by Defendants.

**ANSWER:**  Dixie denies that Plaintiff is entitled to any relief from Dixie, and any allegations of Paragraph 197 that are directed toward Dixie are denied. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 197 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

198.   Plaintiff and Proposed Class Members request this Court to issue an order and decree requiring Defendants to remove their chemicals and toxins from the water supplies of Plaintiff and Proposed Class Members and/or fund the measures necessary to prevent these chemicals and toxins from continuing to contaminate Plaintiff's and Proposed Class Members' water supply, based on the continuing irreparable injury to them posed by the continuing nuisance, for which there is no adequate remedy at law.

**ANSWER:**  Dixie denies that Plaintiff is entitled to any relief from Dixie, and any allegations of Paragraph 198 that are directed toward Dixie are denied. Dixie is

20798687v1

without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 198 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

199.   Plaintiff and Proposed Class Members further request that this Court enter an order and decree permanently enjoining Defendants from continuing the conduct described herein, and requiring Defendants to take all steps necessary to remove their chemicals from Plaintiff's and Proposed Class Members' water supplies and properties.

**ANSWER:**  Dixie denies that Plaintiff is entitled to any relief from Dixie, and any allegations of Paragraph 199 that are directed toward Dixie are denied. Dixie is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 199 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

200.   There is continuing irreparable injury to Plaintiff and Proposed Class Members—and, indeed, all consumers of drinking water supplied by the RWSD and/or the FCWD—if an injunction does not issue, as Defendants' PFAS in Rome's water supplies pose a continuing threat, and there is no adequate remedy at law.

**ANSWER:** Dixie denies the allegations in Paragraph 200 of the Fourth Amended Complaint to the extent those allegations are directed toward Dixie. Dixie is without knowledge or information sufficient to form a belief as to the truth of the

118

allegations of Paragraph 200 to the extent they are directed toward any other Defendant, and those allegations are therefore denied.

Dixie further denies that it is liable to Plaintiff in any manner whatsoever and denies that Plaintiff is entitled to any relief whatsoever from Dixie as set forth in the Relief Demanded section or otherwise in the Fourth Amended Complaint. Dixie is without sufficient information to admit or deny whether any other Defendant is liable to Plaintiff. Any allegation not specifically addressed herein is hereby explicitly denied.

WHEREFORE, Dixie respectfully requests for the Court to dismiss Plaintiff's Fourth Amended Complaint to the extent it is directed toward Dixie; to assess all costs and fees, including reasonable attorneys' fees, against Plaintiff; to hold a trial by jury for the triable issues of the case; in the event any injunctive relief is granted, to require Plaintiff to post a bond in an amount sufficient to protect all of Dixie's interests affected as a result of the injunctive relief; and to award any other relief to Dixie as shall appear just and proper.

Respectfully submitted this 1st day of February 2022.

20798687v1

**MILLER & MARTIN PLLC**

*/s/* Scott Parrish
Scott Parrish, GA Bar # 564980
Ellis Lord, TN Bar # 26642
Neil L. Wilcove, GA Bar # 758401
Meredith C. Lee, GA Bar # 294856
Jenna Fullerton, TN Bar # 36522
832 Georgia Avenue, Suite 1200
Chattanooga, TN  37402
423-756-6600 Telephone
423-785-8480 Facsimile
scott.parrish@millermartin.com
ellis.lord@millermartin.com
neil.wilcove@millermartin.com
meredith.lee@millermartin.com
jenna.fullerton@millermartin.com

*Attorneys for Defendant The Dixie Group, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Undersigned counsel certifies that the foregoing document has been prepared using an approved font (Times New Roman, 14 points) in compliance with Local Rules 5.1(C) and 7.1(D).

This 1st day of February 2022.

**MILLER & MARTIN PLLC**

*/s/* Scott Parrish
Scott Parrish, GA Bar # 564980

20798687v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 1, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

**MILLER & MARTIN PLLC**

*/s/* Scott Parrish
Scott Parrish, GA Bar # 564980