# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| **JARROD JOHNSON, Individually** | ) | |
| **and on behalf of a class of persons** | ) | |
| **similarly situated,** | ) | |
| | ) | **Civil Action No.** |
| | ) | **4:20-cv-0008 AT** |
| **Plaintiff,** | ) | |
| **vs.** | ) | |
| | ) | |
| **3M COMPANY**, *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

I.  BACKGROUND ........................................................................................1

   A. The Conasauga and Oostanaula Rivers are highly contaminated with persistent, bioaccumulative, and toxic PFAS. ..................................1

   B. Defendants created and maintained a public nuisance of PFAS pollution. ....6

   C. The contamination has damaged Johnson and class members......................18

   D. Absent the injunctive relief sought, the polluted LAS will contaminate the Conasauga and Oostanaula for generations...................................................20

II. ARGUMENT.........................................................................................22

   A. The Proposed Classes are adequately defined and ascertainable.................22

   B. Class certification is appropriate under Rule 23(a). ....................................23

      1. The Proposed Classes are so numerous that joinder is impracticable......23

      2. The Proposed Classes raise common contentions capable of class-wide resolution. ...................................................................................24

      3. Johnson's claims are typical of absent class members' claims...............25

      4. Johnson will fairly and adequately represent the Proposed Classes' interests..................................................................................27

   C. Class certification is appropriate under Rule 23(b)(2) and (b)(3).................30

      1. The Damages Class satisfies Rule 23(b)(3). ...........................................30

         a. Common questions of law and fact overwhelm questions affecting only individual class members. ...........................................30

         b. A Class action is superior to other available methods for the fair and efficient adjudication of claims. .........................................35

      2. The Injunction Class satisfies Rule 23(b)(2).............................................38

III.CONCLUSION....................................................................................39

   APPENDIX OF EXHIBITS ................................................................... i

# I.   BACKGROUND

**A.    The Conasauga and Oostanaula Rivers are highly contaminated with persistent, bioaccumulative, and toxic PFAS.**

Over 80 years ago, invention of a class of artificial chemicals called per- and polyfluoroalkyl substances ("PFAS") incited decades of widespread commercial use that continued to multiply through the turn of the century. Their use spread initially without precaution, but PFAS makers and users rapidly learned the chemicals had alarming properties that, with unfettered use and disposal, endangered public health, property, and the environment. They persisted in the body and environment, progressively with repeated exposure; were toxic and linked to multiple human diseases; and due to their water solubility, made surface water and groundwater vulnerable to contamination. The PFAS industry and their customers concealed their knowledge for decades, and when the public and regulators began to catch up, it was too late.

Today, environmental crises around centers of PFAS manufacture and use are well publicized—from Minnesota to Alabama, West Virginia, North Carolina, New Jersey, and Vermont.[1] Manufacturers like 3M and DuPont have faced

---

[1] *See, e.g.*, Tom Perkins, *Cancer fears plague residents of US region polluted by 'forever* chemicals', THE GUARDIAN (July 12, 2022); Michael Hawthorne, *The origin of these highly toxic man-made chemicals*, CHICAGO TRIBUNE (July 10,

significant civil liability and government fines, and multiple sites of legacy

contamination will undergo major remediation.[2]

 This case is about the home of some of the most extensive PFAS pollution in

the country: the Carpet Capital of the World—what 3M's consultant deemed in

1999 as ████████████████████████████████████████████

████████████████████████████████████████████████████

Ex. 1, at 1. Chemical suppliers sold an estimated 70 million pounds of PFAS

products to Dalton carpet companies between 1986 and 2019, and for roughly the

same period the 9,800-acre land application system ("LAS") in Dalton has been

saturated with perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid

("PFOS"), and other PFAS within as much as 30 to 40 million gallons of

wastewater daily. Ex. 2, at 17-18; Ex. 3.

---

2022);  David Gelles and Emily Steel, *How Chemical Companies Avoid Paying for Pollution*, NEW YORK TIMES (Oct. 20, 2021).

[2] *See* Minn. Pollution Control Agency, *PFAS waste sites, available at* https://www.pca.state.mn.us/waste/pfas-waste-sites*;* N.C. Dep't of Envtl. Quality, *Chemours Consent Order*, *available at* https://deq.nc.gov/news/key-issues/genx-investigation/chemours-consent-order; N.J. Dep't of Envtl. Protection, *In re: Poly-and perfluoroalkyl Substances*, Statewide PFAS Directive, Information Request and Notice to Insurers (Mar. 25, 2019), *available at* https://www.nj.gov/dep/docs/statewide-pfas-directive-20190325.pdf. 3M News Center, *3M Reaches Agreement to Address PFAS with Several Parties Near Decatur, Ala.*, *available at* https://news.3m.com/2021-10-19-3M-Reaches-Agreement-to-Address-PFAS-with-Several-Parties-Near-Decatur,-Ala.

Surrounded by the Conasauga River and tributaries, the LAS has from its inception proven highly conducive to surface water runoff, overland flow, and groundwater migration; and it has maintained near-constant PFAS pollution of the river for the entire life of its operation. While previously known to the Defendants, the public was none the wiser until 2008, when media reported that University of Georgia ("UGA") researchers found "staggeringly high" levels in the Conasauga downstream of the LAS—"among the highest ever measured in water at a nonspill location." Ex. 3; *see also* Ex. 4. Pinpointing the LAS as its source, the study found average PFOA levels of 1,150 ppt downstream. Ex. 4, at 2014.

Even now, streams originating from the LAS into the Conasauga have massive PFAS levels—most significantly in a wetland pond directly connected to the river by an overland stream,[3] measuring *almost 190,000 ppt* in total PFAS and almost *45,000 ppt in PFOA and PFOS alone*. GEL Engineering's expert report identifies sample locations and their respective results, for example:

---

[3] Topographical maps maintained by the U.S. Geological Survey demonstrate that this wetland pond (SW-04) sits less than 100 feet from the Conasauga.



| SW-18* | Drowning Bear Creek |
|---|---|
| Total PFAS | 1,640 |
| PFOA+PFOS | 439 |
| PFBA | 86.6 |
| PFBS | 477 |
| PFHxA | 110 |
| PFHxS | 34.2 |
| PFOA | 168 |
| PFOS | 271 |
| PFPeA | 129 |

| SW-02 | Drowning Bear Creek |
|---|---|
| Total PFAS | 4,090 |
| PFOA+PFOS | 732 |
| PFBA | 198 |
| PFBS | 1,740 |
| PFHxA | 191 |
| PFHxS | 53.6 |
| PFOA | 301 |
| PFOS | 431 |
| PFPeA | 292 |

| SW-03 | UT of Drowning Bear Creek |
|---|---|
| Total PFAS | 19,820 |
| PFOA+PFOS | 11,270 |
| PFBA | 525 |
| PFBS | 1,270 |
| PFHxA | 1,290 |
| PFHxS | 607 |
| PFOA | 3,970 |
| PFOS | 7,300 |
| PFPeA | 1,660 |

| SW-01 | UT of Conas River |
|---|---|
| Total PFAS | 19,190 |
| PFOA+PFOS | 9,530 |
| PFBA | 801 |
| PFBS | 2,280 |
| PFHxA | 1,680 |
| PFHxS | 369 |
| PFOA | 3,820 |
| PFOS | 5,710 |
| PFPeA | 2,290 |

| SW-06 | UT of Polecat Cr |
|---|---|
| Total PFAS | 16,630 |
| PFOA+PFOS | 4,710 |
| PFBA | 692 |
| PFBS | 4,870 |
| PFHxA | 1,210 |
| PFHxS | 686 |
| PFOA | 1,170 |
| PFOS | 3,540 |
| PFPeA | 1,840 |

| SW-04 | Wetland pond, flow to Conas R |
|---|---|
| Total PFAS | 180,800 |
| PFOA+PFOS | 44,800 |
| PFBA | 8,360 |
| PFBS | 47,000 |
| PFHxA | 11,400 |
| PFHxS | 2,880 |
| PFOA | 26,700 |
| PFOS | 18,100 |
| PFPeA | 19,600 |

| SW-05/ Duplicate | UT of Conas River |
|---|---|
| Total PFAS | 10,230/10,210 |
| PFOA+PFOS | 2,231/2,309 |
| PFBA | 706/699 |
| PFBS | 2,230/2,250 |
| PFHxA | 1,100/1,060 |
| PFHxS | 141/127 |
| PFOA | 771/759 |
| PFOS | 1,460/1,550 |
| PFPeA | 1,200/1,190 |

| SW-07 | UT of Holly Creek |
|---|---|
| Total PFAS | 18,540 |
| PFOA+PFOS | 6,290 |
| PFBA | 746 |
| PFBS | 4,970 |
| PFHxA | 1,120 |
| PFHxS | 244 |
| PFOA | 1,100 |
| PFOS | 5,190 |
| PFPeA | 1,770 |

Ex. 5, at Fig. 8.

