# EXHIBIT 32



EPD_Rome_00007852

# Georgia Department of Natural Resources

205 Butler Street, S.E., Suite 1252, Atlanta, Georgia 30334
J. Leonard Ledbetter, Commissioner
404/656-3500

July 21, 1988

DALTON

Mr. James E. Brown, Commissioner
Dalton Utilities
Post Office Box 869
Dalton, Georgia  30720

Dear Mr. Brown:

I enjoyed the opportunity of meeting with you to discuss Dalton's progress in water pollution abatement. Your interest is certainly appreciated because this matter is a vital concern for the well-being of many communities in this area.

Dalton Utilities has made significant progress toward the goal of discharge elimination during this decade. I am sure you realize that this goal was mandatory because the capacity of the Conasauga River to assimilate any discharge is severely limited by the low flows measured in this river. The wastewater irrigation project (which has required about 9,000 acres for flow distribution) has allowed Dalton Utilities to move forward in the most cost-effective manner by avoiding the expense of advanced wastewater treatment technology. However, the ability of the land to provide treatment is not unlimited. Accordingly, we have established contaminant concentrations for biochemical oxygen demand and total suspended solids ($BOD_5$ and TSS) at 30 milligrams per liter (mg/l).

Failure to treat wastewater adequately prior to irrigation may jeopardize the ability of the land application process to provide proper treatment. The standard normally applied in Georgia for wastewater irrigation is treatment to reduce $BOD_5$ and TSS to a level not exceeding 50 mg/l. The level of 30 mg/l was selected for Dalton because the presence of components of industrial origin may still pose a threat to groundwater resources at 50 mg/l. We are willing to consider a request for revision to 50 mg/l if expert professional opinion (based upon controlled studies) can demonstrate satisfactory protection of groundwater resources at this level.

The flows which are currently being treated at Dalton's water pollution control plants exceed the capacity of the spray fields which have been completed and are available for use. As soon as Dalton Utilities can provide documentation that sufficient spray fields are completed and available to land apply all of the wastewater which is being generated in the system, we will be able to give favorable consideration to lifting the sewer connection ban.

Mr. James E. Brown
July 21, 1988
Page Two

Although additional plant capacity will still be needed, we regret the fact that sufficient federal funds are not available to provide major grant assistance for future work. The recent notification sent to Dalton Utilities which described revisions in the available grant amount for standby power generation was based upon a projected Statewide shortfall in grant funds coinciding with the phased start-up of the State Revolving Loan Fund (SRF), which will also have federal participation. We have encouraged involvement of Dalton Utilities in this program for any project which is consistent with federal planning requirements. As a point of information, Dalton Utilities has received over $64 million in grant funds through the Construction Grants Program. Only the City of Atlanta has received a higher level of funding through this program in Georgia.

In summary, I welcome your involvement and look forward to receiving your input so that the problems at hand can be resolved at the earliest possible time.

Sincerely,

Leonard

J. Leonard Ledbetter
Commissioner

JLL:jms

cc: Dr. Paul Bradley
    Mr. C.S. Thomas, Jr.
    Mr. V.D. Parrott, Jr.

EPD_Rome_00007854

Georgia Department of Natural Resources
205 Butler Street, S.E., Suite 1252, Atlanta, Georgia 30334
J. Leonard Ledbetter, Commissioner
404/656-3500

October 6, 1988

*Letter No. II*

Mr. James E. Brown, Commissioner
Dalton Utilities
Post Office Box 869
Dalton, Georgia 30720

Dear Commissioner Brown:

I have reviewed the information contained in your letter of August 11, 1988 which included a request to rescind the sewer connection restriction now in effect at Dalton. Although actions taken by Dalton Utilities have provided a substantial amount of capacity for wastewater irrigation, I have not yet received notification that the spray field work has been completed and accepted.

