# EXHIBIT 38

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Rome

JUL 1 7 1998

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>AND THE STATE OF GEORGIA<br><br>      Plaintiffs,<br><br>    v.<br><br>DALTON UTILITIES AND THE<br>WATER, LIGHT AND SINKING<br>FUND COMMISSION OF THE<br>CITY OF DALTON, GEORGIA,<br><br>      Defendants. | Civil Action No.<br><br>4:98-CV 0191 -HLM |

## COMPLAINT

This complaint is brought by two sovereign governments: the United States of America, by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Georgia, by and through the Attorney General of Georgia, at the request of the Director of the Georgia Department of Natural Resources, Environmental Protection Division ("EPD"). The complaint alleges as follows:

## NATURE OF ACTION

1. This civil action is brought against Dalton Utilities and the Water, Light and Sinking Fund Commission of the City of Dalton, Georgia, pursuant to Section 309 of the Clean Water Act (the "Act"), 33 U.S.C. § 1319. The United States seeks penalties and injunctive relief for violations of Sections 301 and 405 of the Act, 33 U.S.C. § 1311 and § 1345, as well as

**07 219140**

3M_AL_GA_00273356

regulations and permits issued under the Act. These violations include unlawfully discharging pollutants into the Conasauga River and its tributaries; using or disposing sewage sludge unlawfully; and failing to comply with requirements that control pollutants that industry sends to Dalton Utilities for treatment.

2. The State of Georgia is a plaintiff in this action and is joined as a party under section 309(e) of the Act, 33 U.S.C. § 1319(e). Whenever a municipality is a party to a civil action brought by the United States under section 309, the Act requires the State in which the municipality is located to be joined as a party.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to section 309(b) of the Act, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

4. Venue is proper in the Northern District of Georgia pursuant to section 309(b) of the Act, 33 U.S.C. § 1319(b), and 28 U.S.C. § 1391(b) and § 1395(a) because it is the judicial district where the Defendant is located and in which the violations occurred.

## PARTIES

5. Plaintiff United States of America is acting at the request and on behalf of the Administrator of the EPA. The United States has authority to bring this action under section 506 of the Act, 33 U.S.C. § 1366, and 28 U.S.C. § 1331, § 1345, and § 1355.

6. The State of Georgia, also a plaintiff in this action, is acting at the request and on behalf of the Director of the Georgia Department of Natural Resources, Environmental Protection Division. With EPA, Georgia regulates Dalton Utilities under the Clean Water Act. On June 26, 1974, EPA authorized the State of Georgia to administer the state permit program for discharges

2

07 219141

3M_AL_GA_00273357

into navigable waters within its jurisdiction pursuant to section 402(b) of the Act, 33 U.S.C. §
1342(b). On March 13, 1981, EPA authorized the State of Georgia to administer the Georgia
NPDES State Pretreatment Program in accordance with 40 C.F.R. Part 403 pursuant to section
402(b) of the Act, 33 U.S.C. § 1342(b). Georgia is also a party to this action pursuant to section
309(e) of the Act, 33 U.S.C. § 1319(e).

      7. Defendants Dalton Utilities and the Water, Light and Sinking Fund Commission
operate the public utilities of the City of Dalton. They are part of the City's government. Control
over Dalton Utilities is vested in, and actually exercised by, the Board of Water, Light and Sinking
Fund Commissioners of the City of Dalton. Dalton Utilities and the Water, Light and Sinking
Fund Commission are each a "person" and a "municipality" under section 502 of the Act, 33
U.S.C. § 1362. In this complaint, Dalton Utilities and the Water, Light and Sinking Fund
Commission are referred to collectively as "Dalton Utilities."

## GENERAL ALLEGATIONS

      8. Dalton Utilities operates a collection system comprised of approximately 200 miles of
sewer pipe, 3,000 manholes, and 13 pump stations. About 87% of the wastewater handled by the
collection system comes from industrial sources, primarily carpet manufacturers. The wastewater
also contains domestic sewage. The collection system conveys wastewater to three treatment
facilities known as Abutment Road, Riverbend, and Loopers Bend. Altogether, these facilities
are designed to treat over 40 million gallons of wastewater per day.

