## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| **JARROD JOHNSON, individually,** ) | |
| **and on Behalf of a Class of Persons** ) | |
| **Similarly Situated,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NUMBER** |
| **v.** ) | **No. 4:20-cv-00008-AT** |
| ) | |
| **3M COMPANY, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MOTION FOR LEAVE TO FILE FIFTH AMENDED COMPLAINT

Plaintiff moves for leave to file a Fifth Amended Complaint for two purposes: to (1) amend the existing class definition to contemplate a Damages Class and Injunction Class; and (2) allege that Defendants pursued a common plan or design and acted in concert concerning Plaintiff's common law claims. Although Plaintiff alleges joint and several liability in his Fourth Amended Complaint (and all complaints), it is unclear whether Plaintiff must also specifically plead the words that Defendants "acted in concert." Plaintiff seeks leave in the exercise of caution.

**A.      Leave to amend the class definition is appropriate.**

The Fourth Amended Complaint ("FAC") proposes the following Class:

> All water subscribers (ratepayers) with the Rome Water and Sewer Division and/or the Floyd County Water Department.

Doc. 716, ¶ 152. In his Motion for Class Certification, Plaintiff seeks to certify two amended Proposed Classes:

> Damages Class – All account holders for water service with the Rome Water and Sewer Division from 2019 through class certification.
>
> Injunction Class – All account holders for water service with the Rome Water and Sewer Division at the time of class certification.

The amended Proposed Classes thus (1) substitute "account holders for water service" for "water subscribers (ratepayers)"; (2) distinguish between members who seek monetary and injunctive relief; (3) establish operative time-periods for both Classes; and (4) remove customers of the Floyd County Water Department.

The first change is straightforward and clarifies that "water subscribers (ratepayers)" are direct customers with the RWSD for water service. It also ensures that Class members are identifiable through their RWSD accounts. *See* Ex. 1, Hackett Dep., vol. 3, at 778:15-780:7. The next two changes are also simple. The classes are divided to recognize the relief sought by, and applicable time periods to, each Proposed Class. The Damages Class sets an operative time that corresponds to the RWSD's rate increases that began in 2019—ensuring that the Damages Class includes only those account holders who have this damage. Likewise, the Injunction Class ensures that only current RWSD account holders seek injunctive relief.

Finally, the Proposed Class excludes FCWD customers. For sake of comparison, RWSD retail customers are residential and commercial water users that receive water from one source: the City of Rome. That water shares common denominators—the City draws it from the Oostanaula River intake and, thus, the water is always contaminated with PFAS flowing downstream from the Conasauga River. By contrast, the FCWD is a wholesale, government customer of the RWSD with a wholesale rate. *See* Ex. 2, Hackett Dep., vol. 2, at 322:25-323:23. It uses Rome water as only one of several sources that it distributes to FCWD customers, including groundwater wells; and its use depends on circumstances like aquifer levels and time of year. *See id.* And while the RWSD has increased the FCWD's wholesale rate, it is unknown whether the FCWD has passed the increases on to its own customers in response. *Id.* at 778:4-9. But even if the FCWD did implement its own rate increases, it would be difficult to link them to water contamination given the mixture of water sources and variations in the FCWD's use of Rome water. This difficulty poses significant challenges to proving causation in all common law claims and to several Rule 23 requisites, including ascertainability, commonality, typicality, adequacy, and predominance. Because there is no release, FCWD customers will not be prejudiced by their exclusion.

**B.      Leave to allege acting in concert is appropriate.**

In actions "for injury to person or property," Georgia's apportionment statute requires a trier or fact to "apportion its award of damages among the persons who are liable according to the percentage of fault of each person." O.C.G.A. § 51-12-33. The act removes joint liability and contribution, limiting each person's liability to the percentage of fault apportioned. *Id.*

By directing factfinders to apportion liability by "percentage of fault," § 51-12-33 "necessarily presumes that fault must be divisible among 'persons' for apportionment to apply in the first place." *Fed. Deposit Ins. Corp. v. Loudermilk*, 826 S.E.2d 116, 126 (Ga. 2019) (citing *McReynolds v. Krebs*, 725 S.E.2d 584 (Ga. 2012)).

