# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

JARROD JOHNSON, Individually and
on behalf of a class of persons similarly
situated,

               *Plaintiff,*

    v.

3M COMPANY, *et al.*,

               *Defendants.*

Civil Action No. 4:20-cv-0008 AT

Judge Amy Totenberg

## DEFENDANTS' JOINT OPPOSITION TO PLAINTIFF'S <u>MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................6

    A.    The complexity of substances known as "PFAS." ...................7

        1.    Variability of the PFAS compounds at issue..................7

        2.    The myriad potential pathways of exposure to PFAS..............................................................................8

        3.    Variability of individuals exposed and health effects...............................................................................9

    B.    Grouping all PFAS together, Johnson files this lawsuit. .........11

    C.    Discovery narrows and clarifies the case.................................13

    D.    Johnson seeks class certification.............................................15

ARGUMENT .....................................................................................15

    I.    JOHNSON SATISFIES NEITHER ADEQUACY NOR TYPICALITY UNDER RULE 23(a)..................................................16

    A.    Johnson and his counsel are inadequate class representatives........................................................................16

        1.    Johnson's interests risk harm to absent class members......................................................................17

        2.    Johnson has abdicated his leadership role. ....................29

    B.    Johnson's claims and defenses are atypical of the class..........34

    II.    JOHNSON'S INJUNCTION CLASS FAILS RULE 23(b)(2)..........37

    A.    Johnson nowhere attempts to satisfy the requirements for equitable relief........................................................................38

    B.    Johnson has not proposed an injunction that may actually issue........................................................................................39

    C.    Johnson's injunction is also insufficiently specified. .............42

    D.    Johnson offers no uniform harm warranting injunctive relief across a cohesive class...................................................43

i

# TABLE OF CONTENTS
### (continued)

|  |  |  | **Page** |
|---|---|---|---|
| | 1. | Johnson needs no injunction for increased water rates. | 43 |
| | 2. | A (b)(2) class for non-water-rate harm would lack cohesion and would violate Article III. | 44 |
| III. | | JOHNSON'S DAMAGES CLASS FAILS RULE 23(b)(3). | 47 |
| | A. | Common issues do not predominate. | 48 |
| | 1. | Determining injury and damages from increased water rates requires individual inquiries. | 49 |
| | 2. | Litigation over the economic loss rule requires individual inquiries. | 55 |
| | B. | This class action is not superior to other methods of adjudication. | 59 |
| | 1. | *City of Rome* could disrupt any class litigation. | 59 |
| | 2. | Manageability difficulties also defeat superiority. | 63 |
| CONCLUSION | | | 65 |

## TABLE OF AUTHORITIES

**Page**

CASES

*A Aventura Chiropractic Care Ctr., Inc. v. BB Franchising LLC*,
   2015 WL 11051056 (S.D. Fla. Aug. 26, 2015) ............................................29, 30

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
   938 F.3d 1170 (11th Cir. 2019) ...........................................................38, 44, 46

*Adams v. S. Farm Bureau Life Ins. Co.*,
   493 F.3d 1276 (11th Cir. 2007) .......................................................................21

*Adler v. Wallace Computer Servs., Inc.*,
   202 F.R.D. 666 (N.D. Ga. 2001) .....................................................................54

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997) ........................................................................16, 21, 28, 32

*Anderson v. Am. Fam. Ins. Co.*,
   800 F. App'x 814 (11th Cir. 2020) ..................................................................19

*Arch v. Am. Tobacco Co.*,
   175 F.R.D. 469 (E.D. Pa. 1997) ......................................................................41

*Ballan v. Upjohn Co.*,
   159 F.R.D. 473 (W.D. Mich. 1994) .................................................................30

*Bell Atl. Corp. v. AT&T Corp.*,
   339 F.3d 294 (5th Cir. 2003) ...........................................................................55

*Benefield v. Int'l Paper Co.*,
   270 F.R.D. 640 (M.D. Ala. 2010) ..............................................................58, 62

*Berni v. Barilla S.p.A.*,
   964 F.3d 141 (2d Cir. 2020) ............................................................................39

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ..............................................................53

*Blinco v. Green Tree Servicing, LLC*,
  366 F.3d 1249 (11th Cir. 2004) ......................................................3, 7

*Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*,
  238 F.R.D. 679 (S.D. Fla. 2006) ........................................................27

*Bronson v. Swensen*,
  500 F.3d 1099 (10th Cir. 2007) ..........................................................39

*Brown v. Blue Cross & Blue Shield of Mich., Inc.*,
  167 F.R.D. 40 (E.D. Mich. 1996) ......................................................63

*Brown v. Electrolux Home Prods., Inc.*,
  817 F.3d 1225 (11th Cir. 2016) ..........................................................48

*Burkhead v. Louisville Gas & Elec. Co.*,
  250 F.R.D. 287 (W.D. Ky. 2008) ......................................................23

*California v. Texas*,
  141 S. Ct. 2104 (2021)........................................................................39

*Caston v. Mr. T's Apparel, Inc.*,
  157 F.R.D. 31 (S.D. Miss. 1994)..................................................31, 33

*Catrett v. Landmark Dodge, Inc.*,
  560 S.E.2d 101 (Ga. Ct. App. 2002)..................................................27

*Cherry v. Dometic Corp.*,
  986 F.3d 1296 (11th Cir. 2021) ..........................................................59

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)........................................................................39, 41

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)......................................................................41, 47

iv

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)........................................................................................54, 55

*Cooper v. Fed. Rsrv. Bank of Richmond*,
  467 U.S. 867 (1984)...............................................................................................22

*Cooper v. S. Co.*,
  390 F.3d 695 (11th Cir. 2004) ..............................................................................21

*Cordoba v. DIRECTV, LLC*,
  942 F.3d 1259 (11th Cir. 2019) ............................................................................47

*Cotromano v. United Techs. Corp.*,
  2018 WL 2047468 (S.D. Fla. May 2, 2018).................................................20, 64

*Crowder v. Lash*,
  687 F.2d 996 (7th Cir. 1982) ................................................................................23

*DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*,
  469 F. App'x 762 (11th Cir. 2012) .......................................................................44

*Ebert v. Gen. Mills, Inc.*,
  823 F.3d 472 (8th Cir. 2016) ..............................................................19, 45, 58

*Eslava v. Gulf Tel. Co.*,
  2007 WL 2298222 (S.D. Ala. Aug. 7, 2007).................................................29, 30

*Feinstein v. Firestone Tire & Rubber Co.*,
  535 F. Supp. 595 (S.D.N.Y. 1982) .......................................................................22

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) ..........................................................................53, 57

*Grimes v. Pitney Bowes Inc.*,
  100 F.R.D. 265 (N.D. Ga. 1983) ..........................................................................30

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999)...............................................................................................38

*Henke v. Arco Midcon, L.L.C.*,
   2014 WL 982777 (E.D. Mo. Mar. 12, 2014) ......................................64

*Hous. Auth. v. MMT Enterprises, Inc.*,
   475 S.E.2d 642 (Ga. Ct. App. 1996) .................................................44

*Hussain v. Burger King Corp.*,
   No. 3:22-cv-02258-AGT (N.D. Cal. Apr. 11, 2022) .........................27

*In re AEP ERISA Litig.*,
   2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) ...................................30

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ..............................................................55

*In re Atlas Roofing Corp. Chalet Shingle Products Liability Litigation*,
   2017 WL 2540822 (N.D. Ga. June 9, 2017)................................56, 59

*In re Dry Max Pampers Litig.*,
   724 F.3d 713 (6th Cir. 2013) ............................................................32

*In re E.I. DuPont de Nemours & Co. C-8 Pers. Inj. Litig.*,
   2022 WL 4149090 (6th Cir. Sept. 9, 2022) ................................44, 47

*In re Flash Memory Antitrust Litig.*,
   2010 WL 2332081 (N.D. Cal. June 9, 2010)......................................54

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig.*,
   2012 WL 379944 (D.N.J. Feb. 6, 2012) ............................................19

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002) .................................................23, 63

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) ....................................54

*In re Proxima Corp. Sec. Lit.*,
   1994 WL 374306 (S.D. Cal. May 3,1994) .........................................28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019)............................................................55

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
    219 F.R.D. 661 (D. Kan. 2004) .........................................................22

*J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*,
    628 F.2d 994 (7th Cir. 1980) ............................................................36

*Kamm v. Cal. City Dev. Co.*,
    509 F.2d 205 (9th Cir. 1975) ............................................................63

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) ...............................................37, 42, 44

*Kirkman v. N. Carolina R.R. Co.*,
    220 F.R.D. 49 (M.D.N.C. 2004).......................................................64

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ........................................................55

*Koziara v. City of Casselberry*,
    392 F.3d 1302 (11th Cir. 2004) ....................................................5, 46

*Kunzelmann v. Wells Fargo Bank, N.A.*,
    2013 WL 139913 (S.D. Fla. Jan. 10, 2013).....................................35

*LaBauve v. Olin Corp.*,
    231 F.R.D. 632 (S.D. Ala. 2005) ................................................58, 64

*Lee-Bolton v. Koppers Inc.*,
    319 F.R.D. 346 (N.D. Fla. 2017) .....................................................20

*London v. Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ........................................................16

*Louglin v. Amerisave Mortg. Corp.*,
    2018 WL 1887292 (N.D. Ga. Mar. 19, 2018) ..................................54

*Maldonado v. Ochsner Clinic Found.*,
  493 F.3d 521 (5th Cir. 2007) ..............................................................42

*Matsushita Elec. Indus. Co. v. Epstein*,
  516 U.S. 367 (1996)............................................................................22

*Mays v. Tenn. Valley Auth.*,
  274 F.R.D. 614 (E.D. Tenn. 2011) ................................................19, 23

*McManus v. Fleetwood Enterprises, Inc.*,
  320 F.3d 545 (5th Cir. 2003) ..............................................................39

*McNichols v. Loeb Rhoades & Co., Inc.*,
  97 F.R.D. 331 (N.D. Ill. 1982)............................................................36

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  259 F.3d 154 (3d Cir. 2001) ...............................................................53

*Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*,
  339 F.3d 1001 (8th Cir. 2003) ............................................................55

*Palmer v. 3M Co.*,
  2007 WL 1879844, slip op. (Minn. Dist. Ct. Jun. 19, 2007)...............57

*Polar Int'l Brokerage Corp. v. Reeve*,
  187 F.R.D. 108 (S.D.N.Y. 1999).........................................................33

*Prado–Steiman ex rel. Prado v. Bush*,
  221 F.3d 1266 (11th Cir. 2000) .....................................................17, 26

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  226 F.R.D. 456 (S.D.N.Y. 2005).........................................................42

*Radcliffe v. Experian Info. Sols. Inc.*,
  715 F.3d 1157 (9th Cir. 2013) .............................................................28

*Ragsdale v. Turnock*,
  841 F.2d 1358 (7th Cir. 1988) .............................................................39

*Reilly v. Gould, Inc.*,
    965 F. Supp. 588 (M.D. Pa. 1997)......................................................64

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    253 F.R.D. 365 (S.D. W. Va. 2008) ................................................57

*Robert Elliott Trucking, Inc. v. Caterpillar, Inc.*,
    2012 WL 2918700 (D.S.C. Mar. 21, 2012)...........................56, 57, 59

*Rouse v. Caruso*,
    2013 WL 588916 (E.D. Mich. Jan. 7, 2013) ....................................23

*Rutherford v. City of Cleveland*,
    137 F.3d 905 (6th Cir. 1998) ...........................................................18

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
    601 F.3d 1159 (11th Cir. 2010) .................................................48, 59

*Sanchez v. Wal Mart Stores, Inc.*,
    2009 WL 1514435 (E.D. Cal. May 28, 2009) ..................................22

*Shelton v. Pargo, Inc.*,
    582 F.2d 1298 (4th Cir. 1978) ...................................................31, 33

*Shiring v. Tier Techs., Inc.*,
    244 F.R.D. 307 (E.D. Va. 2007) .....................................................36

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*,
    543 F.3d 597 (10th Cir. 2008) ...............................................4, 38, 42

*Sikes v. Teleline, Inc.*,
    281 F.3d 1350 (11th Cir. 2002) .................................................54, 55

*Steering Comm. v. Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir. 2006) .............................................19, 57, 58

*Support Working Animals, Inc. v. Governor of Fla.*,
    8 F.4th 1198 (11th Cir. 2021) ..........................................................40

*Thomas v. FAG Bearings Corp.*,
    846 F. Supp. 1400 (W.D. Mo. 1994) ...................................................................19

*Thompson v. Am. Tobacco Co.*,
    189 F.R.D. 544 (D. Minn. 1999) .........................................................................22

*Thornton v. State Farm Mut. Auto Ins. Co., Inc.*,
    2006 WL 3359482 (N.D. Ohio Nov. 17, 2006)...................................................63

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953)......................................................................................39, 40

*Vallario v. Vandehey*,
    554 F.3d 1259 (10th Cir. 2009) ..........................................................................42

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ...........................................................15, 17, 42

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ...................................................................34, 65

*Vulcan Materials Co. v. Driltech, Inc.*,
    306 S.E.2d 253 (Ga. 1983) .................................................................................55

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).....................................................................................passim

*Wallis v. B & A Const. Co.*,
    614 S.E.2d 193 (Ga. Ct. App. 2005)...................................................................35

*Whole Woman's Health v. Jackson*,
    142 S. Ct. 522 (2021)..........................................................................................40

*Wright v. Apartment Inv. & Mgmt. Co.*,
    726 S.E.2d 779 (Ga. Ct. App. 2012)...................................................................50

## STATUTES

Ga. Code Ann. § 11-2-313 ........................................................................................27

x

Ga. Code Ann. § 51-11-2 ..................................................................35

**OTHER AUTHORITIES**

87 Fed. Reg. 118 ............................................................................11

Fed. R. Civ. P. 23 ...................................................................passim

# INTRODUCTION

The classes Plaintiff seeks to represent are composed of disparate individuals with disparate purported injuries; suing disparate defendants that engaged in fundamentally disparate conduct; and all regarding thousands of disparate chemicals with disparate characteristics.

