JARROD JOHNSON vs 3M COMPANY, ET AL.
Charles Andrews on 05/15/2023

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ROME DIVISION


 3
     JARROD JOHNSON,              § CIVIL ACTION FILE NO.
 4   individually, and on         § 4:20-CV-00008-AT
     Behalf of a Class of         §
 5   Persons Similarly            §
     Situated,                    §
 6                                §
                                  §
 7                                §
               Plaintiff,         §
 8                                §
         vs.                      §
 9                                §
                                  §
10                                §
     3M COMPANY, et al.,          §
11                                §
                                  §
12                                §
               Defendants.        §
13   ~~~~~~~~~~~~~~~~~~~~~~~~~

14              VIDEOTAPED DEPOSITION OF
                    CHARLES ANDREWS
15                CONDUCTED REMOTELY

16

17                    8:59 a.m. EST
              Monday, the 15th day of May, 2023
18

19

20

21
        Blanche J. Dugas, RMR, CRR, CCR No. B-2290
22

23

24

25
```

1  investigation and feasibility study reports, being the
2  one that, in a sense, has conceptualized the
3  appropriate response to contamination.
4      Q.    And that addressed, I think, both
5  investigation -- remedial investigation work and
6  remedial design work.  I was going to ask about the
7  latter, which I guess I'll do just for clarity.
8            Are you personally involved in engineering
9  design for contaminated sites?
10     A.    No.  As I noted previously, I'm not an
11 engineer.
12     Q.    Right.
13     A.    I've been involved in developing the
14 approach for remediation, but in terms of, you know,
15 the actual design of the various components that would
16 be involved to achieve that conceptualization has --
17 has been done by engineers.
18     Q.    And would you be personally responsible for
19 choosing a specific remedial component as part of an
20 investigation or a design project?
21     A.    Certainly, in projects that I've been
22 involved in, that I've been the one that has final say
23 as to which remedial components would be utilized.
24 But clearly, I relied on -- on the opinions and
25 expertise of engineers that I work with.

1    Q.    I think, in response a few minutes ago, you
2    mentioned the remedial investigation and feasibility
3    study process, but are you familiar with the
4    traditional, called by the acronym RI/FS process from
5    EPA?
6    A.    Yes.
7    Q.    And is it common for you and your
8    remediation colleagues at SSP&A to follow the EPA
9    RI/FS process?
10   A.    Well, from the large number of projects
11   that I have been involved in, we have followed the
12   kind of conventional or standard RI/FS process as set
13   forth in EPA guidance.
14   Q.    Is there a specific reason that you
15   wouldn't follow that conventional or standard process
16   in a project?
17   A.    Well, I think that there's different ways
18   to look at the process.  I think in a number of sites
19   I've been involved in, there's been an ongoing release
20   to the environment where it's been necessary to have,
21   you know, I guess what would be termed an interim
22   response where not the entire RI/FS process has been
23   involved prior to implementation of a remedial
24   response.
25   Q.    Just so I understand, is that more of like

 1  a removal action in EPA's parlance?

 2      A.    I believe that that's the way they refer to
 3  it typically.

 4      Q.    Okay.  So continuing down Page 2, in the
 5  next full paragraph, you mention that you reviewed
 6  and/or relied upon various documents.  And then at the
 7  end of that paragraph, you say, "The list of documents
 8  that I have reviewed since preparation of my expert
 9  report is contained in Section 14."

10      Do you see that?

11      A.    Yes.

12      MR. SMITH:  And if you flip,
13  McKenzie, to Section 14, which is Page 37.

14      Q.    (By Mr. Smith)  Dr. Andrews, this is the
15  complete list of documents you reviewed; is that
16  correct?

17      A.    It was meant to be the complete list of
18  documents that I reviewed.

19      Q.    Okay.

20      A.    It's possible that I neglected to include
21  some documents, but I'm not aware of any right now.

22      Q.    Okay.  How -- how would I discern documents
23  that you reviewed as compared to documents that you
24  relied upon for your rebuttal opinions?

25      A.    I believe that the best way to do that

1  that type of comparative analysis for purposes of your
2  opinion; is that correct?
3      A.   I -- I apologize, but I kind of forgot what
4  you had previously stated, in terms of what I had
5  done.
6      Q.   What I'm focused on -- and I'm sorry to go
7  back and forth -- in -- in your proposed remedial
8  plan, you say that you relied on your 40 years of
9  experience to -- to come up with what you judge to be
10 a superior remedial plan, but you did not describe the
11 alternative remedial components that were considered.
12           And so I'm trying to understand, I think I
13 read that to say that you -- you performed a
14 comparative analysis, but you did not document it; is
15 that correct?
16      A.   I did evaluate alternatives or alternative
17 components, but I will acknowledge that I did not
18 evaluate those with the type of rigor that is commonly
19 done in terms of completing a final RI/FS of the
20 matter.
21      Q.   So in lieu of a more standard or
22 conventional RI/FS, as you characterized it earlier,
23 what methodology did you apply?
24      A.   Well, the type of methodology I applied
25 is -- you know, I -- the type of methodology that, at

1  least in my experience, has been applied at a large

2  number of sites to conceptualize, develop and

3  implement remedial components prior to completion of a

4  formal RI/FS for a site. I mean, as you're well

5  aware, at many sites going through the RI/FS process,

6  I think particularly today, we're talking about, you

7  know, maybe as much as a decade to get through --

8  through the process and -- and that at many sites that

9  I've been involved in, you know, there's been a desire

10 or even a requirement to cease unwilling discharges

11 from the site prior to completion of the -- the RI/FS

12 process.

13         You know, thinking of sites that I've

14 involved -- been involved in, I think, you know, a

15 site that made a big impression on me is -- is work

