IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

JARROD JOHNSON, on behalf of
himself and others similarly situated,

     Plaintiff,

v.

3M COMPANY, *et al.*,

     Defendants.

:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
4:20-cv-8-AT

## <u>ORDER</u>

This is a complex environmental case involving the discharge of PFAS, also known as "forever chemicals," into the Conasauga River, upstream from the city of Rome's drinking water supply. Plaintiff Jarrod Johnson, a resident of Rome, brings claims against Defendants for their actions in contributing to the alleged unlawful discharges of PFAS. In filing this lawsuit, Plaintiff seeks both money damages and significant injunctive relief — specifically injunctive relief in the form of $850 million for remediation of the Dalton Land Application System ("LAS") which is upstream of Rome, Georgia and adjacent to the Conasauga River.

While the parties have filed a number of motions — including Plaintiff's motion for class certification, Defendants' many (many) motions for summary judgment, and various motions to exclude experts — the Court does not address those filings at this time. Instead, this Order considers only one very narrow question: whether Plaintiff has established and maintains a redressable,

continuing injury sufficient *to pursue injunctive relief*.[1] With that framing in mind, the Court addresses the parties' arguments below.

I.     **BACKGROUND**[2]

       A.     **What Are PFAS?**

"PFAS are a large class of thousands of organic chemicals that have unique physical and chemical properties." *See PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32532-01, 2024 WL 1801641 (Apr. 26, 2024). PFAS are "designed to be stable and non-reactive because of the applications in which they are used: certain industrial and manufacturing processes; stain and water repellants in clothing, **carpets**, and other consumer products, as well as certain types of fire-fighting foams." *Id.* (emphasis added). Colloquially dubbed "forever chemicals," PFAS "break down slowly and persist in the environment, and consequently, they can accumulate in the environment and the human body over time." *Id.*

According to the Environmental Protection Agency ("EPA"), "PFAS exposure over a long period of time can cause cancer and other serious illnesses that decrease quality of life or result in death." (*See* EPA Fact Sheet, PFAS National Primary Drinking Water Regulation*, Doc. 1591-4). And "PFAS exposure during

---

[1] The parties acknowledge that Plaintiff has standing to pursue damages relief. This Order does not address Plaintiff's entitlement to damages.

[2] The factual description here does not constitute actual findings of fact. The Court derives the facts below from the evidence in the record and views these facts in the light most favorable to the Plaintiff as the non-moving party.

critical life stages such as pregnancy or early childhood can also result in adverse health impacts." (*Id.*) For example, the adverse health effects associated with certain PFAS include (but are not limited to), adverse effects on:

- the liver (e.g., liver cell death),
- growth and development (e.g., low birth weight),
- hormone levels,
- the kidney,
- the immune system (reduced response to vaccines),
- lipid levels (e.g., high cholesterol),
- the nervous system, and
- reproduction.

*See PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32532-01, 2024 WL 1801641 (Apr. 26, 2024).[3] PFAS are also associated with increased risk of certain types of cancer. (*Id.*)

As of 2024, the EPA has established legally enforceable levels for six PFAS found in drinking water. (*See* EPA Question & Answers: PFAS National Primary Drinking Water Regulation, Doc. 1591-2). In its April 2024 Final Rule, the EPA set the Maximum Contaminant Level ("MCL") limits for two common PFAS chemicals — PFOA and PFOS — at 4.0 parts per trillion ("ppt").

---

[3] "Adverse health effects relevant to children associated with exposure to some PFAS include developmental effects to fetuses during pregnancy or to breast-fed infants, cardiovascular effects, immune effects, endocrine effects, and reproductive effects." *Id.*

**B.    PFAS in the Conasauga River, Upstream from the City of Rome**

Located upstream from the city of Rome are the Oostanaula, Conasauga, and Coosawatee Rivers. The Etowah River flows into Rome from the East, as shown in the map below.[4]



Defendants — who are chemical suppliers, carpet manufacturers, related intermediaries, the City of Dalton d/b/a Dalton Utilities ("Dalton Utilities"), and the Dalton-Whitfield Solid Waste Authority — operate in or around Dalton,

---

[4] The Court takes judicial notice of the relevant geography which is not in dispute. Available at: https://sustainatlanta.com/wp-content/uploads/2015/04/coosa-river-basin.jpg

Georgia. (*See, e.g.*, Plaintiff's Statement of Material Facts ("PSOMF"), Doc. 1403-1 ¶¶ 31-73).

The chemical supplier Defendants began selling PFAS to carpet manufacturers in Dalton, Georgia as early as the 1970s to impart water, oil, and soil resistance to carpet. (*Id.* ¶ 38). Over the past five-and-a-half decades, the chemical supplier Defendants have sold hundreds of millions of pounds of fluorochemical products containing PFAS to the carpet manufacturers in Dalton. (*Id.* ¶¶ 31-60).[5] And the carpet manufacturing Defendants have used PFAS in their manufacturing operations for years. (*See, e.g., id.* ¶¶ 60, 363, 365, 368, 370). A large amount of the PFAS used in the carpet manufacturing process makes its way into the manufacturing Defendants' industrial wastewater streams.

Dalton Utilities, operated by the City of Dalton, accepts and treats wastewater released by the carpet manufacturers that operate in Dalton. (*Id.* ¶ 74). Since 1986, Dalton Utilities has treated local wastewater and then sprayed it across a 9,800-acre Land Application System ("LAS"). (*Id.* ¶ 75). The below map and key

---

[5] The chemical supplier Defendants have known about the health dangers of PFAS for decades but have continued to supply the carpet manufacturer Defendants (and other companies) with PFAS. (*Id.* ¶¶ 31-59). *See also Toxic Gaslighting: How 3M Executives Convinced a Scientist the Forever Chemicals She Found in Human Blood Were Safe*, The PFAS Project Lab (May 20, 2024), https://pfasproject.com/2024/05/20/toxic-gaslighting-how-3m-executives-convinced-a-scientist-the-forever-chemicals-she-found-in-human-blood-were-safe/; Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, N.Y. Times (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

illustrate the locations of the manufacturing Defendants and the location of the Dalton LAS. (*See* Doc. 563-1).[6]



| 1-9 | Aladdin Manufacturing Corporation | 31-32 | Oriental Weavers USA, Inc. |
|---|---|---|---|
| 10 | Americhem, Inc. | 33 | SECOA Technology, LLC |
| 11-12 | Arrowstar, LLC | 34-51 | Shaw Industries Group, Inc. |
| 13 | Chem-Tech Finishers, Inc. | 52 | Tarkett USA Inc. |
| 14 | Columbia Recycling Corp. | 53 | INV Performance Surfaces (INVISTA) |
| 15 | Cycle-Tex, Inc. | 54 | Dalton Utilities (Riverbend Treatment Plant/POTW) |
| 16 | Dystar, L.P. | 55 | Dalton Utilities (Loopers Bend Treatment Plant/POTW) |
| 17-24 | Engineered Floors, LLC | 56 | Dalton Whitfield Regional Solid Waste Authority |
| 25 | Fibro Chem, LLC | 57 | Polyentive LLC |
| 26 | IMACC Corporation | 58 | JB NSD, Inc. |
| 27-29 | MFG Chemical, LLC | 59 | Color Express |
| 30 | The Dixie Group | LAS in Murray Co. | LAS in Whitfield Co. |

---

[6] As shown in the first map, the Conasauga River flows south into the Oostanaula and into Rome.

