## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

JARROD JOHNSON, individually, )
and on Behalf of a Class of Persons )
Similarly Situated, )
                                           )
     Plaintiff, )
                                           )     **CIVIL ACTION NUMBER**
v.                               )     **No. 4:20-cv-00008-AT**
                                           )
3M COMPANY, et al., )
                                           )
     Defendants. )

## PLAINTIFF'S MEMORANDUM ON STANDING AND MOOTNESS FOR PLAINTIFF'S CLEAN WATER ACT CLAIMS

### PRELIMINARY STATEMENT

This Memorandum is submitted pursuant to the Court's instruction for Plaintiff and Dalton Utilities ("DU") to address "the impact of the Court's December 10 Order on the pending Clean Water Act claims." Doc. 1623 at 1. In accordance with the Court's December 10 Order, Plaintiff's ratepayer injury supports standing for the declaratory judgment, civil penalties, and costs of litigation relief requested by Plaintiff for the Clean Water Act claims in Plaintiff's complaint. Because the violations of the CWA by DU continue to this day, with massive amounts of PFAS being discharged to the Conasauga River on a daily basis, the CWA claims are not moot.

1

## BACKGROUND AND STATUS OF THE CASE

The first Amended Complaint, filed August 27, 2020, added Clean Water Act claims against Dalton Utilities and the Dalton Whitfield Solid Waste Authority. Doc. 236. The Court denied motions to dismiss these claims in its Order dated September 20, 2021. Doc. 629. The Complaint was amended three more times to add additional ongoing Clean Water Act violations, so that the operative Complaint is the Fourth Amended Complaint. Doc. 716.

That Complaint included claims against DU for (1) discharge of PFAS from point sources to the Conasauga River without a CWA permit authorizing those discharges and (2) discharges of non-stormwater containing PFAS to the river in violation of the General Stormwater Permit issued by the Georgia Environmental Protection Division ("EPD"). During discovery Plaintiff sampled the LAS and its streams and conveyances and determined that massive amounts of PFAS are being discharged into the Conasauga River. Although the carpet companies in Dalton aver that they stopped using PFAS-based carpet treatments in 2019,[1] PFAS from decades of the carpet companies' use and disposal of the chemicals remain present in the LAS, including precursor PFAS that are continually transformed to PFOA and PFOS. Indeed, the releases of PFAS from the LAS into the river continue unabated

---

[1] It is worth highlighting, however, Shaw admitted knowing in August 2022 that some of other materials it uses to manufacture carpet contain PFAS. Doc. 1339-22 at 7.

to this day. Furthermore, DU has not obtained an NPDES permit for its discharges, nor has it stopped discharging non-stormwater into the river, so the CWA violations continue.

As the Court is aware, the City of Rome settled its parallel state court lawsuit against DU and other defendants, which are also Defendants in *Johnson*, in June 2023. *See* Doc. 1616 at 10-13. The Rome settlement provided roughly $280 million in funding for Rome to implement reverse osmosis ("RO") treatment to replace its existing, less-effective granular activated carbon ("GAC") treatment system. Additionally, as part of the settlement, Rome agreed to rollback its PFAS-related water rate increases to their pre-2019 levels; the rate rollback became effective September 1, 2023. It is undisputed that the Rome settlement did not require any remediation or clean up of the LAS for PFAS. Furthermore, Rome's RO treatment has not yet been implemented, and GAC treatment currently remains in place.

Plaintiff filed motions for summary judgment on his CWA claims against both DU and DWSWA, and DU and DWSWA filed counter motions, all of which are pending. On December 10, 2024, the Court held that while Plaintiff articulates a cognizable concrete injury under Article III based on the increased water rates he has paid as a result of Defendants' contamination of Rome's water supply, that injury would not be redressed by the injunctive relief he seeks to abate the public nuisance emanating from DU's LAS. Doc. 1616 at 29-32. The Court further held that

Plaintiff's health, property, and recreational injuries in the context of his request for an abatement injunction were insufficient under Article III, and, finally, that his "request for injunctive relief to remedy his ratepaying injury is moot" because of Rome's rollback of PFAS-related rate increases. *Id.* at 19, 21, 25, 34-35. The December 10 Order granted summary judgment in Defendants' favor on the issue of whether Johnson could pursue specific injunctive relief in the form of a remediation proposal from one of Plaintiff's expert reports but did not address the Clean Water Act relief requested by Johnson. The Court stated, "[a]s the Court's ruling is based on the justiciability principles of standing and mootness, Plaintiff's request for injunctive relief is dismissed without prejudice." Doc. 1616 at 40.