4



| SW-08 | UT of Holly Creek |
|---|---|
| Total PFAS | 29,240 |
| PFOA+PFOS | 10,370 |
| PFBA | 1,270 |
| PFBS | 7,030 |
| PFHxA | 2,070 |
| PFHxS | 439 |
| PFOA | 2,100 |
| PFOS | 8,270 |
| PFPeA | 3,380 |

| SW-09 | UT to UT of Holly Creek |
|---|---|
| Total PFAS | 23,480 |
| PFOA+PFOS | 8,400 |
| PFBA | 1,010 |
| PFBS | 6,070 |
| PFHxA | 1,470 |
| PFHxS | 294 |
| PFOA | 1,750 |
| PFOS | 6,650 |
| PFPeA | 2,370 |

| SW-11 | From Mash-burn Lake East |
|---|---|
| Total PFAS | 22,220 |
| PFOA+PFOS | 9,550 |
| PFBA | 848 |
| PFBS | 4,170 |
| PFHxA | 1,390 |
| PFHxS | 387 |
| PFOA | 1,970 |
| PFOS | 7,580 |
| PFPeA | 2,150 |

| SW-16 | UT of Polecat Cr |
|---|---|
| Total PFAS | 38,700 |
| PFOA+PFOS | 9,880 |
| PFBA | 2,110 |
| PFBS | 14,100 |
| PFHxA | 3,000 |
| PFHxS | 244 |
| PFOA | 2,530 |
| PFOS | 7,350 |
| PFPeA | 5,240 |

| SW-10 | Pettite Branch |
|---|---|
| Total PFAS | 23,160 |
| PFOA+PFOS | 8,350 |
| PFBA | 1,040 |
| PFBS | 5,140 |
| PFHxA | 1,560 |
| PFHxS | 394 |
| PFOA | 1,860 |
| PFOS | 6,490 |
| PFPeA | 2,680 |

| SW-12 | From Mash-burn Lake West |
|---|---|
| Total PFAS | 20,860 |
| PFOA+PFOS | 9,000 |
| PFBA | 827 |
| PFBS | 3,830 |
| PFHxA | 1,260 |
| PFHxS | 348 |
| PFOA | 1,830 |
| PFOS | 7,170 |
| PFPeA | 1,880 |

| SW-17 | UT of Polecat Cr |
|---|---|
| Total PFAS | 19,680 |
| PFOA+PFOS | 4,670 |
| PFBA | 953 |
| PFBS | 7,130 |
| PFHxA | 1,380 |
| PFHxS | 247 |
| PFOA | 1,200 |
| PFOS | 3,470 |
| PFPeA | 2,350 |

| SW-15 | UT of Polecat Cr |
|---|---|
| Total PFAS | 25,820 |
| PFOA+PFOS | 6,450 |
| PFBA | 1,190 |
| PFBS | 9,370 |
| PFHxA | 1,700 |
| PFHxS | 358 |
| PFOA | 1,640 |
| PFOS | 4,810 |
| PFPeA | 3,270 |

| SW-14 | UT of Casey Springs Br. |
|---|---|
| Total PFAS | 20,710 |
| PFOA+PFOS | 5,550 |
| PFBA | 968 |
| PFBS | 6,480 |
| PFHxA | 1,580 |
| PFHxS | 322 |
| PFOA | 1,520 |
| PFOS | 4,030 |
| PFPeA | 2,610 |

| SW-13/Duplicate | Casey Springs Branch |
|---|---|
| Total PFAS | 16,320/16,370 |
| PFOA+PFOS | 4,550/4,330 |
| PFBA | 808/762 |
| PFBS | 4,800/5,050 |
| PFHxA | 1,270/1,300 |
| PFHxS | 277/282 |
| PFOA | 1,320/1,340 |
| PFOS | 3,230/2,990 |
| PFPeA | 2,040/2,080 |

Ex. 5, at Fig. 9.

As nature runs its course, the Conasauga carries PFAS downstream, still detectable at high concentrations over 150 river miles[4] downstream where the Coosa River reaches Gadsden, Alabama. *See* Gadsden Water Works & Sewer Board, *GWWSB PFC Sampling Results Compilation.*[5] Closer to the epicenter, Rome's water intake rests on the Oostanaula River only 60 river miles downstream

---

[4] *See* U.S. Geological Survey, *Streamer*, *available at* https://txpub.usgs.gov/DSS/streamer/web/.

[5] *available at* https://gadsdenwater.org/environmentalreporting.aspx. Most recent raw water samples showed 25 ppt of PFOA and 35 ppt of PFOS. *See id.*

from the LAS. *See* Ex. 6, at Table 5-2. Though the Coosawattee River dilutes the Conasauga at their confluence, water at the Rome intake nonetheless contained over 330 ppt in total PFAS as of May 2022. Ex. 5, at Fig. 13, Table 4. Much of it is PFOA (32 ppt) and PFOS (61 ppt)—exceeding EPA's 2022 health advisory by *8000- and 3050-fold* with current limits set at 0.004 ppt (PFOA) and 0.02 ppt (PFOS). Ex. 4, at Table 4.

## B.   Defendants created and maintained a public nuisance of PFAS pollution.

The Dalton carpet industry began using PFAS products in the 1970s to impart water and soil repellency to carpet. Ex. 7, at 102:23-24. These products contained and degraded to PFAS, including well-known, long-chain compounds like PFOA and PFOS and, later on, short-chains like PFHxA and PFBS. Despite mounting evidence of the chemicals' toxicity and contamination of the Upper Coosa River Basin, their use did not cease in Dalton until 2019. *See, e.g.,* Ex. 8, at Interrogatory No. 2; Ex. 9, at Interrogatory No. 1.

Pioneers of fluorochemistry, 3M and DuPont knew for decades that PFAS—PFOS and PFOA in particular[6]—were persistent, bioaccumulative, and toxic,

---

[6] PFOS and PFOA each contain eight carbon atoms and are thus commonly referred to as "C8." PFOA can be produced via either electrochemical fluorination ("ECF") (the process used by 3M) or telomerization (the process used by DuPont and Daikin America), but PFOS can only be produced by ECF.

causing distinctive threats to water resources. Internal documents from the 1960s note the chemicals' respective toxicity and stability, and each company learned in the 1970s that they were accumulating in the blood of plant workers and even members of the public. *See, e.g.*, Ex. 10, at 6, 44;  Ex. 11; Ex. 12; Ex. 13. Often in cooperation, both companies continued to study health and environmental effects of PFAS throughout the 1980s and 1990s while concealing their knowledge from regulators and the public. *See, e.g.*, Ex. 14; Ex. 15; Ex. 16; Ex. 17; Ex. 1. And both companies received significant fines from EPA as a result. Ex. 18; Ex. 19.

The carpet industry's other major PFAS suppliers, Daikin America and Invista, also knew the health and environmental risks of their PFAS products when they entered the market. Incorporated in 1991, Daikin America inherited the knowledge and expertise of its parent company, Daikin Industries Ltd., a long-term manufacturer of fluorochemistry. *See* Ex. 20, at 124:7-11; Ex. 21; Ex. 22. Likewise, Invista inherited DuPont's knowledge and expertise when created in 2004 from DuPont's sale of its textile fibers division. *See* Ex. 7, at 35:14-24; Ex. 23, at 43:8-44:25.

Although starting in the 1970s, the Dalton carpet industry's PFAS use exploded with DuPont's introduction of the Stainmaster® program in 1986, making stain resistance and soil repellency a focus of marketing and competition

amongst both carpet manufacturers and chemical suppliers. *See* Ex. 7, at 102:25-104:24; Ex. 24, at 29:17-23. The boom in fluorochemical applications significantly raised both water demand and contaminated wastewater output. Ex. 25.