The sewer moratorium can be lifted when the system is ready to receive increased flow. Specifically, the following goals must be met:

- The pretreatment plant must have the capability to adequately treat all flows received at the facility so that the concentration of contaminants going to the storage and irrigation system will comply with the limits described in the facility's permit.

- Sprayfield capacity must be at least as great as the wastewater flow on an annual average basis.

We have regularly inspected the project to monitor construction progress, but because it is being constructed by force account work and Dalton Utilities has not submitted construction progress reports, we are unable to determine the exact spray capacity available for use at this time.

Expansion of plant capacity to provide treatment prior to irrigation is still a critical part of the system's needs. It is important for all persons involved in Dalton's project to be aware that the option of irrigating untreated wastewater has never been accepted by this Department on any basis, permanent or experimental. Since the existing flows in the system have frequently exceeded the capacity of the Riverbend facility to treat the wastewater prior to irrigation, Dalton Utilities has been notified of the need to take immediate action to increase this capacity. The latest engineering report for expansion of plant capacity received our concurrence on March 17, 1988. Your schedule for operation of a finished plant in eighteen months will not be achievable if production of plans and specifications has been delayed.

EPD_Rome_00007855

The role of the reservoir is for temporary storage of treated wastewater prior to irrigation. Accordingly, we have not included the volume of this reservoir as a long-term solution for wastewater disposal.

Your letter included a statement that funds had been withdrawn for Dalton Utilities' new wastewater treatment plant. You should be aware that the drastic reduction in federal funding for the construction grant program experienced in recent years has forced all states to change their priorities. Many communities in Georgia have had to settle for reduced grants or no grants at all. We have kept Dalton Utilities eligible for one final grant, which will be awarded if sufficient funds are recovered as a result of grant closeouts for other projects around the State. I want to point out once again that although Georgia has 15 cities larger than Dalton and 15 counties larger than Whitfield, no city or county other than Atlanta has received more construction grant money than the $64 million which has gone to Dalton thus far.

I appreciate your efforts to get these issues resolved.

Sincerely,

*Leonard*

J. Leonard Ledbetter
Commissioner

JLL:jms

EPD_Rome_00007856

# Georgia Department of Natural Resources

205 Butler Street, S.E., Floyd Towers East, Atlanta, Georgia 30334

J. Leonard Ledbetter, Commissioner
Harold F. Reheis, Assistant Director
Environmental Protection Division

September 19, 1988

M E M O R A N D U M

TO:     Alan W. Hallum  AWH

THRU:   David L. Bullard  DLB

FROM:   P. Michael Thomas  PMT

RE:     Legislative Inquiry
        State Representative Phil Foster

On September 15, 1988, I received a call from Representative Foster concerning the compliance history and current status of the Dalton Utilities wastewater treatment facilities. Representative Foster asked the following questions.

-What constitutes compliance?
-How long has the Dalton Utilities facilities been out of compliance?
-Status of the sewer moratorium?
-Is the land application system working?

I explained to Representative Foster that compliance was based on conditions in previous NPDES permits and Orders issued to the Utilities, how permit limits are developed and a brief history of compliance problems with the Dalton facilities. I informed Representative Foster that the sewer moratorium had been maintained as referenced in Commissioner Ledbetter's July 21, 1988 letter to Dalton Utilities Commissioner James Brown. I stated that the ban would be maintained until Dalton Utilities documented that adequate capacity has been constructed at the Loopers Bend land application site to adequately treat current wastewater flows and the Plan of Operation for the site, required by the LAS permit, has been approved. I explained that we had some concerns regarding runoff from the site but that in general it appeared to be operating satisfactorily.

Representative Foster has apparently received calls from developers in the Dalton area concerning the sewer moratorium. Apparently many development projects were begun in Dalton without knowledge of the moratorium.

Attached is a draft response to Representative Foster.