      9. Dalton Utilities' treatment plants produce effluent and sewage sludge. The effluent
and sewage sludge are pumped to a land application system ("LAS"), which consists of 8,875
acres of land and an extensive system of equipment designed to spray effluent and sludge onto a

07 219142

3M_AL_GA_00273358

portion of the land. Until last year, Dalton Utilities sprayed effluent on a portion of the LAS, much of it heavily forested, using an extensive system of aluminum pipe, spray heads, manually and automatically operated valves, and mechanical connections between pipes. In 1997, Dalton reportedly began to replace its piping system with polyethylene pipe and new spray heads, a project not scheduled for completion until July 2000. A significant part of the wastewater sprayed on the LAS leaves the site via surface waters, such as the Conasauga River and Holly Creek.

10. The LAS has been extremely vulnerable to problems that cause wastewater to run off the site into surface waters. For example, Dalton Utilities has reported to EPA that in 1996 there were over 5,100 clogged or broken spray heads; 3,300 split or damaged pipes; 2,300 blow-outs or separated pipes; 2,000 leaning risers (the pipes that connect the spray head to the sewage line on the ground); and 1,500 blown or broken risers.

11. Dalton Utilities' LAS operates under Permit No. GA02-056, issued by the Georgia Department of Natural Resources, Environmental Protection Division ("Georgia EPD") on May 8, 1997. Prior to the current permit, Dalton Utilities operated under LAS permits that were in effect between 1986-1991, 1991-1996 and 1996-1997.

### FIRST CLAIM FOR RELIEF

### (Unpermitted Discharges from Dalton's Collection System)

12. Paragraphs one through eleven are incorporated here by reference.

13. The Clean Water Act prohibits the "discharge of pollutants" by any person into navigable waters of the United States, except in compliance with sections 301, 302, 306, 307, 318, 402, or 404 of the Act. 33 U.S.C. § 1311(a). A "discharge of a pollutant" includes "any

07 219143

3M_AL_GA_00273359

addition of any pollutant to navigable waters from any point source . . . ."  33 U.S.C. § 1362(12).

The term "pollutant" under the Clean Water Act includes sewage, sewage sludge, industrial

waste, and municipal waste discharged into water.  33 U.S.C. § 1362(6).

14.  Dalton Utilities has never been authorized under the Clean Water Act to discharge

pollutants into navigable waters of the United States from its collection system.

15.  During the last five years, Dalton Utilities has intermittently discharged wastewater

from its collection system into navigable waters of the United States in violation of section 301(a)

of the Clean Water Act, 33 U.S.C. § 1311(a).

16.  In May 1996, an EPA criminal investigator and a Georgia EPD inspector found

several locations in Dalton Utilities' collection system that had been altered to allow wastewater

to leave the system and enter navigable waters of the United States.   Georgia EPD determined

that over 10,000 gallons of wastewater overflowed into a creek from two of these locations

during May 1996.   Other locations also showed evidence of overflows, including toilet paper,

sanitary napkins, and other debris.  The overflowing wastewater came from point sources within

Dalton Utilities' collection system.

17.  In 1994 and 1996, Dalton Utilities reported several other discharges of wastewater

from its collection system to navigable waters of the United States, including Mill Creek and

Drowning Bear Creek.   Dalton Utilities reported that these discharges ranged from 500 gallons

to 6,000 gallons each.  These discharges came from point sources within Dalton Utilities'

collection system.

18.  The Conasauga River and its tributaries, which include Holly Creek, Drowning Bear

Creek, Mill Creek, and Pole Cat Creek, are navigable waters of the United States.

5

**07 219144**

3M_AL_GA_00273360

19. There is a great likelihood that Dalton Utilities will continue to discharge pollutants from the collection system into navigable waters of the United States in violation of section 301(a) of the Clean Water Act.

## SECOND CLAIM FOR RELIEF

### (Unlawful Discharges of Pollutants from Dalton Utilities' LAS)

20. Paragraphs one through eleven, thirteen, and eighteen are incorporated here by reference.

21. Since 1988, Dalton Utilities has not been authorized under the Clean Water Act to discharge pollutants into navigable waters of the United States from the LAS.