Thus, the Georgia Supreme Court recognizes a boundary that § 51-12-33 cannot cross: where "fault is indivisible." *Id.* at 126 (cleaned up). There, "the trier of fact cannot carry out the statute's directive of awarding damages 'according to the percentage of fault of each person' and the apportionment statute does not govern how damages are awarded.'" *Id.* at 127 (quoting O.C.G.A. § 51-12-33(b)).

Fault may be indivisible as a matter of either law or fact. *See Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC*, 862 S.E.2d 295, 303 (Ga. 2021). For example, where multiple persons act in concert to commit a tort, there is "no means of dividing fault as a matter of *law*." *Id.* (emphasis in original) (citing *Loudermilk*, 826 S.E.2d at 126-27). "Whether fault is divisible as a matter of *fact*,

4

by contrast, is for the trier of fact to determine so long as some evidence is presented that would allow a rational division." *Alston & Bird*, 862 S.E.2d at 303 (emphasis in original).

Either way, the result is the same: "damages are awarded under joint and several liability." *Loudermilk*, 826 S.E.2d at 129.

From his initial complaint, Plaintiff has sought joint and several liability and has pleaded allegations that would support legal and factual indivisibility of fault. *See* Doc. 1-1, at 30. And discovery has focused not only on the conduct of each individual Defendant, but also on the concerted conduct between Defendants in the carpet industry, their chemical suppliers, and Dalton Utilities.

Without reciting all evidence, discovery has confirmed Plaintiff's allegations (*see, e.g.,* Doc. 716, at ¶¶ 66, 78-80) that Defendants collectively knew of PFAS' toxicity, persistence, and presence in the Conasauga River and downstream waters; and that their collective efforts concealed their knowledge from regulatory agencies and the public. It also confirms that Defendants collectively supplied, used and discharged PFAS that they knew could not be adequately treated and removed without its release into the environment.

By the late 1980s, virtually all Defendants—Dalton Utilities, chemical suppliers, and carpet manufacturers through the Carpet and Rug Institute

("CRI")[1]—began cooperating to address problems with water effluence and pollution in the Conasauga River caused by carpet treatment chemicals.[2] And by the early 2000s, they all knew of the toxicity and persistence of PFAS in soil resist chemicals, the impact of discharging them to the LAS, and their contamination of the Conasauga River.[3]  Despite their collective knowledge, suppliers continued to

---

[1] The CRI is a trade association that represents members of the carpet industry, including most if not all carpet manufacturing Defendants, and their chemical suppliers. *See* Ex. 3, Werner Braun Dep., at 18:24-20:6. The carpet industry communicated with each other through the CRI, which also lobbied and communicated with the EPA on behalf of the industry. *See id.* at 23:10-26:2, 61:12-64:8.

[2] *See* Ex. 4  ); Ex. 5, CRI Bd. of Dir. Minutes (June 23, 1988) ( ); Ex. 6, CRI Bd. of Dir. Minutes (Nov. 1, 1988) ( ); Ex. 7, Jock Ellis, *Dalton Utilities cites industries for pollution*, DAILY CITIZEN-NEWS (attached to CRI Minutes dated Nov. 1, 1988) ( ).

[3] *See* Ex. 8, Heim Dep., at 78:24-84:14, 153:18-154:23 (discussing DuPont, carpet industry customers, and Dalton Utilities conversations on the impact of carpet mills' water usage and biological and chemical oxygen demand placed on Dalton Utilities by use of stain blocker chemicals in the late 80s); *id.*, at 98:1-25 (DuPont's disclosure of PFOA in its products to carpet industry); Ex. 9, Raessler

sell PFAS products to the industry, which continued to utilize these products and

discharge their wastewater to Dalton Utilities, which continued to apply this

contaminated water to the land application system ("LAS") bordering the

Conasauga River—all the while concealing the impact. Indeed, in 2003 and 2004,

when EPA sought data and site monitoring of PFOA and PFOA precursors in air,

water, soil, and biota at carpet industry facilities and Dalton Utilities, members of