There are many reasons that Plaintiff's proposed classes fail, but Plaintiff's efforts to homogenize the interests of proposed class members by sacrificing class members' claims are particularly striking.  Notwithstanding the express allegations of his complaint and the arguments he made to successfully avoid dismissal, Plaintiff would now jettison and thereby preclude class members' personal-injury and property-damage claims, all so that he can serve as class representative to pursue speculative or unnecessary relief.

***Rule 23(a).***  Early in this litigation, Defendants moved to dismiss all state claims based on the economic loss rule, which bars tort relief for economic damages. Plaintiff persuaded the Court that the economic loss rule did not apply because he pled injury to his person and property.  *See, e.g.*, Doc. 629 at 75–76 (MTD Order).

Something happened, however, between the motion to dismiss and the motion for class certification.  Although Plaintiff acknowledged in discovery that he would need to "use [] expert testimony for the purposes of establishing property damages,"

1

Attached Exhibit (or "DX") A, No. 3 (Pl. Interrog. Resp. to OWUSA), he failed to disclose such testimony and, thus, forfeited those claims. He was even more explicit in abandoning his claims for personal injury. *See, e.g.*, DX B, No. 5 (Pl.'s Admission Resp. to DAI) ("Plaintiff admits he is not pursuing personal injury claims on behalf of class members."). Without explanation, then, the personal-injury and property-damage claims advanced by Plaintiff were abandoned.

The reason for such abandonment is plain—such claims are so personal and diverse as to preclude class certification—but if the classes are certified, the abandonment will extend not only to Plaintiff but also to the class members he seeks to represent. Whether the Plaintiff, Jarrod Johnson, subsequently wins or loses at trial, the abandoned claims for personal-injury and property damages on the state-law causes of action will be precluded by res judicata; and if a class is certified, those claims will be precluded not only for Johnson but for all class members. And for Johnson's Injunction Class, the claims of class members will be precluded without even the option for class members to opt out of this case.

Beyond that, Johnson is in the business of selling Rome water as the principal ingredient of the products at his Smoothie King, and both before and after bringing this suit, he publicized his water—which was not filtered for PFAS to his knowledge—as especially safe and healthful. Johnson also became a Rome water

ratepayer only *after* he brought his lawsuit—essentially volunteering for the alleged economic injury required to be a Damages Class member.  Those and other facts give Defendants unique defenses against Johnson that would distract from any class litigation.  For these reasons and others, the classes are uncertifiable for Plaintiff's failure to satisfy the Rule 23(a) adequacy or typicality requirements.

***Rule 23(b)(2).***  Johnson also fails to meet his burdens under Rule 23(b), and multiple problems plague Johnson's proposed injunction class.  Despite treating the proposed injunctive class as an afterthought, Johnson makes a monumental request.  He wants this Court to order each Defendant—no matter its role, ability, or authority—to fix the problems he sees with the Land Application System (LAS) operated by Dalton Utilities.[1]  His "five-part plan" will take place exclusively at the

---

[1] Dalton Utilities joins Parts I, II.A., II.C., and II.D. of Defendants' Joint Opposition while preserving all defenses, rights, and objections based on its sovereign immunity.  *See, e.g.*, Doc. 474 (Dalton Utilities' Mot. to Dismiss); Doc. 716 (Dalton Utilities' Answer to Fourth Am. Compl.).  On October 19, 2021, Dalton Utilities appealed this Court's order denying its Motion to Dismiss based on sovereign immunity.  Doc. 650 (Dalton Utilities' Not. of App.).  The appeal is still pending, and Dalton Utilities maintains that the Notice of Appeal divested this Court of jurisdiction to certify a class against Dalton Utilities.  *See Blinco v. Green Tree Servicing, LLC*, 366 F.3d 1249, 1252 (11th Cir. 2004).  Nevertheless, because the Court has not stayed proceedings and Johnson seeks to certify a class against Dalton Utilities, it joins the parts listed above of the Joint Opposition while preserving all rights based on sovereign immunity.

LAS; will take some 30 years to complete; and will allegedly cost over $850 million. Mot. 21–22. Johnson's proposal runs into issues at every turn.

*First*, the Defendants cannot be ordered to abate what they do not control. Yet Johnson asks this Court to certify a class requiring *all* Defendants to abate an alleged nuisance at the wastewater treatment system that only Dalton Utilities operates.

*Second*, the proposed "injunction" is unnecessary and thus improper given the monetary request. Rome has already approved water-filtration measures and will provide the putative class members the water Johnson wants for them. True, that allegedly harms the class by way of increased water rates—but that supposedly uniform harm is already addressed by Johnson's request for money damages and thus does not warrant injunctive relief.

*Third*, to the extent Johnson wants something else in the form of an "injunction," he does not specify it—which is a fatal problem in and of itself. Johnson cannot leave his requested "injunction at a stratospheric level of abstraction" (say, abate the PFAS in Rome's water). *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (Gorsuch, J.) (citations omitted). If his relief is an injunction generally and broadly requiring remediation of the LAS, it fails for lack of precision.

4

*Fourth*, (b)(2) certification is unavailable because Plaintiff does not propose a cohesive class with concrete and imminent future injury. Rule 23(b)(2) requires that an injunction be appropriate for the class "as a whole" so that conduct can be enjoined as to all class members or none of them. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360–61 (2011). And the class's uniform future injury must be both "real and immediate." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004). Both requirements are unsatisfied here. Putative class members have different personal circumstances and PFAS exposures, and most are not even *allegedly* at risk of concrete and immediate future injury. Far from seeking to enjoin conduct that applies "generally to the class" and that risks immediate injury, therefore, Johnson would need scores of mini-injunctions for different class members, if he could get any injunction at all. Fed. R. Civ. P. 23(b)(2).

**Rule 23(b)(3).** Johnson's water-rate, (b)(3) class suffers from a different set of defects. Determining liability for the thousands of class members would inevitably induce individualized inquiries that would dominate the proceedings. Different ratepayers have unique circumstances. Some are landlords passing on surcharges to others; others are tenants directly or indirectly paying the surcharges; others, like Johnson himself, are joint account holders having indeterminate injuries to allocate. Johnson and his experts lack any formula, statistical analysis, or easy

method of calculating damages because of the injury's inherently individualized nature. The same goes for the adjudication of Defendants' defenses. Individual inquiries will follow from, say, the economic-loss rule, which will rest on the disparate circumstances of each and every class member.

Nor is Johnson's class action the superior method to resolve the controversy at issue. Parallel litigation by the City of Rome involves almost identical claims concerning the same defendants and the same facts. Waiting to resolve filtration-and-monitoring expense issues through the *Rome* case thus also could avoid the serious risks of inconsistent results and duplicative recovery. Then add to that the many manageability problems embedded in resolving this case, and Johnson cannot escape the inferiority of his proposed class action.

Rule 23 precludes Johnson's request for class certification. The Court should deny the motion.

## BACKGROUND

The story presented by Plaintiff is misleading and vastly oversimplified. Taking as true Plaintiff's assertions about the hazards of the water supply to Rome and the rest of Floyd County, one would expect Floyd County to be a cancer hot

spot.  But it is not.  The overall cancer rate in Floyd County is *lower* than the average rate in Georgia.[2]  The real story is much more complex than Plaintiff lets on.

### A.    The complexity of substances known as "PFAS."

To label something "PFAS" barely begins to tell the story.  These substances consist of thousands of different chemical compounds, which have vastly different chemical properties and compositions and come from vastly different manufacturing processes, intermediates, products, and sources that have varied over time.[3]

### 1.    Variability of the PFAS compounds at issue.

PFAS is a broad term encompassing a large array of organic molecules containing fluorine and carbon.  A subset of these compounds contains a chain of between 4 and 16 carbons that are fully bonded to fluorine atoms and one of a large variety of other chemical groups, depending on the particular type of the thousands of types of PFAS.  The properties of PFAS depend, in part, on the carbon chain length, the degree of fluorination, and the particular functional groups that are present.[4]  In part because of these different carbon chain lengths and functional

---

[2] DX Q, 19–25 (Marais Report) (noting Floyd County's below-average cancer rate overall and how its rates "are statistically indistinguishable from those in other counties in Georgia and in the U.S.").
[3] DX R, A-10 (Beck Report); DX S, 513–41 (Buck et al. Article).
[4] DX S, 513–41 (Buck et al. Article).

7

groups, there is substantial variability in the compounds that make up PFAS and the properties of those 12,000 or so PFAS.[5]

The upshot of this PFAS science—the substantially different half-lives, clearance and distribution rates, and targets, if any, of the 12,000 or so different PFAS—is that the toxicity characteristics, if any, of one particular PFAS compound cannot be relied on to make scientific assumptions about the toxicity characteristics of any other PFAS compound.[6]  Still less can these toxicity characteristics—studied in animals—be translated into human health effects without sufficient epidemiologic evidence.[7]  The science instead says that each PFAS must be studied individually; experts cannot make categorical determinations about the potential health risks associated with all PFAS, or even a large class of PFAS.[8]

### 2.    The myriad potential pathways of exposure to PFAS.

The plethora of potential pathways of exposure to these 12,000 different compounds, some of which have been around since the mid-20th century, make generalizations more difficult.   The chemical-manufacturing defendants are not

---

[5] DX R, A-10 (Beck Report); DX S, 513–41 (Buck et al. Article).
[6] DX R, 29, 30 (Beck Report) ("Different PFAS do not have equal toxicity and/or potency across classes and cannot be assumed to act in the same manner, and it is therefore not appropriate to treat them as a single class").
[7] *Id.* A-3–4.
[8] *Id.* 66–69; *see also id.* 29; DX T, 14 (Alexander Report) ("grouping PFASs together may mask relevant associations for specific compounds should they exist").

responsible for all the PFAS in the Rome water supply or Rome environment; the carpet-manufacturing defendants are not responsible for all PFAS-containing products; and Dalton Utilities' LAS is not responsible for all PFAS in the Oostanaula River.[9] In addition to Defendants, myriad other sources of PFAS and PFAS-containing products (both domestically and globally) exist.[10]

The surfactant properties of certain PFAS—e.g., their stability and capacity to repel oil, water, and soil—provide immense use in an enormous range of products. To take a few examples, manufacturers may use PFAS in medical devices and pharmaceuticals; food packaging; building materials; home-use products (e.g., paper plates, liners for ovens and trays); home-maintenance products (e.g., cleaners, paints, varnish, floor polish, and insecticides); personal-care products; stain-resistant, water-repellent, and fire-repellent apparel and textiles; and other miscellaneous products, such as batteries, car waxes, ski waxes, and firefighting foam.[11]

### 3. Variability of individuals exposed and health effects.

As a result of the variety in types of PFAS and means of exposure over time, toxicologists attempting to evaluate a potential link between exposure to a given PFAS compound and any potential health issues must account for a variety of

---

[9] DX U, 4-17–21 (Frankel Report).
[10] *Id.*; *see also* DX V, 165, 193–98 (Zhang et al. Article).
[11] *See, e.g.*, DX R, 56 (Beck Report).

individualized factors.  And epidemiologists—the scientists who study whether a chemical causes adverse health effects in humans when there is no known mechanism of action—must account for yet another set of differentiating factors: the vast variability in the health and health risks of the U.S. population, which may confound any observed association between PFAS and adverse health effects.[12]

An individual's potential risk, if any, for adverse effects from any given chemical (PFAS or otherwise) varies widely across the population.  Some of the critical, individual-specific considerations include exposure level, intake, body mass, age, gender, and medical history.  All of these individual issues must be factored into any study to determine the toxicological effect, if any, of any PFAS on any given person.[13]

Then add to that the considerable scientific uncertainty concerning harmful PFAS levels in water.  Different regulatory bodies reach different conclusions. Consider the World Health Organization, which recently released a draft guidance concerning two types of PFAS—perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS)—in drinking water.  The global health agency's draft guidance recommends a limit of 100 parts per trillion (ppt) of either PFOA or

---

[12] DX T, 14–15 (Alexander Report).
[13] *See, e.g., id.* 12–13.

PFOS in drinking water.[14]   It also recommends a total cap of 500 ppt for combinations of up to 30 PFAS.[15]   Compare that to the U.S. Environmental Protection Agency's interim health advisory of 0.004 ppt for PFOA and 0.02 ppt for PFOS.[16]   In other words, the World Health Organization recommends 5,000 to 25,000 times higher chemical caps.   All of these facts complicate the often-oversimplified picture that people may draw about PFAS.[17]

### B.   Grouping all PFAS together, Johnson files this lawsuit.

Plaintiff Jarrod Johnson lives in Rome, Georgia.   Doc. 716, ¶ 15 (Compl.). He also owns a Smoothie King there.   DX C, 23:14–23:16 (Johnson Dep.). Sometime before the fall of 2019, Johnson heard about PFAS.   *Id.* 160:1–161:1.   In November 2019, Johnson filed this putative class action in state court before its removal to federal court.   Doc. 1 (Notice of Removal).

---

[14] DX W, 80 (PFOS and PFOA in Drinking-Water) (after converting µg/L to ppt), available at https://cdn.who.int/media/docs/default-source/wash-documents/wash-chemicals/pfos-pfoa-gdwq-bd-working-draft-for-public-review-29.9.22.pdf?sfvrsn=eac28c23_3.

[15] *Id.*

[16] EPA, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 118, (June 21, 2022), available at https://www.govinfo.gov/content/pkg/FR-2022-06-21/pdf/2022-13158.pdf.