16 that I had done at the Aerojet General site, which is

17 located near Sacramento. It was a very large site. I

18 think it's a little bit smaller than the LAS, you

19 know, on the order of maybe 6 or 7,000 acres. But it

20 was a site that had a large number of source areas,

21 you know, primarily with organic solvents and rocket

22 fuel residues.

23         There was a large groundwater plume

24 emanating from the site, and the initial response at

25 that site was to capture that groundwater prior to

1  going through the RI/FS process, prior to

2  understanding even what all the source areas were on

3  the site because the objective at the time was to stop

4  an ongoing release.

5            And, you know, there's been many other

6  sites that I've worked on through my career where

7  that's the -- you know, that's the case.  I'm

8  currently working on -- on a site where, you know, the

9  initial remedial components went in in the 1980s, and

10 at the same time, there's been an RI/FS process going

11 on.  And to this day, the RI is not even completed for

12 the site, and it's not expected to be completed for

13 another couple of years, and the FS is not going to be

14 completed until some time in the future.

15           But in -- in the meantime, you know,

16 contaminated surface water that's flowing off the site

17 is being captured and being treated and has been

18 captured and treated for -- for decades, even though

19 there isn't an RI/FS in place.

20      **Q.   So is it fair to say that what you are**

21 **describing in the Aerojet experience and what you**

22 **applied here is something prior to an RI/FS?**

23      A.   Yeah, I -- I believe that that would be a

24 fair way to look at it.  You know, as others noted,

25 there's a lot of data that one could collect on -- on

1  quantifiable and -- and, you know, in a sense,
2  discrete discharges, a presumptive-type remedy
3  approach, in my opinion, is appropriate.
4      Q.    So to be clear, you're saying that the
5  presumptive remedy for the LAS is to, quote, stop the
6  discharge of water, end quote; is that correct?
7      A.    Correct.
8      Q.    In order to achieve that presumptive
9  remedy, however, there are different alternatives;
10 correct?
11     A.    You know, there certainly are aspects of,
12 you know, the engineering that would need to be
13 undertaken and the components that would need to be
14 designed and put in place, that there could be
15 variability in terms of what are the best components
16 to utilize.
17     Q.    But you did not document or describe
18 alternatives that you looked at but rejected for
19 purposes of these opinions; correct?
20     A.    Well, in this -- in this rebuttal report,
21 as I noted, you know, experts for the defendants did
22 propose a number -- a number of different elements
23 of -- in the remedy that, you know, should have been
24 considered or might be better, and I address those in
25 my rebuttal report.

1    Q.    We'll take some of those in series as we go
2    along.  Let's -- let's stay where you were on Page 6
3    where I think you described the components of your
4    presumptive remedy.  The first one, Item 1 --
5          MR. SMITH:  And, Mackenzie, this is
6      Page 6, Tab 1.
7    Q.    (By Mr. Smith) -- you say, "Reduce
8    infiltration of precipitation (and applied wastewater)
9    in the LAS to negligible levels.  In concept, this
10   could be accomplished by placing an impermeable cap
11   over the entire LAS."
12         Do you see that?
13   A.    Yes.
14   Q.    You say this could be accomplished.  Were
15   there other options for this particular item that you
16   considered?
17   A.    You know, in terms of obtaining the
18   objective of negligible infiltration, it's not clear
19   to me that there are any other alternatives except
20   capping.
21   Q.    And then proceeding to Item 2, you say,
22   "Capture and treat the water containing PFAS that
23   flows from the LAS to the Conasauga River.  In
24   concept, this is similar to pump-and-treat to control
25   a groundwater contamination plume."

1  I only had sampling data when I prepared my original
2  expert report from one point in time, and that was May
3  of 2021.
4      **Q.    Have you done any assessment of whether or**
5  **not the data collected in May of 2021 is**
6  **representative of conditions at the LAS over time?**
7      A.    Well, since I've prepared my original
8  expert report, I became aware of two data sets to help
9  me evaluate that question.
10     **Q.    Uh-huh (affirmative).**
11     A.    One -- one is the set of data that was
12  collected by Dr. Andy Davis or Dr. Andy Davis' team in
13  June of '22.  They collected a number of samples from
14  tributaries flowing off the LAS and I discussed those
15  in -- in this extra -- in -- excuse me -- in this
16  rebuttal report.
17           And I also -- I became aware of sampling
18  that was collected -- I forget exactly when, but I
19  think October of 2018 by Dalton Utilities where they
20  sampled the Pettiet Branch that flows off the LAS.
21  And as part of my evaluation, I compared the
22  concentrations that were measured in those later
23  sampling events that I became aware of with those from
24  May 2021, and the result of that evaluation were that
25  concentrations in locations that had been sampled

1   on -- in May 2021 and either in 2018 or 2022 were
2   actually a little bit higher than the concentrations
3   measured in 2021.
4           So given that the concentrations were
5   higher and not lower, I had no basis to alter the
6   conclusions that I had come to about how I calculated
7   the mass coming off the LAS.
8       Q.   This is 2022 data.  Did -- were you able to
9   correlate any of the 2018 data that Dalton Utilities
10  generated --
11      A.   Yeah, I -- I was able -- I was able -- I
12  was able to -- to correlate one sample.  They
13  collected a sample in the Pettiet Branch.  Those were
14  data that I only became aware of after I prepared my
15  rebuttal report, so they're not described in the
16  rebuttal report.
17      Q.   Was that sample taken in 2018 higher, lower
18  or about the same as the 2021 sample?
19      A.   My -- my recollection, it was in the order
20  of 10 to 20 percent higher than the sample collected
21  in May of 2021.
22      Q.   We talked earlier about how your opinion is
23  that the LAS has reached more or less a,
24  quote/unquote, steady state.  How do you account for
25  the variability in the sampling data that you've been