So, the PFAS used by the carpet manufacturing Defendants are discharged in wastewater effluent to Dalton Utilities. (PSOMF, Doc. 1403-1 ¶¶ 80, 81, 154). Dalton Utilities then sprays the PFAS-laden wastewater onto the Dalton LAS. (*Id.*) The sprayed PFAS then infiltrate the soil and groundwater at the LAS and eventually discharge into the Conasauga River. (*Id.* ¶ 83, 154). The PFAS that have been released from the LAS into the Conasauga River then flow downriver to the Oostanaula River, resulting in high concentrations of PFAS in both rivers — which are upstream of Rome. (*Id.* ¶ 84). Since they are long-lasting compounds, PFAS (especially PFOA and PFOS) can persist in the environment for as long as 100 or even 230 years. (*Id.* ¶¶ 85-86).

The EPA has determined that industrial discharge from Dalton LAS is the main source of the PFAS in the Conasauga and Oostanaula Rivers. (*Id.* ¶¶ 156, 157). The levels of PFAS in the Conasauga River — downstream of the LAS and upstream of Rome — have been staggeringly high. (*Id.* ¶¶ 391, 393) (stating that measurements in 2006 found levels of PFOA reaching *1,400 ppt* in Calhoun, GA; further stating that a 2008 UGA study[7] showed that levels of PFOA in the Conasauga, downstream of the LAS, were "among the highest ever measured in water at a nonspill location").

---

[7] The UGA study is in the record. (*See* Doc. 1341-39). It further states that "[c]oncentrations of PFOS and PFOA, and other [PFAS], in the Conasauga River are among the highest ever recorded in surface waters, and much greater than those observed in freshwater environments outside of direct release." (*Id.* at ECF 11).

### C.    The City of Rome's Water Operations

The City of Rome obtains drinking water for its citizens from the Oostanaula River and the Etowah River. (*Id.* ¶ 411). The City's primary intake is on the Oostanaula River and a smaller, secondary intake is on the Etowah River. (*Id.*)

For years, Rome has had sky-high levels of PFAS (particularly PFOA and PFOS) in its drinking water. In 2015, testing showed that PFAS levels in Rome's drinking water were *150 ppt*—more than twice the allowable limits of a 2016 EPA Health Advisory and significantly higher than the 2024 EPA limits of *4 ppt*. (*Id.* ¶ 416).

Before 2016, Rome used conventional water treatment to treat Rome's drinking water — but this treatment was not able to reduce the levels of PFOA and PFOS in the drinking water. (*Id.* ¶¶ 414-15).

In efforts to decrease the amount of PFAS in its drinking water, Rome both (1) began drawing more water from the Etowah River to blend with the water from the Oostanaula River and (2) installed granular activated carbon ("GAC") in existing filter beds at Rome's water treatment plants as an emergency stop-gap measure to reduce PFAS levels. (*Id.* ¶¶ 419-20).

To pay for these emergency measures, Rome's Water and Sewer Division ("RWSD") raised its water and sewer rates for all account holders by 2.5% in both 2019 and 2020. (*Id.* ¶ 433). In 2022, Rome implemented another water rate increase of 9% per year from March 2022 to 2025, to be followed by a 3% increase from 2026 through 2031. (*Id.* ¶ 434).

### D.    Who is the Plaintiff?

Plaintiff Jarrod Johnson is a resident of Rome and is an account holder with the RWSD. (*Id.* ¶ 451). He pays to receive drinking water. (*Id.* ¶ 405). He was subject to increased PFAS-related water rates from 2019 through September 2023. (*Id.* ¶¶ 433-34, 436).[8] Plaintiff seeks to represent a class of other RWSD account holders who pay to receive drinking water from Rome. (*Id.* ¶ 405). Plaintiff does not assert any personalized health injuries resulting from the ingestion of PFAS, nor does Plaintiff allege any change in his home property values or identify any upgrades or changes he has had to make to his property as a result of PFAS in his drinking water. In an eleventh-hour declaration submitted in this litigation in October 2023, Plaintiff asserts that he would use the rivers around Rome recreationally if they were not contaminated with PFAS. (*Id.* ¶ 453). However, Plaintiff did not make such an assertion at his deposition or allege this in his complaint.

In this lawsuit, Plaintiff seeks both damages and injunctive relief. As injunctive relief, Plaintiff asks the Court to order Defendants to remediate the Dalton LAS. Plaintiff believes that remediation of the LAS is a far better long-term solution to the problem of PFAS in Rome's drinking water supply than implementation of a Reverse Osmosis Plant (discussed in the next section). (*Id.* ¶¶ 445-46). Plaintiff's expert, Dr. Charles Andrews, has proposed a plan for this LAS

---

[8] As discussed in a bit, Rome rolled back its PFAS-related rate increases as of September 2023.

remediation. (Andrews Report, Doc. 933-3 at ECF 41-45). The plan involves temporarily discontinuing operations at the LAS, collecting surface water from the closed LAS, treating that collected surface water, capping historic sludge disposal areas, and much more. (*Id.*) That remediation plan, according to Plaintiff's expert, would cost around $850 million dollars. (*Id.* at ECF 42). Plaintiff's expert also expects that operational and management costs would be required for at least 30 years. (*Id.*).

### E.    The Parallel Rome Lawsuit and Settlement

Shortly before Plaintiff filed this lawsuit, the city of Rome filed a similar case against Defendants for their actions of selling, using, manufacturing, and/or discharging PFAS into the Conasauga and Oostanaula Rivers that supply Rome's drinking water. (*See Rome v. 3M et al.* Complaint, Doc. 1-2). That lawsuit proceeded in parallel to this one for the first few years, with the parties keeping the cases on the same procedural track and coordinating discovery.