If the Court permits Plaintiff's CWA claims to go forward, Plaintiff believes the Court will grant summary judgment finding that DU has violated CWA effluent standards and limitations, as defined in 33 U.S.C. § 1365(f), and as demonstrated by the factual record, and issue further orders within the discretion of the Court, pursuant to 33 U.S.C. § 1365(a).

## **ARGUMENT**

## I. **THE COURT'S DECEMBER 10 ORDER DOES NOT FORECLOSE THE ENFORCMENT OF THE CLEAN WATER ACT BY JOHNSON.**

The Court's December 10 Order does not expressly address DU's violations of the CWA or the relief requested by Plaintiff for those violations. Plaintiff's Fourth Amended Complaint did not focus on one particular remedy for the Clean Water Act

4

violations by DU or request a particular remediation dollar figure as the cost of an enforcement order or injunction.[2] Plaintiff requested the Court to grant the following relief against DU:

> (a)    Enter a declaratory judgment that Defendant Dalton Utilities has violated and is in violation of the CWA, 33 U.S.C. § 1311;
>
> (b)    Order or Enjoin Defendant Dalton Utilities to cease and abate the discharge of pollutants from the LAS into waters of the United States without an NPDES permit, including the full remediation and elimination of the LAS and construction of a wastewater treatment facility that is capable of removing all PFAS from wastewater discharged into the Dalton POTW prior to release into the Conasauga River or its tributaries;
>
> (c)    Order or Enjoin Defendant Dalton Utilities to cease and abate the discharge of pollutants from its wastewater collection system into waters of the United States without an NPDES permit;
>
> (d)    Enter an enforcement order or an injunction under the CWA ordering Defendant Dalton Utilities to fully investigate and remediate the PFAS contamination in and around the LAS, including in soils and sediments, as well as the groundwater aquifer beneath the LAS;
>
>                 *             *           *
>
> (g)    Order Defendants Dalton Utilities and DWSWA to pay civil penalties of up to fifty-five thousand eight hundred dollars ($55,800) per day for each day of each violation of the CWA set out in this

---

[2] Defendants' arguments on standing were fixated on the report of Plaintiff's expert witness, Charles Andrews, Ph.D., which developed a preliminary remedy for substantially reducing PFAS releases from the LAS that is "technically and economically feasible" and provided an estimate of the cost of remediation of the nearly 7,000 contaminated acres (approximately $850 million). Doc. 933-3 (Andrews Rep.) at 3, 20. Dr. Andrews included this preliminary remedy and an estimated price tag in his report because, under Georgia nuisance law, when a case is tried to a jury, the jury determines whether the nuisance is permanent or abatable. *State of Ga. v. City of East Ridge, Tenn*., 949 F. Supp. 1571, 1583 (N.D. Ga. 1996). Whether the nuisance is abatable determines whether injunctive relief is available. *H & L Farms LLC v. Silicon Ranch Corporation*, No. 4:21-CV-134 (CDL), 2023 WL 221508, at *5 (M.D. Ga., Jan. 17, 2023). If the jury finds it is an abatable nuisance, then the Court determines whether abatement should be ordered and in what form.

Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33
U.S.C. §§ 1319(d) and 1365(a);

(h)    Award Plaintiff his costs, including reasonable attorney and
expert witness fees, as authorized by Section 505(d) of the CWA, 33
U.S.C. § 1365(d);

Doc. 716 at 72-73.

In light of the Court's December 10 Order, as demonstrated below, Plaintiff
continues to have standing to seek at least declaratory relief, civil penalties, and his
attorney fees and other litigation costs, pursuant to Sections 309(d) and 505(a) and
(d) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), (d); and these claims are not
moot.

**A.**    **<u>Johnson Has Standing to Enforce the Clean Water Act.</u>**

The purpose of the CWA citizen suit provision is to create an avenue for
"vigorous enforcement" of the Clean Water Act if "Federal, State, and local agencies
fail to exercise their enforcement responsibility." See S. Rep. No. 92-414, at 64
(1971) (discussing the Clean Water Act's citizen suit provision). When the
government fails, as here, citizen suits are an important supplement to government
enforcement of the Clean Water Act, given that the government has only limited
resources to bring its own enforcement actions, permitting individual plaintiffs to
step into the government's shoes and function as "private attorneys general"
*Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, ("*Tyson Foods*"), 897

F.2d 1128, 1136 (11th Cir. 1990); s*ee also StarLink Logistics, Inc. v. ACC, LLC*, 101

F.4th 431, 447 (6th Cir. 2024).