With the influx of contaminated wastewater and new chemicals, Dalton Utilities' wastewater treatment plant was overwhelmed. A required chemical component of DuPont's Stainmaster program caused such biological and chemical oxygen demand that it overloaded Dalton Utilities' treatment operations. Ex. 31, at 23:2-24:1, 165:5-169:11; Ex. 32; *see* Ex. 24, at 31:9-33:1. Meanwhile, ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Ex. 33, at 2-3, 6. Dalton Utilities opened the Riverbend LAS in 1986, but from the outset it proved unable to handle the wastewater inundation. *See* Ex. 26. Almost immediately, the LAS too was plagued by treatment problems caused directly by the industry's use of DuPont and 3M products. *See* Ex. 25; Ex. 27; Ex. 28; *see also* Ex. 29, at 3-4; Ex. 30, at 5.

These problems persisted uninterrupted into the 1990s, resulting in numerous fines and consent orders between Dalton Utilities and the Georgia Environmental Protection Division ("EPD"). *See, e.g.*, Ex. 27; Ex. 34; Ex. 35. They came to a head in 1995, when EPA and the FBI opened a criminal

investigation into Dalton Utilities and conducted a raid in August 1995. *See* Ex. 36. An EPA criminal investigator's interview with former Dalton Utilities pretreatment coordinator uncovered that the utility positioned LAS sprayheads "close to the creeks and on top of the rolling hills which lead to the creeks" and intentionally discharged pollutants into the Conasauga River and its tributaries. Ex. 37, at 2. Among other misconduct, the investigation found that Dalton Utilities manipulated carpet manufacturers' sampling data to fabricate their compliance with its pretreatment program. Ex. 37. The former pretreatment coordinator deemed the pretreatment program a "sham," reporting also that Dalton Utilities' CEO DeForrest Parrott told him "'[t]he state could kiss my ass' in regard to operating the pretreatment program." Ex. 37, at 1.

The 1995 investigation culminated not only in EPA's and EPD's 1998 Clean Water Act ("CWA") suit against Dalton Utilities, but also Dalton Utilities' criminal indictment in 1999. *See* Ex. 38; Ex. 39. In short, the actions alleged that Dalton Utilities "chronically discharged pollutants from point sources on the LAS to the Conasauga" since "at least 1989"; failed to inspect, monitor, or enforce pretreatment standards on its industrial users; and falsified reports to environmental regulators. Ex. 38, at 6, 15-19; Ex. 39, at 4-7. EPA also sought Dalton Utilities' debarment, citing its "long and extensive history of repeated

environmental violations." Ex. 40, at 6. It firmly condemned Dalton Utilities'

historic misconduct:

> Operating as one of the State of Georgia's largest public utility [sic],
> the Respondents were in key positions of public trust. They were
> charged with the duty of providing responsible and honest public
> services to citizens in and around the City of Dalton, Georgia. Instead
> of responsible and honest services, the Respondents for years have had
> a systematic history of non-compliance with state and federal
> environmental laws.

Ex. 40, at 7.

Dalton Utilities pleaded guilty to five felony counts, and it ultimately settled

the civil lawsuit in 2001 with a consent decree. Ex. 41; Ex. 42. The settlement

allowed Dalton Utilities to escape debarment but required a $6 million penalty and

improvements to LAS facilities and the utility's pretreatment program. Ex. 42, at

5-8, 11-14, 19; Ex. 43.

Dalton Utilities' unenforced pretreatment program and falsified statements

had one beneficiary: the Dalton carpet industry. Unsurprisingly, throughout its

existence, most Dalton Utilities Board Members have been employed by the carpet

industry at one point or another. Ex. 44, at 1085:1-13, 1086:3-1091:4, 1311:4-

1312:20.

By 2000, Defendants had connected the chemicals in the mills' wastewater

to their impact on Dalton Utilities' treatment operations and to the health of the

Conasauga River. In fact, during the late 1990s, 3M secretly studied its carpet

customers' PFOS releases around Dalton, ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████ Ex. 1, at 1, 23; *see* Ex. 45. And in 1998, 3M informed its carpet customers,

including Shaw and Mohawk, as well as DuPont, Daikin, and the Carpet and Rug

Institute (the carpet industry's trade association) of its "recent"[7] finding that PFOS

was in the blood of the general population. *See, e.g.,* Ex. 46; Ex. 47; Ex. 48.

In May of 2000, 3M publicly announced that it was phasing out its long-

chain PFAS products—an event that rippled through the carpet industry.

Customers were not pleased, most notably Shaw. Its former technical director

recounts a meeting in which President and CEO Bob Shaw threw a carpet sample

at the 3M representatives briefing him on the phaseout and—pointing to the

Scotchgard brand—yelled "[t]hat's not a logo. That's a target. And I've got 15

million of these out in the marketplace, and what am I supposed to do about that?"

Ex. 49, at 88:20-89:9 ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. 50.

---

[7] 3M had in fact known this since 1970s. *See* Ex. 12.

11

3M's competitors saw opportunity in its phase-out. From Daikin's perspective, ██████████████████████████████████████████████ ██████████████████████ Ex. 51. ████████████████████████████ ██████████████████████████████████ Ex. 51. As would Daikin, DuPont sought to distinguish its own products as completely safe. *Cf.* Ex. 52, at 10.[8]

Later in December of 2000, the Carpet and Rug Institute called a meeting to discuss ████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████ Ex. 55. At the same time, 3M warned the carpet industry ████████████████████████████████ ███████████████████████████ Ex. 55. According to 3M, ██████████████████████████████████████████████ ████████████████ Ex. 55.

Concerned that replacement products were also persistent, bioaccumulative, and toxic, the Carpet and Rug Institute ██████████████████████████████

---

[8] For example, in April 2002 DuPont told Braun of the Carpet and Rug Institute there was "no evidence that there is PFOA in [DuPont] products"—an official but entirely false talking point. Ex. 53. In fact, DuPont knew by at least 1999 that PFOA was present in its fluorotelomer products, including the products it sold to the carpet industry. *See* Ex. 54.

██████████████████████████████████████████████ Ex.

55. Suppliers described the review as a ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████ Ex. 55. 3M, DuPont, Daikin, Shaw, and Mohawk each

participated in the "PBT review." Ex. 55.

In the wake of 3M's phaseout announcement, EPA turned to investigating

and identifying major sources of PFOA and related PFAS in the environment. It

also published a Draft Hazard Assessment for PFOA in 2002, followed by a

Preliminary Risk Assessment in 2003. *See* Ex. 56; Ex. 57; Ex. 58. Both identified

PFOA as raising similar concerns to those raised by PFOS in that PFOA was

persistent, resistant to degradation, bioaccumulative, and carcinogenic to animals

and likely to humans. Ex. 56, at 1-3, 5; Ex. 57, at 1-3, 6; Ex. 58, at 1.

To identify major sources of PFOA and other PFAS pollution, EPA looked

to chemical makers and the Dalton carpet industry to obtain "user-site" monitoring

data. Ex. 59, at 1-3; Ex. 60; Ex. 61; Ex. 62, at 118:5-120:-15. EPA tasked

fluorochemical suppliers, including DuPont and Daikin—part of the "Telomer

Working Group"—, with obtaining permission to conduct PFAS testing in the

paper, textile, and carpet industries. *See* Ex. 59, at 1-3; Ex. 60. The carpet industry

was an obvious target, though its concern was not with the environment or human

health, but instead the potential exposure that monitoring would bring. Ex. 61; Ex.

63, at 5-6. Through the Carpet and Rug Institute, ███████████████████

███████████████████████████████████████████████

███████████████████ Ex. 62, at 126:23-128:4, 129:17-23; *see* Ex. 61; Ex.

63, at 6. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████ Ex. 63, at 6; Ex. 61.

    EPA accepted the industry's counteroffer, but by Spring of 2004, ████████

███████████████████████████████████████████████

████████ whose participation was obviously critical. Ex. 64, at 1-2; Ex. 65. The

Carpet and Rug Institute joined Dalton Utilities in a sudden about-face: ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ Ex. 66, at 2-3; Ex. 67. The PFAS pollution of

the Upper Coosa River Basin remained an industry secret.