PMT/lde/3/27

ATTACHMENT

EPD_Rome_00007857

# Georgia Department of Natural Resources

205 Butler Street, S.E., Floyd Towers East, Atlanta, Georgia 30334

J. Leonard Ledbetter, Commissioner
Harold F. Reheis, Assistant Director
Environmental Protection Division

September 20, 1988

MEMORANDUM

TO:     Alan W. Hallum AWH

THRU:   David L. Bullard DLB

FROM:   Michael P. Stevens MPS

RE:     Information on Stainmaster/Stainblocker

GENERAL

On August 3, 1988, the Environmental Protection Division (EPD) performed a process evaluation of the Calhoun WPCP at the request of the City. The facility had been noncompliant in effluent suspended solids for several months previous. As the result of the inspection, the EPD made several recommendations to the City regarding its treatment process and regulation of industrial users discharging to the facility. Some of the recommendations involved major changes in wastewater treatment processes, especially in solids handling. On September 12, Jim Hobgood of the City spoke with you. He was of the opinion that Stainblocker chemicals were affecting solids settleability at the treatment plant. At his request you asked me to obtain information regarding Stainblocker in order to provide some assistance to the treatment plant.

I called Wayne Tincher of the Textile Engineering Department at Georgia Tech. He provided the following information:

1. He acknowledged that stainblockers, including Stainmaster (DuPont's version of the product) do not biodegrade well.

2. He did not feel that stainblockers cause a problem with sludge settling. However, he acknowledged that anionic charges on stainblockers may cause repulsion of particles, therefore poor flocculation and settling. Addition of a cationic polymer may improve sludge settleability.

3. Based on my description of the facility's problem, he was not convinced that stainblocker is the cause. He indicated that high $BOD_5$ and COD loadings, possibly and indirect result of stainblocker, was a more likely cause of the problem.

4. Reverse electrolysis is in the early stages of testing as a method of breaking down stainblocker chemicals.

At Mr. Tincher's suggestion I called Richard Franks from the Fibers Department at DuPont. He provided the following information:

1. DuPont has tested its Stainmaster chemical at its own wastewater treatment plants, and determined that Stainmaster has no adverse effects on wastewater treatability.

EPD_Rome_00007858

MEMORANDUM
September 20, 1988
Page two

---

    2. At some carpet mills in Dalton, pilot tests were done on Stainmaster, and again no adverse effects on the wastewater treatment process were found even at elevated concentrations.

    3. Mr. Franks felt that the problem caused by Stainmaster was indirect, probably related to increased production due to its use

Mr. Franks passed me on to Bob Kissel, the in-house environmental engineering consultant for DuPont in Wilmington, Delware. His information included the following:

    1. He stated that Stainmaster has limited biodegradability, but no known toxic or inhibitory effects.

    2. He acknowledged that the problem with Stainmaster was that it contributes to organic overload of a treatment plant, not because of its chemical effects.

    3. The early versions of stainblocker used ethylene glycol as a solvent. During treatment of carpet fibers with stainblocker, most of the chemical stayed with the carpet. Most (over 50% of organic load) of what went to the WPCP was the ethylene glycol solvent. This provided good food for the organisms but had a very high COD loading. Recently, manufacturers of stainblockers are going to aqueous solutions, which should reduce the BOD/COD loading.

    4. Mr. Kissel also suggested that the problem with the treatment plant may be that the aeration basin dissolved oxygen is too low. The solution to this problem would be to either reduce mixed liquor suspended solids or increase the dissolved oxygen in the aeration basin.

    5. Two observations from Mr. Kissel:

        a. Stainblocker is a new source of organic loading, not a replacement source; hence its use would result in an increase in organic loading.

        b. Stainblocker has revitalized the domestic carpet business. This has resulted in higher carpet production, therefore stronger wastewater.

EPD_Rome_00007859

MEMORANDUM
September 20, 1988
Page three

---

6. Overall the industry is working to reduce the amount of "wasted" stainblocker chemical. The more efficient use of the chemical should result in less of the substance, and therefore less organic loading, going to the WPCP.