22. Since at least 1989, Dalton has chronically discharged pollutants from point sources on the LAS to the Conasauga River and its tributaries. These point sources include, but are not limited to, the pipes, spray heads, and other mechanical systems used to spray pollutants onto the LAS; the ditches and channels through which runoff entered the Conasauga River and its tributaries; and other conveyances from which pollutants are or may be discharged from the LAS to the Conasauga River and its tributaries. Instances of unlawful discharges include the following:

(A) In November 1989, Georgia EPD found that Dalton Utilities' LAS "experiences significant runoff of treated wastewater resulting in discharges of wastewater to the Conasauga River." EPD Order No. EPD-WQ-1517. Consequently, Georgia EPD ordered Dalton Utilities to implement a number of corrective measures and to eliminate runoff from the LAS.

(B) In June 1992, Georgia EPD inspectors found wastewater smelling of textile waste from Dalton Utilities' LAS flowing to a creek, leaving the creek foamy and discolored. The same inspection found numerous examples of broken pipes, broken risers, and spray heads clogged with

6

07 219145

3M_AL_GA_00273361

lint, which allowed sewage to pool and run off the site.

(C) In August 1993, Georgia EPD inspectors discovered black and foaming creeks flowing off Dalton Utilities' LAS into the Conasauga River, and traced the discolored and foaming water to wastewater running off the LAS. Georgia EPD assessed a $115,000 penalty against Dalton Utilities for these violations and other violations of its LAS permit and ordered Dalton Utilities to submit a plan for correcting the defects that led to the runoff.

(D) In January 1995, a Georgia EPD inspection found foam in Pole Cat Creek and in smaller streams that feed into Pole Cat Creek, which was caused by wastewater running off spray field C of Dalton Utilities' LAS.

(E) In August 1995, EPA and FBI agents and a Georgia EPD inspector found dark, foaming streams of wastewater running off Dalton Utilities' LAS into the Conasauga River. The inspectors traced the wastewater back to broken pipes and supersaturated soil.

(F) In February 1997, EPA and Georgia EPD inspectors found phosphorous, nitrates, and other constituents of Dalton Utilities' wastewater in streams that run off the LAS into the Conasauga River. The levels of these constituents were considerably higher than in waters upstream of the LAS.

(G) In March 1997, EPA inspectors discovered between five and eight million gallons of wastewater flowing into the Conasauga River and its tributaries from spray fields BA-2, BA-1, BB-7, and CA-9. The wastewater was laden with foam, had a dark tinge, and smelled like the wastewater handled by Dalton Utilities' wastewater treatment plants. EPA inspectors traced these discharges to broken pipes or spray heads; spray heads that had fallen to the ground; and overland flow from supersaturated soil. The inspection also found generally poor maintenance

7

**07 219146**

3M_AL_GA_00273362

and operation. Fallen, rotted trees straddled lines, vegetation covered spray heads and lines, pipes were cracked, and joints between pipes were open.

23. Dalton Utilities' discharge of pollutants into the Conasauga River and its tributaries violated section 301(a) of the Clean Water Act, 42 U.S.C. § 1311(a).

24. There is a great likelihood that Dalton Utilities will continue to discharge pollutants into the Conasauga River and its tributaries in violation of section 301(a) of the Clean Water Act.

## THIRD CLAIM FOR RELIEF

### (Unlawful Disposal or Use of Sewage Sludge)

25. Paragraphs one through eleven are incorporated here by reference.

26. The Clean Water Act prohibits any person from disposing of sludge from a treatment works treating domestic sewage, except in accordance with regulations promulgated under section 405(d) of the Act, 33 U.S.C. § 1345(d). 33 U.S.C. § 1345(e).

27. The Clean Water Act authorizes EPA to promulgate regulations providing guidelines for the disposal of sludge and the utilization of sludge for various purposes. 33 U.S.C. § 1345(d). EPA published these regulations at 40 C.F.R. Part 503. No person shall use or dispose of sewage sludge through any practice for which requirements are established in Part 503, except in accordance with such requirements. 40 C.F.R. § 503.3(b).