---

Dep., at 110:3-111:4 (DuPont's role as a "spokesperson" for the carpet industry
regarding PFOA-related questions); Ex. 8, Heim Dep., at 28:10-16, 31:3-20, 32:15-
33:1, 35:21-41:2, 43:18-21, 45;19-47:21, 50:14-51:4 (DuPont's direction and
control of carpet mills' application of stain- and soil-resist chemicals); *id.*, at
147:12-149:8, 165:8-166:22 (DuPont's knowledge of C8 reaching the Conasauga
River); Ex. 10, Korzeniowski Dep., at 197:24-198:7 (same); Ex. 8, Heim Dep., at
84:20-85:17, 86:9-90:13, 155:9-160:16, 161:17-163:15 (DuPont's knowledge of its
chemicals reaching Dalton Utilities in the 90s); Ex. 11, Bundros Dep., at 1298:22-
1301:23 (discussing Dalton Utilities communications with 3M and DuPont on
pollution issues at the land application system caused by stain blocker chemicals as
early as 1988); Ex. 12, Williams Dep., vol. 2, at 331:13-18 (confirming that "since
1986 all of Mohawk's suppliers, . . . 3M, DuPont, Daikin, on down the list, have
all known that Mohawk has been discharging industrial wastewater into the Dalton
POTW"); Ex. 11, Bundros Dep., at 1087:2-1091:4 (discussing overlap between
Dalton Utilities board members and executives within carpet industry companies);
Ex. 3, Braun Dep., at 31:13-20 (same); *id.* at 84:15-86:6 (discussing
communications demonstrating CRI and its members knew in early 2000s PFOA
and PFOS were persistent, bioaccumulative, and toxic); *id.*, at 100:21-104:7
(discussing 2003 CRI position statement affirming DuPont's position that PFOA
posed no undue risk despite EPA's 2002 hazard assessment).

the CRI and Dalton Utilities—with the aid of chemical suppliers—all refused site monitoring at both individual carpet mills and Dalton Utilities.[4]

By the time the University of Georgia found high levels of PFAS in the Conasauga River that it linked to the LAS, *see* Ex. 13,[5] "everybody knew that the PFAS . . . that was discharged by the carpet companies was making its way through the LAS into the Conasauga River," including the chemical suppliers. Ex. 14, Cynthia Walaitis Dep., vol. 2, at 386:15-388:21. But all Defendants continued to supply, use, and discharge PFAS chemicals ultimately to the Conasauga River.

And no Defendant disclosed their knowledge; the public would not learn until the Chattanooga Times Free Press published an article disclosing UGA's findings in 2008.[6] ██████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ Ex. 15, Braun Email

---

[4] Ex. 11, Bundros Dep., at 1187:13-1202:12, 1204:5-1206:3; Ex. 3, Braun Dep., at 112:21-115:21, 117:9-118:25, 123:24-130:10, 132:16-133:1, 139:1-141:22, 146:18-148:13, 163:22-165:21, 198:18-200:22, 204:16-205:11, 219:23-222:14.

[5] Konwick et al., *Concentrations and Patterns of Perfluoroalkyl Acids in Georgia, USA Surface Waters Near and Distant to a Major Use Source*, 27 ENVTL. TOXICOLOGY AND CHEMISTRY 2011 (2008).

[6] Erin Fuchs and Pam Sohn, *Georgia: Study Finds High Levels of Stain-Resistance Ingredient in Conasauga River*, CHATTANOOGA TIMES FREE PRESS (Feb. 10, 2008), *available at* https://fluoridealert.org/news/georgia-study-finds-high-levels-of-stain-resistance-ingredient-in-conasauga-river/. *See also* Ex. 11, Bundros Dep., at 1183:3-8.

02/06/2008; *see also* Ex. 3, Braun Dep., at 198:9-211:3. 

. Ex. 16, Dobbs Email 02/07/2008.