[17] DX X (Comella Article) (noting how the EPA's interim guidance levels are often lower than background concentrations detected in rainwater throughout the world, including in remote areas); DX Y, 11174 (Cousins et al. Article) (same).

Johnson has asserted various claims against numerous different-in-kind defendants—chemical suppliers, carpet manufacturers, intermediaries, Dalton Utilities, and the Dalton Whitfield Solid Waste Authority—with alleged ties to supposed chemical contamination in Northern Georgia waterways.  Compl. ¶¶ 1–6.  More specifically, Johnson sued Dalton Utilities and the Solid Waste Authority under the Clean Water Act.  *Id.* ¶¶ 107–145.  And he brought state-law claims on behalf of a prospective class for negligence, negligence per se, punitive damages, nuisance, and abatement of the nuisance against various defendants.  *Id.* ¶¶ 163–200.

When Johnson filed this lawsuit, he had no water accounts with the City of Rome—his corporation and wife did.  Johnson Dep. 186:14–187:16, 196:25–197:5, 206:4–210:7.  He became an account holder only after his deposition in an apparent effort to acquire standing to pursue recovery of increases in Rome water rates allegedly attributable to municipal monitoring and filtering costs.  Doc. 932 (PX 97, City of Rome Water Bill).  As he was not an account holder at the time he filed this suit, the only injuries claimed that related to him were his fears regarding potential health and property effects of PFAS.

Defendants moved to dismiss.  On September 20, 2021, this Court granted and denied in part Defendants' motions to dismiss.  MTD Order at 178–79.  The Court dismissed all negligence claims against the supplier defendants, the

negligence and negligence per se claims against INV Performance Surfaces, the negligence per se claim against Daikin America, Inc., and the nuisance damages claim against Dalton Utilities. *Id.* But it allowed the remaining claims to proceed. *Id.*

### C.    Discovery narrows and clarifies the case.

Since the Court's order, several facts have come to light about Johnson's role in the litigation. For one, Johnson admits that PFAS have not affected him in any noneconomic way. Johnson Dep. 139:18–23. His suit instead focuses on the increased water rates and his general "concern about illness." *Id.*

Then came Johnson's statements about his business's water quality. As Johnson has testified, the principal ingredient of the smoothies he sells is water from the Rome water system. After the filing of this suit, an article featuring Johnson highlighted the purity of his products' water. *See* DX D (Johnson Dep. Ex. 11). In fact, he called his smoothies' water "the cleanest water in Rome." *Id.* But the water comes from the same "contaminated" source that he declares unsafe in this case because of its PFAS contents. And he has no idea if his business's water filter removes PFAS. Johnson Dep. 59:6–24.

Apparently unphased by the PFAS presence, moreover, Johnson and his wife bought a new house after filing this lawsuit. *Id.* 189:24–190:6. They knew—and

did not mind—that the house is supplied with the same water that his lawsuit called dangerous. *Id.*

Now turn to the litigation. Johnson knows little about his case. He knows little about PFAS, *see, e.g.*, *id.* 27:7–28:4, 39:6–40:6; or PFAS's presence in items he uses and sells, *id.* 50:8–51:19; or the regulatory authority of the U.S. Environmental Protection Agency, *id.* 41:2–16. In truth, he has left it all for his attorneys. *See, e.g.*, *id.* 51:20–25, 62:7–63:24. They control all aspects of this case. Indeed, they have answered several of his interrogatories without him realizing their false contents. *See, e.g.*, *id.* 159:2–161:1.[18]

In addition to Johnson bringing this lawsuit, the City of Rome has taken its own water-related measures. Even though Rome's PFAS levels have always complied with federal and state regulatory requirements, it approved a new water-filtration system in November 2021. DX E 614:9–615:3, 616:13–617:4 (Hackett Dep., Vol. 3). Rome will implement a new closed-circuit reverse osmosis process to filter PFAS from the water. *Id.* 614:9–615:3. Rome has also sued many of the Defendants to recover increased filtration and monitoring expenses.

---

[18] When Johnson was asked about these misstatements at his deposition, his counsel said the following: "MR. LUTZ:· This is done on behalf of the plaintiff and you know that the lawyers provide the responses in it." Johnson Dep. 85:7–9.

**D.    Johnson seeks class certification.**

This class action purports "to have those responsible for the PFAS contamination pay for the Class's increased rates and to abate the PFAS contamination at its source."  Mot. 22.  To accomplish this aim, Plaintiff asks for two separate classes:  (1) a "Damages Class" consisting of "[a]ll account holders for water service with the Rome Water and Sewer Division from 2019 through class certification," *id.* at 23; and (2) an "Injunction Class" made up of the same "account holders" at certification, *id.*

Defendants oppose Plaintiff's motion, which should be denied for the reasons detailed below.

## ARGUMENT

Class certification is the exception, not the rule.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  The plaintiff bears the burden of showing that this exception applies.  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).  To meet this burden, the plaintiff cannot rest on allegations but must provide evidence meeting Rule 23's requirements—because, after all, "Rule 23 does not set forth a mere pleading standard."  *Dukes*, 564 U.S. at 350.  Even then, courts must "rigorous[ly]" analyze the evidence to determine whether the plaintiff has met his burden.  *Id.* at 350–51.  In doing so, courts "[f]requently" analyze "the

merits of the plaintiff's underlying claim" in determining whether the plaintiff has satisfied Rule 23's requirements. *Id.* at 351.

This rigorous analysis reveals that Johnson fails his burden on several fronts—under Rule 23(a), (b)(2), and (b)(3).

## I.   JOHNSON SATISFIES NEITHER ADEQUACY NOR TYPICALITY UNDER RULE 23(a).

Rule 23(a) prescribes four requirements for certification, commonly called numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a)(1)–(4). Johnson fails to establish adequacy and typicality.

### A.   Johnson and his counsel are inadequate class representatives.

Courts may certify a class action only if both "the representative parties" and class counsel "will fairly and adequately protect" the class's interests. Fed. R. Civ. P. 23(a)(4); *see* Fed. R. Civ. P. 23(g)(4); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003) (adequacy extends to class counsel). This rule principally "serves to uncover conflicts of interest between named parties [or their counsel] and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). To prove adequacy as a class representative, therefore, Johnson must (1) have no substantial conflicts of interest between himself and the class, and (2) be willing and able to prosecute the action fairly and adequately. *See Valley Drug Co.*, 350 F.3d at 1189.

16

Johnson fails both of these requirements.  *First*, in an effort to simplify this proposed class to make certification easier and protect himself, Johnson would harm absent class members.  And *second*, Johnson has abdicated all responsibility to his lawyers who have failed to place the class members' interests first.

### 1.    Johnson's interests risk harm to absent class members.

"If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate."  *Id.*   In determining whether such conflicts exist, courts consider whether the class representative's incentives "align with those of absent class members so as to assure that the absentees' interests will be fairly represented."  *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (internal quotations omitted).  "[W]here the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members," certification falters.  *Valley Drug Co.*, 350 F.3d at 1190.  And while "the existence of minor conflicts alone will not defeat a party's claim to class certification," "'fundamental' [conflicts] going to the specific issues in controversy" will do so.  *Id.* at 1189 (citations omitted).  In other words, a class representative with interests that "are antagonistic to or in conflict with the objectives of those he purports to represent" cannot properly represent the class.  *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998) (citation omitted).

Johnson's interests and litigation choices have and will put him at odds with the classes' interests.  Three class-defeating conflicts exist:

***Claim splitting.***  Johnson has strategically abandoned absent class members' property-damage and personal-injury claims in an effort to achieve class certification—to the detriment of class members.

Start with property damages.  Johnson originally pursued damages claims based on harm to his property.  MTD Order at 8, 14, 67, 174.  Specifically, Johnson sought recovery for at least three types of property damage, in addition to damages for increased water rates:  (1) property damage stemming from class members' loss of the "use and enjoyment" of their drinking water due to its contamination; (2) damages for the diminution in the value of the property in the form of stigma damages; and (3) "past and future out-of-pocket expenses" incurred from water filtration costs and alternative drinking water costs.  DX F, No. 3 (Pl. Interrog. Resp. to Tarkett).  And in answers to interrogatories, Johnson said he would "use [] expert testimony for the purposes of establishing property damages."  *E.g.* DX A, No. 3 (Pl. Interrog. Resp. to OWUSA).  But when the time came to disclose his property-damages expert(s), he did not disclose one.  He abandoned what was previously a

critical component of his case.[19]  His class-certification motion instead focuses on the increased water rates and alleged pollution in Northern Georgia rivers.  Mot. 25.

Why the drastic change?  Class certification, presumably.  The individualized inquiries necessary to prove a loss in property value would generally inhibit class certification.  *See, e.g.*, *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478–80 (8th Cir. 2016); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601–02 (5th Cir. 2006).  The same result follows for each of the property damages Johnson originally sought.  The lost "use and enjoyment" of water would at minimum vary based on the amount of PFAS in the individual's water and how the individual uses it.  But that would prompt predominance problems.  *See, e.g.*, *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400, 1404 (W.D. Mo. 1994) (declining certification on loss of use or enjoyment damages because of the "individualized proof" required); *Mays v. Tenn. Valley Auth.*, 274 F.R.D. 614, 625 (E.D. Tenn. 2011) (same).  Likewise for out-of-pocket expenses:  Individualized inquiries would have predominated the determination of out-of-pocket expenses for water filtration and bottled water.  *See, e.g.*, *In re Ford Motor Co. E-350 Van Prod. Liab. Litig.*, 2012 WL 379944, at *21 (D.N.J. Feb. 6, 2012).  And so too with stigma damages:  Even if Johnson had the

---

[19] The now-abandoned property damages were also used to deny Dalton Utilities' defense of sovereign immunity, MTD Order at 91, and Defendants' economic loss rule arguments, *see infra* note 24.

required expert analysis, *see Anderson v. Am. Fam. Ins. Co.*, 800 F. App'x 814, 816 (11th Cir. 2020) (affirming summary judgment on stigma damages claim where the expert's opinion was "not derived from his analysis of the property itself, but from the effect that similar losses had on different properties"), such claims would fail predominance, *see, e.g.*, *Cotromano v. United Techs. Corp.*, 2018 WL 2047468, at *13–20 (S.D. Fla. May 2, 2018) (finding no predominance in class action seeking stigma damages related to contamination); *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 386 (N.D. Fla. 2017) (same).

Nor can Johnson pursue property-damage claims based on alleged PFAS contamination of his water.  He has no expert showing that the value of his water or any other property diminished—let alone any expert establishing diminished value for each class member.  True, his remediation expert estimates the costs of removing alleged contamination generally.  Mot. 21–22.  But that concerns only his proposed injunctive relief, not property *damages* for which he has no expert.

Now to personal-injury claims.  Johnson's complaint alleged that he was "personal[ly] harmed" by PFAS in his water supply.  MTD Order at 75–76.  But at his deposition he admitted that PFAS have not affected him in any noneconomic way (Johnson Dep. 139:18–23), and his discovery responses confirm he has abandoned any such claim, *see, e.g.*, DX B, No. 5 (Pl.'s Admission Resp. to DAI)

("Plaintiff admits he is not pursuing personal injury claims on behalf of class members."). Johnson likely avoids these claims now because of the many individualized issues that would need determined. *See, e.g.*, *Amchem*, 521 U.S. at 623–24.

These abandonment decisions could harm the class. Regardless of this case's outcome, class members who, unlike Johnson, want to bring property or personal-injury claims in subsequent litigation will be forever barred from recovering those potentially valuable damages if this Court certifies a class. *See, e.g.*, *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007) (noting that claim preclusion principles "apply to judgments in class actions as in other cases"). Because these claims would all "aris[e] out of the same operative nucleus of fact" as Johnson's case, claim preclusion would bar them in any subsequent litigation. *Id.* (citations omitted).

These threats of preclusion bar class certification. Johnson's "willing[ness] to forego class certification on [these claims] in order to pursue" his water-rate-only claims shows that he will not "adequately represent the interests of the" class. *Cooper v. S. Co.*, 390 F.3d 695, 721 (11th Cir. 2004). His claim-splitting creates preclusion problems and puts him in conflict with the class. This is all the worse because Johnson seeks certification under Rule 23(b)(2), which lacks notice or opt-

out procedures (Fed. R. Civ. P. 23(c)(2)), and thus "create[s] the possibility" that "class members' compensatory-damages claims would be precluded by litigation they had no power to hold themselves apart from." *Dukes*, 564 U.S. at 364; *see Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 880 (1984).

The specter of preclusion can impede class certification. Courts have found that "failure to assert certain claims of the absent class members might give rise to a conflict of interest" between the named plaintiff and the class when the class representative advances his "own interests at the expense of the class." *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 670 (D. Kan. 2004). Numerous courts have therefore refused to certify a class when, as here, the class representative risks class members' potentially valuable claims by not pursuing them. *See, e.g.*, *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 550–51 (D. Minn. 1999) (finding representatives inadequate for not asserting personal-injury claims); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606 (S.D.N.Y. 1982) (same); *Sanchez v. Wal Mart Stores, Inc.*, 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (same).

Johnson also cannot ask this Court to solve the preclusion risks he has created. For one, "[a] court conducting an action cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action." *Matsushita*

*Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396 (1996) (Ginsburg, J., concurring in part and dissenting in part); *accord* Fed. R. Civ. P. 23(c)(3) Advisory Committee's Note; *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 340 (S.D.N.Y. 2002); *Mays*, 274 F.R.D. at 623.