In June 2023, the City of Rome settled that related lawsuit with Defendants. (*See* City of Rome June Resolution, Doc. 1394-6). In settling that case, Defendants agreed to pay the City of Rome around $278.7 million (the "Settlement Funds"). (*See* 4/24/24 Hearing Tr., Doc. 1605 p. 11; Settlement Spreadsheet (Pre-DuPont/Chemours), Doc. 1457-13; PSOMF, Doc. 1403-1 ¶ 437).[9] Approximately one-third of those Settlement Funds have been paid as attorneys' fees to counsel

---

[9] The Settlement Spreadsheet and the PSOMF do not include the settlement amounts from DuPont and Chemours.

in the Rome case. (*See* Settlement Spreadsheet (Pre-DuPont/Chemours), Doc. 1457-13) (showing that attorneys' fees were around one third of the total settlement).

As a part of the settlement agreements with 3M and Dupont, the City of Rome promised to both (1) roll back the PFAS-related water rate hikes and reinstitute the water rates that existed before the PFAS increases and (2) never implement PFAS-related water rate hikes again in the future. (Settlement Agreements, Doc. 1457-11 at 8, 145).

Consistent with this agreement, the City of Rome passed a resolution in June 2023 that rolled back the water rates and reinstated the rates in existence as of December 31, 2018 — before the PFAS-related rates were instituted. (City of Rome June Resolution, Doc. 1394-6 at 4). The June 2023 Rome Resolution explains:

> WHEREAS, with the Settlements approved and ratified in this Resolution, the Rome City Commission resolves to roll back the PFAS related rates (2.5%, 2.5 [%], 9% and 3% respectively), effective September 1, 2023, and as of September 1, 2023, reestablishes the rates in existence immediately prior to the effective date of January 1, 2019, before the PFAS related rates.

(*Id.*)

Regarding the promise never to implement PFAS-related rate hikes in the future, the City's Settlement Agreements with 3M and Dupont specifically state that Rome agrees to "not charge or pass along to its ratepayers . . . any cost to treat

its water for PFAS in the form of surcharges, rate increases, or otherwise." (Settlement Agreements, Doc. 1457-11 at 8, 145).[10]

It is undisputed that Rome water rates have been rolled back to preexisting rates as of September 1, 2023, and that Rome ratepayers have not paid PFAS-related surcharges since that date.

In addition to rolling back the PFAS-related rate increases, the City of Rome's June 2023 Resolution also resolved that all Settlement Funds "shall be used exclusively within the water and sewer designated funds for the design, construction, installation, operation, and maintenance of a closed-circuit reverse osmosis water treatment facility and related water and sewer operations." (City of Rome June Resolution, Doc. 1394-6 at 5).

Bryan Pate, the City of Rome's Engineering Expert, who has designed the proposed Reverse Osmosis ("RO") Plant, testified that the Plant will "remove essentially everything except the 2Hs and the O in the water" so that it will remove all PFAS to the possible extent. (Pate Dep., Doc. 1272-24 pp. 116-117). He anticipates that his design and construction of the RO Plant will accomplish this goal. (*Id.*) He expects that the RO Plant will take three years to construct and that it will be operational in about four years. (*Id.* pp. 117, 119). EPA guidance lists reverse osmosis technology as a solution to cleanse drinking water of PFAS. (*See, e.g., PFAS National Primary Drinking Water Regulation Q&A*, Doc. 1591-2 at ECF

---

[10] The Settlement Agreements provide, however, that Rome "reserves the right to change its rates for reasons other than the treatment of PFAS. (*Id.* at 8, 145).

2; *EPA National Primary Drinking Water Regulation Fact Sheet*, Doc. 1591-4 at ECF 3-4).

The parties dispute the implications of the Rome Settlement on the circumstances of this case. Defendants argue that Rome cannot raise water rates in the future under the terms of the Settlement Agreement and that Rome has sufficient Settlement Funds to build and operate the planned RO Plant, which will solve the PFAS problem in Rome's drinking water. Plaintiff, on the other hand, contends that Rome's Settlement Funds will run out and that Rome will be required to reinstitute the PFAS-related rate hikes in the future. Plaintiff's economic expert, William Zieburtz, calculated the costs and determined that the Rome Settlement Funds will fully fund the RO Plant only until 2047, at which time the funds will run out. (PSOMF, Doc. 1403-1 ¶¶ 438, 440). Plaintiff argues that, at that time, Rome — which operates the RWSD as an enterprise fund solely funded by rates paid by account holders (*id.* ¶ 407) — will have no choice but to raise water rates.

### F.     Present Posture of This Lawsuit

This case, originally filed in the Superior Court of Floyd County, was removed to this Court in January 2020. (Doc. 1). Plaintiff filed the operative complaint (the Third Amended Complaint) in December 2020. (Doc. 418). Defendants submitted a slew of motions to dismiss. The Court denied Defendants' motions in large part but dismissed the negligence claims against the chemical

supplier Defendants. *See Johnson v. 3M*, 563 F. Supp. 3d 1253, 1357 (N.D. Ga. 2021).[11]

Since the Court's ruling, the parties have engaged in extensive fact and expert discovery. Plaintiff has filed a motion for class certification. (Doc. 930). Defendants have filed dozens of motions for summary judgment and related *Daubert* motions. The parties also engaged in mediation — but those efforts were unsuccessful. A significant barrier to mediation efforts was the parties' differing views on whether Plaintiff is entitled to injunctive relief, and specifically injunctive relief that would require Defendants to remediate the Dalton LAS at a cost of $850 million.

Considering this barrier and the number of motions filed, the parties agreed that the Court should begin by addressing a key issue in contention: whether Plaintiff is legally entitled to obtain his requested injunctive relief, especially considering the changed circumstances brought about by the City of Rome's settlement with Defendants in the parallel action. (*See* 11/28/23 Teleconference Transcript, Doc. 1465 pp. 15-18, 22-23; *see also* docket entry of 11/30/2023; docket entry of 12/6/23). The Court held a hearing to address this issue of Plaintiff's entitlement to injunctive relief in the form of LAS remediation on April 24, 2024. (*See* Hearing Transcript, Doc. 1605).

---

[11] The claims that remain in the case are: the Clean Water Act claims against Dalton Utilities and the Dalton Whitfield Solid Waste Authority ("DWSWA"); the negligence and negligence *per se* claims against the manufacturing Defendants and DWSWA; the public nuisance and abatement of the nuisance claims against all Defendants; and the punitive damages claim against all Defendants (except Dalton Utilities). *See id.*

## II.    SUMMARY JUDGMENT STANDARD

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on the motion, the Court must resolve all reasonable doubts about the facts in favor of the non-movant and draw all justifiable inferences in his favor. *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys. in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*) (citations and punctuation omitted). The Court must avoid weighing conflicting evidence or making credibility determinations. *Anderson,* 477 U.S. at 255. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.    PLAINTIFF'S STANDING TO PURSUE INJUNCTIVE RELIEF

Before diving into the standing analysis, the Court once again clarifies the scope of this dispute. All parties acknowledge that Plaintiff has standing *to pursue damages relief*. Plaintiff's theory in support of damages is this: the city of Rome raised water rates because of elevated PFAS contamination in Rome's drinking water supply. The PFAS contamination was, as alleged, caused by Defendants' actions. So Plaintiff has suffered (1) an injury (payment of increased water rates),

(2) likely caused by Defendants, (3) that could be redressed by an order awarding damages. Plaintiff's request for damages is *not* presently at issue and is *not* the subject of this Order.