In the CWA citizen suit provision, Congress authorized "any citizen" to

"commence a civil action on his own behalf" and defined "citizen" as "a person or

persons having an interest which is or may be adversely affected." 33 U.S.C. §

1365(g). It is clear from the Senate Conference Report for the 1972 amendments to

the Clean Water Act (referred to as the Federal Water Pollution Control Act at the

time) that the definition of "citizen" in the citizen suit provision was intended by

Congress to allow suits by all persons possessing standing under the Supreme

Court's decision in *Sierra Club v. Morton*, 405 U.S. 727 (1972). See S. Conf. Rep.

No. 92–1236, p. 146 (1972). The Supreme Court subsequently stated that "[t]his

broad category of potential plaintiffs necessarily includes both plaintiffs seeking to

enforce these statutes as private attorneys general, whose injuries are

"noneconomic" and probably noncompensable, and persons like respondents who

assert that they have suffered tangible economic injuries because of statutory

violations." *Middlesex Cnty. Sewerage Authority v. National Sea Clammers Ass'n,*

("*Sea Clammers*") 453 U.S. 1, 16–17 (1981).

More recent standing decisions under the CWA reference the same

requirements as previously set out in *Sea Clammers*, and they are interpreted

broadly. A plaintiff must show (1) he has suffered an injury in fact; (2) the injury is

fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.* ("*Laidlaw*"), 528 U.S. 167, 180–81 (2000). In its December 10 decision, dealing with Johnson's standing to seek the specific remediation proposal in Dr. Andrews' expert report, the Court found that Johnson satisfied the injury in fact requirement for only his economic injury of payment of increased rates, but that this injury would not be redressed by the injunctive relief as framed by the Court.

**1. As the Court Has Held, Johnson Has an Injury in Fact Under Article III.**

In its December 10 Order, the Court held that Johnson's ratepaying injury constituted "a concrete, particularized, and actual economic injury" cognizable under Article III. Doc. 1616 at 29. As a precise economic harm that results from DU's PFAS discharges in violation of the CWA, this ratepaying injury is also a cognizable Article III injury in the context of Johnson's CWA claims.

This conclusion is in accordance with cases involving Article III and CWA citizen suits that recognize similar economic harms as constituting concrete injuries in fact. While *Laidlaw* is widely cited for the finding of recreational or aesthetic injuries as injuries in fact for standing, the Court also found that property injuries satisfy the injury in fact requirement. *Id*. at 182–83. ("[Plaintiff] member Gail Lee attested that her home, which is near Laidlaw's facility, had a lower value than

similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy."). The Eleventh Circuit has recognized, as have other circuits, that economic injuries confer standing under the CWA. For instance, in *Parker v. Scrap Metal Processors, Inc.*, ("*Parker*"), 386 F.3d 993, 1004 (11th Cir. 2004), the Court found that Parker demonstrated an injury-in-fact by showing that water runoff contaminated by hazardous substances directly entered her property. Parker was not a riparian owner of the stream into which the water ultimately flowed and did not plead or prove an aesthetic or recreational injury, but the Court held that "[s]uch allegations are sufficient, but not necessary, to satisfy the injury-in-fact requirement." *Parker*, 386 F.3d at 1004. By alleging that the value of her property was diminished, at least in part due to the pollution from the polluting facility, Mrs. Parker adequately demonstrated an injury-in-fact. *Id*.

Similarly in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154-159 (4th Cir. 2000) (*en banc*) (diminished value of property containing lake fed by polluted stream), cited with approval by the Eleventh Circuit in *Parker*, 386 F.3d at 1004, n. 11, the Fourth Circuit made it clear that economic interests are clearly injuries in fact under the CWA, stating:

> The standing inquiry in environmental cases, for example, must reflect the context in which the suit is brought. In some instances, environmental injury can be demarcated as a traditional trespass on property or tortious injury to a person. In other cases, however, the damage is to an individual's aesthetic or recreational interests.