    Neither the Telomer Working Group nor its individual members attempted

PFAS testing in the Dalton area again. *See* Ex. 68, at 53:2-56:19; Ex. 69, at

14

292:16-23, 294:16-295:9; Ex. 20, at 583:15-20. But in or before 2005, Shaw developed the capability to conduct its own PFAS testing, which it used to analyze PFAS at various locations between 2006 and 2008. *See* Ex. 70, at 743:7-11. The results should have been alarming, confirming high PFOA and PFOS levels:

- in the Conasauga River downstream of the LAS and in the Oostanaula, while non-detect upstream of the LAS, Ex. 70, at 770:16-774:2, 784:5-789:1; Ex. 71; Ex. 72; Ex. 73, at 221:17-224:15; Ex. 74; Ex. 75; Ex. 76;

- in the Oostanaula above Rome, *see id.*; and, worst of all,

- in the Rome drinking water. Ex. 73, at 223:20-224:15; Ex. 75; Ex. 76.

Although EPA's monitoring request prompted Shaw's testing, Shaw did not relay any results to EPA or to the State of Georgia. Ex. 70, at 774:3-22. Nor did it alert Rome that it found PFAS in its tap water. Ex. 70, at 833:16-23; *see also* Ex. 73, at 223:25-224:15.

The PFAS contamination would remain an industry secret until 2008, when UGA researchers published results of their own 2006 water sampling. Citing 3M's PFOS phaseout in 2000, the persistence and toxicity of PFAS, and the likelihood that Dalton was a regional pollution source, the researchers suspected that "[c]ontamination by PFAAs,[9] both historic and current, may be significant in the

---

[9] The researchers used "PFAAs" to reference perfluoroalkyl acids, which are a type of PFAS including PFOA and PFOS.

Conasauga River because of its close proximity to the extensive carpet industry"
and the LAS. Ex. 4, at 2011. They were right; results showed "[c]oncentrations of
PFOS, PFOA, and other PFAAs in the Conasauga River . . . among the highest
ever recorded in surface waters. . . ." Ex. 4, at 2015. With elevated PFAS levels
downstream of the LAS, the authors pinpointed it as the likely source. Ex. 4, at
2016, 2017.

As the UGA study results were published, news reporters alarmed Dalton
Utilities and the carpet industry because they were "hot on the trail for a PFOA
article" that would expose the industry's contamination. Ex. 77; *see also* Ex. 78;
Ex. 79; Ex. 80. The Carpet and Rug Institute quickly formed a "crisis management
team" to deal with the fallout, including representatives for DuPont, 3M, Daikin,
Invista, and Shaw. Ex. 81. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████[10] Ex. 82.

_____

[10] EPA's voluntary stewardship program focused solely on chemical suppliers and
did not involve any monitoring of carpet companies, Dalton Utilities, or the
Conasauga River. *See* U.S. Environmental Protection Agency, *Fact Sheet:*
*2010/2015 PFOA Stewardship Program*, *available at*
https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-
20102015-pfoa-stewardship-program#what.

███████████████████████████████████████████

███████████████████████████████████████████████

Ex. 82. Nonetheless, a local news outlet published an article in February of 2008,

both exposing that Dalton Utilities and the industry quashed the 2004 monitoring

plan and revealing the results of the UGA study. Ex. 3. The secret was out.

With the PFAS contamination now in the public eye, the carpet industry and

suppliers were motivated to transition from long-chain to the short-chain PFAS.

For example, ████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████ Ex. 83. But short-chains were a non-

solution: Not only were their adverse health and environmental effects

understudied, but Defendants knew the products still contained long-chain PFOA.

*See* Ex. 84, at 22; Ex. 85; Ex. 86.

EPA also returned its attention to Dalton, this time with compulsory PFAS

monitoring orders to Dalton Utilities that covered its treatment facilities, carpet

manufacturers' wastewater discharges, and the Conasauga River and its tributaries.

Ex. 87; Ex. 88. █████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████



*See* Ex. 89; Ex. 90; Ex. 91.

*See* Ex. 89; Ex. 90; Ex. 91.

Ex. 90.

In May of 2016, EPA set its drinking water health advisory at 70 ppt combined for PFOA and PFOS. Ex. 92. Not long after, the Alabama cities of Gadsden and Centre sued the carpet industry for the PFAS pollution of the Coosa River. *See* Ex. 93; Ex. 94. For its part, the City of Rome was forced to implement emergency measures to comply with the health advisory because Rome's conventionally treated water supply exceeded it by double. Ex. 95, at 55:4-56:10, 73:13-74:6, 161:21-162:16. With ever growing regulatory scrutiny, public and market pressures, and now lawsuits, the carpet industry finally abandoned fluorochemicals in or around 2019. *See, e.g.*, Ex. 8, at Interrogatory No. 2; Ex. 9, at Interrogatory No. 2. But the damage was done.

## C.   The contamination has damaged Johnson and class members.

Faced with the influx of PFAS at the water intake, the City of Rome began removing as much from potable water as possible through granular activated

carbon ("GAC") treatment, costing millions of dollars. Ex. 95, at 74:2-6, 186:10-187:2; Ex. 96, at ¶ 1. It passed those expenses on to water customers with consecutive 2.5% annual rate increases totaling roughly $1.4 million. Ex. 96, at ¶ 1. The City then announced effective March 1, 2022, that water rates will see 9% annual raises until 2026, followed by 3% annual raises until 2031 for the same purpose, including to pay for a reverse osmosis treatment system—costing water customers (i.e., Johnson and the Proposed Classes) roughly $93 million over the period. Ex. 96, at ¶ 2. The rate increases are intended to fund the installation, operation, and maintenance of the reverse osmosis system for the next 30 years. Ex. 96, at ¶ 2.

Johnson is a Rome resident and, along with members of the Proposed Classes, is a water customer with the Rome Water and Sewer Division ("RWSD"). Ex. 97. Through no fault of their own, they must pay extraordinary sums for ordinary tap water—simply to use and enjoy it in their homes and businesses without toxic "forever chemicals." But Defendants' pollution has far wider effects than contaminating drinking water, also thoroughly polluting major rivers and their tributaries in northwest Georgia and spreading throughout the food chain in vegetation, fish, and animals both wild and domestic. *See, e.g.,* Ex. 4; Ex. 91; Ex.

98, at ¶¶ 3, 18-23; Ex. 99. 3M's environmental consultant expected and identified

all these pathways over 20 years ago:



Ex. 99.

**D.      Absent the injunctive relief sought, the polluted LAS will contaminate
the Conasauga and Oostanaula for generations.**

Due to PFAS' stable and persistent nature, the outpour of both long- and

short-chain PFAS from the LAS did not cease either with 3M's PFOS phase-out in

2000, the industry's switch to short-chains in 2009, or with the total phase-out in

20

2019. Nor will it cease any time remotely soon. *See* Ex. 2, at 3, 22-23. The LAS's

contaminated streams measure far greater PFAS concentrations than wastewater

distributed by its sprayheads, indicating that PFAS saturate the soil and vegetation.

Ex. 2 at 22. There, chemicals degrade to terminal PFAS compounds like PFOS,

PFOA, PFBS, PFBA, PFHxA, and PFPeA and continually pollute the Conasauga

via the LAS's overland conveyances. *See* Ex. 2, at 22. Because of PFAS'

persistence, the LAS will continue to pollute the Conasauga River at consistently

high levels for hundreds of years, impacting generations, if not remediated. *See* Ex.

2, at 22-23.[11]

     Fortunately, abatement and remediation are just as feasible as they are

necessary. Johnson has retained an expert seasoned in environmental remediation

projects, who has developed a five-part plan to:

- Replace land application with treatment of industrial wastewater with granular activated carbon ("GAC");

- collect and GAC-treat contaminated surface waters throughout the LAS before they are discharged;

---

[11] Observable in Gadsden (roughly 150 miles downstream of the LAS), PFOA and PFOS levels have maintained steady monthly levels since 2016. *See* Gadsden Water Works & Sewer Board, *GWWSB PFC Sampling Results Compilation*, *available at* https://gadsdenwater.org/environmentalreporting.aspx.

- cap historic (~525 acre) sludge fields that have particularly high PFAS concentrations to prevent interaction with precipitation and surface waters;

- comprehensively sample industrial users to identify those with elevated PFAS discharges, and require them to implement GAC pre-treatment systems under pre-treatment permits; and

- investigate, study, and design a collection system for surface waters of roughly 1,500 acres of sprayfields that do not have ready collection points.

Ex. 2, at 34-37. Remediation to abate the nuisance will take an estimated 30 years to complete, and its estimated cost is $850,761,302.00. Ex. 2, at. 34, 37.

## II.   ARGUMENT

Johnson seeks to certify a Damages Class and an Injunction Class (collectively "Proposed Classes") to have those responsible for the PFAS contamination pay for the Class's increased rates and to abate the PFAS contamination at its source. Rule 23 controls class certification, and its application to the Proposed Classes is straightforward.