7. Mr. Kissel suggested that the WPCP run filtered versus unfiltered COD analyses. He believes that this will show that most of the effluent COD will be attributable to high suspended solids leaving the WPCP, not untreated soluble $BOD_5$/COD.

MPS/lde/5/12

EPD_Rome_00007860

**Georgia Department of Natural Resources**

205 Butler Street, S.E., Floyd Towers East, Atlanta, Georgia 30334

J. Leonard Ledbetter, Commissioner
Harold F. Reheis, Assistant Director
Environmental Protection Division

September 26, 1988

NAME. DALTON

CORRESPONDENCE ✓
PERMIT.

PRETREATMENT
STATE.
LOCAL.
PERMIT:

M E M O R A N D U M

TO:     Alan W. Hallum

THRU:   David L. Bullard

FROM:   P. Michael Thomas

RE:     Dalton Utilities-Loopers Bend LAS

On September 2, 1988 we received the revised Operation and Maintenance Manual for the Riverbend facility and Loopers Bend LAS, including the Plan of Operation for Areas B and C. This manual has been reviewed and comments are attached. Further revision of the manual will be required. However, it includes most of the necessary information including application rates. The manual also indicates that enough sprayfield capacity has been completed to adequately treat current flows. It is stated that the Area B capacity is 9 MGD and the current capacity of Area C is 20 MGD with construction continuing.

Based on this information I believe we should lift the sewer ban in Dalton. I have received numerous calls from developers whose projects have been halted because of the ban and an inquiry from State Representative Philip Foster. Dalton Utilities has met all the conditions that were contained in Order No. 1194, although, only at a minimum. It should be noted that Dalton Utilities has told developers that if they had not gotten EPD involved that they could have hooked up. These developers also accuse the Utilities of hooking up numerous other facilities recently.

The following course of action is recommended. The sewer ban should be lifted upon execution of a proposed Consent Order which would include the following conditions:
 -Revise and update the O&M manual according to EPDs comments and resubmit by April 1, 1989.
 -Complete construction of all sprayfields at the Loopers Bend LAS by _____.
 -Submit a preliminary report on future upgrades planned for the preapplication treatment facilities.
 -Sewer ban which would be put into effect if any of these conditions are not met.
Other items of concern regarding the Dalton Utilities wastewater treatment facilities are outlined below.

O&M MANUAL - The manual as originally completed makes many references to the Loopers Bend WTF which was not constructed and to interim operations. The manual should be revised and these references removed, especially references of discharges to the Conasauga River from the reservoir.

MEMORANDUM
Page two
September 26, 1988

---

LAS APPLICATION RATES AND CAPACITIES - A copy of the application rates listed in the O&M manual are attached. By approving the O&M manual, we will be approving these monthly application rates. Has MEP approved these, if not do they concur? In most cases in the past, a single year round rate has been determined, normally, the lowest monthly value. The O&M manual also lists the total acreage in each sprayfield, however, fields of similar size have varying numbers of sprinklers based on topography. The irrigated acreage for each field should be determined before actual capacities can be determined. This may be one reason the site appears to be experiencing excessive runoff. A field originally designed to accept 1 MGD, for example, may only be able to accept 0.75 MGD after sprinkler installation.

AREA A-SLUDGE APPLICATION - The sludge application rates are the same as for treated effluent. Sludge application seems to be based on the hydrologic budget rather than pollutant loading. This may be causing overloading of the site because of the high nutrient concentrations found in the sludge. Sludge application also occurs on the most environmentally important portion of the site - the bottom lands along the river in Loopers Bend. Any soil or groundwater problems in this area may directly affect water quality in the Conasauga. Two monitoring wells in this area have shown high concentrations of nitrates.

LAS PERMIT - The original LAS permit issued to Dalton contained limits for discharge to the sprayfield of 50 mg/l for $BOD_5$ and SS. Recent correspondence to Dalton Utilities (Commissioners 7-21-88 letter) referred to limits of 30 mg/l. We will revise this permit to include the monitoring requirements, however, we are probably stuck with the 50/50 limits.