28. Part 503; subpart B establishes requirements for the land application of sewage sludge. These requirements apply to "any person who prepares sewage sludge that is applied to the land, to any person who applies sewage sludge to the land, to sewage sludge applied to the land, and to the land on which sewage sludge is applied." 40 C.F.R. § 503.10(a). The subpart B regulations have applied to Dalton Utilities since the earliest date set for compliance under 40

8

**07 219147**

3M_AL_GA_00273363

C.F.R. § 503.2.

29. Dalton Utilities owns and operates a publicly owned treatment works ("POTW"), as defined by 40 C.F.R. § 501.2, with a design flow rate greater than one million gallons per day.

30. Dalton Utilities has disposed of "sludge from a publicly owned treatment works or any other treatment works treating domestic sewage," within the meaning of 33 U.S.C. § 1345(e), since at least July 20, 1993.

31. Dalton Utilities has been a "person who prepares sewage sludge that is applied to land" since at least July 20, 1993, because it has generated sewage sludge during the treatment of domestic sewage in a treatment works. The term "person who prepares sewage sludge" is defined at 40 C.F.R. § 503.9(r).

32. Dalton Utilities has been a "person who applies sewage sludge to the land" since at least July 20, 1993.

33. Subpart B regulations state that the maximum amount of listed pollutants that can be applied to a hectare of land, called a "cumulative loading rate," shall not exceed the concentrations listed in 40 C.F.R. § 503.13(b)(2). The pollutants are arsenic, cadmium, copper, lead, mercury, nickel, selenium, and zinc. It is unlawful to exceed the cumulative loading rate, or to apply one of the listed pollutants to land if the cumulative amount of the pollutant applied to the land since July 20, 1993 is unknown. 40 C.F.R. § 503.12(b) and § 503.12(e)(2)(iv).

34. Subpart B regulations also require that sewage sludge be monitored periodically to determine compliance with the cumulative loading rate requirements of 40 C.F.R. § 503.13, as well as other requirements in subpart B. 40 C.F.R. § 503.16.

35. Dalton Utilities violated the monitoring and testing requirements in 40 C.F.R. §

9

07 219148

3M_AL_GA_00273364

503.13 and § 503.16 by failing to monitor and test for molybdenum in 1993, 1994, 1995, 1996, and 1997.

36.  Dalton Utilities violated the monitoring and testing requirements in 40 C.F.R. § 503.13 and § 503.16 by failing to monitor and test for arsenic, selenium, and copper in 1993, 1994, 1995, and 1996.

37.  Because Dalton Utilities failed to monitor and test for arsenic, selenium, and copper as required in 40 C.F.R. § 503.13 and § 503.16, it has not been able to determine the cumulative amount of these pollutants applied since July 20, 1993 to any hectare of land where it has applied bulk sewage sludge.

38.  Between July 20, 1993 and the present, Dalton Utilities has applied bulk sewage sludge containing arsenic, selenium, and copper to land in violation of 40 C.F.R. § 503.12.

39.  Subpart B regulations state that bulk sewage sludge shall be applied to agricultural land or forest at a whole sludge application rate that is equal to or less than the agronomic rate for the bulk sewage sludge.  40 C.F.R. § 503.14(d).  Agronomic rate is the whole sludge application rate (dry weight basis) designed: (1) to provide the amount of nitrogen needed by the food crop, feed crop, fiber crop, cover crop, or vegetation grown on the land, and (2) to minimize the amount of nitrogen in the sewage sludge that passes below the root zone of the crop or vegetation grown on the land to the ground water.  Applying bulk sewage sludge above the agronomic rate is inconsistent with the regulation, and thus is a violation of the Clean Water Act.  40 C.F.R. § 503.3(b).

40.  Dalton Utilities has applied bulk sewage sludge well above the agronomic rate. According to Dalton Utilities' records, Dalton Utilities has applied bulk sewage sludge to fields

10

07 219149

3M_AL_GA_00273365

planted with Johnson, Bermuda, and Fescue grasses. The annual agronomic rate for these grasses is 300 to 500 pounds of nitrogen per acre. EPA has calculated that Dalton Utilities applied bulk sewage sludge at the annual rate of 4,102 pounds per acre in 1993; 3,434 pounds per acre in 1994; 2,233 pounds per acre in 1995; and 2,058 pounds per acre in 1996.