All told, those outside the industry had to publicly disclose decades of knowing, continuing pollution in northwest Georgia at the hands of Defendants. But it was too late—they had already saturated the LAS with toxic "forever" PFAS chemicals for decades. Now, as reflected by the Parties' inspection and sampling of the LAS in the Spring of 2021, the LAS acts like a sponge absorbing these forever chemicals that ultimately make their way and pollute the Conasauga River and the communities downstream. Indeed, the levels on the LAS are shocking—reaching nearly 190,000 ppt, in comparison to the current EPA drinking water advisory limit of 0.004 ppt for PFOA, 0.02 ppt for PFOS, and 10 ppt for GenX

---

[7] The EPA's stewardship program involved only chemical manufactures of PFAS—with the goal to reduce PFOA from their own plants' emissions and product content. *See* U.S. EPA, Fact Sheet: 2010/2015 PFOA Stewardship Program, *available at* https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program. It did not cover the carpet industry or Dalton Utilities, and it did not entail monitoring of their discharges or of any Dalton Utilities facility.

(C6 "short chain" PFAS). *See* U.S. EPA, *2022 Interim Updated PFOA and PFOS Health Advisories* (June 2022).[8]

While Plaintiff contends that fault underlying this conduct is indivisible as a matter of fact, the evidence also supports the contention that Defendants acted in concert as a matter law. *See Ga. Farm Bureau Mut. Ins. Co. v. Hill*, 331 S.E.2d 12, 14 (Ga. Ct. App. 1985) ("Concert of action, amounting to conspiracy, may be shown by circumstantial as well as direct evidence. It is not necessary to prove an express agreement or compact among the wrongdoers; their common design may be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances.") (citation omitted); *see also Loudermilk*, 826 S.E.2d at 127-28 (observing that elements of concerted action are almost identical to civil conspiracy).

With the deadline for amendments as of right passed, *see* Doc. 192, Rule 15(a)(2) controls this Motion[9] and states that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The Court should

---

[8] *available at* www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos#:~:text=On%20June%2015%2C%202022%2C%20EPA,and%20polyfluoroal kyl%20substances%20(PFAS).

[9] Because this Court's Scheduling Order covers only amendments as of right under Rule 15(a)(1) and not "other amendments" under Rule 15(a)(2), *see* Doc. 192, Rule 15(a)(2)'s "freely given" standard applies rather than Rule 16's "good cause."

freely give leave when justice so requires." FED. R. CIV. P. The Supreme Court

explains,

> If the underlying facts or circumstances relied upon by a plaintiff may
> be a proper subject of relief, he ought to be afforded an opportunity to
> test his claim on the merits. In the absence of any apparent or declared
> reason—such as undue delay, bad faith or dilatory motive on the part
> of the movant, repeated failure to cure deficiencies by amendments
> previously allowed, undue prejudice to the opposing party by virtue of
> allowance of the amendment, futility of amendment, etc.—the leave
> sought should, as the rules require, be "freely given."

*Forman v. Davis*, 371 U.S. 178, 182 (1962). Thus, leave should be granted except

where "(1) where there has been undue delay, bad faith, dilatory motive, or

repeated failure to cure deficiencies by amendments previously allowed; (2) where

allowing amendment would cause undue prejudice to the opposing party; or (3)

where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th

Cir. 2001)). Otherwise, Rule 15 "instructs that a court should liberally grant leave

to amend when it is in the interest of justice to do so." *Cowart v. Metropolitan Life

Ins. Co.*, 444 F. Supp. 2d 1282, 1296 (M.D. Ga. 2006) (quoting *Burger King Corp.

v. C.R. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999)).

    "'In most cases, delay alone is not a sufficient reason for denying leave to

amend.'" *Cowart*, 444 F. Supp. 2d at 1295 (quoting Wright & Miller, *Fed. Prac. &

Procedure* § 1488); *see also Bryant*, 252 F.3d at 1164 ("When a party delays in

filing a motion to amend, the lengthy nature of litigation, without any other

evidence of prejudice to the defendants or bad faith on the part of the plaintiffs,

does not justify denying the plaintiffs the opportunity to amend their complaint.")
(cleaned up) (citations omitted).