For another, *issue* preclusion would also bar future claims that depend on matters litigated by the class here because the "determination of dispositive issues in a classwide trial" binds class members. *MTBE*, 209 F.R.D. at 340 n.25; *see Crowder v. Lash*, 687 F.2d 996, 1007–11 (7th Cir. 1982). And the implications of this reality only favor Defendants in this instance. To illustrate, consider the personal-injury claims. Johnson admits that the case centers on the safety of Rome's water. Johnson Dep. 140:14–22. So if the factfinder concludes that Rome's water *is* safe to drink, a later court deciding a class member's personal-injury claim would still be bound by that finding. Such a finding would effectively doom the hypothetical case, whereas the opposite conclusion would still leave future defendants with other defenses. And that holds true no matter whether the future court applies claim preclusion in light of Johnson's decision to raise and then abandon these claims. So Johnson cannot escape the implications of his claim-splitting. *See, e.g.*, *Rouse v. Caruso*, 2013 WL 588916, at *6 (E.D. Mich. Jan. 7, 2013); *Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287, 296–97 (W.D. Ky.

23

2008).  Worse yet, this again occurs in the context of a potential 23(b)(2) class that lacks the ability to opt-out.

Nor are the potential preclusion-related harms lost on Johnson.  He believes that many class members would have serious personal-injury and property-damage claims.  After all, he thinks "that PFAS are toxic chemicals which have been linked to carcinogenic, immunological, reproductive, developmental, and other adverse human health effects."  DX B, No. 4 (Pl. Admission Resp. to DAI).  He stated that PFAS "contamination has impacted the health and safety of [him] and the putative class." DX G, No. 12 (Pl. Supp. Interrog. Resp. to Defs.).  And he accepts that "there may be some people in the Rome water district who have illnesses that they might attribute to PFAS in the water."  Johnson Dep. 140:23–141:3.  Yet, with all that said, Johnson is willing to bind those people to a class that will prevent them from ever raising their personal-injury and property-damage claims.  In the interests of absent class members, this Court should not permit it.

***Different claims against third parties.***  It is not just the personal-injury and property-damage claims of absent class members that Johnson has chosen to not pursue.  He also has chosen to not pursue claims against Rome, even though absent class members may well have strong claims against the City.

The Rome Water Department issued reports as late as 2021 representing that its water was "safe for consumption" and "absolutely safe." *See* DX H (Johnson Dep. Exs. 6, 7, 8, Rome Water Reports).  Johnson calls these declarations false. Johnson Dep. 113:13–20.  And under Johnson's theory of the case, Rome must have known of that falsity, as it issued these statements after it learned of the PFAS in the water and sued others because of it.  Rome also itself used—and discharged—PFAS, which would have made it into the putative class's water. *See, e.g.*, DX I 89:3–90:5 (Brock Dep.) (discussing Rome fire department's discharge of PFAS-containing foam into the environment).  So it was a contributor, at the least.

Any class member who justifiably relied on Rome's statements and/or was damaged by drinking Rome's PFAS-containing water may have a viable claim against Rome for nuisance, misrepresentation, or other claims.  These claims are arguably stronger than the claims here because no Defendant here made representations about Rome's water quality.  Other people thus may want to pursue claims against Rome for discharging PFAS into their water.  Johnson, though, is not one of those people.

Again here, therefore, Johnson has disserved his class.  Without Rome in this case, class members would not be able to collect any liability allocated to Rome, losing a potentially significant source of recovery.  And Johnson has already argued

that sovereign immunity restrictions do not apply in nuisance-related actions like this one.  MTD Order at 84–92.  But Johnson had to set aside these potentially strong claims, and thus his interests do not align with absent class members' interests.  *See Prado*, 221 F.3d at 1279.

***Class members' claims against Johnson.***  Johnson's interests also conflict with the class's because putative class members may have claims against *Johnson himself*—for fraudulently misrepresenting his Smoothie King water's cleanliness.

Johnson gave an interview on his Smoothie King business that was published in January 2020.  In the article, he stated (1) that the base of his smoothies is "water and ice"; (2) "we don't use tap water: All water used in Smoothie King comes through a double filtration system"; and (3) "I would say it is the cleanest water in Rome."  *See* DX D (Johnson Dep. Ex. 11).  In so doing, he says he was certifying his water's cleanliness to customers.  Johnson Dep. 136:18–25.  And, as he has testified, he wanted potential customers to rely on those representations—in fact, he conducted the interview to bring in new business.  *Id.* 132:14–16, 137:1–138:6.

But according to the logic of Johnson's allegations in this case, his statements were misleading because Johnson's Smoothie King water contained PFAS.  Johnson does not know whether his double-filtration system at Smoothie King filters out PFAS.  *Id.* 136:10–13, 58:21–59:24.  And his statements came *after* Johnson filed

suit. *Id.* 131:25–132:3. So class members may have justifiably relied on his representation about the cleanliness of his water, given his publicly filed water-contamination lawsuit on their behalf.

This reality creates a problem for Johnson. Any class member who relied on these statements and/or allegedly faced harm by buying Johnson's PFAS-containing smoothies might have a claim against him (and his Smoothie King) for some type of fraud, breach of warranty, or similar purported wrongdoing. *See Catrett v. Landmark Dodge, Inc.*, 560 S.E.2d 101, 103 (Ga. Ct. App. 2002); Ga. Code Ann. § 11-2-313(1)(b). Indeed, these kinds of claims have appeared countrywide. *See, e.g.*, Class Action Compl. ¶ 137, *Hussain v. Burger King Corp.*, No. 3:22-cv-02258-AGT (N.D. Cal. Apr. 11, 2022) (bringing fraudulent misrepresentation claims against Burger King using PFAS in its Whopper packaging based on allegations that Burger King marketed "the [Whopper] as safe and sustainable").

From there, a fundamental conflict results. Johnson potentially engaged in conduct that may have led class members to ingest PFAS, circumstances that parallel the allegations made in this lawsuit. *See, e.g.*, *Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 696–98 (S.D. Fla. 2006) (finding fundamental conflicts of interest where some class member hospitals engaged in the same unlawful behavior that defendant allegedly engaged in and so had "economic

interests contrary to the hospitals in the class that did not engage in such conduct"), *aff'd on other grounds*, 582 F.3d 1227 (11th Cir. 2009).

And Johnson's conflict of interest could concretely affect the way he approaches the case and any settlement—including in ways that would harm absent class members. He might, for example, abandon class claims that could provide fodder for claims against him—like the health-based claims that he has abandoned. Or he might have an added incentive to settle the case early to avoid future misrepresentation claims or findings against him. Personal incentives to settle the case, such as these, create a conflict of interest with the class. *See, e.g.*, *Amchem*, 521 U.S. at 626–27; *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013) (noting that courts decline to certify a class where the named plaintiff had "no incentive to go to trial" even if it "was best for the class").

In short, there is ample reason to doubt that putative class members can rely on Johnson to protect their interests. *See, e.g.*, *In re Proxima Corp. Sec. Lit.*, 1994 WL 374306, at *12 (S.D. Cal. May 3,1994) (finding named plaintiff inadequate in a shareholder action when he previously admitted to committing fraud and thus could not now properly seek to prosecute it).

### 2.     Johnson has abdicated his leadership role.

To serve as class representative, the named plaintiff must additionally have "demonstrated [s]ufficient participation in and awareness of the litigation." *Eslava v. Gulf Tel. Co.*, 2007 WL 2298222, at \*3 (S.D. Ala. Aug. 7, 2007) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987)).   This includes having "a working knowledge of the case" so he can adequately prosecute it.   *Id.* (citations omitted); *accord A Aventura Chiropractic Care Ctr., Inc. v. BB Franchising LLC*, 2015 WL 11051056, at \*3 (S.D. Fla. Aug. 26, 2015).   And, critically, it means not abdicating responsibility over the litigation.   *Eslava*, 2017 WL 2298222, at \*3–4.   Johnson does not meet these requirements.

Johnson has relinquished his representation responsibilities.   He has testified, and his counsel confirmed on the record, that he entirely relies on his counsel.   *See, e.g.*, Johnson Dep. 43:1–19, 51:20–25.[20]   To be sure, Johnson need not be a legal

---

[20] This is perhaps best evidenced by the fact that Johnson signed off on false interrogatory answers that his counsel wrote for him.   Johnson, for example, affirmatively responded to an interrogatory—directed at him—that "Plaintiff has carefully reviewed the deposition testimony of Rome Fire Department Chief Troy Brock and related discovery" to make certain determinations about whom to sue. DX F, No. 6 (Pl. Interrog. Resp. to Tarkett).   Yet in his deposition, Johnson admitted that he did not remember reviewing any depositions in this case, let alone the deposition testimony of Rome Fire Department Chief Troy Brock.   Johnson Dep. 89:14–19 (does not recall reading any depositions); 84:12–16 (does not recall reading the Rome Fire Chief's deposition).   This was also no isolated incident. *Compare, e.g.*, DX F, No. 8 (Pl. Interrog. Resp. to Tarkett) (swearing to when he

scholar, epidemiologist, and toxicologist.  But he has not demonstrated enough "working knowledge" to adequately represent absent class members' interests. *Eslava*, 2007 WL 2298222, at *3 (citation omitted).  This abdication precludes certification.  While no one contests class counsel's experience in cases like this, the named plaintiff must still be able to monitor class counsel if he wishes to represent a class.  *See, e.g.*, *id.* at *3–4; *In re AEP ERISA Litig.*, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008); *A Aventura*, 2015 WL 11051056, at *4; *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 486 (W.D. Mich. 1994).  Johnson has not shown that he can do so.[21]

---

became aware of PFAS), *with* Johnson Dep. 34:14–23, 35:6–37:11 (admitting this interrogatory response was wrong); *see also id.* 43:1–19, 51:20–52:21, 62:7–63:24.
[21] Johnson's lack of knowledge also coincides with his counsel's error on a key aspect of the case.  *Ballan*, 159 F.R.D. at 486–88; *see also Grimes v. Pitney Bowes Inc.*, 100 F.R.D. 265, 271 (N.D. Ga. 1983).  Johnson's entire case hinges on showing the at-issue PFAS have adverse effects on *human* health.  The only way to show that is through an epidemiologist's expert testimony, which Johnson's own purported human-health-effects expert admits.  *See* DeWitt Dep., Vol. II, 285:3–13, 398:14–21.  Yet Johnson's counsel still have disclosed no opinions of an epidemiologist. Counsel instead offered only a toxicologist who admits that her expertise does not extend to humans and she would need to phone an epidemiologist to answer some of the basic human-health-related questions presented in the case.  *See, e.g.*, *id.* 286:2–10; *id.* 293:13–19; *id.* 308:18–310:17; *id.* 316:23–317:7.  That omission thus reinforces inadequacy, as plaintiffs in other PFAS lawsuits uniformly recognize the need for an epidemiologist to support such health claims.  *See, e.g.*, DX M, 2–4 (*Gadsen* Expert Disclosure) (including Dr. DeWitt *and* an epidemiologist); DX N, 3 (*Lindsey* Epidemiologist Report).  That error could harm not just Johnson's proposed class here, but also in future cases.  *See supra* Part I.A.1.

Johnson's general abdication reveals a more specific problem.  His counsel have risked advancing their own interests at the class's expense by entering into individual settlements to dismiss six defendants against whom the class otherwise would have had potentially valuable claims:  Secoa Technology, LLC; Color Express, Inc.; JB NSD, Inc.; IMACC Corp.; Tarkett USA Inc.; and Polyventive LLC.  *See* Docs. 831, 832, 833, 915, 983, 1003.  That Johnson and his counsel entered into these settlements—with parties who may yet be deemed necessary under Civil Rule 19—disqualifies them both from serving as adequate fiduciaries in this case.  Any time a putative class representative settles an individual claim before certification, courts must carefully ensure that, "under the guise of compromising the plaintiff's individual claim, the parties have not compromised the class claim to the pecuniary advantage of the plaintiff and/or his attorney." *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1315 (4th Cir. 1978); *see also Caston v. Mr. T's Apparel, Inc.*, 157 F.R.D. 31, 33 (S.D. Miss. 1994) (warning of the "danger that, through the mechanism of class allegations included in a complaint, a plaintiff has attempted to exact a larger sum from a defendant in settlement of her own personal claims and with prejudice to the rights of other members of the putative class.").  Courts thus must give "undiluted, even heightened, attention in the settlement context" to Rule

23(a)'s requirements.  *Amchem*, 521 U.S. at 620; *see also In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013).

The consent decrees here suggest inadequacy.  Although nominally styled as individual consent decrees under the Clean Water Act, each of the six "individual" settlements contains a general release of "any and all claims … that could have been brought in this action."  *See* Docs. 831, 832, 833, 915, 983 at ¶ 13; 1003 at ¶ 14. Each settlement thus forever resolves the same claims that Johnson previously alleged on behalf of the class against those defendants—a red flag on its own, and one that creates a conflict between Johnson and class members moving forward.

The consent decrees' language further demonstrates their problematic nature. In particular, Johnson has asserted that class members have sustained $1.4M in damages in the form of rate increases to date.  Mot. 19.  Even including speculative future rate increases, the total damages alleged by Johnson approximate a present value of just $74.4M for 18,981 water customers—or roughly $3,900 per customer. Doc. 392 (PX 96, Zieburtz Rep. ¶ 3).  But Johnson's "individual" settlements far exceed $3,900, and, more troublingly still, none sets aside any money for Johnson or any other class member.  Each instead reflects an agreement to submit lump-sum payments to Plaintiff's Counsel coupled with comparatively smaller charitable donations.  *See* ¶¶ 11–12 Doc. 831 ($17,500 in fees and costs, $7,500 donation); 832

($3,000 in fees and costs, $1,000 donation); Doc. 833 ($7,500 in fees and costs, $2,500 donation); Doc. 915 ($25,000 in fees and costs, $10,000 donation); Doc. 983 ($125,000 in fees and costs, $50,000 donation); Doc. 1003 ($175,000 in fees and costs, $75,000 in donation).