Instead, Defendants argue that Plaintiff lacks standing *to pursue injunctive relief* in the form of remediation of the Dalton Land Application System ("LAS"). With that clarification provided upfront, the Court outlines the relevant legal authority and evaluates Defendants' arguments below.

### A.    Governing Law

A plaintiff bears the burden of demonstrating that he has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("*Lujan II*")). Standing is determined at the time a plaintiff's complaint is filed. *Arcia v. Fla. Sec. of State*, 772 F.3d 1335, 1340 (11th Cir. 2014). In demonstrating standing, a plaintiff must maintain a personal interest in the dispute "at all stages of litigation," and must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation." *Ramirez*, 594 U.S. at 431.

One standing principle that is especially relevant here is this: "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press **and for each form of relief that they seek (for example, injunctive relief and damages)**." *Id.* (emphasis added) (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

To demonstrate standing to pursue a particular form of relief, a plaintiff must show (1) that he suffered an injury in fact that is "concrete, particularized, and actual or imminent;" (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed *by the judicial relief sought*. *Id.* at 423 (citing *Lujan II*, 504 U.S. at 560–61).

As to the first requirement, the injury in fact must be: (a) "concrete," meaning real and not abstract; (b) "particularized," meaning that it affects "the plaintiff in a personal and individual way," rather than being a generalized grievance; and (c) "actual or imminent, not speculative," meaning that the injury has already occurred or will likely occur soon. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If a plaintiff asserts an *imminent* injury (rather than one that has already occurred), the Supreme Court has explained that the threatened injury must be certainly impending:

> "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Lujan*, 504 U.S. at 565 n.2 (internal quotation marks omitted). Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

*Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (emphases in original).

The second requirement — causation — needs little further explanation, for purposes of the present dispute.

As to the third requirement, "[t]o determine whether an injury is redressable, [courts] consider the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 144 S. Ct. 1972, 1995 (2024) (internal quotation omitted); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) (explaining that the plaintiff's injury must be "likely to be redressed by the requested relief"); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (stating that redressability means "a likelihood that the requested relief will address the alleged injury").  Put another way, the requested relief must connect to, match, and remedy the cognizable injury in fact.

When a plaintiff seeks prospective injunctive relief, he must demonstrate a "'real and immediate threat' of future injury." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1274-75 (11th Cir. 2003) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)). Notably "[p]ast exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (internal quotation omitted). *See also Johnson v. Bd. of Regents*, 263 F.3d 1234, 1265 (11th Cir. 2001) ("[T]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future."); *Wooden v. Bd. of Regents*, 247 F.3d 1262, 1284 (11th Cir. 2001) ("Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a

real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury.").

Citing the above authority, Defendants argue that Plaintiff has not suffered any cognizable injury that would likely be redressed by injunctive relief, let alone injunctive relief in the form of complex remediation of the Dalton LAS.

Throughout this action, Plaintiff has asserted four types of injury: a health injury, a property injury, a recreational injury, and a ratepaying injury. Below, the Court addresses whether Plaintiff has standing *to pursue injunctive relief* based on any of these alleged injuries.

### B.    Analysis of Plaintiff's Injuries

#### 1.    Health Injury

To repeat: to establish standing to pursue injunctive relief, Plaintiff must show (1) a "concrete, particularized, and actual or imminent" injury; (2) caused by Defendants; (3) that will likely be redressed by injunctive relief. *Ramirez*, 594 U.S. at 423.

Mr. Johnson's health injury theory fails on the first standing element because he has not established a cognizable health injury. To establish such a "concrete, particularized, and actual or imminent injury" at summary judgment, Plaintiff is required to present some concrete evidence of a health injury that he has suffered. *Id.* Plaintiff has not done so. Plaintiff does not point to any evidence that he has suffered any PFAS-related health conditions. Nor does Plaintiff provide any evidence of elevated PFAS levels in his blood. Nor does Plaintiff rely on any

evidence that he is *imminently* likely to suffer a future health injury because of PFAS exposure. Instead, Plaintiff relies on the general dangers that PFAS ingestion poses to the wider community. (*See, e.g.*, EPA Pre-Publication Rule, Doc. 1597-13 (explaining that PFOA and PFOS exposure can lead to testicular, kidney, and liver cancer; pregnancy-induced hypertension and preeclampsia; decreased immune response to vaccination; thyroid problems; developmental effects or delays in babies and young children, liver damage, increased cholesterol levels, and more); *see also* EPA guidance, Doc. 1447-1 at 1-2).

These potential health harms are no doubt concerning for the North Georgia community at large. Yet, Plaintiff's generalized possible future harm does not meet the rigorous requirements for establishing a *concrete* injury *particular to Mr. Johnson.* Plaintiff has not provided *any* evidence about his personal health — for example, evidence of medical testing showing that he has high cholesterol, impaired liver or kidney functioning, or other adverse health effects associated with PFAS. *See PFAS National Primary Drinking Water Regulation*, 89 Fed. Reg. 32532-01, 2024 WL 1801641 (Apr. 26, 2024) (discussing health effects of PFAS exposure). That type of evidence, accompanied by blood tests showing elevated PFAS in his blood, would likely show the colorable harm required. But no such evidence has been provided. Ultimately, Mr. Johnson fails to show that he *in particular* has suffered a concrete health harm or one that is certainly impending. *See Clapper*, 568 U.S. at 409 ("threatened injury must be *certainly impending* to

constitute injury in fact, and that allegations of *possible* future injury are not sufficient") (emphasis in original, internal quotes omitted).

As Plaintiff has not established a cognizable health injury "with the manner and degree of evidence required" at summary judgment, *see Ramirez*, 594 U.S. at 431, these health-related allegations do not afford Plaintiff standing.

### 2.    Property Injury

Again: to establish standing, Plaintiff must show (1) a "concrete, particularized, and actual or imminent" injury; (2) likely caused by Defendants; (3) that will likely be redressed by injunctive relief. *Ramirez*, 594 U.S. at 423.