*See also Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 392 (D.N.J. 2021)[3] (home water filtration expenses and other costs to obtain clean drinking water); *City of Greenville, Ill. v. Syngenta Crop Protect., Inc.*, 756 F. Supp. 2d 1001, 1007-08 (S.D. Ill. 2010) (increased cost of monitoring and remediating contaminated water); *Optimus Steel, LLC v. U.S. Army Corps of Engineers*, 492 F. Supp. 3d 701, 716 (E.D. Tex. 2020) ("losing the opportunity to expand and develop [plaintiff's] business").

**2. Johnson's Injury Is Fairly Traceable to DU's CWA Violations.**

The Court's December 10 Order found Plaintiff's injury is traceable to Defendants' conduct, stating:

> Plaintiff has presented evidence that Defendants caused or contributed to the discharge of PFAS into the Conasauga River, from which Rome draws some of its water. Because its water supply contains PFAS, Rome must cleanse its drinking water. To do so, it installed Granular Activated Carbon ("GAC") in its filter beds and raised water rates for its citizens to pay to subsidize these measures. The court accepts that this is a sufficient theory of causation, at this juncture.

---

[3] *Severa*, like this case, involved a class action by residents whose municipal water supply was contaminated by PFAS. In addition to recognizing plaintiffs' economic harms as Article III injuries, the court endorsed "Plaintiffs claim that the exposure to the PFNA [a type of PFAS] discharged into the environment by Defendants and their consumption of water contaminated with PFNA has put Plaintiffs at significant risk of developing medical conditions associated with exposure to PFNA." *Id.*

Doc. 1616 at 29. Although the Court did not consider DU's CWA violations, the Court's conclusion that the Article III requirement of traceability is satisfied continues to pass muster in the context of Plaintiff's CWA claims.

Ample evidence has been developed in this case that shows that the effluent DU applies to the LAS via sprayheads is contaminated with PFAS; that the applied PFAS move via overland or shallow subsurface flows to surface waters on the LAS; that those LAS surface waters transport the PFAS to the Conasauga River (rendering the entire LAS a point source under the CWA); that the overwhelming majority of the PFAS found in the Oostanaula River are traceable to the LAS; that Rome was forced to undertake measures, including GAC treatment, to remediate the resulting high PFAS levels in the drinking water it supplies ratepayers like Johnson; and that in order to fund the increased costs associated with these measures, Rome implemented the rate increases incurred ratepayers like Johnson. *See generally* Doc. 1403-1 ¶¶ 74-86, 124-38, 405-53.

**3. Johnson's Ratepaying Injury Is Redressable Under the CWA.**

The Court ultimately held that Johnson's ratepaying injury would not be redressable by the hypothetical nuisance-abatement injunction that was the focus of Defendants' motions. Doc. 1616 at 31-32. This determination turned on the Court's finding that this injury "is so clearly a monetary harm," for which the legal remedy of damages was more appropriate than the equitable remedy of injunctive relief. *Id.*

The Court's holding concerning injunctive relief and redressability, however, does not control whether any other relief requested, such as the civil penalties under the CWA, would redress Plaintiff's injury. It is important to note that Plaintiff cannot recover monetary damages under the CWA. *Sea Clammers*, 453 U.S. at 18.

The Supreme Court and Courts of Appeals have held that a citizen suit plaintiff has standing, including redressability, to seek civil penalties for CWA violations because of their deterrence effect. The Supreme Court in *Laidlaw* rejected the argument that "a citizen plaintiff can never have standing to seek" civil penalties under the CWA "because they are paid to the Government," explaining:

> [I]t is wrong to maintain that citizen plaintiffs facing ongoing violations never have standing to seek civil penalties.
>
> We have recognized on numerous occasions that "all civil penalties have some deterrent effect." *Hudson v. United States*, 522 U.S. 93, 102, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) . . . . More specifically, Congress has found that civil penalties in Clean Water Act cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations. This congressional determination warrants judicial attention and respect. . .
>
> It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

528 U.S. at 185-86.

Similarly, in a case involving ongoing NPDES permit violations, the Third Circuit articulated the principle that "[w]here Congress has expressly granted a right of action and plaintiff have shown 'a distinct and palpable injury,' plaintiffs 'may invoke the general public interest in support of their claim.'" *Public Interest Res. Grp. of N.J. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 73 (3d Cir. 1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). It held:

> The general public interest in clean waterways will be served in this case by the deterrent effect of an award of civil penalties. Penalties will deter both [defendant] specifically and other NPDES permit holders generally. Thus, [plaintiff's] members' injuries may be redressed by a favorable decision in this case.