### A.   The Proposed Classes are adequately defined and ascertainable.

Rule 23(a) imposes an initial, implicit condition of "ascertainability." *Cherry v. Dometic Corp*., 986 F.3d 1296, 1302-03 (11th Cir. 2021); FED. R. CIV. P. In short, an "adequately defined and clearly ascertainable" class definition is necessary to evaluate Rule 23(a)'s explicit requirements. *Cherry*, 986 F.3d at 1302-03. Having removed "administrative feasibility" from the equation, the Eleventh

Circuit reduces ascertainability to a single question: whether a proposed class "is adequately defined such that its membership is capable of determination." *Id.* at 1302, 1304 (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)).

Johnson seeks to represent two similar, ascertainable classes:

Damages Class – All account holders for water service with the Rome Water and Sewer Division from 2019 through class certification.

Injunction Class – All account holders for water service with the Rome Water and Sewer Division at the time of class certification.

(Proposed Fifth Amended Complaint, ¶ 152). Members are identifiable by reference to objective criteria apart from any individualized questions—here, through records of the Rome Water and Sewer Division. *See* Ex. 100, at 778:15-780:7; *see, e.g., Petersen v. Am. Gen. Life Ins. Co.*, 2019 WL 11093815, at *3 (M.D. Fla. Apr. 4, 2019) (class members "readily ascertainable from the electronic records of a third-party").

**B.     Class certification is appropriate under Rule 23(a).**

**1.     The Proposed Classes are so numerous that joinder is impracticable.**

"Numerosity" under Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. Here, numerosity is not subject to credible dispute—Rome's 2021 Annual Financial Report (its most recent) shows there are 18,981 water customers, easily satisfying numerosity. *See*

City of Rome, Georgia Finance Dept., *Annual Comprehensive Financial Report*

*Year Ended December 31, 2021*, at 149[12]; *see also Cox v. Am. Cast Iron Pipe Co.*,

784 F.2d 1546, 1553 (11th Cir. 1986) (over 40 class members satisfies

numerosity).

### 2. The Proposed Classes raise common contentions capable of class-wide resolution.

Rule 23(a)(2) "commonality" requires that there be "questions of law or fact

common to the class." FED. R. CIV. P. The standard is "qualitative rather than

quantitative." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675,

693 (N.D. Ga. 2016). Class members must "have suffered the same injury," and

there must be a "common contention" where "determination of its truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one

stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011); *see also id.*

at 350 ("What matters . . . [is] the capacity of a class-wide proceeding to generate

common answers apt to drive the resolution of the litigation."). If it meets this

qualitative threshold, "even a single common question will do." *Owens v. Metro.*

*Life Ins. Co.*, 323 F.R.D. 411, 417-18 (N.D. Ga. 2017).

---

[12] *available at* https://www.romega.us/DocumentCenter/View/2085/2021-Annual-Comprehensive-Financial-Report.

The Proposed Classes clear this "low hurdle." *Id.* All class members share the same injury in the pollution of the Conasauga and Oostanaula Rivers, and all class members have paid and must pay increased rates to remove PFAS from their potable water. And centrally, all class members share common contentions that:

- the Conasauga and Oostanaula Rivers are contaminated with PFAS, which each of the Defendants caused or contributed to;

- the potable water the class members purchase from RWSD has been contaminated with PFAS from Defendants' pollution; and

- the class members have suffered and will continue to suffer damage in paying increased water rates to pay the costs of removing the PFAS contamination from their potable water. *See also* FAC, at ¶¶ 160(a)-(k).

The truth or falsity of these contentions affects all class members alike and will drive resolution of each class claim. *Dukes*, 564 U.S. at 350.

### 3.   Johnson's claims are typical of absent class members' claims.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. Whereas "commonality refers to the group characteristics of the class as a whole, . . . typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). Thus, typicality calls for "a sufficient nexus . . . between the legal claims of the named representatives and those of the class at large." *Id.* at 1279; *see also Gen.*

*Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.").

The typicality nexus exists where claims of the representative and the class "'arise from the same event or pattern or practice and are based on the same legal theory.'" *J.M. v. Crittenden*, 337 F.R.D. 434, 449 (N.D. Ga. 2019) (quoting *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

That is the case here. Like all class members, Johnson is an account holder for water service with RWSD and contends that Defendants have damaged and interfered with the use and enjoyment of his property by causing his potable water supplied by RWSD to be contaminated with persistent, bioaccumulative, and toxic PFAS that also caused water rates to increase. *See, e.g.,* Doc. 716 at ¶¶ 15-16, 116, 119.  Johnson's claims arise from the same set of facts and series of events by which Defendants contaminated their common water source, and they assert the same legal theory—down to each individual element—of each applicable class claim. *See id.* at ¶¶ 150-203.

**4.      Johnson will fairly and adequately represent the Proposed Classes' interests.**

Both Plaintiff and his counsel are more than adequate to represent the

Proposed Classes under Rule 23(a)(4). As this Court has found, the standard for

adequacy of representation is well established:

> To prove that representation is adequate, Plaintiffs must demonstrate
> that "the representative parties will fairly and adequately protect the
> interests of the class." FED. R. CIV. P. 23(a)(4). This inquiry "serves to
> uncover conflicts of interest between named parties and the class they
> seek to represent." "This 'adequacy of representation' analysis
> encompasses two separate inquiries: (1) whether any substantial
> conflicts of interest exist between the representatives and the class; and
> (2) whether the representatives will adequately prosecute the action."

*Crittenden*, at 450–51 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625,

(1997); *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189

(11th Cir. 2003)). "Minor differences in the interests of the class representatives

and the class are not enough to defeat class certification under the adequacy

requirement." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247,

1275 (11th Cir. 2021). "Instead, only a 'fundamental' conflict 'going to the

specific issues in controversy' can defeat class certification." *Id.* "A conflict is

fundamental 'where some party members claim to have been harmed by the same

conduct that benefitted other members of the class.'" *Id.* (quoting *Valley Drug*, 350

F.3d at 1189).

27

Here, there is no dispute that Plaintiff's and the Classes' claims arise out of the same unifying events—decades of PFAS pollution to the City of Rome's primary drinking water source. All seek to redress the same injuries—increased water rates and the abatement of a public nuisance. There is no credible dispute that the PFAS pollution "harmed all class members and made none better off." *See id.* at 1276. Thus, there is no fundamental conflict between Plaintiff and the Classes he seeks to represent.

Nor should there be any dispute that Johnson and his counsel will adequately prosecute the action. Johnson has hired competent legal counsel who collectively have decades of experience handling highly complex litigation, including class actions, mass torts, and environmental pollution cases. Ex. 101. They have devoted substantial time and resources to this case, e.g.,

- taking 70 depositions (including those who were deposed multiple days);

- evaluating millions of pages of documents;

- overseeing the reports of seven experts totaling over 1,300 pages;

- opposing numerous motions to dismiss; and

- opposing Dalton Utilities' appeal before the Eleventh Circuit.

Johnson has participated in substantial discovery and has:

- responded to 22 sets of interrogatories (201 responses), 19 sets of Requests for Production (210 responses), and 8 sets Requests for Admission (169 responses);

- produced 4,361 documents totaling 141,209 pages, with Johnson himself producing 96 separate documents totaling 251 pages; and

- sat for a seven-hour deposition, for which he prepared for ten hours over the span of three days. Ex. 102, at 16:16-17:15.

Mr. Johnson generally understands his claims, the Classes he seeks to represent, and the relief he is seeking. He understands that as class representative, his role is to "oversee this litigation and speak on behalf of the class." Ex. 102, at 62:7-10, 63:13-24. Indeed, Johnson has already overseen multiple settlements approved by the Court, the Department of Justice, and EPA that will prevent pollution and ensure that these Defendants will never again send PFAS wastewater to Dalton Utilities. Ex. 101. As his conduct shows, Mr. Johnson is dedicated to cleaning up this nuisance and making those who caused it pay for it:

> We need clean water. We need – we need our river cleaned. I would like to have clean water coming out my pipes, our tap water, clean drinking water. The citizens here, the ratepayers here, rates have risen because of this. I would love for them to receive some compensation for the rise in rates. I would like my citizens to feel safe and not have to worry about toxic water.

Ex. 102, at 31:20-32:5.