PREAPPLICATION TREATMENT FACILITIES - The existing preapplication treatment facilities are inadequate. The Riverbend facility was previously unable to meet 30/30 limits and even a limit of 50 mg/l of SS would have been chronically violated in the past. This facility now receives all the effluent from the Abutment Road facility (5.4 MGD). The facility has been in compliance during the summer. However, when wastewater flows begin to increase as Dalton releases drought related water restrictions and the sewer ban is lifted the Riverbend facility will not likely meet the 50/50 limits. This situation will be aggravated by D. Parrott's unwillingness to enforce a sewer use ordinance limit of 750 mg/l for COD against the carpet industry. COD concentrations in carpet mill wastes are currently ranging from 1,000 to 5,000 mg/l. Dalton Utilities should be encouraged to expand existing preapplication treatment facilities. Mr. Parrott stated that the Utilities currently had plans of doubling the capacity at Riverbend (24 to 48 MGD).

Many of these issues will be investigated further during a compliance evaluation inspection of all facilities in October. However, I recommend we initiate ~~with~~ procedures to release the sewer ban as soon as possible.

PMT/lde/3/30

September 20, 1988

Review Comments
Operation and Maintenance Manual
Loopers Bend Land Application System
Dalton Utilities

1. The manual refers to tables which list the hydrologic budget for the site and weekly loading rates. It should be stated that this is the maximum amount of water which may be applied per week to each field regardless of site conditions.

2. Table 17-5 lists loading rates in lbs/acre-day for Area B at 9 MGD and 11 MGD. If Area B is complete and designed for 9 MGD, why is 11 MGD referenced?

3. The Loopers Bend LAS permit will be reissued to include minimum monitoring requirements. However, the section referring to monitoring for the land application site should be expanded and include the following.

    a. Monitoring plan for the soil, including specific parameters and frequencies and sampling location determination.

    b. Monitoring plan for surface waters adjacent to or flowing through the site.

    c. Specific monitoring locations and parameters for discharge to the land application site, reservoir, etc.

    d. It should be noted that the operating reports for each field should be submitted to the EPD with all monthly reports.

    This comment may be addressed by revising Section 8 and referring to this in Section 17 and 19.

4. Regular inspections of all distribution lines and sprinklers should be added to the maintenance checklists so that performance of these inspections is documented.

5. Future revisions of this document should include updated information on Area C, such as the number of sprinklers installed in each field.

6. Sections 19 and 20 consist mostly of information duplicated from Sections 17 and 18. Certain parts of these sections could be combined.

7. Reference to land management practices in Areas A, B and C refer to leaving cuttings on site. Uptake by plants is a significant source of nutrient removal from the site. Therefore, an effort should be made to remove harvested vegetation from the site to maximize the treatment efficiency of the land application system. This is especially important in Area A where sludge is being applied. The nutrient concentrations in the sludge are much higher than in the treated effluent.

8.  A more detailed flow schematic for the reservoir should be included. This schematic should include the location of all possible discharge points from the reservoir, how treated wastewater enters and leaves the reservoir and all related valves and pumps. Section 13 should be revised and all references to interim operations removed. It should be stated that any discharge from the reservoir to the Conasauga River will be allowed only in extreme emergencies and the EPD will be notified.

9.  Describe the use and operation of the Loopers Bend aeration basin. Will this unit be used only as an aerobic digestor for sludge from the Riverbend facility? Describe in more detail how and where sludge is pumped from the Riverbend facility. Will only waste sludge from the secondary clarifiers be pumped to the Loopers Bend aeration basin or can mixed liquor or other sources be pumped to this basin? These items should be outlined.

10. The description of the preapplication facilities should include the Abutment Road facility. This description should include how this facility will be used; as a pumping and storage facility only, or to provide preliminary treatment. This facility should also be included on a flow schematic which indicates where the discharge from the Abutment Road facility enters the Riverbend facility.