41. Dalton Utilities violated the record keeping requirements of 40 C.F.R. § 503.17. For example, Dalton Utilities failed to document compliance with the management practices in section 503.14, and failed to record required information about the amount of pollutants in the bulk sewage sludge it applied; the locations where bulk sewage sludge was being applied, and the amount being applied; the date and time when bulk sewage sludge was being applied, and how pathogen and vector requirements were being met.

42. Dalton Utilities violated the reporting requirements of 40 C.F.R. § 503.18, which required Dalton Utilities to submit specified information to EPA on February 19th of each year. Dalton Utilities failed to submit this information for the calendar years 1993, 1994, 1995, and 1996.

43. Subpart B regulations include requirements for controlling pathogens. Under 40 C.F.R. § 503.15(a)(1), a person must meet either the Class A pathogen requirements in section 503.32(a) or the Class B pathogen requirements in section 503.32(b) when bulk sewage sludge is applied to agricultural land or forest.

44. At no time between July 1993 and at least April 1997 has Dalton Utilities fully complied with either the Class A pathogen requirements or the Class B pathogen requirements in 40 C.F.R. § 503.32. Dalton Utilities' violations include its failure to use approved sampling and analysis methods set forth in 40 C.F.R. § 503.8.

11

**07 219150**

3M_AL_GA_00273366

45. Dalton Utilities' records indicate that Dalton Utility chose to comply with Class B pathogen reduction requirements set forth in 40 C.F.R. § 503.32(b)(2). These requirements state that seven samples of the sewage sludge shall be collected at the time the sewage sludge is used or disposed, and the geometric mean of the density of fecal coliform in the samples collected shall be less than either 2,000,000 per gram of total solids (dry weight basis) or 2,000,000 Colony Forming Units per gram of total solids (dry weight basis). The samples shall be collected and tested according to the schedule in 40 C.F.R. § 503.16.

46. Dalton Utilities did not collect the seven samples required by 40 C.F.R. § 503.32(b)(1) between July 1993 and February 1997 or test them as required by 40 C.F.R. § 503.32(b)(2).

47. Dalton Utilities did not collect the seven samples required by 40 C.F.R. § 503.32(b)(1) between January 1997- February 1997, and March 1997 and April 1997, or test the samples as required by 40 C.F.R. § 503.32(b)(2).

48. Between July 1993 and at least February 27, 1997, Dalton Utilities violated 40 C.F.R. § 503.8 by failing to analyze sewage sludge for fecal coliform using the method outlined in part 9221 E. or Part 9222 D., "Standard Methods for the Examination of Water and Wastewater," 18th Edition, American Public Health Association.

49. Subpart B regulations also include requirements for controlling vectors, which are organisms that carry pathogens from one host to another. 40 C.F.R. § 503.33. Under these regulations, Dalton Utilities was required to meet one of the requirements set forth in section 503.33(b)(1) through (b)(10).

50. Between July 1993 and at least April 1997, Dalton Utilities violated 40 C.F.R. §

12

**07 219151**

3M_AL_GA_00273367

503.33 by failing to fully comply with any of the requirements set forth in section 503.33(b)(1) through (b)(10). Dalton Utilities' violations include its failure to use approved sampling and analysis methods set forth in 40 C.F.R. § 503.8.

51. Dalton Utilities' records indicate that Dalton Utility chose to comply with the vector attraction requirements in 40 C.F.R. § 503.33(b)(4). This provision states that the specific oxygen uptake rate ("SOUR") for sewage sludge treated in an aerobic process shall be equal to or less than 1.5 milligrams of oxygen per hour per gram of total solids (dry weight basis) at a temperature of 20 degrees Celsius.

52. Between July 1993 and April 1997, Dalton Utilities failed to meet the requirements of 40 C.F.R. § 503.33(b)(4).

53. Between July 1993 and at least February 27, 1997, Dalton Utilities violated 40 C.F.R. § 503.8 by failing to analyze its sewage sludge using the SOUR test described in Parat 2710B., "Standard Methods for the Examination of Water and Wastewater," 18th Edition, American Public Health Association.