"Instead, the most important factor to consider in deciding whether to grant
or deny leave to amend is prejudice to the opposing party." *Edmond v. BASF
Catalysts, LLC*, 2010 WL 11519530, at *2 (M.D. Ga. Jan. 21, 2010) (quoting
Wright & Miller, *Fed. Prac. & Procedure* § 1488). And "[t]he burden to prove
prejudice is on the non-moving party." *Sapp v. Four Winds Int'l Corp*., 2011 WL
13295390, at *3 (M.D. Fla. Jan. 5, 2011) (citations omitted).

No prejudice will result from granting leave for the amendment. From this
case's inception, Plaintiff has sought joint and several liability against all
Defendants and alleged facts placing the divisibility or indivisibility of fault at
issue. *See* Docs. 1-1, at 31; 236, at 64-65; 282, at 64-65; 418, at 67-68; 716, at 74-
75; *see also* Docs. 1-1, at ¶¶ 62, 74-76; 236, at ¶¶ 66, 78-80; 282, at ¶¶ 66, 78-80;
418, at ¶¶ 66, 78-80; 716, at ¶¶ 66, 78-80 (alleging all Defendants knew of PFAS'
toxicity through communications with one another, knew they would threaten the
environment, and knew of PFAS' persistence but concealed their knowledge from
the public and government agencies). Likewise, as demonstrated above, discovery
has focused on Defendants' communications and collective efforts to influence and
conceal their knowledge from regulatory agencies and the public. As such, the
parties have litigated this case concerning the divisibility or indivisibility of fault

and concerted action in lengthy discovery, Defendants have been on notice that Plaintiff was pursuing this contention throughout this litigation, and they will lose no opportunity to rebut it through existing evidence.

As such, and to the extent this Court finds it necessary that Plaintiff plead specific language that Defendants' acted in concert, Plaintiff seeks leave to do so. Here where prejudice is absent, Rule 15(a)(2)'s liberal amendment policy dictates that leave is appropriate.

Plaintiff has attached a Proposed Fifth Amended Complaint as Exhibit 17.[10]

## CONCLUSION

Plaintiff respectfully requests that the Court grant Plaintiff leave to file the Proposed Fifth Amended Complaint, and for such other and further relief as the Court deems just and proper.

<div style="margin-left:40%">

*/s/ Brett C. Thompson*
Brett C. Thompson, Esq. (*phv*)
Hirlye R. "Ryan" Lutz, III, Esq. (*phv*)
F. Jerome Tapley, Esq. (*phv*)
R. Akira Watson (*phv*)
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, Alabama 35205
bthompson@corywatson.com
rlutz@corywatson.com
jtapley@corywatson.com
awatson@corywatson.com
Telephone: (800) 852-6299

</div>

---

[10] It omits dismissed Defendants Color Express, Inc.; JB NSD, Inc.; Secoa Technology, LLC; and IMACC Corporation.

13

Fax: (205) 324-7896

Ryals D. Stone (GA Bar No. 831761)
William S. Stone (GA Bar No. 684636)
THE STONE LAW GROUP –TRIAL
LAWYERS, LLC
5229 Roswell Road NE
Atlanta, Georgia 30342
Telephone: (404) 239-0305
Fax: (404) 445-8003
ryals@stonelaw.com
billstone@stonelaw.com

James S. Whitlock (*phv*)
Gary A. Davis (*phv*)
Davis & Whitlock, P.C.
Attorneys at Law
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone: (828) 622-0044
Fax: 828-398-0435
jwhitlock@enviroattorney.com
gadavis@enviroattorney.com

**Attorneys for Plaintiff**

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing pleading upon all parties to this matter by Court Electronic Filing to counsel of records as follows:

This 18th day of August 2022.

*/s Brett C. Thompson*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Norther District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C.:

This 18th day of August 2022.

*/s Brett C. Thompson*