This settlement structure raises the prospect that Johnson's counsel have "compromised the class claim" for their "pecuniary advantage." *Shelton*, 582 F.2d at 1315; *see also Caston* 157 F.R.D. at 33; *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 118 (S.D.N.Y. 1999) (warning against settlements "providing a nonpecuniary benefit of very little value to" class members). In the most glaring example, Johnson's consent decree with Secoa purports to *directly release all the claims of the class*—without providing them any direct benefit or even notice of the agreement—in exchange for primarily (70%) a payment of attorneys' fees and costs. *See* Doc. 831, ¶ 13 ("In consideration of the foregoing, Johnson *and similarly situated parties* release and forever discharge Secoa … from any and all claims … that could have been brought in this action.") (emphasis added). In another agreement, Johnson's counsel secured favorable fees in exchange for an express representation to IMACC that they did not represent any other class member against it, and that they had no intention of doing so in the future. *See* Doc. 915, ¶ 18 ("Representation of Counsel"). These circumstances indicate that—intentional or

not—Johnson's counsel have leveraged the rights of class members for pecuniary benefit before the class has even been certified.  In doing so, Johnson and his counsel have acted adversely to the class they purportedly represent—not only will they not vigorously pursue absent class members' claims against all possible defendants, they have contractually bound themselves *not* to do so in exchange for personal benefit.

All said, both counsel and client have demonstrated their inadequacy as fiduciaries.  These inadequacies should preclude class certification.

### B.    Johnson's claims and defenses are atypical of the class.

Johnson fails typicality, too.  Rule 23(a) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The named plaintiff must "possess the same interest and suffer the same injury as the class members" to satisfy typicality.  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1275 (11th Cir. 2009) (quotation omitted).

Many of the same issues addressed above and below also make Johnson's claims and defenses atypical of the class.  This is true for Johnson's statements about his smoothies' water, which expose him to unique credibility attacks.  It is also true for Johnson's lack of use of the river.  While class members who live near the river or actually use it might have a claim that the alleged actions harmed their use and enjoyment of the water, Johnson can assert no such harm.  *See* Johnson Dep. 300:4–

18 (admitting that he does not use the rivers).  And any injury from drinking water would be cured by Rome's newly approved water-filtration system.  Hackett Dep. 614:9–615:3.  Johnson thus atypically seeks only reimbursement for water rates, *supra* Part I.A.1, and thus atypically cannot seek injunctive relief for cleaning up the water, *infra* Part II.C.

Defendants have other typicality-destroying unique defenses against Johnson based on Johnson's choice to essentially volunteer to pay the increased rates by signing up as a ratepayer long after the suit was filed when he did not have to do so. Doc. 932 (PX 97, City of Rome Water Bill).  This choice opens him up to consent, causation, and voluntary-payment defenses that the rest of the class will not face. *See, e.g.*, Ga. Code Ann. § 51-11-2 ("As a general rule no tort can be committed against a person consenting thereto if that consent is free, is not obtained by fraud, and is the action of a sound mind."); *Wallis v. B & A Const. Co.*, 614 S.E.2d 193, 198 (Ga. Ct. App. 2005); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *4 (S.D. Fla. Jan. 10, 2013) ("His knowledge, awareness, and voluntary payment after consulting with legal counsel is atypical of the class and subjects him to defenses not applicable to others.").  Similarly, Johnson's choice to buy a new house in Rome after filing this lawsuit will reinforce those same defenses.

35

Courts often decline to certify classes due to unique defenses. This is so because "the named plaintiff will become distracted by the presence of a possible defense applicable only to him," and this distraction will alter the representation at the expense of the class. *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 998–99 (7th Cir. 1980). Defendants also need not show that the unique defense will "ultimately succeed" for courts to reject class certification on this ground. *McNichols v. Loeb Rhoades & Co., Inc.*, 97 F.R.D. 331, 334 (N.D. Ill. 1982). "[E]ven an *arguable* defense peculiar to the named plaintiff" suffices to "destroy the required typicality[.]" *J.H. Cohn*, 628 F.2d at 999 (emphasis added). Johnson's susceptibility to unique defenses renders him atypical.

Without acknowledging these unique defenses, Johnson asserts that his underlying alleged injury will share some characteristics with the rest of the class. Mot. 26. But even if so, "class certification is" still "inappropriate" because Johnson "is subject to unique defenses which threaten to become the focus of the litigation." *Shiring v. Tier Techs., Inc.,* 244 F.R.D. 307, 313 (E.D. Va. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)). Rule 23(a) thus bars certification here.

## II.     JOHNSON'S INJUNCTION CLASS FAILS RULE 23(b)(2).

Johnson devotes just two paragraphs to his proposed Rule 23(b)(2) class.  Mot. 38–39.  But that is no reflection of the enormity of his request.  Johnson wants Defendants to undertake some largely undefined, 30-year project to remediate the Land Application System that Dalton Utilities owns—at the alleged cost of $850 million.  Mot. 22.  This demand, though, is not a legitimate request capable of (b)(2) certification or injunctive relief.

Rule 23(b)(2) does not allow certification of just any request labeled an "injunction."  It requires that the plaintiff show that the defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

To satisfy this standard, plaintiffs must first show that an injunction is the "appropriate" remedy for the claim they assert on the class's behalf.  *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).   Plaintiffs thus must demonstrate (1) irreparable injury, (2) that monetary damages are inadequate, (3) that the balances of hardships favor the requested remedy, and (4) that the remedy is in the public interest.  *Id.*  Put simply, where "an injunction is not the right remedy,

Rule 23(b)(2) is not the right path to class certification." *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co*., 938 F.3d 1170, 1178 (11th Cir. 2019).

If a plaintiff can demonstrate the propriety of injunctive relief for his claim, he must then show that such relief would be "appropriate" for the class "as a whole." The "key" to that inquiry "is 'the indivisible nature of the injunctive or declaratory remedy warranted.'" *Dukes*, 564 U.S. at 360 (citation omitted). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id*. The defendants' conduct instead must be uniform—so that a "single injunction" applies equally "to all of the class members or as to none of them." *Id*. Their conduct must also be capable of being enjoined in the first place. *Shook*, 543 F.3d at 604 (Gorsuch, J.); *see also Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

Johnson's proposal satisfies none of these requirements.

## A. Johnson nowhere attempts to satisfy the requirements for equitable relief.

Unless Johnson meets his burden to establish that the requested injunctive relief is "serious" and "suitable" for his claims, certification "will be denied." *AA Suncoast*, 938 F.3d at 1178 (quoting 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1784.1 (3d ed. 2005)). Johnson's two paragraphs

38

of conclusory support for this relief fail to satisfy that burden.  He offers no evidence or argument of why injunctive relief is "appropriate" for his claim, let alone on behalf of a class.  The words "irreparable harm," for example, appear nowhere in his brief.  These basic failures alone preclude his injunctive relief claim apart from his failures under Rule 23(b).  *See McManus v. Fleetwood Enterprises, Inc*., 320 F.3d 545, 554 (5th Cir. 2003) ("The district court abused its discretion in allowing the Rule 23(b) classifications to inform the appropriate remedy, instead of vice versa."); *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147–49 (2d Cir. 2020).

## B.     Johnson has not proposed an injunction that may actually issue.

Johnson also has not met his burden of describing a specific and final injunction that can actually issue.  A court may enjoin a defendant's conduct only when the plaintiff shows that an irreparable injury will occur without the equitable relief.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  Courts thus generally may not enjoin conduct that has already ceased because "[t]he purpose of an injunction is to prevent *future*" misconduct.  *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (emphasis added); *see, e.g.*, *Ragsdale v. Turnock*, 841 F.2d 1358, 1366 (7th Cir. 1988).  And courts also avoid the "meaningless gesture" of enjoining a defendant who lacks the authority to provide the ordered relief.  *Bronson v. Swensen*, 500 F.3d 1099, 1112 (10th Cir. 2007); *cf., e.g.*, *California v. Texas*, 141

S. Ct. 2104, 2116 (2021); *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534 (2021); *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).  Under these rules, neither of the "two essential ingredients" of Johnson's proposed injunction, Mot. 38, is available.

*First*, Johnson requests that Defendants "discontinu[e] further PFAS discharges."  Mot. 38.  But as the Motion itself states, all manufacturer Defendants have already stopped using PFAS-based, soil-resistant treatments in the manufacture of their products—by 2019 at the latest.  Mot. 6, 18.  And a court may not issue an injunction to halt conduct that has already ceased and is unlikely to resume.  *See W. T. Grant Co.*, 345 U.S. at 633.

*Second*, and primarily, Johnson wants "remediati[on] [of the] legacy pollution of the LAS" by having Defendants implement his expert's "five-part plan."  Mot. 21–22, 38.  But only Dalton Utilities controls the LAS.  No other Defendant has *access* to the LAS, far less the ability to, for example, "[r]eplace" Dalton Utilities' current wastewater treatment system with "granular activated carbon" or "collect" that granular activated carbon "throughout the LAS."  Mot. 21.  Nor do Defendants control Rome's water treatment facilities, which Rome is already in the process of rebuilding.  *See* Hackett Dep. 614:9–615:3.  An injunction ordering Defendants to "remove" the "chemicals and toxins from the water supplies," therefore, is nothing

more than an aspiration as to all Defendants collectively.  Compl. ¶ 198.  And courts do not issue aspirational injunctions.  *See Lyons*, 461 U.S. at 105–06; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–11 (2013).

This forecloses certification of Johnson's proposed (b)(2) class.  And any argument about Defendants' ability to *pay* for the alleged costs associated with their past conduct goes to monetary relief that would fall under Rule 23(b)(3), not (b)(2).  Forcing Defendants to pay over $850 million would be nothing more than a quintessential damages claim.  And plaintiffs may not "transform" that kind of request "into a Rule 23(b)(2) class action" by calling the monetary remedy an "injunction."  McLaughlin on Class Actions § 5:15 (18th ed.).  Courts will instead deny Rule 23(b)(2) certification when plaintiffs use "a fund as a repository for money damages," *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 484 (E.D. Pa. 1997), or "clothe their claim for relief in the vestments associated with equitable claims," *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 468 (S.D.N.Y. 2005).  This Court should do likewise.[22]

---

[22] In all events, Johnson's Motion abandons the alternative "fund" remedy that he previously mentioned.  Compl. ¶ 198.

### C.   Johnson's injunction is also insufficiently specified.

To the extent Johnson's conceived-of injunction is something other than forcing Defendants to cease doing something they have already ceased—and to do something they cannot do—it fails for lack of specifics.

Johnson bears the burden of proving that he seeks relief suitable for Rule 23(b)(2) certification. *See Valley Drug Co.*, 350 F.3d at 1196. That includes offering "sufficient detail that the district court can conceive of an injunction that comports with the requirements of Rule 23(b)(2) and 65(d)." *Vallario v. Vandehey*, 554 F.3d 1259, 1267–68 (10th Cir. 2009); *see also, e.g.*, *Shook*, 543 F.3d at 604 (Gorsuch, J.) (relief cannot be defined at "stratospheric level of abstraction"); *Kartman*, 634 F.3d at 893; *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007).

Johnson's proposed remedy does the opposite:  it avoids all specificity.  What injunctive order this Court could ultimately order against all Defendants, in one fell swoop, remains elusive.  Who would run this 30-year abatement project?  Would the Court monitor it throughout?  How would the various defendants contribute if they cannot control the LAS?  How would this fit with Rome's efforts to implement a new filtration system on its own?  Without these specifics, certification of Johnson's Rule 23(b)(2) class should be denied.

**D.     Johnson offers no uniform harm warranting injunctive relief across a cohesive class.**

It is not just Johnson's proposed *remedy* that precludes a (b)(2) class.  It is also the alleged *harm* supporting that remedy.  Johnson alleges one and only one kind of harm that affects Johnson and all the putative class members:  that everyone had to pay higher water rates.  As Johnson puts it, "class members suffer the same damage and from the same source:  increased water rates to filter PFAS from water drawn at the Oostanaula River intake."  Mot. 34.  But this alleged harm—higher water rates—is already addressed by Johnson's (b)(3) class.  Indeed, it is why the (b)(3) proposal exists.  There is therefore no need (and no basis) to certify a (b)(2) class or issue an injunction for this harm.

**1.     Johnson needs no injunction for increased water rates.**

Johnson's proposed Rule 23(b)(3) class already pursues remedies for the higher-rate harm—compensation for the costs that Rome has passed through and will pass through to citizens for the capital improvements used to filter PFAS from Rome's water.  The (b)(3) class's relief would therefore completely remedy any of the allegedly uniform past and future harm among the proposed class.  And a plaintiff cannot seek an injunction—let alone certification of a Rule 23(b)(2) class—when damages would suffice.  *Kartman*, 634 F.3d at 892; *Hous. Auth. v. MMT Enterprises, Inc.*, 475 S.E.2d 642, 642 (Ga. Ct. App. 1996); *see also DWFII Corp. v. State Farm*

*Mut. Auto. Ins. Co.*, 469 F. App'x 762, 765 (11th Cir. 2012); *AA Suncoast*, 938 F.3d at 1175.  All told, Johnson does not need—and this Court lacks the authority to award—an injunction for the alleged water-rate harm.  And there is no reason to allow class litigation over an injunction purportedly costing $850 million to remedy a water-rate injury that Johnson's own expert calculates at $74.4 million.  Doc. 932 (PX 96, Zieburtz Rep. ¶ 3).

### 2.     A (b)(2) class for non-water-rate harm would lack cohesion and would violate Article III.

Johnson occasionally mentions purported harms beyond increased water rates.  But Johnson has already disavowed those harms.  *See supra* Part I.A.1.  He cannot resurrect them now.  But even if he could—and thus if this case involved more than increased water prices (such as PFAS "spreading throughout the food chain in vegetation, fish, and animals both wild and domestic," Mot. 19)—the class would fail to be cohesive, as required by Rule 23(b)(2).  *See In re E.I. DuPont de Nemours & Co. C-8 Pers. Inj. Litig.*, 2022 WL 4149090, at *8 (6th Cir. Sept. 9, 2022) (collecting cases requiring cohesion).  Any non-water-rate harm also fails Article III.