Plaintiff similarly fails to establish a cognizable property-based injury that is "concrete, particularized, and actual or imminent." *Id.* In briefing, Plaintiff's assertion of his property injury is vague. Plaintiff argues that Johnson has a right to "use and enjoy his home[] unfettered by exposure to toxic chemicals in its only water supply." (Pl. MSJ Resp., Doc. 1403 at 10 n.5). In support, Plaintiff cites a Georgia's statute that speaks to such a right. *See* O.C.G.A. § 51-9-1 ("The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie.").

While Georgia law, through O.C.G.A. § 51-9-1, provides a *cause of action* for interference with one's property rights, a plaintiff must still have Article III standing (and in particular, an injury in fact) to pursue such a cause of action in federal court.

In *Ramirez*, the Supreme Court explained this distinction between a statutory cause of action (albeit under federal law) and Article III standing:

> For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. **But under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court.** As then-Judge Barrett succinctly summarized, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019).

*Ramirez*, 594 U.S. at 426–27 (emphasis added). While *Ramirez* involved a cause of action under a federal statute, the same principle applies in the context of Plaintiff's reliance on Georgia statutory law. Ultimately, Plaintiff must establish that he has been "concretely harmed" by Defendants' interference with his property rights. Some examples of such harm might be a decrease in the value of his home or, for damages purposes, the cost of installing home water filters or making other changes to his property in response to Defendants' conduct. But Plaintiff has provided no evidence in support of such a property injury.

At the April 24, 2024 hearing, the Court pressed Plaintiff's counsel for more specificity as to his client's alleged property injury. Plaintiff responded that his property harm involved the contamination of his household water which affected

household activities like showering and bathing, washing clothes, and brushing teeth. (Hearing Tr., Doc. 1605 p. 56 (citing Johnson Dep., Doc. 1208 pp. 194, 195, 300-01)). But these examples all involve PFAS exposure that relates to potential future health harms. None of these examples suffice as a concrete, particularized, and actual (or imminent) property injury.

Plaintiff fails to put forth evidence to support a cognizable property harm, and therefore his property-related allegations do not afford him standing to pursue injunctive relief.

### 3.    Recreational Injury

For a third time: to establish standing, Plaintiff must establish (1) a "concrete, particularized, and actual or imminent" injury; (2) caused by Defendants; (3) that will likely be redressed by injunctive relief. *Ramirez*, 594 U.S. at 423.

It is well-settled law that an environmental plaintiff may establish injury in fact by demonstrating "that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 182–83 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). That said, a plaintiff must provide more than "general averments" of intended recreational use. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) ("*Lujan I*") (holding that plaintiff could not survive summary judgment merely by offering averments that individual members would use unspecified portions of an immense tract of land, some portions of which would probably be

affected by the mining regulation at issue). Similarly, "some day intentions" to engage in recreation, or visit an area, are not sufficient. *Lujan II*, 504 U.S. at 564 (holding that affiants' intent to return to places they had visited before to see animals is "simply not enough" without any "description of concrete plans"). And a plaintiff's decision to refrain from engaging in recreational activity must be reasonable. *Laidlaw*, 528 U.S. at 184.

In *Laidlaw*, the Supreme Court held that the plaintiff-organization sufficiently established an injury in fact based on their members' recreational injuries from the defendant's unlawful discharges of a toxic pollutant (mercury) into a river. 528 U.S. at 181–83. There, the plaintiff relied on particularized evidence including that:

- a member wished to fish, camp, and swim a few miles downstream from defendant's facility as he did when he was a teenager but would not do so because of mercury pollution;

- another member used to picnic, walk near, and wade in the river at a particular location but no longer did so because of harmful effects from mercury pollution;

- a member would like to buy a home near the river but did not intend to do so because of mercury discharges; and several similar examples.

*Id.* at 182–83. Under the circumstances, the *Laidlaw* Court found that the specific injuries were concrete and particularized, rather than speculative and general, and that the individuals' fears of recreating in the river were reasonable. *Id.* at 184–85 ("[W]e see nothing improbable about the proposition that a company's continuous

and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of the waterway and would subject them to other economic and esthetic harms") (internal citation omitted).

Here, Plaintiff did not allege a recreational injury in the operative complaint (or in earlier iterations of the complaint). At his deposition on May 24, 2022, Plaintiff testified that he *did not* boat, swim, or fish in the rivers around Rome. (*See* Johnson Dep., Doc. 1208 p. 300) (Q: "Have you – do you ever swim or fish in the rivers around Rome?" A: "No."). Later, on October 13, 2023, Plaintiff executed a declaration stating that: (1) when he first moved from Houston, Texas to Rome, he canoed in the rivers around Rome[12] and (2) he "would use the rivers recreationally around Rome if they were not excessively contaminated with PFAS." (Johnson Decl., Doc. 1350-9). Plaintiff does not state specifically what recreational activities he would engage in, when he would engage in such activities, or at what location of which river or body of water.

The record evidence related to dangers associated with recreating in or near PFAS-laden waters is as follows. In his initial summary judgment response, Plaintiff cited no evidence about the dangers of recreational exposure to PFAS (through swimming, fishing, and so on). In response to the Court's pre-hearing questions, Plaintiff supplemented the record with a few articles involving possible recreational impacts. One article measured the presence of PFAS in swimming

---

[12] Plaintiff does not state when he moved from Texas to Rome.

pools in Florida and notes in passing that PFAS exposure, "through contact or ingestion of contaminated waters, has been linked to cancers, endocrine diseases," and other adverse health effects. (*See* Swimming with PFAS Article, Doc. 1597-5). A second article indicates that "[i]nhalation and transdermal absorption" of PFAS are not yet well studied but are active areas of research. (*See* National Academies Guidance on PFAS Exposure, Doc. 1597-4). A third article suggests that dermal exposure to PFOA and PFOS[13] may result in alterations to the immune system. (*See* DeWitt Article, Doc. 1597-6 at ECF 14). Plaintiff also submitted evidence related to PFAS levels in fish. Plaintiff submitted a preliminary analysis of PFAS in fish in the Conasauga River completed by the Georgia DNR Wildlife Resource Division. This study concluded that "PFOS concentrations in fish are very high in the Conasauga River downstream of the Dalton LAS." (Analysis of PFCs in Biota, Doc. 1597-9). Another article, involving a national assessment, found that locally caught freshwater fish across the U.S. are likely a significant source of exposure to PFOS. (Locally Caught Freshwater Fish Article, Doc. 1597-10).