*Id.* This invocation of the general public interest as well as the deterrence rationale present in both *Laidlaw* and *Public Interest Research Group* are consistent with the notion that citizen suit plaintiffs fulfill the role of a private attorney general by enforcing federal environmental law. *See Tyson Foods*, 897 F.2d at 1136. *See also Sierra Club v. Simkins Industries, Inc*., 847 F.2d 1109, 1113 (4th Cir. 1988) ("The judicial relief of civil penalties, even if payable only to the United States Department of the Treasury, is causally connected to a citizen-plaintiff's injury. Such penalties can be an important deterrence against future violations.").

As the Court's December 10 Order recognizes, the general public interest in deterring DU's discharges of PFAS near the headwaters of the Coosa River system is robust: "The harm wrought on communities downstream of Dalton, Georgia . . .

resulting from years of PFAS proliferation is incalculable." Doc. 1616 at 38. Unlike in *Laidlaw*, where the facility at issue "was permanently closed" and "all discharges from the facility [had] permanently ceased," 528 U.S. at 179, the discharges of PFAS from DU's LAS are *continually occurring every single day*—and will continue, absent enforcement, for the foreseeable future. The need and capacity for deterrence is therefore starkly apparent. As *Laidlaw* instructs, civil penalties can provide that deterrence and in so doing, redress Plaintiff's ratepaying injury.

Furthermore, as *Public Interest Research Group* holds, civil penalties not only deter the immediate wrongdoer; they also can deter "other NPDES permit holders generally." *Public Interest Research Group*, 913 F.2d at 73. Thus, civil penalties in this case would also address the other sources of PFAS to the rivers upstream from Rome that the Court observed in its Order. *See* Doc. 1616 at 30-31.

The same analysis applies to the declaratory judgment requested by Plaintiff that DU has violated and is in violation of the CWA, 33 U.S.C. § 1311. Doc. 716 at 72. *Winyah Rivers Alliance v. Active Energy Renewable Power, LLC*, ("*Wynah Rivers*") 579 F.Supp.3d 759, 766–67 (E.D.N.C. 2022) (plaintiff has shown redressability for declaratory relief, "because a declaratory judgment would settle the propriety of defendants' alleged unlawful discharges that contribute to plaintiff's members' injuries.")

Finally, Plaintiff's Complaint also requests an award of costs of litigation, including reasonable attorney and expert witness fees, pursuant to 33 U.S.C. § 1365(d). Because the award of litigation costs turns on whether Plaintiff is the "substantially prevailing party" on the merits of the case, 33 U.S.C. § 1365(d), no independent Article III analysis of his entitlement to this specific recovery is required. *See Laidlaw*, 528 U.S. at 194-96 (addressing citizen-suit plaintiffs' entitlement to attorney fees separately from its standing and mootness analyses).

**B.    Johnson's Clean Water Act Claims are Not Moot.**

The Court's December 10 Order addressed mootness only in the context of whether there is any irreparable ratepayer injury to Johnson personally left to warrant the imposition of the hypothetical $850 million injunction after Defendants' settlements with Rome. *See* Doc. 1616 at 33-38. However, even if Johnson's ongoing injury cannot support this injunctive relief, this does not moot his claims against DU under the CWA.

The Supreme Court has made it clear that a claim for CWA violations is not moot unless the defendant demonstrates that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc*., 484 U.S. 49, 66–67 (1987); *Laidlaw*, 528 U.S. at 171 ("Both Laidlaw's permit compliance and the facility closure might moot this case, but only if one or the other event made it absolutely

clear that violations could not reasonably be expected to recur."). The Court elaborated:

> A defendant's voluntary cessation of a challenged practice ordinarily does not deprive a federal court of its power to determine the legality of the practice. If it did, courts would be compelled to leave the defendant free to return to its old ways. Thus, the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.

*Laidlaw*, 528 U.S. at 169–70.