**C.**     **Class certification is appropriate under Rule 23(b)(2) and (b)(3).**

A proposed class must also satisfy applicable provisions of Rule 23(b), and as the Eleventh Circuit directs: "Injunction classes can go forward under Rule 23(b)(2); damages classes must satisfy Rule 23(b)(3)." *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019) (citing *Dukes*, 564 U.S. at 361-63).[13]

Johnson and the putative class seek compensatory and punitive damages in Counts Four through Seven; and in Count Eight, they seek injunctive relief and abatement of a public nuisance. Doc. 716 ¶¶ 166-203. Thus, Johnson seeks to certify the Damages Class under subsection (b)(3) for Counts Four through Seven and the Injunction Class under subsection (b)(2) for Count Eight.

**1.**     **The Damages Class satisfies Rule 23(b)(3).**

**a.**     **Common questions of law and fact overwhelm questions affecting only individual class members.**

Rule 23(b)(3)'s first and primary need is predominance: that "questions of law or fact common to class members predominate over any questions affecting only individual members. . . ." FED. R. CIV. P. As it indicates, the Rule doesn't demand that all issues be common, only that common ones predominate. *Klay v.*

---

[13] *See also* Newberg and Rubenstein on Class Actions § 4:43 (6th ed.) (noting environmental class actions are often hybrids under (b)(2) and (b)(3)).

*Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

Accounting for "'the claims, defenses, relevant facts, and applicable substantive law,'" courts must "assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *Id.* (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)). Predominance exists where common issues "'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Id.* (quoting *Ingram*, 200 F.R.D. at 699). On the other hand, (b)(3) certification is inappropriate if "a great deal of individualized proof" or "legal points" need resolution for "most or all of the elements of [the class members'] claims. . . ." *Id.* (citation omitted). In an "alternate" test: "'the addition or subtraction of any of the plaintiffs to or from the class should not have a substantial effect on the substance or quantity of evidence offered.'" *Id.* (cleaned up) (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)).

This is a quintessential environmental contamination case where class treatment is particularly appropriate: the Damages Class contends all Defendants contaminated a single source of potable water that uniformly damages them all. *See In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 288 (S.D. Ohio 1997)

31

("Numerous courts have found that common issues predominate when a large number of lawsuits arise from a single disaster or single course of conduct.") (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) (contaminated water exposure); *Watson v. Shell Oil Co.*, 979 F.2d 104, 1023 (5th Cir. 1992) (individuals injured by oil refinery explosion); *In re "Agent Orange" Prods. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987) (herbicide exposure).

Classwide issues overwhelmingly predominate. Damages Class members state the same claims against the same Defendants: negligence and negligence per se against carpet manufacturers; and public nuisance, abatement, and punitive damages against all Defendants. All claims share common fact issues underlying, in equal measure, each element of each members' claim, e.g.:

- The history of PFAS' invention and their use in Dalton;

- the chemical properties of PFAS chemicals, including persistence, bioaccumulation, and toxicity;

- the PFAS products supplied, used, and discharged by Defendants;

- Dalton Utilities' inability to treat industrial wastewater containing PFAS at its treatment facilities;

- the operation of the Riverbend LAS, including spray fields;

- migration of industrial wastewater from LAS to the Conasauga River, including from point sources;

- the LAS's suitability for treating wastewater containing PFAS;

32

- the fate and transport of PFAS discharged by Defendants;

- appropriate and inappropriate modes of disposal for PFAS chemicals;

- the history of Defendants' consideration of alternatives to long-chain and short-chain PFAS;

- the suitability of short-chain PFAS as substitutes for long-chains;

- human and animal health effects of PFAS, including epidemiological and scientific evidence;

- EPA regulatory action on PFAS;

- The carpet industry's, Dalton Utilities', and chemical suppliers' concerted effort to conceal pollution of the Upper Coosa River Basin, including through the Carpet and Rug Institute;

- PFAS degradation;

- contamination of the City of Rome water supply at the Oostanaula River intake;

- Rome's response to the water contamination and resulting water rate increases to RWSD customers;

- Defendants' knowledge regarding each of the above topics;

- appropriate modes of removing PFAS from drinking water; and

- appropriate methods for remediating and abating the pollution.

These issues affect the existence of a nuisance, duty, breach, causation, and damages identically for all class members—acting as "linchpins that connect the[ir] claims" that have "direct impact on their effort to establish liability and [their] entitlement to injunctive and monetary relief." *Ingram*, 200 F.R.D. at 700-

33

01 (cleaned up); *see also Klay*, 382 F.3d at 1266 ("In *Allapattah*, Exxon cheated all of the plaintiffs in exactly same way", and "[o]nce the plaintiffs proved [this] behavior, each individual plaintiff's[] claim was substantially advanced."); *c.f. Rowe v. E.I. du Pont de Nemours and Co.*, 262 F.R.D. 451, 462 (D.N.J. 2009) ("[T]o the extent DuPont's conduct is deemed unreasonable as to any of the proposed class members, it must be unreasonable as to all the proposed class members."). All told, classwide issues affect Defendants' liability equally as to each class member—be it on "question[s] of violation, . . . of fact of injury, or impact. . . ." *Williams*, 568 F.3d at 1358 (citation omitted); *see also Watson*, 979 F.2d at 1022 ("[A] class issue predominates if it constitutes a significant part of the individual cases."). Their resolution will "substantially advance" or impede each class member's claims alike. *Klay*, 382 F.2d at 1266.

Simplifying matters more, class members suffer the same damage and from the same source: increased water rates to filter PFAS from water drawn at the Oostanaula River intake. Thus, no individualized issues exist as to *which* members have been harmed, or *how*. Their damages will certainly vary based on their water usage and City billing policies, but this does not defeat predominance. *See Klay*, 382 F.3d at 1259; *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (observing "numerous courts have recognized that the presence of

individualized damages issues does not prevent a finding that common issues in the case predominate" and compiling cases); *see also LeClerq v. Lockformer Co.*, 2001 WL 199840, at *7 (N.D. Ill. Feb. 28, 2001) (finding "ample support for certifying a class action in a contamination case even though there may be individualized issues of damages" and citing cases). This is particularly true "where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods. . . ." *Id.* at 1259-60 (citations omitted). So it is here: As provided by economist William Zieburtz (also the City of Rome's water rate expert), each members' damages consist of past and future rate increases calculated from a simple, common formula based on known percentage base- and usage-rate increases recorded by RWSD. *See* Ex. 96, ¶¶ 4-5; *see also Klay*, 382 F.3d at 1259 ("Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis.") (cleaned up).

> **b.    A Class action is superior to other available methods for the fair and efficient adjudication of claims.**

Rule 23(b)(3) next asks whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. As with predominance, the question is relative. *See Klay*, 382 F.2d at 1269 (the focus is not "the convenience or burden of a class action suit *per se*" but on its "relative

advantages" over other available "forms of litigation"). The Rule offers four "non-exhaustive" factors:

> (A)     the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)     the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3). None of them weigh against certification.

First, there's no indication that Damages Class members have particular interest in controlling their own individual claims. Indeed, none have filed an individual suit against Defendants to Johnson's knowledge.

As for the expedience of concentrating the litigation, it "will almost always mitigate in favor of certifying a class" where predominance exists. *Klay*, 382 F.3d at 1270; *see also id.* at 1269 (predominance has "tremendous impact" on superiority because "the more common issues predominate . . ., the more desirable a class action lawsuit will be") (citations omitted). That makes sense here in particular. Separate lawsuits of numerous class members would require retreading each of the numerous, complex issues listed above, many of which may require expert testimony. Moreover, average individual compensatory damages are

relatively small,[14] making it "unlikely that most of the plaintiffs, or attorneys working on a contingency fee basis, would be willing to pursue the claims individually." *Id.* at 1271; *see also id.* at 1269 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813 (1985) (explaining that aggregating small claims is "'required to make it economical to bring suit'").

Finally, no manageability issues weigh against certification and, in any case, "rarely, if ever, [are] in [themselves] sufficient to prevent" it. *Klay*, 382 F.3d at 1272; *see also id.* at 1273 ("Even potentially severe management issues have been held insufficient to defeat class certification.") (citing *Carnegie v. Mut. Sav. Life Ins. Co.*, 2002 WL 32989594, at *24 (N.D. Ala. Nov. 1, 2002); *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002)). Once again, manageability is relative to alternatives—here, managing potentially over 18,000 separate lawsuits with myriad overlapping fact issues. *See id.* at 1273. Where common issues predominate as here, courts are "hard pressed to conclude that a class action is less manageable than individual actions." *Id.* Administrative feasibility has "limited relevance" to manageability, and here it is straightforward: Damages Class members can be easily located through RWSD records. *See* Ex. 100, at 778:15-780:7; *Cherry*, 986 F.3d at 1303 ("A plaintiff proves administrative

---

[14] *See* Ex. 96.

feasibility by explaining how the district court can locate the remainder of the class after certification.") (emphasis omitted).