11. The entire manual should be revised to remove references to the following items:

    a. The Loopers Bend WTF - It is apparent that this facility will not be constructed.

    b. Interim operations - all sections should concern final operations.

    c. NPDES Permit - The NPDES Permits are no longer applicable and reference should be made to the LAS Permit.

If Dalton Utilities plans to upgrade the Riverbend facility these plans should be outlined briefly. Of specific concern is what the eight pumps provided in the Riverbend pump station to pump raw sewage to the Loopers Bend WTF will now be used for.

PMT/lde/329

PMT

## Georgia Department of Natural Resources

205 Butler Street, S.E., Floyd Towers East, Atlanta, Georgia 30334

J. Leonard Ledbetter, Commissioner
Harold F. Reheis, Assistant Director
Environmental Protection Division

September 27, 1988

Mr. DeForrest Parrott, General Manager
Dalton Utilities
Post Office Box 869
Dalton, Georgia 30720

RE: Compliance Evaluation Inspection
Loopers Bend Land Application System

Dear Mr. Parrott:

I plan to conduct the referenced inspection on October 11, 1988. This inspection will include the preapplication treatment facilities, Abutment Road and Riverbend, as well as the Loopers Bend Land Application System. Please have records regarding plant operation, maintenance and monitoring ready for review.

I plan to arrive at the Riverbend WPCP at 10:00 a.m. on said date. Should you have any questions or comments concerning the inspection, please contact me at (404) 656-7400.

Sincerely,

P. Michael Thomas

P. Michael Thomas
Environmental Specialist
West Compliance Unit
Municipal Permitting Program

PMT/sst/3-36

cc: Mr. Bruce Parker
    Water Reclamation Manager
    Dalton Utilities

EPD_Rome_00007865

Pmt 10/4/88

# Georgia Department of Natural Resources

205 Butler Street, S.E., Suite 1252, Atlanta, Georgia 30334
J. Leonard Ledbetter, Commissioner
404/656-3500

October 4, 1988

The Honorable Philip A. Foster
State Representative, District 6
4425 Airport Road, S. E.
Dalton, Georgia 30721

Dear Representative Foster:

This letter will provide you with a follow-up to your inquiry for information concerning the compliance history and current status of the Dalton Utilities wastewater treatment facilities.

The Dalton Utilities facilities, especially the Riverbend Road Wastewater Treatment Plant, have experienced chronic noncompliance with discharge permit limits for the past several years. This has been due to a combination of operational problems and inadequate facilities. The Riverbend discharge has been a primary factor in preventing the Conasauga River from meeting the State's water quality standards.

The Environmental Protection Division (EPD) issued an order to Dalton Utilities on May 20, 1987 for failure to meet permit limits. This order also placed the Utilities under a sewer moratorium until several conditions were met, including removal of all the Utilities' discharges from the Conasauga River. This was also necessary to ensure that the Utilities complied with the July 1, 1988 deadline established by Congress, requiring all municipal sewage treatment plants to meet final permit limits.

Dalton Utilities successfully removed all discharges from the river by the April 30, 1988 deadline in the order by storing the effluent in the storage pond and by spraying some of it on the land. However, construction of the spray system is still not complete. When Dalton Utilities documents that adequate capacity has been constructed to properly treat and spray the current wastewater volume, the sewer moratorium will be removed. Dalton Utilities is making significant progress in fulfilling these conditions.

We appreciate your interest in this matter.