54. Between July 1993 and at least February 27, 1997, Dalton Utilities violated 40 C.F.R. § 503.8 by failing to analyze its sewage sludge for total solids, fixed solids, and volatile solids in accordance with Part 2540 G., "Standard Methods for the Examination of Water and Wastewater," 18th Edition, American Public Health Association.

55. There is a great likelihood that Dalton will continue to violate Part 503 regulations in the future.

07 219152

3M_AL_GA_00273368

# FOURTH CLAIM FOR RELIEF

## (Violations of Pretreatment Standards)

56. Paragraphs one through eleven are incorporated here by reference.

57. The Clean Water Act authorizes EPA to publish pretreatment standards for pollutants that are introduced into publicly owned treatment works ("POTWs"). 33 U.S.C. § 1317(b) and (c). EPA published these standards, known as "General Pretreatment Regulations for Existing and New Sources of Pollution," at 40 C.F.R. Part 403. The standards describe the responsibilities of federal, state, and local governments, as well as industry and the public, to control pollutants that pass through or interfere with treatment processes in POTWs, or that may contaminate sewage sludge.

58. EPA may authorize a state to administer its own permit program for controlling discharges into navigable waters within its jurisdiction, which may include pretreatment requirements. 33 U.S.C. § 1342(b). EPA authorized the State of Georgia to administer the Georgia NPDES State Pretreatment Program on March 13, 1981.

59. The State of Georgia, through Georgia EPD, issued LAS Permit No. GA02-056 to Dalton Utilities under the approved state permit program on May 8, 1991. Georgia EPD issued an amended version of this permit to Dalton Utilities on May 6, 1996, with an expiration date of May 5, 1997. LAS Permit No. GA02-056 contained federally enforceable pretreatment requirements. EPA may enforce the pretreatment requirements under the authority of 33 U.S.C. § 1342(a) and (b).

60. Dalton Utilities is a publicly owned treatment works ("POTW") within the meaning of 40 C.F.R. § 403.3(o) and Chapter 391-3-6-.09(1)(b) of the Georgia Rules and Regulations for

14

**07 219153**

3M_AL_GA_00273369

Water Quality Control ("Rules").

**Personnel**

61. The LAS permit generally required Dalton Utilities to enforce pretreatment requirements against industrial users who send wastewater to the POTW through inspections, surveillance, and monitoring. To accomplish this goal, the LAS permit also required Dalton Utilities to ensure that it has sufficient funds to implement the pretreatment standards. In addition to these requirements, the LAS permit incorporated a pretreatment program prepared by Dalton Utilities and approved by Georgia EPD on August 1, 1984. At section 1.8.2, the pretreatment program requires Dalton Utilities to provide sufficient staff to implement the pretreatment standards.

62. Dalton Utilities violated the LAS permit and the approved pretreatment program by failing to have adequate staff to operate an effective pretreatment program.

**Group Permits**

63. The LAS permit required Dalton Utilities to ensure that all industrial dischargers meet state and federal pretreatment regulations. Federal regulations required Dalton Utilities "to control through permit, order, or similar means, the contribution to the POTW by each Industrial User to ensure compliance . . . ." 40 C.F.R. § 403.8(f)(1)(iii). State regulations contained similar requirements at Chapter 391-3-6.-9(9)(a)(2) of the Rules. Section 4.1 of Dalton Utilities' approved pretreatment program required in particular that a discharge permit be issued to each industrial user.

64. Dalton Utilities violated the LAS permit, its approved pretreatment program, federal pretreatment regulations, and Georgia pretreatment regulations by failing to monitor and control

15

**07 219154**

3M_AL_GA_00273370

the contribution of each industrial user to the POTW. Instead, Dalton Utilities issued a single permit to cover several discharges from numerous industrial users located throughout the service area.