*Cohesion*.     Rule 23(b)(2) requires not only that the proposed class representative seeks relief common to the class, but also that he can prove his claims with evidence common to each class member.  *See Ebert*, 823 F.3d at 481.  Yet Johnson never attempts to show that all class members experience PFAS

"throughout the food chain" (for example) in the same way.  The type of harm will therefore vary depending on each class member's use of the river and other individual facts.  Class members' experiences also will vary with the enormous variety of PFAS and PFAS-containing products—to which Defendants and numerous non-parties have very different connections that varied over time and by location.  *See supra* page 8–10.  These individual issues arising from the "disparate factual circumstances of class members" will "prevent [a] class from being cohesive."  *Id.*

Nor has Johnson shown any common, class-wide conduct by Defendants.  To certify a class, Rule 23(b)(2) requires that the defendants have "acted or refused to act on grounds that apply generally to the class," Fed. R. Civ. P. 23(b)(2)—so that their "conduct … can be enjoined or declared unlawful" in one fell swoop, as to all of them or none of them, *Dukes*, 564 U.S. at 360–61.  Johnson has not set forth a course of conduct by Defendants—including Dalton Utilities, different carpet manufacturers, different chemical suppliers and intermediaries—that applies "generally to the class."  Fed. R. Civ. P. 23(b)(2).  Some defendants had no connection to certain PFAS and PFAS-containing products.  Other defendants had connections to certain PFAS and PFAS-containing products only for certain periods

of time or only in certain locations.  So putative class members would have different causation arguments based on different evidence.

In an attempt to avoid these issues, Johnson lumps together all defendants as if they were one indiscriminate actor.  They are not.  Different defendants acquired different knowledge about different PFAS at different times and took different actions in response.  *See* Mot. 2–18.  Johnson thus cannot cure the lack of cohesion by lumping everyone together.

***Article III.***  A non-water-rate injury would also run into Article III problems.  A plaintiff seeking injunctive relief must prove "a real and immediate threat of future injury" to satisfy Article III.  *Koziara*, 392 F.3d at 1305 (citation omitted).  And a "'forward-looking *interest*' in redressing a past harm" does not suffice.  *AA Suncoast*, 938 F.3d at 1176.  But the required tangible future injury is not remotely uniform across the class.

Johnson's individual case proves the point.  PFAS did not affect his decision to move to Rome, to buy a new house in Rome, or to start a business in Rome.  He does not use the allegedly contaminated rivers.  And he admits that he faces no physical injury from PFAS.  He can point only to water bills for concrete harm—but again, that is an injury that warrants at most monetary, not injunctive, relief.  True, Johnson might claim that he wants his "citizens to feel safe and not have to worry

about toxic water," Johnson Dep. 32:1–5, and that the water might somehow "impact[] generations," Mot. 21.  But there is nothing concrete and imminent about that.  *See Clapper*, 568 U.S. at 416.  Johnson thus lacks Article III standing for injunctive relief. [23]  And while other class members could have different circumstances that lead to a different conclusion, only cohesion-destroying individual inquiries could locate any such class members.

## III.   JOHNSON'S DAMAGES CLASS FAILS RULE 23(b)(3).

Under Rule 23(b)(3), Plaintiff seeks certification of a class of all RWSD accountholders from 2019 through class certification alleging that Defendants are liable—on negligence, wantonness, or nuisance theories—for increased past and future water rates supposedly attributable to the RWSD's efforts to monitor and remove PFAS in municipal water.  Mot. 23, 30–38.  Those claims do not satisfy Rule 23(b)(3)'s requirements of common-issue predominance or class-action superiority.  Certification of this class should thus be denied.

---

[23] MFG Chemical, LLC takes the position that Johnson lacks standing to bring *any* claims against it at this stage.  Even at the class certification stage, a plaintiff must put forth some proof that each defendant is causally connected to the alleged harm.  *See In re E.I. DuPont de Nemours & Co. C-8 Pers. Inj. Litig.*, 2022 WL 4149090, at *6 (6th Cir. Sept. 9, 2022); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019).  Johnson has not done so for MFG Chemical and it maintains that it has not used or discharged PFAS from its operations.  DX O (Welch Decl.); DX P, 3 (MFG Expert Report).

### A.    Common issues do not predominate.

Rule 23 does not permit class certification of Plaintiff's damages claims because Plaintiff has failed to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

To determine whether common issues predominate, a court must "identify the parties' claims and defenses and their elements" and "classify these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016). "Common questions are ones where 'the same evidence will suffice for each member.'" *Id.* After identifying common and individual questions, a court must ask whether the common issues "'ha[ve] a *direct impact* on every class member's effort to establish liability' that is *more substantial than the impact of individualized issues* in resolving the claim or claims of each class member." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (citation omitted).

Under that standard, common issues do not predominate, and Rule 23(b)(3) certification is improper. The evidence regarding injury, damages, and a key defense

would be highly accountholder-specific, creating individual issues that would overwhelm any common issues.

### 1. Determining injury and damages from increased water rates requires individual inquiries.

Class litigation of Plaintiff's damages claims would be dominated by individual mini-trials over the injury and damages elements of those claims. *See* MTD Order at 99, 132 (injury and damages are elements of nuisance and negligence claims). Plaintiff admits that class-member damages "will certainly vary based on their water usage and City billing policies." Mot. 34. But he asserts that class certification is nonetheless proper because no individualized issues supposedly exist as to "*which* [class] members have been harmed, or *how*," and his expert supposedly has a "simple, common formula" for calculating damages. *Id.* at 34–35. Those assertions are baseless.

Plaintiff and his expert simply *assume* that every RWSD accountholder has paid and will pay the full amount of past and future water rate increases. But there is no evidence for that assumption. Some accountholders surely did and would pass through, or share, some or all of the increased water rates with others who are not listed in RWSD accountholder records. Landlords, for instance, may pass on increased water rates to tenants. And businesses like Johnson's own may pass on increased water rates to customers. In cases like this, the accountholder might not

be any worse off as a result of water rate increases, or might incur only a fraction of increase compared to other putative class members. *See Wright v. Apartment Inv. & Mgmt. Co.*, 726 S.E.2d 779, 784 (Ga. Ct. App. 2012) (holding that property manager "was not entitled to recover any damages because it was merely a 'pass-through' entity that suffered no loss of its own").

Likewise, individual accountholders could have otherwise shared or shifted the cost of those increases. Johnson is a prime example. Before he added his name to the RWSD account—in August 2022 and only after his deposition—Johnson asserted that he was injured by increased water rates because *his wife* paid water bills from a joint checking account. Johnson Dep. 185:1–7 (alleging that he was a "ratepayer" because "[m]y wife and I have one [checking] account. Our funds go in one account. We pay bills out of that account"). Yet Johnson's name appeared nowhere in RWSD's records. *Id.* 186:14–187:16 (admitting that his name is not listed as an accountholder or ratepayer with Rome). And his situation can hardly be unique; there inevitably will be many circumstances where non-accountholders pay some or all of a water bill but are not reflected on Rome's account lists.

Determining which accountholders pass through, shift, or share rate increases would require thousands of individual inquiries. As with Johnson, each accountholder would have to testify and produce documents to establish who

actually pays what rate increases. Sorting through the ultimate payor of rate increases for a single accountholder would be difficult, especially when Plaintiff wants to make predictions through 2031. Doing so for a putative class of 18,000 would quickly become a morass of litigation over how landlords charge tenants, how those cohabitating share expenses, and who pays for whose water. As a result, individual injury and damages issues would consume the proposed class litigation.

Plaintiff cannot dodge that conclusion with his assurances that the variations in damages can be overcome by a "simple, common formula" developed by his "water rate" expert, William Zieburtz. Defendants' arguments on this score go to the fact of injury, not just the amount of damages.

The purported "formula" is also not a formula at all. Instead, as Zieburtz has explained, he simply offers an *illustration* of how a *hypothetical* class member's damages *could* be calculated based on *assumptions*. Doc. 932-19 at 13 (PX 96, Zieburtz Rep. Ex. 7); *see also* DX J 148:9–149:8 (Zieburtz Dep.) (characterizing his work as "a way of getting to a representative typical bill," "an assumption for expository purposes," and a "sample customer bill"). Indeed, Zieburtz has not even been asked to analyze the damages attributable to water rate increases for any particular actual accountholder. DX J 177:24–178:3 (Zieburtz Dep.). He simply picked a random meter size and a random volume of water usage, identified the

associated 2018 charges for two RWSD geographic zones, and then multiplied those charges by projected rate increases through 2031.  Doc. 932-19 at 13 (PX 96, Zieburtz Rep. Ex. 7).

In any event, the purported "formula" rests on a series of unsupported assumptions.  It assumes that each accountholder actually incurs the entire cost of increased water rates, which is implausible for the reasons already noted.  It assumes that all accountholders will remain in the same location through 2031, which defies common sense and historical mobility trends.  DX Z, 25 (Killian Report).  It assumes that projected water rate increases will be implemented exactly as Zieburtz expects, which is pure speculation.  *Id.* 19, 20–22; *see infra* Part III.B.1.  It assumes that all RWSD accountholders pay the same water rates, which ignores the fact that RWSD charges different usage and base rates for accountholders in different geographic zones served by RWSD.  DX K (2022 City Resolution).  And it assumes that each accountholder will maintain exactly the same water usage for the next decade, which ignores the ordinary variation in water usage resulting from changes in accountholder circumstances (family size, work from home, retirement, etc.), accountholder reactions to any increased water rates, and accountholder adoption of habits and technologies promoting water conservation.  DX Z, 22–24 (Killian Report).

For all these reasons, the assumptions of Zieburtz's purported "formula" will be wrong for virtually all class members.  Only individual inquiries could sort out the fact and amount of any injury from increased water rates for each class member. And Zieburtz seemingly agrees.  He has acknowledged that the impact of rate increases for each accountholder would be higher or lower depending on a particular accountholder's circumstances, especially water usage.  DX J 163:25–164:7, 177:1–7 (Zieburtz Dep.).  He admits that while some class members' water usage may be affected "dramatically" by costs, others' may not.  *Id.* 156:7–13, 157:2–11.  And he admits that while some class members' water usage may fall in line with downward water usage trends, others' may increase.  *Id.* 150:12–18, 157:2–16.

As many courts have recognized, when plaintiffs propose to use an expert-developed methodology to prove injury and damages, they must show that it could work to prove classwide injury and damages with common evidence *before* class certification can be granted.  *See, e.g.*, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 265–67 (3d Cir. 2011); *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005). It is not enough to simply promise that an expert will later develop a workable methodology that accounts for currently unaddressed factors.  *See, e.g.*, *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187–88, 191 (3d Cir. 2001).  For the reasons already noted, Plaintiff has not even come close to showing

that his purported "formula" could establish classwide injury and damages. That failure to come forward with a viable formula for identifying injured class members and the amount of their individual damages precludes Rule 23(b)(3) certification. *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–36 (2013) ("courts must conduct a 'rigorous analysis'" to ensure that a damages model adequately measures damages "across the entire class for purposes of Rule 23(b)(3)").

When injury and damages are individualized in the way they are for Plaintiff's proposed (b)(3) class, courts have not hesitated to deny class certification. *See, e.g.*, *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1365–66 (11th Cir. 2002) ("extensive individualized inquiries on the issues of injury and damages" made class action "not sustainable"); *Louglin v. Amerisave Mortg. Corp.*, 2018 WL 1887292, at *3 (N.D. Ga. Mar. 19, 2018) ("[t]he individual damages questions here are not easily resolved by a formula, but will instead require investigation" and individualized "record review"); *Adler v. Wallace Computer Servs., Inc.*, 202 F.R.D. 666, 672–73 (N.D. Ga. 2001) ("the compensatory and punitive damages requested require individualized proof"); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, at *11–13 (W.D. Mo. Nov. 9, 2021) (plaintiffs' attempt to prove passed-through charges on a common basis "clearly mask[ed] … individualized issues" that precluded class certification); *In re Flash Memory Antitrust Litig.*, 2010 WL

2332081, at *10–13 (N.D. Cal. June 9, 2010) ("individualized inquiry will be necessary" to evaluate passed-through charges, which cannot "be established on a common, formulaic basis").

To be sure, individual damages questions do not automatically preclude Rule 23(b)(3) classes. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004). But they can be a basis for denying certification. *See Comcast*, 569 U.S. at 35–36; *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003). And when coupled with individual *injury* questions, as here, they routinely do cause courts to refuse class certification. *See, e.g.*, *Sikes*, 281 F.3d at 1365–66; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623–27 (D.C. Cir. 2019); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51–58 (1st Cir. 2018); *Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003).

## 2. Litigation over the economic loss rule requires individual inquiries.

Common issues also do not predominate because individual inquiries would be necessary to adjudicate defenses based on the economic loss rule. That rule bars claims for purely economic damages—like the water rate increases here—unaccompanied by "personal injury or damage to other property." *Vulcan Materials Co. v. Driltech, Inc.*, 306 S.E.2d 253, 254 (Ga. 1983). The Court declined to apply the economic loss rule to Plaintiff at the pleading stage because his claims seeking

to recover water "surcharges" were then "accompanied by other [alleged] property injury and risk to personal health," which "are not economic losses within the meaning of the rule."  MTD Order at 66–80.[24]  But whether any particular class member actually experienced other property damage or personal injury that would save their claims from the economic loss rule turns on individual circumstances that cannot be litigated on a class-wide basis.