Defendants argue that Plaintiff's belated declaration is too vague and speculative to adequately establish recreational injury. Defendants also contend that Plaintiff's decision to refrain from recreating in the rivers is not reasonable,

---

[13] To refresh, PFOS and PFOA are two common types of PFAS chemicals.

since — according to Defendants — there is no evidence that recreational or dermal exposure to PFAS is harmful.   (*See* Joint Reply, Doc. 1501 at ECF 8-9).[14]

      After careful review, the Court concludes that Plaintiff has not established a concrete, particularized, and actual recreational injury. Plaintiff's eleventh-hour declaration is closer to the "general averment" of intended recreational use, rather than a specific plan to engage in a particular activity (such as fishing or swimming at a specific location near a discharge site). *See Lujan I*, 497 U.S. at 889. Plaintiff's vague statement that, if there were no PFAS in the water, he "would use the rivers recreationally" is not the type of concrete, particularized intention as was in the case in *Laidlaw*. If Plaintiff were a regular fisherman and declared that he was refraining from catching and eating fish from the Conasauga because of PFAS, that would likely constitute sufficient evidence to support a recreational injury — particularly given Plaintiff's evidence of PFOS and PFOA levels in fish in the Conasauga. Yet, that is not Plaintiff's evidence. While Plaintiff has proffered some sliver of evidence about possible dangers of recreational exposure to PFAS (and evidence reflecting that harm from dermal exposure is an area of current study[15]), this cannot by itself support a recreational injury, especially because Plaintiff has offered such a vague assertion of intended recreation. Without more, Plaintiff's

---

[14] Defendants' reply brief was filed before Plaintiff supplemented the record with articles he considers relevant to dermal exposure.

[15] If past is prologue, it would be no surprise if scientists later establish that PFAS poses dangers through dermal exposure in high amounts. But no such evidence is currently in the record.

unpled[16] Hail-Mary declaration is insufficient to establish a cognizable recreational injury and thus is not a basis for establishing standing to pursue injunctive relief.

### 4.  Ratepaying Injury

One last time: to establish standing, Plaintiff must show (1) a "concrete, particularized, and actual or imminent" injury; (2) caused by Defendants; (3) that will likely be redressed by injunctive relief. *Ramirez*, 594 U.S. at 423.

To refresh a few more standing principles: first, standing is determined at the time the plaintiff's complaint is filed. *Arcia*, 772 F.3d at 1340; *see also Focus on the Fam.*, 344 F.3d at 1275 (assessing standing at the time complaint was filed, despite later changes in circumstances); *Johnson*, 263 F.3d at 1267 ("It is true that a party's standing to sue is generally measured at the time of the complaint, with the effect of subsequent events generally analyzed under mootness principles."); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1134–35 (11th Cir. 1990) (finding that district court erred in addressing the injury, for purposes of standing, at the time summary judgment papers were filed instead of at the time the complaint was filed).

And second: in establishing the third standing prong, a plaintiff must show "a likelihood that the requested relief will address the alleged injury." *Steel Co.*, 523 U.S. at 103. That is, the relief must match the legally recognized injury. *Id.*

---

[16] A plaintiff cannot raise at summary judgment new theories not pled in the complaint. *See Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002); *Ganstine v. Sec'y, Fla. Dept. of Corr.*, 502 Fed. App'x. 905, 909–10 (11th Cir. 2012). Plaintiff's theory of recreational injury was not pled in the complaint.

### a. Redressability

Because standing is determined at the time the plaintiff's complaint is filed, *see Arcia*, 772 F.3d at 1340, the Court assesses Plaintiff's ratepaying injury as it existed at the time of the filing of the operative complaint — while the ratepaying injury was ongoing. For purposes of standing, the Court *does not* consider the changed circumstances resulting from the City of Rome's settlement with Defendants — and specifically does not consider the water surcharge rollbacks or Rome's plans to build a Reverse Osmosis Plant.

As to the first standing requirement, Plaintiff has established a concrete, particularized, and actual economic injury because he paid increased water surcharges as a result of PFAS contamination. As to the second standing requirement, Plaintiff has presented evidence that Defendants caused or contributed to the discharge of PFAS into the Conasauga River, from which Rome draws some of its water. Because its water supply contains PFAS, Rome must cleanse its drinking water. To do so, it installed Granular Activated Carbon ("GAC") in its filter beds and raised water rates for its citizens to pay to subsidize these measures. The court accepts that this is a sufficient theory of causation, at this juncture.

The hurdle for Plaintiff is the third prong of the standing analysis: whether Plaintiff's *economic* harm of paying increased water rates is likely to be redressed *by injunctive relief* — and specifically relief in the form of an $850 million remediation of the Dalton LAS.

Defendants argue that an $850 million dollar remediation of the Dalton LAS will not redress Plaintiff's ratepaying harm, which is better addressed via damages relief. Besides identifying this mismatch between the *monetary* harm and the requested *equitable* relief, Defendants contend that Plaintiff's requested relief won't in fact redress the ratepaying harm at issue. Defendants argue that remediating the Dalton LAS won't eliminate the PFAS in Rome's water supply. They argue that LAS remediation will not get rid of the "*forever* chemicals" already in the Oostanaula River. They also point out that Rome gets much of its water from the Etowah River, which is *not* downstream of the Dalton LAS and which also contains PFAS. Defendants therefore contend that Rome will have to cleanse its water of PFAS regardless of remediation of the LAS. And if Rome has to cleanse the water, it has to pay for that cleansing, potentially through water surcharges.[17]

The record evidence supports Defendants' contentions that remediation of the Dalton LAS will not redress Plaintiff's ratepaying injury. Plaintiff's expert, Charles Andrews, acknowledged that there are PFOA and PFOS in the Etowah River (from which Rome draws some of its water); that the Etowah River is not impacted by the Dalton LAS; and that LAS remediation would not reduce PFAS levels in the Etowah or Coosawatee Rivers at all. (Andrews Dep., Doc. 1259-5 pp. 277-79, 414). Andrews also testified that, while the Plaintiff's LAS remediation plan

---

[17] Defendants also highlight problems related to how such injunctive relief would in fact be implemented. They question whether the Court could order, as *equitable injunctive relief*, Defendants like 3M and Mohawk — which have no authority or control over the Dalton LAS — to pay *money* to Dalton Utilities to remediate the LAS. The Court need not address this issue.

would result in a *reduction* of the amount of PFOA and PFOS released by the Dalton LAS into the Conasauga River (by 90%), the remediation plan *would not eliminate* the release of these PFAS chemicals from the LAS to the Conasauga. (*Id.* p. 414). Finally, Plaintiff himself points out that PFAS already released into Rome's water supply will persist for over a hundred years. (See PSOMF, Doc. 1403-1 ¶¶ 85-86) (asserting that, because PFAS are long-lasting compounds, they can persist in the environment for as long as 100 or even 230 years).