The CWA violations complained of in Johnson's three Amended Complaints are continuing unabated daily and will do so for the foreseeable future unless some action is taken by DU and other responsible parties. There is no indication from EPD records that DU has applied for or received an NPDES permit authorizing these discharges. The Conasauga and Oostanaula Rivers continue to receive large amounts of PFAS from the LAS, impairing the use of the waterways for drinking water and other beneficial uses. The Defendants' settlements with the City of Rome for the construction of a new drinking water treatment plant, while beneficial to Rome water users, have done nothing to remedy these CWA violations.

Even if injunctive relief is not available to Johnson, the CWA claims are not moot where the violations continue. The Court can still impose civil penalties, as discussed above, which can deter future violations. For instance, in *Laidlaw* the defendant argued that because the district court had denied injunctive relief, and that

denial was not appealed, plaintiff's claim for civil penalties was moot. The Supreme Court found that the denial of injunctive relief does not necessarily mean that the district court has concluded there is no prospect of future violations for civil penalties to deter and upheld the district court's assessment of civil penalties after finding that a citizen suit plaintiff has standing to seek civil penalties because of their deterrent effect. *Laidlaw*, 528 U.S. at 193.

The Eleventh Circuit has explained the rationale for the continued viability of claims for civil penalties after a case becomes moot:

> Specifically, we find that for purposes of assessing a plaintiff's allegations of ongoing violations, the court must always look to the date the complaint was filed. If on and after that date, the defendants continued to violate their NPDES permit, then the plaintiffs may request both injunctive relief and civil penalties…If, after the complaint is filed, the defendant comes into compliance with the Act, then traditional principles of mootness will prevent maintenance of the suit for injunctive relief as long as there is no reasonable likelihood that the wrongful behavior will recur. However, the mooting of injunctive relief will not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed.

*Tyson Foods*, 897 F.2d at 1134–35. In the instant case, DU was violating the CWA when Johnson filed his first Amended Complaint (adding DU to the case), which sought both injunctive relief and the imposition of civil penalties. Civil penalties attach at the time of the violations, which continue, and the request for civil penalties cannot be mooted by the denial or mooting of injunctive relief.

The continued viability of civil penalties in this case is even stronger because DU did not moot injunctive relief by coming into compliance with the CWA. Instead, the Court found that Defendants' settlements with Rome deprived Johnson of irreparable harm to support injunctive relief because his future water rate increases are speculative.

## CONCLUSION

The Court can still grant meaningful relief under the Clean Water Act in this case to address "the real harms posed by the discharge of PFAS by the Dalton carpet industry" without offending the jurisdictional requirements of standing. Doc. 1616 at 39. In the face of government inaction, Plaintiff has been the only one to shoulder the burden of enforcing the CWA at the LAS. Johnson has standing to pursue a declaratory judgement and civil penalties for their deterrent effect, and, once he is a prevailing party, he should be able to pursue reimbursement of his costs of litigation. His CWA claims, furthermore, are not moot because the CWA violations continue today and will continue for the foreseeable future.

Respectfully submitted this 21st day of February, 2025.

*/s/ Gary A. Davis*
Gary A. Davis (*phv*)
Keith A. Johnston (*phv*)
DAVIS, JOHNSTON, & RINGGER,
PC
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Telephone: (828) 622-0044
Fax: 828-398-0435
gadavis@enviroattorney.com
kjohnston@enviroattorney.com

R. Akira Watson, Esq. (*phv*)
Brett C. Thompson, Esq. (*phv*)
Hirlye R. "Ryan" Lutz, III, Esq. (*phv*)
F. Jerome Tapley, Esq. (*phv*)
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, Alabama 35205
awatson@corywatson.com
bthompson@corywatson.com
rlutz@corywatson.com
jtapley@corywatson.com
Telephone: (800) 852-6299
Fax: (205) 324-7896

Ryals D. Stone (GA Bar No. 831761)
William S. Stone (GA Bar No.
684636)
THE STONE LAW GROUP –TRIAL
LAWYERS, LLC
5229 Roswell Road NE
Atlanta, Georgia 30342
Telephone: (404) 239-0305
Fax: (404) 445-8003
ryals@stonelaw.com
billstone@stonelaw.com

***Attorneys for Plaintiff***

19

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Northern District of Georgia Civil Local Rule 7.1.D., the undersigned counsel certifies that the foregoing filing is prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1.C.

This 21st day of February, 2025.

/s/ Gary A. Davis

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been filed electronically with the Clerk of the Court by using the CM/ECF system which will automatically email all counsel of record.

This 21st day of February, 2025.

/s/ Gary A. Davis