### 2.     The Injunction Class satisfies Rule 23(b)(2).

Certification is appropriate under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. "The 'key' to demonstrating a Rule 23(b)(2) class is 'the indivisible nature of the injunctive or declaratory relief warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *J.M. v. Crittenden*, 337 F.R.D. 434, 453 (N.D. Ga. 2019) (quoting *Dukes*, 564 U.S. at 345).

Defendants have contaminated the Conasauga and Oostanaula Rivers, which applies generally to the Injunction Class because all receive potable water from the same Oostanaula River intake. Broadly, the Injunction Class seeks injunctive relief with two essential ingredients: discontinuing further PFAS discharges and remediating legacy pollution of the LAS that, unabated, will continue to contaminate the Rome water supply for many years. *See Star Residential, LLC v. Hernandez*, 860 S.E.2d 726, 728-29 (Ga. 2021) (characterizing abatement of a

nuisance as injunctive relief) (citing *Superior Farm Mgmt. v. Montgomery*, 513 S.E.2d 215, 216 (Ga. 1999)). These measures take effect 60 river miles upstream from the Oostanaula River intake, require no individualized review of Injunction Class members' circumstances, and by drastically reducing the flow of PFAS into the Conasauga will provide adequate relief for each member.

### III.   CONCLUSION

Johnson's motion for class certification should be granted.


Respectfully submitted,

*/s/ Brett C. Thompson*
Brett C. Thompson, Esq. (*phv*)
Hirlye R. "Ryan" Lutz, III, Esq. (*phv*)
F. Jerome Tapley, Esq. (*phv*)
R. Akira Watson (*phv*)
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, Alabama 35205
bthompson@corywatson.com
rlutz@corywatson.com
jtapley@corywatson.com
awatson@corywatson.com
Telephone: (800) 852-6299
Fax: (205) 324-7896

Ryals D. Stone (GA Bar No. 831761)
William S. Stone (GA Bar No. 684636)
THE STONE LAW GROUP –TRIAL
LAWYERS, LLC
5229 Roswell Road NE

Atlanta, Georgia 30342
Telephone: (404) 239-0305
Fax: (404) 445-8003
ryals@stonelaw.com
billstone@stonelaw.com

James S. Whitlock (*phv*)
Gary A. Davis (*phv*)
Davis & Whitlock, P.C.
Attorneys at Law
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone: (828) 622-0044
Fax: 828-398-0435
jwhitlock@enviroattorney.com
gadavis@enviroattorney.com

***Attorneys for Plaintiff***

40

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing pleading upon all parties to this matter by Court Electronic Filing to counsel of records as follows:

This 18th day of August 2022.

*/s Brett C. Thompson*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Norther District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C.:

This 18th day of August 2022.

<u>/s Brett C. Thompson</u>

# APPENDIX OF EXHIBITS

1.  Batelle Memorial Institute, *Exposure Assessment for Fluorochemical Products* (1999).

2.  Expert Report of Charles B. Andrews (July 14, 2022).

3.  Erin Fuchs and Pam Sohn, *Georgia: Study Finds High Levels of Stain-Resistance Ingredient in Conasauga River*, CHATTANOOGA TIMES FREE PRESS (Feb. 10, 2008).

4.  Konwick et al., *Concentrations and Patterns of Perfluoroalkyl Acids in Georgia, USA Surface Waters Near and Distant to a Major Source*, 27 ENVTL. TOXICOLOGY AND CHEMISTRY 2011 (2008).

5.  Expert Report of GEL Engineering, LLC (July 13, 2022).

6.  U.S. Army Corps of Engineers, *Water Supply Reallocation Study* (2020).

7.  Deposition of Rick Raessler (DuPont 30(b)(6)) (Oct. 28, 2021).

8.  Shaw Industries Inc.'s Second Supplemental Responses to Plaintiff's First Interrogatories and Requests for Production of Documents.

9.  Aladdin Manufacturing Corp.'s Amended Responses and Objections to Plaintiff's First, Second, and Third Sets of Interrogatories.

10. 3M Company Chemical Division, *Technical Information, 3M Brand Fluorochemical Surfactants* (1963).

11. Memorandum from R.G. Alsup, DuPont, to R.F. Anderson, DuPont, *Disposal of Solid "Teflon" Wastes Containing C-8 APFC* (Aug. 31, 1966).

12. 3M Company, *Chronology – Fluorochemicals in Blood* (Aug. 26, 1977).

13. Letter from R.M. Shepard, DuPont, Energy & Envtl. Affairs – Mfg. Div., to W.A. Bower, DuPont, Washington Works, *Medical Surveillance Programs*, with attachments (Aug. 9, 1978).

14. Letter from W.H. Pearlson, 3M, Commercial Chem. Div., to Martin Greif, U.S. EPA, TSCA Interagency Testing Comm. (July 15, 1982).

15. Memorandum from R.J. Zipfel, DuPont, to C.A. Dykes & J.A. Schmid, DuPont, *C-8 Control Program*, with attachments (July 7, 1987).

16. Memorandum from H.A. Smith, DuPont, to R.D. Lanyon et al., DuPont, *Ammonium Perfluorooctanoate (C-8) CAS #3825-26-1 Hazard Determination and AEL Review* (Feb. 29, 1988).

17. Memorandum from David O. Halvorson, DuPont, to Marshall W. Humphrey, DuPont, *C-8 ingredient* (Nov. 15, 1994).

18. U.S. Environmental Protection Agency, *Consent Agreement and Proposed Final Order to Resolve DuPont's Alleged Failure to Submit Substantial Risk Information Under the Toxic Substances Control Act (TSCA) and Failure to Submit Data Requested Under the Resource Conservation and Recovery Act (RCRA)*, (Dec. 14, 2005).

19. *In re: 3M Company*, Consent Agreement and Final Order, Dkt. No. TSCA-HQ-2006-5004 (EPA App. Bd. 2006).

20. Deposition of Ralph Werling (Daikin America 30(b)(6)) (Mar. 16-17, 2022).

21. Daikin America, *Presentation to EPA and ADEM on Monitoring and Reduction Efforts in Decatur* (Mar. 24, 2004).

22. Email from Jack Cowart, U.S. EPA,  to Kathy McBee, Daikin America (Oct. 17, 2002).

23. Deposition of Lance Leggett (Invista 30(b)(6)) (Feb. 22, 2022).

24. Deposition of William Heim (DuPont) (June 7, 2022).

25. Dalton Utilities, Minutes of Board of Commissioners meetings on April 7, 1987, May 5, 1987, June 2, 1987, and August 4, 1987.

26. Ga. Environmental Protection Division, Land Application System Permit No. GA02-056, issued to Dalton Utilities (Aug. 20, 1986).

27. Dalton Utilities, Minutes of Board of Commissioners meeting on Sept. 1, 1987.

28. Dalton Utilities, Minutes of Board of Commissioners meeting on Mar. 14, 1989.

29. Carpet and Rug Institute, Minutes of Board of Directors meeting on June 23, 1988.

30. Carpet and Rug Institute, Minutes of Board of Directors meeting on Nov. 1, 1988.

31. Deposition of Robert Kissell (DuPont) (Apr. 26, 2022).

32. Memorandum from Michael P. Stevens, Ga. Dep't of Nat. Res., Envtl. Prot. Div., to Alan W. Hallum, *Information on Stainmaster/Stainblocker* (Sept. 20, 1988).

33. 3M Company, *PCPD FX-369 Wastewater* (Oct. 13, 1987).

34. *In re: Dalton Utilities Loopers Bend Land Application System*, Administrative Order No. EPD-WQ-1517 (Ga. EPD 1989).

35. *In re: Dalton Utilities Loopers Bend Land Application System*, Consent Order No. EDP-WQ-AH 4-93 (Ga. EPD 1995).

36. Murray Coleman, *U.S. Agents Raid Dalton Utilities*, DAILY CITIZEN-NEWS (Aug. 17, 1995).

37. U.S Environmental Protection Agency, Criminal Investigation Division, Memorandum of Interview with Richard J. Belanger (June 16, 1995).