Sincerely,

J. Leonard Ledbetter
Commissioner

JLL/pmtt

## Georgia Department of Natural Resources

205 Butler Street, S.E., Floyd Towers East, Atlanta, Georgia 30334

J. Leonard Ledbetter, Commissioner
Harold F. Reheis, Assistant Director
Environmental Protection Division

October 5, 1988

M E M O R A N D U M

TO:   Alan Hallum *AwH*

THRU: David Bullard *DLB*

FROM: Michael Thomas *PmT*

RE:   Dalton Utilities Sewer Ban

    On October 3, 1988, I conducted a review of Dalton Utilities' service records. This review was conducted to evaluate the Utilities compliance with the sewer ban originally implemented by order #1194. I met with Mr. DeForrest Parrott, General Manager of Dalton Utilities and his assistant, Mr. Bob Seaton.

    Records were reviewed for the period of May through August, 1988. These records included the computerized transaction register and the log book containing all original work orders. Very few sewer taps were made during this time period. All sewer taps that were documented in these records appeared to be included in the exceptions to the sewer ban including the prior commitments list (Attachment A to the order).

    I would conclude from the records reviewed, that Dalton Utilities is complying with the sewer ban. The only inconsistency was that the names of some establishments were not the same as those originally submitted on the prior commitments list, however, the location and type of establishment were consistent.

PMT/sst/2g57

# Georgia Department of Natural Resources

205 Butler Street, S.E., Suite 1252, Atlanta, Georgia 30334
J. Leonard Ledbetter, Commissioner
404/656-3500

October 8, 1988

The Honorable Ed Jenkins
U.S. House of Representatives
203 Cannon Building
Washington, D. C. 10515

Dear Congressman Jenkins:

This letter will provide you with a follow-up to your inquiry for information concerning the Dalton Utilities wastewater treatment facilities.

The Dalton facilities, especially the Riverbend Road wastewater treatment plant, have experienced chronic noncompliance with discharge permit limits for the past several years. This has been due to a combination of operational problems and inadequate facilities.

The Environmental Protection Division of the Georgia Department of Natural Resources issued an order to Dalton Utilities on May 20, 1987 for failure to meet the permit limits. This order also placed the Utilities under a sewer moratorium until several conditions were met, including the removal of all the Utilities' discharges from the Conasauga River and completion of the Loopers Bend Wastewater Land Application System.

Dalton Utilities successfully removed all discharges from the river by the April 30, 1988 deadline in the order and began spray application of the treated wastewater to the land application site. However, construction of the land application system is still not complete. When Dalton Utilities documents that adequate capacity has been constructed to properly treat and spray the current wastewater flows, the sewer moratorium will be removed. Dalton Utilities is making significant progress in fulfilling this condition.

We appreciate your interest in this matter.

Sincerely,

J. Leonard Ledbetter
Commissioner

JLL/pmtt

1

<u>DALTON AGENDA</u>
<u>10-14-88</u>

M. Thomas

<u>APPLICATION RATES</u> & <u>IRRIGATION CAPACITIES</u>

To determine LAS capacity we must know:
  1) Maximum application Rate
  2) Wetted area

1) Application Rates
   A) Original Hydrologic Budget   1.6-3.4 in/wk; 2.43 in/wk avg.
   B) Permit application - 2.0 in/wk
   C) O&M manual - 1/6"/hr max. = 0.167 in/hr

2) Wetted Area
   A) O&M manual - original wetted area
                   or total sprayfield area =  Area B - 1193 acres
                                               Area C
                                                 completed - 2,184 ac
                                                 future total - 3,384 ac


Sprinkler spray coverage

   B) Actual wetted area based on
      area of coverage of actual sprinklers
      installed
              Area B - ~ 212 ac
              Area C ~ 364 ac

Metro from JCD to McLemore investigate site

optimizations operations to prevent runoff

3) Capacity - Current
   @ 2.5"/wk  -  total sprayfield area - 32.7 MGD
                 actual wetted area - 5.5 MGD
   @ 2.0"/wk  -  total sprayfield area - 26.2 MGD
   O&M manual reports Area B capacity - 9 MGD
                      Area C capacity - 20 MGD
   This is what the Utilities is currently applying ~ 2.5"/wk based
                                                     on total area

EPD_Rome_00007869