**Sampling and Inspections**

65. The LAS permit required Dalton Utilities to carry out inspection, surveillance, and monitoring requirements to detect violations of pretreatment standards by industrial users. Among those requirements are the compliance monitoring and reporting requirements in Georgia's pretreatment regulations. At Chapter 391-3-6(8)(a)(5), Georgia regulations required Dalton Utilities to inspect and sample the effluent from each significant industrial user at least once per year. Georgia regulations at Chapter 391-3-6(8)(a)(7) required Dalton Utilities to document these inspections with evidence admissible in enforcement proceedings.

66. Dalton Utilities' approved pretreatment program also required annual inspections and documentation of all surveillance activity. Section 4.7.1(c) of Dalton Utilities' approved pretreatment program required annual inspections of each significant discharger. Section 4.5(7) required Dalton Utilities to compile and maintain a current data base on all surveillance activity.

67. Dalton Utilities violated the LAS permit, its approved pretreatment program, and Georgia pretreatment regulations by failing to inspect and sample the effluent from each significant industrial user and discharger at least annually, and by failing to adequately document its inspections and surveillance activities.

**Industrial User Identification**

68. The LAS permit required Dalton Utilities to maintain and update records identifying the nature, character, and volume of pollutants contributed by industrial users to the POTW.

16

**07 219155**

3M_AL_GA_00273371

Section 4.5 of Dalton Utilities' approved pretreatment program similarly required the Utility to compile and maintain a current data base that lists, by industry, all priority and prohibited pollutants known or suspected to be in each industrial discharge.

69. Dalton Utilities violated the LAS permit and the approved pretreatment program by failing to document the identity of all industrial users and the character and volume of pollutants contributed to the POTW by industrial users, and to have such documents available for inspection by EPA and Georgia EPD.

**Permit Conditions**

70. The LAS permit required Dalton Utilities to ensure that all industrial dischargers meet federal pretreatment regulations. Dalton Utilities violated this requirement, as well as other requirements in the LAS permit.

71. Federal regulations require a POTW to control each individual user's contribution to the POTW, and to use control mechanisms that are enforceable, that contain self-monitoring, sampling, reporting, notification, and record keeping requirements, and that identify the sampling location. 40 C.F.R. § 403.8(f)(1)(iii)(D).

72. Dalton Utilities violated the LAS permit and federal pretreatment regulations by failing to issue industrial user permits, or to use other permissible control mechanisms, that specified necessary sampling requirements as well as the sampling location.

73. Federal regulations require a POTW to control each individual user's contribution to the POTW through enforceable mechanisms that state the applicable civil and criminal penalties for violating pretreatment standards and requirements. 40 C.F.R. § 403.8(f)(1)(iii)(E).

74. Dalton Utilities violated the LAS permit and federal pretreatment regulations by

17

**07 219156**

3M_AL_GA_00273372

failing to issue industrial user permits, or to use other permissible control mechanisms, that state the applicable civil and criminal penalties for violating pretreatment standards and requirements.

75. Federal regulations require a POTW to control each individual user's contribution to the POTW through enforceable mechanisms that require industrial users to sample their effluent, and if the sample indicates a violation, to notify the POTW within 24 hours of becoming aware of a violation. 40 C.F.R. § 403.8(f)(1)(iii)(D) and § 403.12(g)(2). Additionally, 40 C.F.R. § 403.12(g)(2) requires an industrial user to repeat the sampling and analysis and to submit the results of the repeat analysis within 30 days.

76. Dalton Utilities violated the LAS permit and federal pretreatment regulations by failing to issue permits, or to use other permissible control mechanisms, that require the notice and re-sampling described in 40 C.F.R. § 403.12(g)(2).

77. Federal regulations require a POTW to control each individual user's contribution to the POTW through enforceable mechanisms that include reporting requirements. 40 C.F.R. § 403.8(f)(1)(iii)(D). Such reports must be signed by a person representing the industrial user, as described in 40 C.F.R. § 403.12(l).

78. Dalton Utilities violated the LAS permit and federal pretreatment regulations by failing to issue permits, or to use other permissible control mechanisms, which contain the signatory requirements for reporting contained in 40 C.F.R. § 402.12(l).