For precisely that reason, courts have repeatedly recognized that economic-loss-rule defenses preclude class certification.  In *In re Atlas Roofing Corp. Chalet Shingle Products Liability Litigation*, 2017 WL 2540822 (N.D. Ga. June 9, 2017), for example, the court declined to certify a class where "the economic loss rule may bar some of the class members' claims."  *Id.* at *10.  The court found that "each class member will need to demonstrate some other form of damage," which "will create numerous individualized questions."  *Id.*  Similarly, in *Robert Elliott Trucking, Inc. v. Caterpillar, Inc.*, 2012 WL 2918700 (D.S.C. Mar. 21, 2012), the court declined to

---

[24] The Court also held that the economic loss rule did not apply to the negligence and negligence *per se* claims against the Manufacturing Defendants and DWSWA because they owed Plaintiff a common-law duty of care.  MTD Order at 81.  Now that Johnson has disavowed the non-economic injuries on which the Court previously relied, his claims should be dismissed—at least against the Supplier Defendants if not everyone.  If these claims are not dismissed, class certification should be denied because continued litigation over the economic loss rule would raise many individual issues.

certify a class where the economic loss rule required "individualized damages determinations" "of whether the class member suffered any damages other than property damage." *Id.* at *9.

In this case, there can be no doubt that establishing some form of property damage or personal injury not barred by the economic loss rule will require numerous individualized inquiries.  Consider personal injury first.  Even if real-world exposures to PFAS could increase the risk of adverse health effects—a notion not supported by existing science—whether a class member's use and ingestion of Rome water containing PFAS caused any personal injury (or increased risk thereof) depends on a host of individual factors:  how much of the water they ingested; what other ways they use the water; how long they have ingested or used the water; whether they have other PFAS exposures; the type and amount of PFAS in their body, if any; their age, sex, and weight; their current health conditions and habits; and their health history and genetic predispositions.  DX R 7–15, 66–69 (Beck Report); DX T, 12–15 (Alexander Report).  That is why courts routinely reject personal-injury and medical-monitoring class actions based on allegedly harmful exposures.  *See, e.g.*, *Gates*, 655 F.3d at 266–68; *Steering Comm.*, 461 F.3d at 601–02; *Rhodes v. E.I. du Pont de Nemours & Co.*, 253 F.R.D. 365, 376–79 (S.D. W. Va.

2008) (PFAS case); *Palmer v. 3M Co.*, 2007 WL 1879844, slip op. at 43–44 (Minn. Dist. Ct. Jun. 19, 2007) (PFAS case).

Similar individual questions pervade any inquiry into potential property damage. Even if the presence of PFAS in Rome water could have negatively affected property values—which Johnson has put forward no competent evidence to show—whether a class member might have such damage would depend on numerous individual factors: whether they own property served by RWSD; the nature and uses of any such property (residential, commercial, industrial, agricultural, etc.); how they use Rome water on the property; the amount and type of PFAS on the property; the property's current and historical values; and the property's location and amenities. Again, these individual questions have led court after court to reject property-damage class actions alleging chemical contamination. *See, e.g.*, *Ebert*, 823 F.3d at 478–80; *Steering Comm.*, 461 F.3d at 601–02; *Benefield v. Int'l Paper Co.*, 270 F.R.D. 640, 650–62 (M.D. Ala. 2010); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 673 (S.D. Ala. 2005).

The many decisions rejecting personal-injury, medical-monitoring, and property-damage class actions undoubtedly explain Plaintiff's choice to limit class damages claims to increased water rates. Yet those decisions confirm that the need to prove some other form of damage under the economic loss rule requires

predominating individual inquiries for water-rate claims as well. As in cases like *Atlas Roofing* and *Elliott Trucking*, defenses based on the economic loss rule thus preclude certification of the proposed Rule 23(b)(3) class.

> **B.      This class action is not superior to other methods of adjudication.**

Rule 23(b)(3) allows for class certification only where a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Sacred Heart Health*, 601 F.3d at 1183. In assessing superiority, a court must consider, among other things, whether "a class action [would] create more manageability problems than its alternatives" and "how … the manageability concerns compare with the other advantages or disadvantages of a class action." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304–05 (11th Cir. 2021). Plaintiff cannot demonstrate superiority for the proposed (b)(3) class because municipal litigation and individual issues would create tremendous manageability problems for any class litigation. For this reason, too, the proposed Rule 23(b)(3) class should not be certified.

> **1.      *City of Rome* could disrupt any class litigation.**

The class litigation to recover past and future payments for water-rate increases that Plaintiff wants to pursue on behalf of RWSD accountholders largely overlaps parallel litigation by the City of Rome. Class proceedings thus risk

becoming duplicative and unmanageable as *City of Rome* proceeds.  It is far more efficient to deny certification of the (b)(3) class, or at least postpone a ruling on the subject, until *City of Rome* concludes.[25]

In the *City of Rome* litigation, Rome, which controls the RWSD, has sued Dalton Utilities and most of the same supplier and manufacturer defendants in this case based on the presence of PFAS in the water that the RWSD obtains from the Oostanaula River and distributes to customers.  DX L ¶¶ 1–4, 13–37 (*Rome* Compl.). Rome asserts negligence, public and private nuisance, abatement of nuisance, trespass, and wantonness claims (among others).   As relief, it seeks damages including but not limited to "expenses associated with the installation of temporary emergency filtration and pumping systems; pilot program costs associated with a permanent filtration system; costs associated with the purchase, installation and operation of a permanent filtration system capable of removing Defendants' PFCs from the water; expenses incurred to monitor PFC contamination levels; damage to goodwill and reputation; and lost profits and sales."  *Id.* ¶ 5.  Rome also seeks "abatement of the continuous nuisance and trespass and equitable and injunctive

---

[25] Many of the Defendants here also plan to raise arguments in *City of Rome* that would preclude any liability in that case.  Thus, no party here concedes in any way that *City of Rome* is a proper vehicle for resolving the alleged dispute.  But that does not change the many manageability problems addressed in this brief with allowing both cases to proceed simultaneously.

relief compelling the Defendants to remediate their contamination and prevent additional releases of PFCs and other toxic chemicals into Rome's raw water source." *Id.* ¶ 6.

The *City of Rome* litigation thus thoroughly overlaps this case. It asserts the negligence, wantonness, and nuisance claims raised here. *See* Compl. ¶¶ 163–203; Mot. 32. And it seeks effectively the same relief as this case, which includes compensation for the very past and future expenses that purportedly led it to approve increased rates. *See* DX L ¶ 5 (*Rome* Compl.); Doc. 932-19 at 2–3 (PX 96, Zieburtz Rep. ¶¶ 1–2); Mot. 18–19, 34 (asserting that increased rates resulted from increased filtering costs). In other words, this case and *City of Rome* both pursue Defendants for the filtration and monitoring expenses allegedly incurred by Rome and purportedly passed along to the putative class members. Indeed, the cases are so similar that, with only one exception, plaintiffs in both cases engaged identical experts, with identical reports, whose depositions proceeded without differentiation between the cases.

These facts negate the claimed superiority of the proposed (b)(3) class litigation for addressing Defendants' alleged responsibility for the City's increased filtration and monitoring expenses. To begin, *City of Rome* is further along, with a scheduled trial date of June 5, 2023. As an individual action, *City of Rome* also

raises none of the complications of class litigation, such as customer-specific injury and damages determinations.  *See supra* Part III.A.  Nor does it risk precluding class members from pursing potential claims for alleged injuries beyond increased water rates.  *See supra* Part I.A.1.

Allowing *City of Rome* to conclude before considering whether to proceed with any class litigation would provide crucial information about whether Rome would be receiving any compensation from Defendants, how Rome would use any such compensation, whether future rate increases would actually occur, and whether any past rate increases would be refunded.  By contrast, moving forward with this case on a class basis would create serious risks of duplication, inconsistency, and mootness as the same facts, claims, and relief are considered in two different suits. *See Benefield*, 270 F.R.D. at 653 ("[p]roceeding in a class action separate from" pending state litigation would not serve the Rule 23 interest in "prevent[ing] the duplication of effort and the possibility of inconsistent results").  For instance, Defendants could face a judgment for the same filtration and monitoring expenses in both cases, effectively providing a double recovery for Rome and class members. Or the judgments could disagree over which, if any, Defendants are responsible.  Or a resolution in *City of Rome* could moot or otherwise upend the damages claims here by eliminating or reducing past or future rate increases.

These risks of charging ahead with class proceedings show that the better course of action is to allow *City of Rome* to play out before determining whether a class action would be superior to available alternatives.  After all, other courts have ruled that government actions supplemented by individual suits are superior to class litigation.  *See, e.g.*, *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205 (9th Cir. 1975); *Brown v. Blue Cross & Blue Shield of Mich., Inc.*, 167 F.R.D. 40 (E.D. Mich. 1996); *Thornton v. State Farm Mut. Auto Ins. Co., Inc.*, 2006 WL 3359482 (N.D. Ohio Nov. 17, 2006); *MTBE*, 209 F.R.D. at 350.  The Court should thus deny class certification or at least postpone any class certification ruling until *City of Rome* is resolved.

## 2. Manageability difficulties also defeat superiority.

"[T]he likely difficulties in managing a class action" also preclude any conclusion that the proposed (b)(3) class litigation is superior to available alternatives. Fed. R. Civ. P. 23(b)(3)(D).  As already described, a host of individual issues plague the proposed (b)(3) class.   Only accountholder-by-accountholder inquiries could possibly determine who actually paid (or would pay) how much in water-rate increases and who has the kind of property damage or personal injury required by the economic loss rule.  *See supra* Part III.A.  But conducting those inquiries would be an utterly unmanageable task.  The court would have to conduct

a series of mini-trials for each class member, with a different set of facts and circumstances for each one.

Numerous decisions in environmental-contamination cases have denied class certification based on the need for such unmanageable mini-trials. *See, e.g.*, *LaBauve*, 231 F.R.D. at 681 ("individualized determinations necessary for plaintiffs' claims" rendered the case "unmanageable as a class action"); *Kirkman v. N. Carolina R.R. Co.*, 220 F.R.D. 49, 54 (M.D.N.C. 2004) (inquiry into the "variety of potentially impacted commercial, rural, and urban property" would be so "lengthy" that a "class action [was] simply not the superior way to handle th[e] litigation"); *Cotromano*, 2018 WL 2047468, at *21 ("varying kinds and amounts of contamination" to various properties at issue made "a class action a particularly inappropriate vehicle for this litigation"); *Henke v. Arco Midcon, L.L.C.*, 2014 WL 982777, at *20 (E.D. Mo. Mar. 12, 2014) ("simply too many individualized inquiries" to meet the superiority requirement); *Reilly v. Gould, Inc.*, 965 F. Supp. 588, 606 (M.D. Pa. 1997) (management issues arise when court "would have to basically pick apart the class member by member, taking into consideration circumstances applicable only to that plaintiff"). The same analysis applies here.

Plaintiff, of course, insists that "no manageability issues weigh against certification." Mot. 37. But he offers no support for that conclusion aside from

assurances that common issues supposedly predominate.  He does not consider the individual liability and damages issues identified by Defendants.  He does not describe, even on a sample basis, how his damages expert's "formula" would apply to the actual circumstances of particular class members.  And he does not submit a proposed trial plan, even though the Eleventh Circuit has held that forgoing a trial plan and "putting off [manageability] issues until trial" runs "an unnecessarily high risk of introducing needless and avoidable complexity into an already complex case" and thus weighs against class certification.  *Vega*, 564 F.3d at 1278–79.  All of that warrants denying Rule 23(b)(3) class certification.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion to certify the proposed classes.

Dated:  December 2, 2022                              Respectfully submitted,

                                                     /s/ Theodore M. Grossman

                                                     *On Behalf of the Below-Signed*
                                                     *Attorneys for Defendants*

/s/ Theodore M. Grossman
Theodore M. Grossman, *Pro Hac Vice*
JONES DAY
250 Vesey Street
New York, New York 10281
Phone:  (212) 326-3939
Email:  tgrossman@jonesday.com

*and*

/s/ Jeffrey Kaplan, Jr.
Jeffrey Kaplan, Jr., GA Bar No. 859280
JONES DAY
1221 Peachtree Street, N.E., Ste. 400
Atlanta, Georgia 30361
Phone:  (404) 581-8330
Email:  jkaplan@jonesday.com

*and*

Louis A. Chaiten, *Pro Hac Vice*
James Robert Saywell, *Pro Hac Vice*
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Phone:  (216) 586-7244
Email:  lachaiten@jonesday.com

*and*

Kevin P. Holewinski, *Pro Hac Vice*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Phone:  (202) 879-3797
Email:  kholewinski@jonesday.com

/s/ Robert B. Remar
Robert B. Remar, GA Bar No. 600575
Monica Perdomo Witte, GA Bar No. 405952
Sterling Gardner Culpepper, III, GA Bar No. 201210
SMITH GAMBRELL & RUSSELL, LLP
1105 West Peachtree Street, N.E., Ste. 1000
Atlanta, Georgia  30309
Phone:  (404) 815-3500
Email:  rremar@sgrlaw.com

*and*

W. Larkin Radney, IV, *Pro Hac Vice*
Harlan Irby Prater, IV, *Pro Hac Vice*
Jackson R. Sharman, III, GA Bar No. 637930
Mark Christian King, *Pro Hac Vice*
Richard Rosario, *Pro Hac Vice*
Benjamin Phillip Harmon, GA Bar No. 979043
LIGHTFOOT FRANKLIN & WHITE, LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
Phone:  (205) 581-0786
Email:  lradney@lightfootlaw.com

*and*

Christopher L. Yeilding, *Pro Hac Vice*
BALCH & BINGHAM
1901 Sixth Avenue North, Ste. 1500
Birmingham, Alabama 35203
Phone:  (205) 226-8728
Email:  cyeilding@balch.com

*Counsel for Daikin America, Inc.*


/s/ Warren N. Coppedge, Jr.
Warren N. Coppedge, Jr., GA Bar No. 187300
Stephen Michmerhuizen, GA Bar No. 107109
COPPEDGE, MICHMERHUIZEN &
RAYBURN
508 South Thornton Avenue
Dalton, Georgia 30720
Phone:  (706) 226-0050
Email:  Trisha@coppedgefirm.com

*Counsel for Arrowstar, LLC*


/s/ Douglas A. Vonderhaar
Douglas A. Vonderhaar, *Pro Hac Vice*
Kayla Marie Prieto, *Pro Hac Vice*
BAKER & HOSTELER LLP
200 Civic Center Drive, Ste. 1200
Columbus, Ohio 43215
Phone:  (614) 462-2634
Email:  dvonderhaar@bakerlaw.com

*and*

Kevin Daniel Bradberry, GA Bar No. 532880
Ronald Barrett Gaither, Jr., GA Bar No.