As a result, even if Plaintiff were to obtain the $850 million LAS remediation he seeks to address PFAS remediation, the reality remains that PFAS would still exist in the water upstream of Rome because PFAS would still be released from the LAS, PFAS would still enter the water supply via the Etowah River, and preexisting PFAS in the Oostanaula River would still be present.

Considering the circumstances and record evidence, Plaintiff has not shown, with the degree of evidence required, "a likelihood that the requested relief will address the alleged injury." *Steel Co.*, 523 U.S. at 103. *See Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984) (affirming district court's denial of injunctive relief where plaintiffs' asserted harm would not be remedied by their requested injunction).

This is particularly so where the injury in fact — increased water rates — is so clearly a monetary harm that can be fully addressed through damages. *See, e.g., Spanish Fort Water Sys. v. N. Baldwin Utils.*, 618 F. Supp. 3d 1321, 1333 (S.D. Ala. 2022) (denying preliminary injunctive relief because the plaintiff's harms were "all

economic in nature, and, therefore, redressable through economic damages"). In assessing whether injunctive relief is appropriate, courts consider whether a plaintiff has shown that "remedies available at law, such as money damages, are inadequate to compensate for that injury." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). And "federal courts should aim to ensure the framing of relief no broader than required by the precise facts." *Laidlaw*, 528 U.S. at 193 (2000) (internal quotation omitted); *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) ("Injunctive relief should be narrowly tailored to fit the specific legal violations adjudged") (internal quotation omitted).

Applying these principles of standing and equity to the instant facts, the Court concludes that Plaintiff fails to establish that the expansive and expensive LAS remediation program he seeks is an appropriate remedy to redress his ratepaying harm when money damages would adequately compensate for that injury. In the end, Plaintiff is trying to fit a square peg in a round hole — the requested remedy does not fit the injury.[18]

---

[18] While Plaintiff's economic ratepaying harm is not redressable by expansive injunctive relief, the same might not be true for individuals who may have suffered a cognizable recreational injury as a result of Defendants' conduct.  In other words, the Court recognizes that other residents personally impacted by recreational, environmental, and health related PFAS harms in this region may seek appropriate remedial relief in the years to come.

### b. Mootness

Assuming the Court is wrong and Plaintiff's ratepaying injury is in fact redressable via his expert's proposed $850 million LAS remediation plan, Plaintiff still faces a second hurdle. Even if Plaintiff had a continuing, redressable injury sufficient to support injunctive relief *at the outset of this case*, he no longer does. The events surrounding Defendants' settlement with Rome in the parallel action have fundamentally altered Plaintiff's ratepaying situation, thereby depriving Plaintiff (at this juncture) of any ongoing ratepaying harm.

Continuing or future irreparable injury is a requirement for establishing entitlement to injunctive relief. *See Keener*, 342 F.3d at 1269 (explaining that, to obtain permanent injunctive relief, a plaintiff must establish "continuing irreparable injury"); *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1207 (11th Cir. 1991) (same).

When a change in circumstances deprives the plaintiff of future harm, a request for injunctive relief becomes moot. *See Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 916 (11th Cir. 2018) (finding that, in case where challenged county ordinance was subsequently preempted by passage of new state statute, the county ordinance was "incapable of sowing future harm," thereby mooting the plaintiff's claims for declaratory and injunctive relief); *Covenant Christian Ministries, Inc. v. City of Marietta, Ga.*, 654 F.3d 1231, 1243 (11th Cir. 2011) (concluding that new ordinance "fundamentally changed" city's zoning regulations, rendering plaintiff's claims for injunctive relief moot). This is because

"[e]quitable relief is a prospective remedy, intended to prevent future injuries," and "[w]hen the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury." *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997); *see also Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) (explaining that, while the standing doctrine assesses whether a plaintiff has established a redressable injury at the outset of the case, the mootness doctrine considers whether a plaintiff's redressable injury exists throughout the proceedings).

To determine whether an issue is moot, a court must "stop, look, and listen" to determine the effect of the change in circumstances. *Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) (discussing changed circumstances involving the repeal of a challenged law). For example, where a law is amended to remove its challenged features, the claim for injunctive relief becomes moot as to those features. *Id.* (collecting cases).

Keeping in mind this authority, the Court concludes that a fundamental change in circumstances (brought forth by Rome's settlement with Defendants) has — at this point in time — deprived Plaintiff of any ongoing and future ratepaying harm, rendering his request for injunctive relief moot.

The city of Rome, effective September 1, 2023, rolled back its PFAS-related water rate hikes and reinstituted the water rates in existence as of December 31, 2018 (before the PFAS-related rates were instituted). (*See* City of Rome June Resolution, Doc. 1394-6). Rome agreed, in its Settlement Agreements with 3M and

DuPont, to "not charge or pass along to its ratepayers . . . any cost to treat its water for PFAS in the form of surcharges, rate increases, or otherwise." (Settlement Agreements, Doc. 1457-11 at 8, 145).

It is undisputed that Plaintiff has not suffered a ratepaying injury since before September 1, 2023, and that Plaintiff is not suffering any continuing ratepaying harm. In briefing, Plaintiff acknowledges that — considering the rate rollbacks — he, and putative class members, are not seeking to recover damages for future rate increases. (Resp. to Mot. to Exclude, Doc. 1606 at ECF 25) (recognizing that previously projected damages "based on future rate increases are now moot").

With no future harm, or imminent future harm, Plaintiff's request for injunctive relief to remedy his ratepaying injury is moot. *See Checker Cab Operators,* 899 F.3d at 916 (finding that a change in circumstance depriving plaintiff of future harm mooted request for injunctive relief); *Adler*, 112 F.3d at 1477 (same) ("When the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury.").

Plaintiff attempts to argue otherwise. Plaintiff contends that Rome will inevitably raise the water rates in the future because of PFAS proliferation. Plaintiff relies on testimony from his damages expert that Rome will have to raise water rates in 2047, in about 23 years, because that is when the Settlement Funds will run out. (*See* Pl. Resp., Doc. 1466 at ECF 4 (citing Ziebertz Decl., Doc. 1350-10 ¶¶

10-14); *see also* PSOMF, Doc. 1403-1 ¶¶ 438, 440). Plaintiff further points out that the RWSD is an enterprise fund, funded *solely* by subscribers' rates and fees and will have no other way to pay for water treatment besides through raised rates. (Doc. 1466 at ECF 4).

The Court acknowledges that Rome's contractual promise never to implement PFAS-related rate increases again (*see* Settlement Agreements, Doc. 1457-11 at 8, 145) is by no means watertight. Under Georgia law, one city council may not bind itself or its successors "so as to prevent free legislation in matters of municipal government." O.C.G.A. § 36-30-3. So it is not at all clear that the 2023 Rome City Council could bind future city councils as it relates to setting water rates, even considering its commitment in the binding Settlement Agreements. *See Glendale Ests., Inc. v. Mayor and City Council of Americus*, 151 S.E.2d 142, 144 (Ga. 1966) ("The fixing of water rates, from time to time, by a municipality, is a legislative and governmental power, and one council may not, by contract or ordinance, deprive succeeding councils of this legislative or governmental power.").