38. Complaint, *United States and the State of Georgia v. Dalton Utilities*, Civil Action No. 4:98-cv-0191-HLM (N.D. Ga., July 17, 1998).

39. Criminal Indictment, *United States v. Dalton Utilities*, Criminal Information No. 4 99-CR-044 (N.D. Ga., Sept. 9, 1999).

40. Memorandum from S. Charles Murray, U.S. EPA, Southeastern District Counsel, to Robert F. Meunier, U.S. EPA, Debarring Official, *Request for the Debarment of Dalton Utilities* (Dec. 13, 1999).

41. Guilty Plea and Plea Agreement, *United States v. Dalton Utilities*, Criminal No. 4 99-CR-044 (N.D. Ga., Sept. 9, 1999).

42. Consent Decree, *United States et al. v. Dalton Utilities*, Civil Action No. 4:98-CV-191-HLM (N.D. Ga., Mar. 28, 2001).

43. Withdrawal of Request for Proposed Debarment, *In the Matters of Dalton Utilities*, EPA Case Nos. 98-0082-01, 98-0082-02 (Aug. 16, 2000).

44. Deposition of Tom Bundros (Dalton Utilities 30(b)(6)) (Mar. 4, 2022).

45. Fax from Sue Beach, 3M, Envtl. Lab (Apr. 13, 1999).

46. 3M Company, *Customer Follow-Up* (Nov. 30, 1999).

47. Letter from Michael C. Harnetty, 3M, to Jeff Lorberbaum, Mohawk, President and COO (Jan. 25, 1999).

48. Letter from Dr. Bill Weppner, 3M, Dir. of Envtl., Health, Safety & Reg. Affairs, to Jeff Lorberbaum, Mohawk, President and COO (Feb. 4, 1999).

49. Deposition of Carey Mitchell (Shaw Industries 30(b)(6)) (Sept. 1, 2021).

50. Email from Bill Weppner, 3M, Specialty Materials Mtks. Grp., to Charles Reich and Jack S. Boyd, 3M, Specialty Materials Mtks. Grp. (Aug. 28, 2000).

51. Daikin America, *2. Sales Strategy* (Feb. 6, 2001).

52. Daikin America, *Unidyne Rising: A Near-Future View of* [sic] *the American Fabric Protector Market* (Aug. 11, 2001).

53. Email from Robert C. Buck, DuPont, to Alan E. Luedtke, DuPont (Apr. 9, 2002).

54. Email from Lam H. Leung, DuPont, to Mary A. Kaiser, DuPont (May 31, 2000).

55. Email from Wesley Blanding, Daikin America, to Chad Chandler and Don Harris, Daikin America (Dec. 29, 2000).

56. U.S. Environmental Protection Agency, Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts (Feb. 20, 2002).

57. U.S. Environmental Protection Agency, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts (Nov. 4, 2002).

58. U.S. Environmental Protection Agency, Preliminary Risk Assessment of the Developmental Toxicity Associated with Exposure to Perfluorooctanoic Acid and Its Salts (April 10, 2003).

59. U.S. Environmental Protection Agency, *PFOA ECA Telomer Monitoring Technical Subgroup Meeting Summary, 10/09/03* (Oct. 24, 2003).

60. Telomer Monitoring Technical Subgroup presentation (Oct. 9, 2003).

61. Email from Denise Wood, Mohawk, to Nathan Peters, Mohawk (Nov. 13, 2004).

62. Deposition of Werner Braun (Carpet and Rug Institute) (April 20, 2022).

63. Carpet and Rug Institute, Minutes of Board of Directors Meeting (Oct. 24, 2003).

64. U.S. Environmental Protection Agency, *PFOA ECA Telomer Technical Workgroup Meeting Summary, 12/8/03* (Jan. 8, 2004).

65. Email from David Menotti, Shaw Pittman, to Stephen Korzeniowski, DuPont, and Blake Biles, Arnold & Porter (Apr. 28, 2004).

66. Carpet and Rug Institute, Minutes of Board of Directors Meeting (May 13, 2004).

67. CRI Board of Directors to Telomer Work Group, PFOA Position Statement (May 13, 2004).

68. Deposition of Stephen Korzeniowski (DuPont 30(b)(6)) (Oct. 26, 2021).

69. Deposition of Jim Kotsmith, vol. I (3M 30(b)(6)) (Jan. 18, 2022).

iv

70. Deposition of Julie Brumbelow, vol. II (Shaw Industries 30(b)(6)) (June 9, 2022).

71. Email from Terry Liles, Shaw (Dec. 4, 2006).

72. Shaw Industries, Analytical Results of PFAS Sampling from April 2007 and December 2007 (Feb. 7, 2008).

73. Deposition of Dennis Jones (Shaw Industries) (Oct. 7, 2021).

74. Email from Dennis Jones, Shaw, to Carey Mitchell and Terry Liles, Shaw (Feb. 22, 2008).

75. Email from Dennis Jones, Shaw, to Carey Mitchell, Shaw (Mar. 5, 2008).

76. Email from Dennis Jones, Shaw, to Carey Mitchell and Terry Liles, Shaw (Mar. 10, 2008).

77. Email from Lori McDaniel, Dalton Utilities, to Don Cope, Dalton Utilities, and Denise Wood, Mohawk (Feb. 6, 2008).

78. Email from James Beach, CRI, to Don Cope, Dalton Utilities (Feb. 4, 2008).

79. Shaw Industries, *Shaw recommendations*.

80. Email from Charlie Bethel, J&J Industries, to Denise Clopton, Office of U.S. Senator John Isakson (Feb. 7, 2008).

81. Email from Werner Braun, CRI, to multiple recipients (Feb. 6, 2008).

82. Email from Mike Ladd, Daikin America, to Cliff Adams, Rich Staff, and Satoshi Doi, Daikin America (Feb. 12, 2008).

83. Invista, Document discussing Shaw conversion from C8- to C6-based fluorochemical products (Mar. 19, 2008).

84. DuPont document, *EPA Meeting September 8, 2005* (Sept. 6, 2005).

85. Daikin America, Presentation slides.

86. Invista, *Testing & Conversion to "New N-119"* (Sept. 24, 2007).

87. Letter from Douglas F. Mundrick, U.S. EPA, P.E. Chief of Clean Water Enf't Branch – Water Prot. Div., to Don Cope, Dalton Utilities, President and CEO, *Information Request – Section 308 of the Clean Water Act: Dalton Utilities Land Application System* (May 20, 2009).

88. Letter from James D. Giattina, U.S. EPA, Dir. of Water Prot. Div., to Don Cope, Dalton Utilities, President and CEO, *Information Request – Section 308 of the Clean Water Act: Continuation of Review* (Oct. 6, 2009).

89. Dalton Utilities, Summary Spreadsheet of Dalton Utilities PFAS Testing (I).

90.  Dalton Utilities, Summary Spreadsheet of Dalton Utilities PFAS Testing (II).

91.  Dalton Utilities, Summary of Dalton Utilities PFAS Testing.

92.  U.S Environmental Protection Agency, *Fact Sheet: PFOA & PFOS Drinking Water Health Advisories* (May 2016).

93.  Complaint, *The Water Works and Sewer Board of the City of Gadsden v. 3M Company et al.*, Civil Action No. 31-CV-2016-900676.00 (Cir. Ct. of Etowah Cty., Ala. Sept. 22, 2016).

94.  Complaint, *The Water Works and Sewer Board of the Town of Centre v. 3M Company et al.*, Civil Action No. 13-CV-2017-900049.00 (Cir. Ct. of Cherokee Cty., Ala. May 15, 2017).

95.  Deposition of Michael Hackett, vol. I (City of Rome 30(b)(6)) (Nov. 2, 2021).

96.  Expert Report of William Zieburtz.

97.  City of Rome Water & Sewer, Utility Bill (Due Aug. 8, 2022).

98.  U.S. Environmental Protection Agency, *PFC Q&A* (Oct. 8, 2009).

99.  Batelle Memorial Institute, *Exposure Pathways* (Apr. 28, 1999).

100. Deposition of Michael Hackett, vol. III (City of Rome 30(b)(6)) (Dec. 1, 2021).

101. Declarations of Counsel for Plaintiff Jarrod Johnson.

102. Deposition of Jarrod Johnson (Plaintiff) (May 24, 2022).