**Listing of Industrial Users in Violation of Pretreatment Standards**

79. The LAS permit required Dalton Utilities to prepare an annual list of industrial users in violation of pretreatment standards. Section 4.5(6) of the approved pretreatment program required Dalton Utilities to compile and maintain a current data base containing all routine reports

07 219157

3M_AL_GA_00273373

filed by industrial users and all records of surveillance activities.

80.   In 1997, Dalton Utilities was unable to provide the underlying evidence supporting its annual list of industrial users in violation of pretreatment standards, or to describe the procedures it used to generate the list.  Thus, Dalton Utilities violated the LAS permit and the approved pretreatment program.

81.   There is a great likelihood that Dalton Utilities will continue to violate the pretreatment requirements in LAS Permit No. GA02-056, the approved pretreatment program, the federal pretreatment regulations, and the state pretreatment regulations in the future.

## PRAYER FOR RELIEF

82.   The Clean Water Act provides that any person who violates Section 301 of the Act, 33 U.S.C. § 1311; Section 405 of the Act, 33 U.S.C. § 1345; any permit condition or limitation in a permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342; or any requirement imposed in a pretreatment program approved by EPA shall be subject to a civil penalty not to exceed $25,000 per day for each violation.  33 U.S.C. § 1319(d).  For each violation occurring after January 30, 1997, the maximum penalty increases to $27,500 per day for each violation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-410, enacted October 5, 1990; 104 Stat. 890), as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Public Law 104-134, enacted April 26, 1996; 110 Stat. 1321).

83.   The Clean Water Act also provides that persons who violate the Act may be subject to other appropriate relief, including a permanent injunction.  33 U.S.C. § 1319(b).

THEREFORE, the United States and the State of Georgia request that the Court enter

19

**07 219158**

3M_AL_GA_00273374

judgment on their behalf against Dalton Utilities, as follows.

    a. Order Dalton Utilities to cease unlawful discharges of pollutants into navigable waters of the United States.

    b. Order Dalton Utilities to comply with the sewage sludge regulations at 40 C.F.R. Part 503.

    c. Order Dalton Utilities to comply with the pretreatment requirements in LAS Permit No. GA02-056, Dalton Utilities' approved pretreatment program, and applicable federal and state regulations.

    d. For violations beginning five years prior to the date this complaint was filed, assess civil penalties against Dalton Utilities of up to $25,000 per day for each day of each violation that occurred before January 31, 1997, and up to $27,500 per day for each day of each violation that occurred after that date. The United States is not seeking penalties for violations for which Dalton Utilities has already paid a penalty to the State of Georgia.

    e. Award the United States and the State their costs in this action.

    f. Award the United States all relief appropriate under 33 U.S.C. §1319(e).

20

**07 219159**

3M_AL_GA_00273375

g.  Grant the United States and the State such other relief as the Court deems appropriate

Respectfully submitted,

LOIS J. SCHIFFER
Assistant Attorney General
Environmental and Natural Resources Division

PAUL G. WOLFTEICH
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044
(202) 514-3482
(202) 514-2583 (telecopy)

21

07 219160

3M_AL_GA_00273376

FOR PLAINTIFF THE STATE OF GEORGIA:

This 17th day of July, 1998.

Respectfully submitted,

THURBERT E. BAKER    033887
Attorney General

BRENDA H. COLE    176600
Deputy Attorney General

ROBERT S. BOMAR    066400
Senior Assistant Attorney General

ALAN GANTZHORN    283813
Senior Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATION TO:

ALAN GANTZHORN
Senior Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: (404) 656-7542

07 219161

3M_AL_GA_00273377

RICHARD H. DEANE, JR.
UNITED STATES ATTORNEY
NORTHERN DISTRICT OF GEORGIA


DAVID WRIGHT
ASSISTANT UNITED STATES ATTORNEY
GEORIGA BAR NO. 777730

75 Spring Street, S.W.
Suite 1800
Atlanta, GA 30335


OF COUNSEL:

WILLIAM T. JONES
ASSISTANT REGIONAL COUNSEL
U.S. EPA - REGION 4
61 Forsyth Street, S.W.
Atlanta, GA 30303

22

07 219162

3M_AL_GA_00273378