*and*

Andrew J. Calica, *Pro Hac Vice*
Jordan Sagalowsky, *Pro Hac Vice*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Phone:  (212) 506-2256
Email:  acalica@mayerbrown.com

*Counsel for 3M Company*


/s/ Douglas G. Scribner
Douglas G. Scribner, GA Bar No.
632755
David Baird Carpenter, GA Bar
No. 292101
Fiona O'Carroll, GA Bar No.
442663
William Joseph Repko, III, GA
Bar No. 301797
ALSTON & BIRD, LLP
1201 West Peachtree Street, Ste.
4900
Atlanta, Georgia 30309
Phone:  (404) 881-7000
Email:  doug.scribner@alston.com

*Counsel for Aladdin*
*Manufacturing Corporation,*
*Mohawk Carpet, LLC, and*
*Mohawk Industries, Inc.*


/s/ Christopher Jones
Christopher Jones
Christopher M. Ward

282292
BAKER & HOSTELER LLP
1170 Peachtree Street, N.E., Ste. 2400
Atlanta, Georgia 30309
Phone:  (404) 256-8783
Email:  kbradberry@bakerlaw.com

*Counsel for Cycle Tex, Inc.*


/s/ Elizabeth A. Dieck
Elizabeth A. Dieck, *Pro Hac Vice*
PARKER POE ADAMS &
BERNSTEIN, LLP
200 Meeting Street
Charleston, South Carolina 29401
Phone:  (843) 727-2663

*and*

Mallory S. Sparks, *Pro Hac Vice*
PARKER POE ADAMS &
BERNSTEIN LLP
1221 Main St., Ste. 1100
Suite 1100
Columbia, South Carolina 29201
Phone:  (803) 253-6883

*and*

Alexander Bunnen Feinberg, GA Bar No.
956505
MAYNARD COOPER & GALE, P.C.
1901 Sixth Avenue North, Ste. 1700
Birmingham, Alabama 35203
Phone:  (205) 254-1858
Email:  afeinberg@maynardcooper.com

CALFEE HALTER &
GRISWOLD LLP
41 South High Street, 12th Floor
Columbus, Ohio 43215
Phone:  (614) 621-1500

*Counsel for Americhem, Inc.*


/s/ David Joel Marmins
David Joel Marmins, GA Bar No.
470630
Edward Alexander Marshall, GA
Bar No. 471533
Morgan McCloy Harrison, GA
Bar No. 470983
ARNALL GOLDEN GREGORY
LLP
171 17th Street, N.W., Ste. 2100
Atlanta, Georgia 30363
Phone:  (404) 873-8126
Email:  david.marmins@agg.com

*Counsel for Chem-Tech Finishers,
Inc.*


/s/ Tracy C. Wooden
Tracy C. Wooden, GA Bar No.
775070
WOODEN LAW FIRM, PC
735 Broad Street, Ste. 900
Chattanooga, Tennessee 37402
Phone:  (423) 756-9972
Email:
tracywooden@woodenlaw.com

*Counsel for Columbia Recycling*

68

*and*

Joshua David Marks, GA Bar No. 470773
PARKER POE ADAMS & BERNSTEIN,
LLP
1075 Peachtree Street NE, Ste. 1500
Atlanta, Georgia 30309
Phone: (678) 690-5734
Email: joshmarks@parkerpoe.com

*and*

Steven Daniel Weber, GA Bar No. 825170
PARKER POE ADAMS & BERNSTEIN
LLP
620 South Tryon Street, Ste. 800
Charlotte, North Carolina 28202
Phone: (704) 372-9000
Email: steveweber@parkerpoe.com

*Counsel for Dystar, LP*

/s/ W. Randall Wilson
W. Randall Wilson, *Pro Hac Vice*
MILLER & MARTIN, PLLC
832 Georgia Avenue, Ste. 1200
Chattanooga, Tennessee 37402
Phone: 423-756-6600
Email: randy.wilson@millermartin.com

*and*

Elizabeth Marquardt, GA Bar No. 944547
MILLER & MARTIN PLLC
1180 W. Peachtree Street Ste. 2100
Atlanta, Georgia 30309
Phone: (404) 962-6100

*Corp.*

/s/ C. Bradford Marsh
C. Bradford Marsh, GA Bar No.
471280
SWIFT, CURRIE MCGHEE &
HIERS,
LLP
1355 Peachtree Street, N.E., Ste.
300
Atlanta, Georgia 30309
Phone: (404) 874-8800
Email:
brad.marsh@swiftcurrie.com

*and*

Henry C. Tharpe, Jr., GA Bar No.
703250
SPONCLER AND THARPE
P.O. Box 398
225 W. King Street
Dalton, Georgia 30722
Phone: (706) 278-5211
Email:
htharpe@daltongalaw.com

*and*

Stephanie F. Glickauf, GA Bar
No. 257540
GOODMAN MCGUFFEY, LLP
3340 Peachtree Road, N.E., Ste.
2100
Atlanta, Georgia 30326
Phone: (404) 926-4137

Email:
elizabeth.marquardt@millermartin.com

*Counsel for Engineered Floors, LLC*

/s/ David C. Higney
David C. Higney, GA Bar No. 352780
GRANT KONVALINKA & HARRISON,
PC
Republic Centre
633 Chestnut Street, Ste. 900
Chattanooga, Tennessee 37450
Phone:  (423) 756-8400
Email:  dhigney@gkhpc.com

*Counsel for Oriental Weavers USA, Inc.*

/s/ William Vance Custer, IV
William Vance Custer, IV, GA Bar No.
202910
George Patrick Watson, GA Bar No. 741226
Jennifer Burch Dempsey, GA Bar No. 217536
Christian James Crowder-Bromley, GA Bar
No. 206633
Justin Erik Jorgensen, GA Bar No. 204124
BRYAN CAVE LEIGHTON PAISNER LLP
One Atlantic Center, Fourteenth Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Phone:  (404) 572-6999
Email:  bill.custer@bclplaw.com

*Counsel for Shaw Industries Group, Inc. and
Shaw Industries, Inc.*

Email:  sglickauf@gm-llp.com

*Counsel for Dalton/Whitfield
Regional Solid Waste Authority*

/s/ Adam K. Peck
Adam K. Peck, *Pro Hac Vice*
John M. Johnson, *Pro Hac Vice*
Lana A. Olson, *Pro Hac Vice*
Suzanne A. Fleming, *Pro Hac
Vice*
Amaobi Joseph Enyinnia, GA Bar
No. 327957
Brian Patrick Kappel, GA Bar No.
916728
LIGHTFOOT FRANKLIN &
WHITE, LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama 35203
Phone:  (205) 581-0700
Email:  apeck@lfwlaw.com

*and*

Blair Joseph Cash, GA Bar No.
360457
Donavan Eason, GA Bar No.
487358
MOSELEY MARCINAK LAW
GROUP, LLP
P.O. Box 1688
Kennesaw, Georgia 30156
Phone:  (470) 480-7258
Email:
blair.cash@momarlaw.com

/s/ Jarred A. Klorfein
Jarred A. Klorfein, GA Bar No. 562965
Michael A. Caplan, GA Bar No. 601039
CAPLAN COBB LLP
75 14th Street NE, Suite 2700
Atlanta, Georgia 30309
Phone:  (404) 596-5600
Email:  jklorfein@caplancobb.com

*Counsel for The Carpet and Rug Institute*

*Counsel for E.I. du Pont de Nemours and Company and Chemours Company*

/s/ Elizabeth Bolton Davis
Elizabeth Bolton Davis, GA Bar No. 208260
Tala Amirfazli, GA Bar No. 532890
BURR & FORMAN LLP
171 17th Street, N.W., Ste. 1100
Atlanta, Georgia 30363
Phone:  (404) 685-4323
Email:  bdavis@burr.com

*Counsel for Fibro Chem, LLC*

/s/ Merideth Snow Daly
Merideth Snow Daly, *Pro Hac Vice*
Alexandra B. Cunningham, GA Bar No. 096280
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Phone:  (804) 788-8645
Email:  mdaly@huntonak.com

*and*

Brooke F. Voelzke,ale GA Bar No. 728727
HUNTON ANDREWS KURTH LLP

Bank of America Plaza
600 Peachtree Street NE, Ste.
4100
Atlanta, Georgia 30308
Phone:  (404) 888-4171
Email:
BVoelzke@HuntonAK.com

*Counsel for INV Performance
Surfaces, LLC*


/s/ Martin A. Shelton
R. Scott Masterson GA Bar No.
476359
Martin A. Shelton GA Bar No.
640749
Keith M. Kodosky GA Bar No.
404814
LEWIS BRISBOIS BISGAARD
& SMITH
600 Peachtree Street, NE, Ste.
4700
Atlanta, Georgia 30308
Phone:  (404) 476-2009
Email:
martin.shelton@lewisbrisbois.com

*Counsel for MFG Chemical, LLC*


/s/ Lindsey B. Mann
E. Fitzgerald Veira, GA Bar No.
726726
Lindsey B. Mann, GA Bar No.
431819
Wheaton Webb, GA Bar No.
902682

TROUTMAN PEPPER
HAMILTON SANDERS LLP
600 Peachtree Street, N.E., Suite
3000
Atlanta, Georgia 30308
Phone:  (404) 885-3000
Email:
lindsey.mann@troutman.com

*and*

Brooks M. Smith, *Pro Hac Vice*
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
Phone:  (804) 697-1200
Email:
brooks.smith@troutman.com

*Counsel for The City of Dalton,
Georgia, acting through its Board
of Water, Light and Sinking Fund
Commissioners, d/b/a Dalton
Utilities*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day served a copy of the within and foregoing pleading upon all parties to this matter by Court Electronic Filing to counsel of records as follows:

Dated: December 2, 2022.

Respectfully submitted,

<u>/s/ Theodore M. Grossman</u>

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is a computer document and was prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C. Dated: December 2, 2022.

Respectfully submitted,

/s/ Theodore M. Grossman

## APPENDIX OF EXHIBITS

A.        Plaintiff's Responses to Defendant Oriental Weavers USA, Inc.'s First Requests for Admission, Interrogatories, and Requests for Production to Plaintiff (5/18/2022)

B.        Plaintiff's Responses to Defendant Daikin America, Inc.'s First Requests for Admission, Interrogatories, and Requests for Production to Plaintiff (4/19/2022)

C.        Deposition Transcript of Jarrod Johnson (5/24/2022)

D.        Exhibit 11 to Deposition of Jarrod Johnson

E.        30 (b)(6) Deposition Transcript of Michael F. Hackett, Vol. III (12/1/2021)

F.        Plaintiff's Responses to Defendant Tarkett USA Inc.'s First Interrogatories and Requests for Production to Plaintiff (2/18/2022)

G.        Plaintiff's Supplemental Responses to the Johnson Defendants' Consolidated First Interrogatories to Plaintiff (7/28/2021)

H.        Exhibits 6, 7, 8 to Deposition of Jarrod Johnson

I.        Deposition Transcript of James Troy Brock (10/27/2021)

J.        Deposition Transcript of William Zieburtz (10/18/2022)

K.        2022 City of Rome Resolution

L.        Third Amended Complaint filed in *The City of Rome, Georgia v. 3M Company, et al*. (8/20/2021)

M.        Plaintiff's First Supplemental Response to Defendant Shaw's Interrogatories submitted in *The Water Works and Sewer Board of the City of Gadsen v. 3M Company, et al.* (1/21/2022)

N.        Report of Philippe Grandjean, MD, DMSc (1/3/2020)

O.        Declaration of Joe Welch (11/30/2022)

P.        PFAS Litigation Support Memorandum – MFG Chemical LLC (12/2/2022)

Q.        Report of M. Laurentius Marais, PhD (12/2/2022)

R.        Expert Report of Barbara D. Beck, Ph.D., DABT, ATS (12/2/2022)

S.        Robert C Buck, et al., *Perfluoroalkyl and Polyfluoroalkyl Substances in the Environment: Terminology, Classification and Origins,* Integrated Environ. Assessment and Management, Vol. 7, No. 4, pp. 513-541 (2011)

T.        Expert Report of Dominik D. Alexander, Ph.D., MSPH (12/2/2022)

U.        Expert Report of Avram J. Frankel (12/2/2022)

V.        Lai Zhang, et al., *The inventory of sources, environmental releases and risk assessment for perfluorooctane sulfonate in China*, Environ. Pollution 165 (2012), 193-198 (2011)

W.        PFOS and PFOA in Drinking-water, Background document for development of WHO Guidelines for Drinking-water Quality (9/29/2022)

X.        Phillip Comella, *EPA Must Clarify Confusing PFAS Advisory Levels*, Law360, (Nov. 9, 2022 5:24 pm EST),

https://www.law360.com/articles/1547733/epa-must-clarify-confusing-pfas-advisory-levels

Y.     Ian T. Cousins, et al., *Outside the Safe Operating Space of a New Planetary Boundary for Per- and Polyfluoroalkyl Substances (PFAS)*, Environ. Sci. Technol. 56, 11172-11179 (2022)

Z.     Report of Karl L. Killian (12/2/2022)