Even so, the possibility that Rome could institute PFAS-related rate hikes years in the future cannot overcome the fact that Plaintiff is suffering no continuing harm *now* and no evidence indicates that Plaintiff is likely to suffer ratepaying harm in the immediate future.[19] Put another way Plaintiff's evidence that Rome —

---

[19] At the April 24, 2024, hearing, Plaintiff argued that Rome is likely to raise water rates much sooner than 20 years from now. Plaintiff does not present any evidence to support

a third party to this suit — will likely take certain actions *years in the future* cannot alone support entitlement to injunctive relief *now*. *See Keener*, 342 F.3d at 1269 (11th Cir. 2003) (explaining that "continuing irreparable injury" is required for injunctive relief); *Cone Corp.*, 921 F.2d at 1207 (explaining that a plaintiff seeking injunctive relief must show that he is "likely to suffer future injury" and that the "relief the plaintiff seeks will likely prevent such future injury from occurring").

Considering the many factors at play, it is not at all apparent that Plaintiff himself will suffer a ratepaying harm again. Plaintiff may move out of Rome and thus no longer be subject to Rome's rates. *See Bourgeois v. Peters*, 387 F.3d 1303, 1309 (11th Cir. 2004) (stating that injunctive relief must be based on future harm involving substantially the same parties). Rome may begin drawing its water from another source. Funding from other entities — whether government or private — may become available to Rome to support its water and sewer operations. At this time, any future ratepaying harm is speculative.

That said, if Rome implements PFAS-related surcharges again in the future, Plaintiff (or another Rome ratepayer) could likely initiate a new lawsuit at that time. In that context, the injured party would likely be able to establish an ongoing and future harm.[20] This Order does not preclude such a finding. But, for now,

---

this that the Court could rely on to find that Plaintiff was imminently likely to suffer a future ratepaying injury.

[20] And perhaps, such a plaintiff might also provide evidence of concrete, ongoing health or recreational harms.

Plaintiff is not suffering any ongoing or likely imminent ratepaying harm. His request *for injunctive relief* based on his ratepaying harm is therefore moot. Again, although Plaintiff's request for *injunctive* relief based on his ratepaying harm may be moot, his request for *damages* resulting from past rate hikes is clearly not moot.

## IV.    CONCLUSION

The harm wrought on communities downstream of Dalton, Georgia (and all across the country) resulting from years of PFAS proliferation is incalculable. The chemical supplier Defendants knew *for decades* about the potential health impacts of PFAS on humans. Those health impacts include increased risk of cancer, reproductive and fertility problems, worsened kidney functioning, and other medical harms. As scientists continue to study the impact of PFAS on human heath, one thing is clear: a Pandora's box has been opened and it cannot now be closed. PFAS are products that can't be recalled. They are in our water and our food.[21] They persist in the environment and our bodies. They are called "forever chemicals" for a reason. The impacts flowing from their manufacture and spread will reverberate for many years to come.

---

[21] *See, e.g.,* Hiroko Tabuchi, *Her Children Were Sick. Was It 'Forever Chemicals' on the Family Farm?*, N.Y. Times (Sept. 21, 2024), https://www.nytimes.com/2024/09/21/climate/farm-pfas-meat-poison-sewage-sludge.html; *Tap water study detects PFAS 'forever chemicals' across the US*, United States Geological Survey (July 5, 2023), https://www.usgs.gov/news/national-news-release/tap-water-study-detects-pfas-forever-chemicals-across-us.

Despite the real harms posed by the discharge of PFAS by the Dalton carpet industry, *this specific* case — brought by *this* Plaintiff — is not the appropriate vehicle to address these harms. From its inception, this class action case has in large part focused on addressing economic harm related to Plaintiff's payment of increased water rates. (See Third Am. Compl., Doc. 418 ¶¶ 136–37) (asserting claims to, *inter alia*, recover damages on behalf of a putative class, defined as "[a]ll water subscribers (ratepayers)" within the RWSD).  Plaintiff has presented no evidence of his own personal health harm (at least right now). He has not been an avid recreational user of the rivers in the Upper Coosa River Basin. There are individuals living in Dalton, Calhoun, or Rome who likely are suffering (or will suffer) PFAS-related health harms, or individuals who have suffered genuine recreational injuries in having to avoid fishing or swimming in the Conasauga River. And they, or their local governments, may be able to pursue robust injunctive relief in conjunction with federal and state regulators. But this case — due to the problematic individual standing and mootness issues discussed above — provides no legal foundation for the Court to grant such extensive injunctive relief.

For the reasons above, the Court concludes that Plaintiff himself has not suffered a concrete, particularized injury that would be redressable by comprehensive remediation of the Dalton LAS. He therefore does not have legal standing to pursue the broad injunctive relief he seeks in this case. And even if Plaintiff had an ongoing injury that could be redressed by injunctive relief, the

Rome monetary settlement has deprived Plaintiff of the future harm necessary to support entitlement to such injunctive relief. In sum, Plaintiff lacks standing to pursue injunctive relief, and even if he does have standing, his request for injunctive relief is now moot.

The Court therefore finds that Plaintiff is not entitled to injunctive relief as a matter of law and so **GRANTS** summary judgment in Defendants' favor on this issue. As the Court's ruling is based on the justiciability principles of standing and mootness, Plaintiff's request for injunctive relief is dismissed without prejudice.

Although the Court has ruled on this issue of injunctive relief, issues related to damages associated with past PFAS-related rate surcharges and attorneys' fees and costs remain outstanding. Lead counsel for the parties are **DIRECTED** to confer with the Special Master to discuss how they would like to proceed with the litigation of the remaining monetary issues in this case, including Plaintiff's (and the putative class members') request for damages associated with water surcharges, as well as attorneys' fees. The parties should discuss what motions remain that require Court resolution, if any.[22]  After speaking with the parties, the Special Master shall provide a status report to the Court within 21 days of this Order.

---

[22] Defendants' Motion to Exclude Plaintiff's Expert's Future Damages Opinion [Doc. 1583] remains pending. The parties are **DIRECTED** to discuss with the Special Master their positions on whether this Motion is moot in light of the rulings in this Order. In the meantime, the Court **STAYS** the Motion [Doc. 1583] and will determine how to proceed after receiving the anticipated status report.

**IT IS SO ORDERED** this 10th day of December 2024.

_____

**Honorable Amy Totenberg**
**United States District Judge**