IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

|  |  |  |
|---|---|---|
| JARROD JOHNSON, Individually and on behalf of a class of persons similarly situated, | : : : : | CIVIL ACTION NO. 4:20-cv-8-AT |
| Plaintiff, | : : | |
| v. | : : | |
| 3M COMPANY, *et al.*, | : : | |
| Defendants. | : | |

**ORDER**

This matter is before the Court on Defendant Americhem, Inc.'s ("Americhem") Motion for Summary Judgment [Doc. 1183]; and Defendant MFG Chemical, LLC's ("MFG") Motion for Summary Judgment [Doc. 1184] and related motions. These related motions include: Plaintiff's Motion to Exclude Expert Testimony of MFG's expert witness Timothy Richards [Doc. 1268], MFG's Motion for Oral Argument [Doc. 1337] regarding the Richards motion, and MFG's Motion to Strike Plaintiff's Response to its Motion for Summary Judgment [Doc. 1559].

## I.    **Background**

Plaintiff filed this case more than five years ago against approximately three dozen Defendants in the Superior Court of Floyd County. (Doc. 1-1). Defendants

removed the action to this Court on January 10, 2020. *Id.* The operative Fourth Amended Complaint ("FAC"), filed on January 11, 2022, alleges several claims under the Clean Water Act and Georgia law. (FAC, Doc. 716). Due to the winding course of this action, the Court presumes some knowledge of the factual background on the part of the reader and will not provide a detailed timeline here. However, a brief overview of Plaintiff's allegations is necessary to explain the arguments raised by Americhem and MFG in support of summary judgment.[1]

All the underlying events giving rise to this case center around the City of Dalton, Georgia, known colloquially as the "Carpet Capital of the World" due to its prominence as the worldwide hub of carpet manufacturing and production. Per- and polyfluoroalkyl substances ("PFAS") are a group of synthetic, chemical compounds that repel oil and water and are resistant to heat and chemical reactions due to their strong carbon-fluorine bonds. (Fourth Amended Complaint ("FAC"), Doc. 716 ¶ 51). These properties have made PFAS popular in carpet and textile production for the purpose of providing water and stain resistance. *Id.* Because of these strong chemical bonds, PFAS have no known breakdown mechanism once introduced into the environment and have been linked to adverse

---

[1] Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party, the Court's factual background is taken from Plaintiff's operative complaint. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007). However, the factual allegations recited here do not amount to findings of fact by the Court. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007) (noting that a summary judgment proceeding "by definition involves no findings of fact").

health effects including cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. (*Id.* ¶¶ 52; 55).

Plaintiff alleges that the City of Dalton, Georgia, acting through its Board of Water, Light and Sinking Fund Commissioners, d/b/a Dalton Utilities ("Dalton Utilities"), Dalton-Whitfield Solid Waste Authority ("DWSWA"),[2] and various industrial users have contributed to or caused the discharge of PFAS into North Georgia waterways around the City of Dalton. (*Id.* ¶ 1). Movants Americhem and MFG are each one of those industrial users alleged to have contributed to the discharge of PFAS into the waterways.

To elaborate on Plaintiff's claims, Plaintiff alleges that the owners and operators of manufacturing facilities related to the carpet industry ("Manufacturer Defendants"), including Americhem[3] and MFG, discharged industrial wastewater containing high levels of PFAS from their facilities into the Dalton Utilities Publicly

---

[2] Plaintiff has reached a settlement with DWSWA. (Joint Status Rpt., Doc. 1646 at 2 n.2; Proposed Consent Decree, Doc. 1647). However, since DWSWA has not yet been dismissed from the case and the mandatory 45-day statutory period for the Attorney General and the EPA Administrator to review the Consent Decree has not yet passed, the Court includes Plaintiff's pending claims against DWSWA in its summary.

[3] Plaintiff alleges that Americhem is the "owner and operator of a carpet and synthetic fibers manufacturing facility." (FAC ¶ 20). However, Defendant Americhem contends that it "is **not** a carpet manufacturer" but is a manufacturer and designer of "masterbatch, . . . a liquid or solid additive used for coloring plastics." (Doc. 1183-1 at 4) (emphasis in original). The Court refers to Americhem as one of the "Manufacturer Defendants" for consistency with how the various named Defendants have been grouped together since the early stages of litigation in this case. Defendant MFG does not dispute that it owns and operates three chemical manufacturing facilities located in Dalton, Georgia, as alleged in the complaint, *see* (FAC ¶ 39; Doc. 1184-1 at 3), although, as discussed at length in this Order, MFG does dispute that it has ever manufactured or sold any PFAS-containing materials.

Owned Treatment Works ("POTW"). Again, PFAS are popularly used in carpet production because they impart water, oil, and soil resistance to carpet, and the majority of worldwide carpet production takes place in and around Dalton, Georgia. Since PFAS resist degradation during treatment processing at Dalton Utilities' wastewater treatment facilities, Plaintiff contends the Manufacturer Defendants' PFAS-laden discharge thus contaminated the Conasauga River, the Oostanaula River, the Coosa River, and other tributaries and wetlands in the Upper Coosa River basin. (*Id.* ¶ 3).

Based on these allegations, Plaintiff asserts a number of claims against Americhem, MFG, and other purported Manufacturer Defendants, which include the tort claims in Counts Four, Five, and Seven of the FAC—for Willful, Wanton, Reckless or Negligent Misconduct, Negligence Per Se, and Public Nuisance, respectively. (Doc. 716, FAC ¶¶ 163-74; 184-93). Plaintiff also seeks punitive damages against Americhem, MFG, and other purported Manufacturer Defendants in Count Six of the FAC. (*Id.* ¶¶ 175-183).[4]

Americhem and MFG now move for summary judgment. [Docs. 1183; 1184]. The core argument animating both motions is that Americhem and MFG have never contributed PFAS to the POTW through its wastewater discharge, and thus they cannot be held liable for any of Plaintiff's claims in the FAC, all of which are

---

[4] Plaintiff asserts eight claims. Plaintiff's Counts One, Two, and Three assert claims against only Dalton Utilities and DWSWA. (FAC ¶¶ 107–62). Count Eight seeks injunctive relief, (*id.* ¶¶ 194–200), which the Court has already denied in an Order granting summary judgment in Defendants' favor on this issue. (Doc. 1616).

premised on the allegation that Manufacturer Defendants discharged industrial wastewater containing PFAS into the City of Dalton's POTW.

Specifically, Americhem contends that no evidence produced during discovery "supports that Americhem purchased, used, supplied, or sold PFAS-containing materials to and from" any entities "in a way that contributed to PFAS in [Dalton Utilities'] water that was discharged back to [Dalton Utilities]." (Doc. 1183-1 at 13). Although Americhem concedes that there have been two instances when it used small amounts of PFAS-containing materials in its facilities, one of those instances resulted in no more than *de minimis* discharge and post-dated the most recent sampling results showing PFAS in its wastewater discharge by four years, and the other instance did not result in any discharge whatsoever. (Doc. 1183-1 at 6-8). Accordingly, Americhem argues that neither instance could have contributed to the sampling results from 2012 and 2016 showing PFAS in Americhem's wastewater discharge, which is the primary evidentiary basis on which Plaintiff relies for his claims against Americhem. Americhem also challenges Plaintiff's interpretation of the results of that 2012 and 2016 testing on the basis that there was no testing of PFAS concentrations in the water coming ***into*** the facility to compare against the PFAS concentrations of the water coming out of the facility.

MFG's arguments in support of summary judgment are similar to those raised by Americhem, which is why the Court finds it appropriate to address the motions at the same time. Specifically, MFG contends it has "never manufactured,

produced, used, discharged, or distributed the PFAS products at issue in this litigation." [Doc. 1184 at 1-2]. MFG states that the way it uses and disposes of water in its chemical manufacturing process precludes the possibility that it could be discharging PFAS in its wastewater. (Doc. 1184-1 at 4-5). Further, MFG contends it has never manufactured any chemicals or products containing the PFAS referenced in the operative complaint. (*Id.* at 7). In response to Plaintiff's previous reliance at the motion-to-dismiss stage on evidence that MFG possessed safety documents related to nine specific PFAS-containing products, MFG asserts its own investigation into its inventory led it to the conclusion that it never actually used, manufactured, or distributed any of those products. (*Id.* at 7-9; Gyomory Decl., Doc. 1184-7 ¶¶ 10-11).

Like Americhem, MFG also points to the flaws in the methodology of earlier sampling events that allegedly showed the presence of PFAS constituents in MFG's effluent, because the testing failed to account for what PFAS constituents were present in MFG's influent. (Doc. 1194-1 at 7-8). Both Americhem and MFG rely on more recent testing of PFAS concentrations in their facilities' effluent (outgoing wastewater discharge) as well as comparative testing of the influent (finished water coming into their facilities), in order to rebut the earlier effluent-only sampling results on which Plaintiff relies to support his claims.

As described above, the Manufacturer Defendants' alleged discharge of PFAS into the POTW by the Manufacturer Defendants forms the basis of all of Plaintiff's claims against those entities in this action. Thus, based on their

6

contentions that there is no evidence to support a finding that they have contributed to the discharge of PFAS into the POTW, both Americhem and MFG assert they are entitled to summary judgment on all of Plaintiff's claims as a matter of law.[5]

The Court will address the evidence on which Plaintiff relies for his claims against Americhem and MFG separately, in order to assess whether either set of evidence is sufficient to create a triable issue on the question of either Defendant's liability for the PFAS discharge into the POTW.

## II.    Legal Standards Governing Summary Judgment Motions

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the

---

[5] MFG also specifically challenges Plaintiff's standing as a basis for summary judgment. (Doc. 1184-1 at 12-15). However, MFG's first standing argument concerns Plaintiff's standing to pursue relief based on "increased surcharges that may or may not be imposed in the future as the City of Rome upgrades its PFAS removal system[.]" (*Id.* at 14). The Court has already dealt with Plaintiff's standing to pursue injunctive relief claims based on speculative future harm in its December 10, 2024 Order granting Defendants summary judgment on that issue. (Doc. 1616). However, Plaintiff still has standing to pursue damages relief, based on the City of Rome's previous water rate increases due to elevated PFAS contamination in Rome's drinking water supply. *See* (*id.* at 15-16). MFG's other standing argument is that Plaintiff has failed to show that any damage that he may allegedly suffer is "fairly traceable" to conduct by MFG, because MFG did not contribute any PFAS to the water supply through its wastewater discharge. (Doc. 1184-1 at 14-15). Since this standing argument rests entirely on the same underlying assertion as the rest of MFG's summary judgment motion—that it did not contribute PFAS to the water supply—the Court need not address the standing challenge separately.

proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting the Advisory Committee's note to Fed. R. Civ. P. 56). "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to establish, by going beyond the pleadings, that there is indeed a genuine issue as to the material facts its case. *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1583 n.16 (11th Cir. 1991); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). A dispute of material fact "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita*, 475 U.S. at 587.

When ruling on the motion, the Court must view all the record evidence in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992); *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). The Court must avoid weighing conflicting evidence. *Liberty Lobby*, 477 U.S. at 255; *McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere

"scintilla" of evidence will not suffice. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *Pepper v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989). But where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted).

The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

With these principles in mind, the Court will begin with an analysis of Americhem's Motion for Summary Judgment, before turning to MFG's motion.

## III.   Americhem's Motion for Summary Judgment

Americhem argues that it is entitled to summary judgment because Plaintiff provides no evidence to support its claim that Americhem contributed any PFAS substances to its wastewater discharge. (Doc. 1183-1 at 3).

To situate Americhem's summary judgment motion arguments in context, Americhem served a contention interrogatory on Plaintiff in this action demanding that Plaintiff identify all evidence, including supporting documents, on which Plaintiff relies to show that Americhem contributed to any of Plaintiff's alleged grounds for relief. *See* (Pl. Resp. to Americhem ROG No. 1, Doc. 1183-5 at 3). Plaintiff's response to this contention interrogatory can be grouped into two categories of evidence: (1) evidence that Americhem purchased, was supplied, or

itself supplied PFAS-containing materials, based on documents produced in discovery by other Defendants in this action; and (2) the results of the wastewater discharge sampling done at the Americhem Dalton facility in 2012 and 2016, which showed PFAS concentrations in Americhem's wastewater.

In the summary judgment motion, Americhem structures its argument as a line-by-line response to each piece of evidence on which Plaintiff relies in his response to this contention interrogatory. Americhem's argument that it did not discharge PFAS into the POTW is common to and dispositive of all counts, and thus resolution of this argument in Americhem's favor would compel the Court to grant Americhem summary judgment on all claims. For that reason, the Court will orient its analysis in the same way that Americhem does in its motion, by evaluating in turn each piece of evidence on which Plaintiff relies to support his contention that Americhem is responsible for discharging wastewater containing PFAS into the POTW. The Court will begin with the documentary evidence showing that Americhem purchased, was supplied, or supplied PFAS-containing materials, before turning to the 2012 and 2016 wastewater discharge sampling.

### A. Documents Indicating Americhem Purchased, Was Supplied, or Supplied PFAS-Containing Materials

Plaintiff's discovery responses indicate that he believes Americhem (1) purchased or was supplied PFAS-containing materials from 3M, Daikin America and/or Peach State Labs, (2) used or compounded these PFAS-containing materials, and (3) sold or supplied these or other materials to Defendants

Engineered Floors, Tarkett, Shaw, and/or Mohawk. (Doc. 1183-1 at 4 (citing Pl.'s Resps. to Americhem ROG No. 1, Doc. 1183-5 at 3)).

Specifically, in his contention interrogatory response, Plaintiff identified documents indicating that Americhem purchased or was supplied PFAS-containing products including L-19329, PM-870, S-2005, TG-1001 or TG-1002, FA-500, FA-600, Lubron Type MLX5, GEO-8168, and DA310ST. (*Id.* at 7-9). Additionally, Plaintiff identified documents produced by Tarkett USA reflecting that Americhem may have supplied PFAS-containing products (specifically, certain additives for stain resistance) to Tarkett. (*Id.* at 9). Plaintiff further responded that Americhem has "been a major supplier of pigments, color concentrates, masterbatches, and/or other similar products to at least Engineered Floors, Tarkett USA and/or Tandus, and Shaw Defendants[,]" and stated his belief that some of those products supplied by Americhem may have contained PFAS. (*Id.* at 10).

Importantly, through the discovery process, Plaintiff has now significantly pared down the list of PFAS-containing materials that he contends Americhem used. Plaintiff now deems it undisputed that Americhem did not use, purchase, or supply a number of these products. Specifically, Plaintiff does not dispute that Americhem did not receive or use L-19329, S-2005, TG-1001, TG-1002, FA-500, FA-600, or Lubron Type MLKX5 at its Dalton Facility. (Pl. Resp. to SOMF, Doc. 1353-1 ¶¶ 2, 4). Plaintiff also does not dispute that Americhem has not supplied

PFAS-containing products to Tarkett, Engineered Floors, Tarkett USA, Tandus, or to any of the Shaw Defendants. (*Id.* ¶¶ 7, 8).

That leaves the question of whether Americhem used PFAS-containing products DA310ST, GEO-8168, or PM-870 in its manufacturing processes, in such a way as to give rise to a plausible inference that it contributed PFAS to its industrial discharge wastewater. Before discussing whether Americhem's potential use of these products gives rise to a genuine issue of material fact, the Court must address a discovery dispute raised in the briefing related to Americhem's use of DA310ST or GEO-8168.

Specifically, to rebut Plaintiff's allegations regarding these products, Americhem provides an Affidavit from its Quality and Design Lab Manager at the Dalton Facility, Kelly Wootten. (Doc. 1183-4). Through Ms. Wootten, Americhem admits that its internal documentation shows that its Dalton facility received 4.8 pounds of DA310ST from Daikin in 2013, which was used in a laboratory project as a "purging compound material." (Wootten Aff., Doc. 1183-4 ¶ 16). However, Americhem asserts "[t]here was no process or wastewater created from this work whatsoever, and therefore, no discharge of any PFAS-containing water or materials" flowed into the Dalton Utilities Publicly Owned Water Treatment facility. (*Id.*).

Americhem denies that it has ever used GEO-8168 in its Dalton facility. Although Plaintiff received information from another Defendant during discovery about Americhem's use of GEO-8168 in a project between Peach State Labs and

Americhem, Americhem has responded with evidence indicating that this project was completed at Americhem's Cuyahoga Falls, Ohio facility, not the Dalton facility. (*Id.* ¶ 8).

Notwithstanding Americhem's evidence, Plaintiff continues to dispute Americhem's assertions about its use of DA310ST and GEO-8168, solely on the basis that the documents Americhem relies on to support those assertions were not produced in discovery and should thus be excluded under Rule 37(c)(1). Consequently, the Court must address this procedural discovery issue before it can turn to analyzing the substance of the evidence.

### B. Whether Americhem's Evidence Regarding DA310ST and GEO-8168 Should be Excluded Under Rule 37

The late-produced evidence in question consists of "internal Americhem documents" Americhem reviewed to rebut Plaintiff's evidence regarding DA310ST, (Wootten Aff., Doc. 1183-4 ¶ 16), and a 2014 fact sheet cited to rebut Plaintiff's evidence regarding GEO-8168, (*id.* ¶ 21). Plaintiff argues that these "non-produced documents shouldn't be considered," citing Rule 37(c)(1).[6] (Doc. 1353 at 3–4); (Pl. Resp. to SOMF, Doc. 1353-1 ¶¶ 5, 6); Fed. R. Civ. P. 37(c)(1).

For its part, Americhem argues that it received Plaintiff's responses to its written discovery requests "just one month prior to the close of factual discovery"

---

[6] In addition to Plaintiff's argument regarding Americhem's discovery conduct, Plaintiff also argues that Americhem inaccurately attributed its statement of fact that "GEO-8168 has never entered the Dalton facility" to Ms. Wootten's affidavit. (Pl. Resp. to SOMF Doc. 1353-1 ¶ 6). This is true. Ms. Wootten's affidavit in fact states that "[n]o work with regard to this [GEO-8168] project was performed in the Dalton facility." (Wootten Aff., Doc. 1183-4 ¶ 21). However, Plaintiff does not dispute that the project between Peach State

and that the documents in question were "relevant specifically to rebut the accusations made in Plaintiff's Discovery Responses." (Doc. 1516 at 9). After identifying the documents as relevant to its defenses to Plaintiff's claims, Americhem supplemented its production by serving these documents on Plaintiff on April 6, 2023, in compliance with the duty of supplementation under Rule 26(e). *See* (*id.*); (Americhem Produc. Email, Doc. 1355-12).

Rule 37(c)(1) permits a district court to impose sanctions for failure to timely disclose information unless the failure "was substantially justified" or "is harmless." *See* Fed. R. Civ. P. 37(c)(1); *see also Johnson v. Airbus Def. & Space Inc*, 858 F. App'x 304, 307 (11th Cir. 2021) ("If a party fails to comply with the disclosure requirements of Rule 26, then it is not allowed to use the undisclosed information or witness as evidence on a motion unless the failure to disclose was substantially justified or is harmless.") (internal quotation marks omitted).[7]

The Court finds Americhem's late disclosure was both substantially justified and harmless here and will not exclude the documentary evidence submitted to support Ms. Wootten's Affidavit.

Although Americhem indeed produced these documents after the close of discovery, Plaintiff had provided his responses to Americhem's written discovery

---

Labs and Americhem that he mentions in his contention interrogatory response occurred in Cuyahoga Falls, Ohio, (Pl. Resp. to SOMF, Doc. 1353-1 ¶ 6), and Plaintiff provides no other evidence of GEO-8168 projects, at Americhem's Dalton facility, or elsewhere.

[7] The Court notes that Plaintiff does not object to Ms. Wootten as a late-disclosed witness, only to the documents relied upon in some of the statements in Ms. Wootten's affidavit. *See* (Pl. MSJ Resp., Doc. 1353 at 3; Pl. Resp. to SOMF, Doc. 1353-1 ¶¶ 5, 6).

requests just one month prior to the close of fact discovery. (Pl. Resp. to Americhem Disc. Reqs., Doc. 1183-5). Those responses included dozens of documents produced by other Defendants in the litigation, as well as contention interrogatory responses that were based on inferences that Plaintiff drew from those underlying documents. (Doc. 1516 at 9). Thus, Americhem's late-produced documents were offered specifically to rebut arguments made in Plaintiff's written discovery responses, which relied on Plaintiff's interpretations of the underlying documents that Americhem had not previously had the chance to review. (*Id.*). Accordingly, the Court finds Americhem's failure to produce the documents earlier was substantially justified.

Further, Americhem supplemented its production on April 6, 2023, in compliance with Rule 26(e)(1), after conducting its investigation into Plaintiff's documents and then identifying its rebuttal evidence thereto. (Americhem Produc. Email Ex., Doc. 1355-12 (producing the documents on April 6, 2023)). Americhem also produced the Wooten Affidavit in May 2023. (Wooten Aff., Doc. 1183-4 at 15). Since the time Americhem produced the responsive Wooten Affidavit and related documents, Plaintiff has never requested leave to depose Ms. Wooten or otherwise seek to adduce additional evidence to respond to the documents at issue. This indicates the late disclosure was harmless and has not prejudiced Plaintiff. *See POWERbahn, LLC v. Found. Fitness LLC*, 2021 WL 2689852 at *5 (N.D. Ga. 2021) (permitting Plaintiff to rely on previously undisclosed advertisements

because, *inter alia*, Defendant "did not seek to adduce additional evidence in response to the advertisements at issue").

Other factors that might counsel in favor of excluding untimely produced evidence, such as indications that the proponent sought to surprise the opposing party or willfully withheld the information at issue, are not present here. *See Houston Specialty Ins. Co. v. Vaughn*, 763 F. App'x 853, 855 (11th Cir. 2019) (upholding a district court's exclusion of an untimely policy disclosure because the late production "surprised" the opposing party, "affected their litigation posture and strategy," "caused them prejudice," and "there was no substantial justification for the late disclosure."); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1358 (N.D. Ga. July 18, 2012) (admitting late-produced documents absent evidence that the documents were "willfully withheld" or the documents contained "smoking gun" information").

Therefore, finding Americhem's late disclosure was substantially justified and did not prejudice Plaintiff, the Court will not exclude the documents at issue as untimely under Rule 37. The Court will consider the documents in evaluating whether there is a triable issue as to whether Americhem contributed PFAS to its wastewater discharge as a result of using DA310ST or GEO-8168 in its Dalton facility.

### C. Whether the Documents Related to Americhem's Potential Use of PFAS-Containing Materials Create a Genuine Issue of Material Fact as to Americhem's Discharge of PFAS into the POTW

The Court turns back now to the substance of the parties' arguments regarding the remaining disputed PFAS-containing products DA310ST, GEO-8168, and PM-870. First, the Court finds there is no record evidence to create a genuine issue of material fact regarding Americhem's use of GEO-8168 in the Dalton facility. Plaintiff's sole piece of evidence to suggest Americhem used this product consists of documents reflecting a project between Peach State Labs and Americhem that involved GEO-8168. However, the possible significance of this evidence has been diminished by unrebutted evidence that the project was completed at Americhem's Cuyahoga Falls, Ohio facility, not the Dalton facility. (Wootten Aff., Doc. 1183-4 ¶ 8).

Americhem admits that its internal documentation shows that its Dalton facility received 4.8 pounds of DA310ST from Daikin in 2013, which was used in a laboratory project as a "purging compound material." (Doc. 1183-1 at 7). However, Americhem asserts "[t]here was no process or wastewater created from this work whatsoever, and therefore, no discharge of any PFAS-containing water or materials" into the POTW. (*Id.* at 8). Plaintiff does not dispute this, except to object that this factual assertion is based on documents not produced in discovery. (Doc. 1353-1 ¶ 5). Accordingly, the Court finds that Americhem's use of DA310ST, which did not create any process or wastewater, does not create a triable issue as to whether Americhem contributed PFAS to the POTW.

Next, Americhem acknowledges that an eleven-pound sample of PM-870 was received at the Dalton facility in April 2020, and that the sample was compounded and extruded in its lab at 20% into 55 pounds of another material called the 65712-D1-200 Natural product.[8] (Doc. 1183-1 at 6-7). But Americhem contends that there is no record evidence that Americhem engaged in any commercial sales of this product, and that to the extent there was any discharge of process water from the lab as a result of this one-time compounding of an 11-pound sample of PM-870 product, "it was at most de minimis." (*Id.* at 7). Americhem also makes the point that the compounding and extruding of PM-870 in April 2020 post-dated Dalton Utilities' most recent testing of Americhem's wastewater discharge by four years. Thus, that event could not have contributed to Dalton Utilities' detection of PFAS constituents in Americhem's wastewater discharge in 2012 and 2016, which—as discussed in more detail below—forms the cornerstone of Plaintiff's theory of liability against Americhem. (*Id.*).

Plaintiff does not dispute that the only time PM-870 entered the Americhem Dalton facility was during an instance in which an eleven-pound sample was extruded exclusively in the on-site laboratory and shipped out of the facility. (Pl. Resp. to SOMF, Doc. 1353-1 ¶ 3).

---

[8] While acknowledging the presence, compounding, and extruding of PM-870 in the Dalton Facility in April 2020, Americhem denies that any PM-870 was in the Dalton facility during the separate 2012–2013 time frame alleged by Plaintiff based on email communications between 3M and Americhem from that period. (Doc. 1183-1 at 6).

To summarize, the parties' postures as to Plaintiff's documents indicating that Defendant Americhem purchased, was supplied, supplied, or sold PFAS-containing materials are as follows:

| PFAS-Containing Compound | Americhem's Statement | Plaintiff's Response |
|---|---|---|
| L-19329 | "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge or sell Defendant, 3M Company's product, L-19329, at its Dalton facility. L-19329 has never entered the Dalton facility." (Pl. Resp. to SOMF, Doc. 1353-1 at ¶ 2). "[A]ny activities related to this additive took place in Americhem's Research & Development facility in Cuyahoga Falls, Ohio." (Wootten Aff., Doc. 1183-4 ¶ 8). | "**Undisputed** that Americhem did not receive or use [L-19329] at its Dalton facility." (Doc. 1353-1 ¶ 2). |
| PM-870 | "The only time PM-870 entered the Americhem facility was in 2020 when an eleven-pound sample was extruded exclusively in the on-site laboratory and was shipped out of the facility." (Doc. 1353-1 ¶ 3). | "**Undisputed**." (Doc. 1353-1 ¶ 3). |
| FA-500 | "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge or sell Defendant, Daikin America's product[] FA-500." (Doc. 1353-1 at ¶ 4). "[T]hese documents are from . . . a project involving FA-500 . . . considered by Americhem's Salisbury, Maryland facility." (Doc. 1183-4 ¶ 14). | "**Undisputed** that Americhem did not receive or use [FA-500] at its Dalton facility." (Doc. 1353-1 ¶ 4). |
| FA-600 | "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge or sell Defendant, Daikin America's product[] . . . FA600." (Doc. 1353-1 | "**Undisputed** that Americhem did not receive or use [FA-600] at its Dalton |

|  | at ¶ 4). "[T]hese documents are from . . . a project involving FA-500 . . . considered by Americhem's Salisbury, Maryland facility." (Doc. 1183-4 ¶ 14). | facility." (Doc. 1353-1 ¶ 4). |
|---|---|---|
| S-2005 | "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge or sell Defendant, Daikin America's product[] . . . S-2005." (Doc. 1353-1 ¶ 4). "[D]iscussions between representatives of Daikin and Americhem regarding potential sampling by Americhem of S-2005 [occurred, but] . . . no documents . . . show any work done with any actual material." (Doc. 1183-4 ¶ 15). | "**Undisputed** that Americhem did not receive or use [S-2005] at its Dalton facility." (Doc. 1353-1 ¶ 4). |
| TG-1001 | "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge or sell Defendant, Daikin America's product[] . . . TG-1001." (Doc. 1353-1 at ¶ 4). "[Plaintiff's evidence] is merely a market estimation/potential share analysis by Daikin and there is no record of Americhem working with [TG-1001] at all." (Doc. 1183-4 ¶ 18). | "**Undisputed** that Americhem did not receive or use [TG-1001] at its Dalton facility." (Doc. 1353-1 ¶ 4). |
| TG-1002 | "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge or sell Defendant, Daikin America's product[] . . . TG-1002." (Doc. 1353-1 at ¶ 4). "[Plaintiff's evidence] is merely a market estimation/potential share analysis by Daikin and there is no record of Americhem working with [TG-1002] at all." (Doc. 1183-4 ¶ 18). | "**Undisputed** that Americhem did not receive or use [TG-1001] at its Dalton facility." (Doc. 1353-1 ¶ 4). |
| Lubron Type MLX5 | "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge or sell | "**Undisputed** that Americhem did not receive or use |

| | | |
|---|---|---|
| | Defendant, Daikin America's product[] . . . Lubron Type MLX5." (Doc. 1353-1 at ¶ 4). "[Plaintiff's evidence] is a spreadsheet of potential projects and . . . Americhem's records show that Americhem never worked with any Lubron MLX5 materials at its Dalton facility or elsewhere." (Doc. 1183-4 ¶ 19). | [Lubron Type MLX5] at its Dalton facility." (Doc. 1353-1 ¶ 4). |
| DA310ST | "Americhem never discharged process wastewater associated with the one-time use of Daikin product DA310ST on the Dalton facility's laboratory fiber spinning machine." (Doc. 1353-1 ¶ 5). | Johnson objects to this statement of fact as relying on **documents not produced during discovery**." (Doc. 1353-1 ¶ 5). |
| GEO-8168 | "Americhem never purchased from or was supplied GEO-8168 from Peach State Labs, nor did Americhem use, compound, blend, mix, manufacture, discharge GEO-8168 at its Dalton facility, nor did it sell GEO-8168 to Defendant Shaw." (Doc. 1353-1 ¶ 6). | Johnson objects to this statement of fact as relying on **documents not produced during discovery**." (Doc. 1353-1 ¶ 6).[9] |

Excluding the arguments related to late-produced discovery addressed above, Plaintiff does not dispute Americhem's rebuttal evidence as to the specific uses of PFAS Plaintiff identified in its contention interrogatory response.[10] Thus,

---

[9] *See also supra* note 6 (addressing Plaintiff's contention regarding Defendant's wording in the Statement of Fact).

[10] Plaintiff argues that Defendant Americhem's contention—that "Americhem did not purchase, receive, use, compound, blend, mix, manufacture, discharge, or sell any PFAS-contaminated products from its Dalton, Georgia facility"—is disputed. (Pl. Resp. to SOMF, Doc. 1353-1 at ¶ 1). However, Plaintiff supports this contention solely with evidence of the 2012 and 2016 samples taken by Dalton Utilities. (*Id.*). The Court discusses whether those samples create a genuine issue of material fact sufficient to overcome summary judgment in more detail below.

Americhem has demonstrated that each piece of evidence cited by Plaintiff in that response related either to a project that did not come to fruition, *see, e.g.*, (Wootten Aff., Doc. 1183-4 ¶ 15), a project undertaken at an Americhem facility other than the Dalton facility, *see* (*id.* ¶¶ 8, 14), or singular instances of either very little or no discharge, *see* (*id.* ¶¶ 10, 16).

As such, these documents alone do not give rise to a plausible inference that Americhem uses or processes PFAS at its manufacturing facilities. And, absent such evidence of Americhem's use of PFAS at the Dalton facility, there can be no triable issue as to whether Americhem's Dalton facility discharges industrial wastewater containing high levels of PFAS into the POTW. As these allegations form the basis of Plaintiff's claims against Americhem, *see* (FAC, Doc. 716 ¶¶ 4-6; 20; 163-93), in order for Plaintiff to overcome summary judgment, there must be sufficient evidence from which a reasonable juror could conclude Americhem was responsible for such discharges of PFAS into the POTW. The Court now turns to the other evidence on which Plaintiff relies to support these allegations against Americhem—that is, the 2012 and 2016 Dalton Utilities testing of Americhem's wastewater discharge.

### D. 2012 and 2016 Effluent Samples Collected by Dalton Utilities

The Court's finding above hardly ends the inquiry. The bread and butter of Plaintiff's argument is really the results of the sampling done in 2012 and 2016. *See* (Doc. 1353 at 4-5). That is, Plaintiff states that Ms. Wootten's affidavit focuses only on "rebutting *specific instances* of using PFAS"—i.e., the instances outlined

above. (*Id.* at 4). But Plaintiff asserts that Americhem "does not—and cannot—negate material evidence here: that Americhem discharged PFAS to Dalton Utilities it knew were running off the LAS into the Conasauga River." (*Id.*). Plaintiff bases this allegation on the presence of PFAS in Americhem's wastewater discharge when it was tested in 2012 and 2016. (*Id.* at 4-8).

For its part, Americhem does not dispute the results of the effluent discharge samples collected by Dalton Utilities in 2012 and 2016. (Doc. 1183-1 at 3). However, Americhem argues that the data is of limited utility to Plaintiff's argument. (*Id.* at 2). Americhem argues this is because Plaintiff tested only effluent discharges from Americhem's Dalton facility and did not test the influent, i.e., the water entering the facility. (*Id.*). Therefore, according to Americhem, Plaintiff's data demonstrates only that Americhem "served as a conduit for PFAS-containing water it received from Defendant, Dalton Utilities . . . to pass through its facility and be discharged with its wastewater," and does not prove that it contributed to the PFAS pollution. (*Id.* at 1–2).

To substantiate this argument, Americhem points to its own 2021 sampling and testing of wastewater at the facility. (*Id.* at 9). Americhem engaged Ramboll U.S. Consulting Inc. ("Ramboll") in 2021 to have the intake water at the Dalton Americhem facility, "Dalton Utilities' finished water," tested in addition to the facility's effluent discharge. (Doc. 1183-1 at 9).[11]

---

[11] Plaintiff argues that the complete Ramboll report discussing the analytical results of the 2021 sampling, (Doc. 1183-14), as well as the authenticating affidavit from Robert Patchett, (Doc. 1183-13), should be excluded under Rule 37(c)(1) as they were produced

Specifically, Ramboll tested the water that Americhem receives from Dalton Utilities by collecting samples from the municipal water supply and comparing those influent samples to samples of effluent from two discharge points at the facility. (Doc. 1516-3 at 2). The first effluent measurement was taken at a wastewater discharge pipe located in a manhole in the parking lot behind Americhem's Dalton facility. This effluent location is notable, because the 2012 and 2016 samplings underlying Plaintiff's claims against Americhem were performed only at that same wastewater discharge pipe in the parking lot manhole. (Doc. 1183-1 at 9). The second effluent measurement was taken at the discharge point for Americhem's sanitary wastewater. (Doc. 1516-3 at 2). The sampling was performed

---

"almost a year after discovery closed and nearly five months after expert disclosures." (Doc. 1353 at 5 n.3). Even though the Ramboll report is dated December 14, 2021 (Doc. 1183-14 at 1), it was not provided to Plaintiff until 15 months later on April 6, 2023—after the close of discovery. (Doc. 1516-2). The authenticating affidavit from the Senior Managing Consultant of Ramboll, Robert Patchett, is dated May 26, 2023, also after the close of discovery. (Doc. 1183-13). However, Americhem did produce to Plaintiff a summary of the 2021 Ramboll testing results from SGS Laboratories on January 18, 2022. (Doc. 1516-3 at 2). The Court has discretion to admit an untimely report. *Bearint ex rel. Bearint v. Dorell Juv. Grp., Inc.*, 389 F.3d 1339, 1348-49 (11th Cir. 2004); *see also Long v. E. Coast Waffles, Inc.*, 762 F. App'x 869, 871 (11th Cir. 2019) ("district courts are entitled to broad discretion in managing pretrial discovery matters"). Plaintiff has not sought to depose Mr. Patchett or otherwise address the report since receiving it over two years ago, nor does Plaintiff argue Mr. Patchett is not qualified as an expert to authenticate the report, nor does Plaintiff challenge the validity of the results. The Court has reservations about excluding evidence when Plaintiff has taken no steps to seek additional discovery on this evidence sooner. All that said, the Court is deeply concerned that Americhem failed to properly disclose this expert witness and documentation on a timely basis. For this reason, the Court will only consider the SGS testing results in this Order, since a summary of those results was provided to Plaintiff during the discovery period in January 2022. (Doc. 1516-3 at 2). The Court will not consider the Eurofins results contained in the full Ramboll report or the Patchett affidavit submitted after the close of discovery.

on October 22, 2021, and the samples were split and sent to two laboratories for testing, Eurofins Lancaster Laboratories Env LLC and SGS North America Inc. ("SGS"). The Court considers only the testing results from SGS for the reasons explained *supra* note 11.

A summary of Ramboll's testing results is provided in the chart below:

| Type of PFAS | Influent (MUNICIPAL-1) | Effluent #1 (WW-1) | Effluent #2 (WW-2) |
|---|---|---|---|
| **SGS Laboratories Testing Results** | | | |
| PFPeA | 0.0049 ug/l[12] | 0.0049 ug/l | Non-Detect (ND) (0.010 ug/l) |
| PFHxA | 0.0036 ug/l J[13] | 0.0036 ug/l J | ND (0.010 ug/l) |
| PFOA | 0.0049 ug/l | 0.0035 ug/l J | ND (0.010 ug/l) |
| PFBS | 0.0201 ug/l | 0.0197 ug/l | 0.0165 ug/l J |
| PFHxS | ND (0.0020 ug/l) | ND (0.0020 ug/l) | 0.0165 ug/l |
| PFOS | 0.0036 ug/l J | 0.0031 ug/l J | ND (0.010 ug/l) |
| **Total PFAS** | **0.0371 ug/l** | **0.0313 ug/l** | **0.0330 ug/l** |

(Doc. 1183-14 at 2).

---

[12] The Ramboll testing measured PFAS concentrations in units of micrograms (ug) per liter, which is equivalent to parts per billion. However, since the parties discuss the results in terms of "parts per trillion" in their briefing, the Court will follow suit in its discussion of the data. Converting the ug/l measurements to ppt measurements is merely a matter of multiplying the values reflected in this chart by 1000.

[13] A "J" flag indicates that the reported concentration is an estimated value. (Doc. 1183-14 at 9).

For comparison, below is a chart summarizing the 2012 and 2016 testing results, which show the concentrations of the same PFAS compounds found in Americhem's effluent at the wastewater discharge pipe ("WW-1" in the chart above), without any influent comparator:

|  | **2012 Results** | **2016 Results** |
|---|---|---|
| PFPeA | N/A (not tested) | N/A (not tested) |
| PFHxA | 0.0055 ug/l J | 0.021 ug/l |
| PFOA | ND | ND |
| PFBS | ND | 0.0087 ug/l J |
| PFHxS | 0.026 ug/l J | 0.030 ug/l |
| PFOS | 0.13 ug/l | ND |
| **Total PFAS** | **0.1615 ug/l** | **0.0597 ug/l** |

(Docs. 1183-11 at 12; 1183-12 at 7).

Americhem contends that the 2021 testing shows, first, that the effluent PFAS levels across the 2012, 2016, and 2021 samples were consistent—apart from "statistically insignificant deviations." (Doc. 1183-1 at 10). Further, Americhem argues that the PFAS levels in the 2021 intake water was "consistent with the PFAS levels in the sampling . . . in all three sampling events." (*Id.*). Therefore, Americhem contends the data shows that the PFAS present in its wastewater discharge can only be reasonably interpreted as having been present in the intake water before it even entered the facility.

Plaintiff has a different take on how to interpret this data. In opposition, Plaintiff argues that: (1) the 2012, 2016, and 2021 samples are *not* consistent,

specifically noting variations in PFHxS, PFHxA, and PFOS concentrations; and (2) Americhem "ignores" other samples Dalton Utilities gathered from water treatment plants in 2009, 2010, and 2015 with significantly lower PFOS, PFHxS, and PFPA concentrations than the 2012 and 2016 Americhem effluent discharge samples. (Doc. 1353 at 5–8).

In particular, to support his argument that the 2012, 2016, and 2021 samples are inconsistent, Plaintiff notes that PFHxS concentrations in Americhem's effluent discharge was "non-detect" in 2021, but 26 parts per trillion ("ppt") in 2012 and 30 ppt in 2016. (Pl. Resp. to Americhem SOMF, Doc. 1353-1 ¶ 10). Further, Plaintiff argues that the 30 ppt average PFOS concentration in 2021 is not "remotely consistent with" the 130 ppt PFOS concentration measured in 2012. (*Id.*; *see also* Doc. 1353 at 7-8). Plaintiff notes that "neither Dalton Utilities' finished water, nor its raw water sources, nor any water in the Conasauga River upstream of the LAS, has ever measured anything close to th[e] PFOS concentration [of 130 ppt measured in 2012]." (Pl. Resp. to SOMF, Doc. 1353-1 ¶ 11).

In reply, Defendant Americhem concedes that the 130 ppt PFOS concentration measured in 2012 is a "singular outlier result," and that the 2016 and 2021 PFOS concentrations are significantly lower. (Doc. 1516 at 7). Excluding this outlier, Americhem argues that the remaining results are consistent, as the range of concentration data points is relatively narrow in terms of parts per trillion. (*Id.*)

As for Plaintiff's argument that the 2009, 2010, and 2015 testing results of Dalton Utilities' finished water should serve as appropriate "influent" comparators to the effluent results of Americhem's wastewater discharge in 2012 and 2016, Americhem provides an answer to that as well. Americhem argues that the finished water tested at Dalton's water treatment plants —Miller Creek, Freeman Springs, and River Water—in those years is "not the best evidence" to infer PFAS concentrations of the intake water at the Dalton Americhem facility. (*Id.* at 8). Further, Americhem argues that if the water treatment plants' finished water concentrations were to be considered relevant to its Dalton facility's intake water concentrations, the 2009, 2010, and 2015 samples demonstrate that PFAS concentrations were present in both finished and raw water. (*Id.*). This presence, Americhem argues, supports its contention that PFAS concentrations were found throughout Dalton's water system, including in the water entering the Dalton Americhem facility. (*Id.*). Consequently, Americhem argues, the PFAS concentrations measured in the 2012 and 2016 effluent discharge samples do not necessarily indicate the Dalton Americhem facility was the contributor of that discharge. (*Id.*).

The Court is mindful that "[s]ummary judgment is only appropriate when there is no genuine issue as to any material fact," *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999), and that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d

1151, 1154 (11th Cir. 2012) (citing *Liberty Lobby,* 477 U.S. at 255). "[T]he non-movant's evidence is to be accepted for purposes of summary judgment," *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996), and "[w]here a reasonable fact finder may draw more than one inference for the facts, and that inference creates a genuine issue of material fact, . . . the court should refuse to grant summary judgment." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (internal quotation marks omitted); *see also id.* ("It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried.") (citing *Liberty Lobby*, 477 U.S. at 247).

Nevertheless, for factual issues to be considered genuine[14]—as required at the summary judgment stage—the issues "must have a real basis in the record." *Mize*, 93 F.3d at 742. Further, "there is a difference between direct evidence and inferences that may permissibly be drawn from that evidence." *Id.* When the non-movant presents direct evidence, the only issue is of credibility and thus does not present a legal issue for a court to decide. *Id.* (citing *Liberty Lobby* 477 U.S. at 253–55). However, an issue need not proceed to a jury when "the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Id.* at 743; *see also Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723

---

[14] An issue of fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

F.3d 1287, 1294 (11th Cir. 2013) ("an inference based on speculation and conjecture is not reasonable").

Although there is no dispute that PFAS were present in the effluent discharge of Americhem's Dalton facility in 2012 and 2016, (Pl. Resp. to SOMF, Doc. 1353-1 at ¶ 9), the record lacks any evidence to plausibly connect Americhem's actions to the presence of the effluent concentrations. The effluent measurements have no evidentiary value without a control measurement of the influent to set a baseline.

The Court recognizes that Plaintiff relies on the 2009, 2010, and 2015 measurements of finished water from Dalton Utilities as a stand-in for what the PFAS concentrations in Americhem's intake water would have been. *See* (Docs. 1355-2 – 1355-5). However, particularly when coupled with the lack of any documentation showing that Americhem uses PFAS-containing materials in its Dalton facility, the data from the 2009, 2010, and 2015 testing of Dalton Utilities' raw and finished water is insufficient to create a triable issue as to Americhem's liability for PFAS contamination of the waterways. Not a single one of those sampling events took place in the same year as the sampling events of Americhem's effluent, making them poor control measurements by which to evaluate whether the PFAS concentrations in Americhem's effluent in 2012 or 2016 were higher than the PFAS concentrations in its influent at the same time.

The 2021 Ramboll testing results, on the other hand, provide strong evidence to show that Americhem is not contributing PFAS to its wastewater

discharge. The SGS testing results show that the total PFAS concentration in the effluent tested at Americhem's wastewater discharge pipe in the manhole—the same effluent source tested in 2012 and 2016—is roughly equal to the PFAS concentration present in the influent of finished water from Dalton Utilities. *See* (Doc. 1183-14 at 2). Specifically, SGS found total PFAS concentrations in the influent to be 37.1 ppt and total PFAS concentrations in the effluent to be 31.3 ppt. (*Id.*). Faced with this evidence, which provides a direct comparison between influent and effluent sources on the same day, a reasonable fact-finder could not conclude from the 2012 and 2016 testing results alone that Americhem should be held liable for the PFAS contamination at issue in this case.

To find that Americhem contributed PFAS to the POTW based upon the 2012 and 2016 samples, a juror must assume that: (1) evidence of Defendant Americhem's purchase, sale, or use of PFAS-containing materials exists but could not be located by Plaintiff; ***and*** (2) had Dalton Utilities taken samples of Americhem's intake water in 2012 and 2016, the PFAS concentrations measured would have been significantly lower than the concentrations measured in the effluent discharge. Even viewing the evidence in the light most favorable to Plaintiff, these assumptions would necessarily—and impermissibly—lie wholly outside of evidence on the record that could be presented to a jury on this issue. *See Liberty Lobby*, 477 U.S. at 252 ("there must be *evidence* on which the jury could reasonably find for the plaintiff") (emphasis added); *id.* at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party

for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 1996) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat summary judgment motions.").

Therefore, the results of the 2012 and 2016 sampling of Americhem's wastewater discharge, without any comparable measurements of the PFAS concentrations present in Americhem's intake water from Dalton Utilities, are not sufficient to create a plausible inference that Americhem is responsible for the introduction of PFAS into its wastewater based solely upon the 2012 and 2016 samples. This is particularly true when weighed against the more recent testing evidence that shows similar PFAS concentrations in the influent and effluent water sources at Americhem's Dalton Facility. Further, the inferences of Americhem's liability that might have been drawn from the documents on which Plaintiff relied at earlier stages in the litigation to show that Americhem purchased, was supplied, supplied, or sold PFAS-containing materials have not been borne out by discovery. Rather, Americhem has successfully rebutted those inferences through its own undisputed evidence showing that, in each instance, the documents at issue referred either to projects that never came to fruition, projects at other Americhem facilities, or projects involving little or only one-time, de minimis discharge of PFAS.

Consequently, the Court finds the record evidence is insufficient to create a genuine issue of material fact as to Americhem's liability. This finding is dispositive of all counts in the operative complaint. That is, without a triable issue as to whether Americhem contributed PFAS to its wastewater discharge, there can be no finding that Americhem breached any of the duties under Georgia law that could give rise to negligence liability in this action, as the Court discussed in its Order on the Motion to Dismiss. *See* (Doc. 629 at 103-09). There can also be no finding that Americhem is responsible for a public nuisance without a showing that Plaintiff's injury "is the natural and proximate consequence of the acts of the defendant and not the acts of others." *Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 986 F. Supp. 1406, 1420 (N.D. Ga. 1997). Nor can Americhem be held liable as an indirect discharger under Section 307 of the Clean Water Act without evidence to raise a genuine issue of material fact that Americhem introduced any pollutants into its wastewater. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015) (explaining that, to show that his injury is fairly traceable to a particular defendant under the Clean Water Act, a plaintiff must "show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern.") (cleaned up).

It is notable here that Americhem raised these same arguments at the motion-to-dismiss stage, where the Court permitted Plaintiff's claims against Americhem to proceed based on the 2016 Dalton Utilities testing. At that juncture

of the case, Plaintiff's claims were held only to the "plausibility" standard, which can be met where a plaintiff alleges sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Also at that juncture, Plaintiff stated that he expected to reveal additional industrial discharges of PFAS by Americhem into the Dalton POTW during discovery in this matter. *See* (Doc. 503 at 6 n.5). That Order was issued more than four years ago now, and the discovery period has come and gone, without any additional evidence revealed relating to Americhem's handling of its industrial discharges. Plaintiff had the opportunity to develop additional evidence in discovery, such as by having his own water sample testing conducted to show that the PFAS concentrations present in Americhem's effluent exceeded the PFAS concentrations in its influent, or by hiring an expert to opine that the results of Americhem's Ramboll testing could be interpreted differently. In the absence of such evidence, the Court has no choice but to grant summary judgment. Accordingly, the Court will **GRANT** Americhem's Motion for Summary Judgment [Doc. 1183] in full.

## IV.  MFG's Motion for Summary Judgment and Related Motions

### A. Summary Judgment Motion

MFG's arguments in support of summary judgment are similar to those raised by Americhem. Specifically, MFG contends it has "never manufactured, produced, used, discharged, or distributed the PFAS products at issue in this litigation." [Doc. 1184 at 1-2]. However, both the documentary evidence to show

MFG's potential use of PFAS-containing products, as well as the empirical data collected through testing of both influent and effluent water of MFG's facilities, are stronger in the case against MFG than in the case against Americhem. Indeed, the Court finds the evidence is strong enough to overcome summary judgment on Plaintiff's claims against MFG. To explain why, the Court will describe MFG's arguments in support of summary judgment before evaluating the evidence on which Plaintiff relies to support his claims that MFG is liable for discharging PFAS into the POTW.

As it winds its way through this analysis, the Court will also address related pending motions, including MFG's Motion to Strike Plaintiff's Response to its summary judgment motion [Doc. 1559], Plaintiff's Motion to Exclude the Testimony of MFG's expert Timothy Richards [Doc. 1268], and MFG's Motion for Oral Argument [Doc. 1337] on Plaintiff's motion to exclude Mr. Richards's testimony.

### i. MFG's Arguments and Evidence in Support of Summary Judgment

MFG owns and operates three specialty chemical manufacturing facilities in Dalton, Georgia. MFG contends it has never produced or used the PFAS substances Plaintiff complains about, and that it has never discharged PFAS, directly or indirectly, to any of the water bodies referenced in Plaintiff's Fourth Amended Complaint. (Doc. 1184-1 at 2). In support of this argument, MFG relies chiefly on (1) affidavit evidence provided by its Chief Financial Officer, Darin Gyomory, which includes by reference evidence regarding MFG's product inventory, and

(2) the results of November 2022 testing of the PFAS concentrations in both the influent and effluent of MFG's three Dalton facilities, which, MFG contends show that the effluent at each facility contains "PFAS concentrations less than or substantially equal to" the PFAS concentrations present in the influent. (Doc. 1184-1 at 10).[15] The Court will focus its analysis on these pieces of evidence.

### a. Affidavit Evidence

MFG's predecessor was MFG Chemical, Inc., which Plaintiff previously named and then voluntarily dismissed from this lawsuit. MFG asserts that its predecessor was dismissed based on the declaration of founder/chairman/CEO Charles E. Gavin, III, stating that MFG Chemical, Inc. never manufactured any PFAS; never sold or otherwise provided PFAS to any customer anywhere; and, if there were any PFAS in MFG Chemical, Inc.'s wastewater, those same PFAS were in potable water supplied to MFG Chemical, Inc. by Dalton Utilities. MFG states that the information in Mr. Gavin's declaration "remains true following MFG Chemical, Inc.'s conversion to an LLC in 2017, as shown by the sworn affidavit of

---

[15] MFG also raises the argument with respect to each of Plaintiff's claims against it—negligence, negligence per se, and public nuisance—that the claims must fail because the effluent from MFG's facilities is "below the EPA risk screening level for tap water" of 70 parts per trillion. (Doc. 1184-1 at 20-21, 23, 25; Doc. 1184-2, MFG SOMF ¶ 91). However, the EPA updated its guidance in 2022 to set the maximum safe level of PFOA in drinking water at 0.004 parts per trillion (ppt) and the maximum safe level of PFOS in drinking water at 0.02 ppt. *See Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances*, 87 FR 36848-02, 2022 WL 2192008 (EPA June 21, 2022). These interim updated health advisories for PFOA and PFOS "supersede EPA's 2016 health advisories for PFOA and PFOS." *Id*. Therefore, the Court will disregard this argument.

MFG's Chief Financial Officer, Darin Gyomory." (Doc. 1184-1 at 4). *See also* (Doc. 1184-7, Gyomory Aff. ¶¶ 8-12).

Mr. Gyomory's declaration does not eliminate any triable issue as to whether MFG has contributed PFAS to the POTW, for several reasons. First, Mr. Gyomory provides a table reflecting MFG's review of all Material Data Safety Sheets ("MSDS") and/or Safety Data Sheets ("SDS")[16] for all materials known to have been utilized in production operations at Dalton area facilities within the past ten years.[17] (Doc. 1184-7, Gyomory Aff. ¶ 10). MFG's review of the MSDS/SDS sheets resulted in a list of materials containing one or more PFAS compounds at issue in this case. (*Id.*). The list of materials was then cross-referenced in the enterprise resource planning system (essentially an inventory) utilized by MFG, Chempax. (*Id.*). Based on this Chempax query, MFG determined that only one of the nine PFAS-containing products at issue (API-295E LC) was listed in the system, and there were no quantities entered related to inventory received or quantities utilized in production. (*Id.*). Mr. Gyomory concludes from this evidence that "MFG has not utilized any of the chemicals of concern within the past 10 years." (*Id.* ¶ 11).

---

[16] To give some context to MFG's affidavit evidence, it is necessary to note that Plaintiff bases his claims against MFG in part on evidence that MFG had nine MSDS and SDS in its records for PFAS-containing products. *See* (Doc. 1184-1 at 7 (citing Pl.'s Resp. to MFG's MTD, Doc. 507 at 4-5)). Thus, Mr. Gyomory's affidavit testimony on this subject is offered to rebut the inferences that could be drawn from MFG's possession of those MSDS and SDS—i.e., that MFG used or kept PFAS-containing products in its inventory.

[17] Since Mr. Gyomory's Affidavit is dated October 20, 2020, it follows that the "past ten years" goes back to 2010.

However, Mr. Gyomory does not adequately explain why API-295E LC is listed in MFG's Chempax system if it was never received in MFG's inventory or used in production. Nor does MFG provide evidence showing how or why the MSDS/SDS sheets regarding nine PFAS-containing products came into its possession to rebut the inference that it had the MSDS/SDS sheets because the products were at one time used by MFG in its manufacturing process. MFG argues that "[t]he fact that MFG possesses safety information on a product is not evidence that MFG created, manufactured, or distributed a product. MFG is a chemical company and conducts appropriate due diligence and research on all the products it considers utilizing or manufacturing. Part of that due diligence is collecting MSDS/SDS sheets." (Doc. 1184-1 at 8-9). But at the summary judgment stage, the Court must construe all the facts in the light most favorable to the non-movant. At best, Mr. Gyomory's affidavit testimony creates a conflict between Plaintiff's evidence and MFG's evidence. That is not enough.

Second, as Plaintiff points out, there is independent documentary evidence produced during discovery that MFG  has used "at least four [other] PFAS-containing fluorochemical products[,]" including Repearl F-8025, NK Guard NPN-158, NK Guard NF-420, and Ultraguard FS. (Doc. 1356 at 8). In particular, Plaintiff relies on Dalton Utilities' response to a Clean Water Act information request sent by the EPA in 2009 as part of its investigation into PFAS at Dalton Utilities. (Doc. 1356-8, Don Cope Letter to EPA (June 18, 2009)). In the information request, the EPA asked for a list of all Dalton Utilities industrial users,

as well as their "principal products" and "raw materials." (*Id.* at 6, § B.1). Dalton Utilities included in its response copies of MFG applications for industrial discharge permits for MFG's Callahan Road and Brooks Road facilities.

The Brooks Road application includes a document referencing MFG's on-hand inventory, and that inventory lists Repearl F-8025, a long-chain PFAS chemistry. (Doc. 1356-7 at 9). The Brooks Road application also contains a list of MFG products characterized as "Products for Carpet Finishing," including "Ultraguard FS," which is described as "effective fluorocarbon dry soil and oil/water repellent." (Doc. 1356-7 at 25)). Similarly, the Callahan Road application includes an "MFG Chemical List" that also contains Repearl F-8025. (Doc. 1356-2 at 23). Further, in conflict with Mr. Gyomory's affidavit testimony stating that the materials NK Guard NF-420 and NK Guard NPN-158 could not be located within MFG's Chempax system, the "MFG Chemical List" contained in MFG's Callahan Road application lists both NK-GUARD NPN-158 and NICCA NF-420.[18] (*Id.* at 24, 25).

Third, Plaintiff points to the fact that Dalton Utilities assessed MFG a "PFC[19] Discharge Fee" for MFG's calculated portion of Dalton Utilities' expenses incurred

---

[18] Plaintiff represents that NICCA NF-420 is the same product as NK Guard NF-420. (Doc. 1356 at 9 n.8). However, the Court need not accept this representation as true to find that there is sufficient record evidence to create a genuine issue of material fact regarding Mr. Gyomory's affidavit testimony that MFG has not used NK Guard NPN-158 in its production or kept that product in its inventory, when it is listed in the MFG Chemical List contained in MFG's Callahan Road facility application.

[19] "PFCs" is an umbrella term including both PFAS and other non-toxic chemicals.

from its PFAS sampling. (Doc. 1356 at 7 (citing to Doc. 1356-5, Haverland Letter (Dec. 29, 2010); Doc. 1356-6, Haverland Letter (Sept. 3, 2010))). In response to Dalton Utilities' calculation, MFG's then-president Charles E. Gavin, IV emailed Dalton Utilities to question the amount assessed, responding, "I received your invoice for PFC yesterday. Would you please review with we [sic] how this amount was calculated? For a company that does [sic] make these products for the carpet industry I am surprised at the amount we are being invoiced." (Doc. 1356 at 8 (citing to Doc. 1358-7, Haverland-Gavin emails (Jan. 4, 2011)).[20] However, Plaintiff points out that MFG's president did not dispute the accuracy of the results or the fact of it being charged.

MFG, through its Vice President of Environmental Health Safety & Security Joe Welch, rebuts this evidence. Specifically, MFG points to evidence that it did dispute the accuracy of the Dalton Utilities sampling results. *See* (Welch. Decl., Doc. 1549-1 ¶ 16) (citing Doc. 1358-12 at 2, 3 (email correspondence between MFG and Dalton Utilities, showing that MFG stated it had "never handled, purchased, or manufactured products containing PFCs" and requesting data to support 2010 sampling results at MFG's Callahan Road facility showing a reading of over 4000 parts per trillion)). Further, with respect to the product Repearl F-8025, Mr. Welch

---

[20] MFG contends that Mr. Gavin intended to write "For a company that does <u>not</u> make these products for the carpet industry. . . ." (Doc. 1549 at 12-13). The Court agrees with MFG that the most plausible reading of this sentence in context is that Mr. Gavin erroneously omitted the word "not." Nonetheless, a fact-finder could also plausibly infer that Mr. Gavin's challenge only to the ***amount*** of expenses assessed, and not the fact that MFG was assessed a PFC discharge fee in the first place, indicates that MFG's manufacturing activities resulted in some PFAS discharge.

states that it is "highly likely" that a sample was obtained at some point in time for [Research and Development] purposes[,]" and he explains why MFG would have retained MSDS for the product to comply with OSHA Hazard Communication Standards. (Welch Decl., Doc. 1549-1 ¶¶ 19-21). Mr. Welch also asserts that "[i]t is highly likely" that the MFG marketing brochure referencing the PFAS-containing product Ultraguard FS, "was a sample marketing brochure for products that were never produced or sold." (*Id.* ¶ 23).

However, whether MFG's explanation is the "highly likely" explanation or not, the Court must view the facts in the light most favorable to Plaintiff at the summary judgment stage. MFG's arguments essentially ask the Court to find that it is more likely than not that it would win at trial in showing that it never produced, manufactured, used, or sold PFAS-containing materials. However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255.

For that reason, the affidavit evidence from Mr. Gyomory and Mr. Welch cannot eliminate the triable issues raised by Plaintiff's documentary evidence that could create a plausible inference that MFG has used PFAS-containing materials, particularly when coupled with the PFAS testing results discussed in the next section.

### b. Sampling Evidence of PFAS Concentrations in MFG's Wastewater

Plaintiff argues that whether MFG has discharged PFAS to the Dalton POTW is a genuine issue of material fact. In support, Plaintiff points to the results across seven sampling events between 2009 and 2016 at three MFG plants that confirm the presence of PFAS in MFG wastewater:

| Date | MFG Plant | Chemical Concentration (ppt) |
|------|-----------|------------------------------|
| 5/19/2016 | MFG Brooks Road | PFOS+PFOA – Non-Detect ("ND") Total PFAS – 25 |
| 5/19/2016 | MFG Callahan Road | PFOS+PFOA – ND Total PFAS – 11 |
| 5/19/2016 | MFG Kimberly Park Drive | PFOS+PFOA – 17 Total PFAS – 153.8 |
| 9/30/2014 | MFG Kimberly Park Drive | PFOS+PFOA – 13 Total PFAS – 86.8 |
| 11/14/2013 | MFG Callahan Road | PFOS+PFOA – ND Total PFAS – 15.9 |
| 11/11/2010 | MFG Callahan Road | PFOS+PFOA – 4,170 Total PFAS – 4,257.8 |
| 12/14/2009 | MFG Brooks Road | PFOS+PFOA – 87.6 Total PFAS – 87.6 |

(Doc. 1356 at 4; (citing UGA study sampling results at Doc. 1356-4; Dalton Utilities testing results at Docs. 1358-4 – 1358-6)).

MFG argues the sampling methodology of this earlier testing is flawed because it failed to account for what PFAS constituents were present in MFG's influent at the time of the samples. On this point, and for the same reasons discussed above with respect to Americhem, the Court agrees with MFG that the

testing results showing PFAS concentrations in the effluent at MFG's facilities are of little to no evidentiary value without a baseline measurement of the PFAS concentrations in the influent for comparison. Therefore, the Court agrees that this particular evidence of effluent-only sampling events between 2009 and 2016 at MFG's facilities does not create a triable issue as to MFG's liability for PFAS contamination of the POTW.

However, the unreliability of the effluent-only sampling results does not end the Court's analysis of whether any sampling evidence in this case could create a plausible inference that MFG is contributing PFAS to the POTW. Indeed, MFG's own testing could reasonably be interpreted as showing that the MFG is contributing PFAS to its wastewater discharge. The Court turns to that evidence now.

In November 2022, MFG retained engineering firm WSP USA, Inc. ("WSP") "to provide expert opinion on whether MFG is currently or has historically contributed [PFAS] to the environment as a result of releases of PFAS-containing materials to the ground surface or permitted process and/or sanitary wastewater discharges to [the POTW]." (Doc. 1184-8 at 1). As part of those efforts, WSP sampled various intake and process/wastewater discharge locations at each of the three MFG facilities. (*Id.*) MFG asserts that the results of the 2022 WSP testing "confirm that MFG does not contribute any PFAS constituents to the water that passes through its facilities" because its effluent wastewater "leaves each facility with PFAS concentrations ***less than or substantially equal to*** what is

observed prior to entering each facility." (*Id.* at 10); *see also* (Richards Memo, Doc. 1184-8 at 3). Relying on its own expert's testimony, MFG further argues that any "minuscule fluctuations" between the influent to and effluent from MFG's facilities are easily explained by "(1) the capacity for the PFAS concentration from multiple influent sources to compound upon each other; (2) variability in the two different analytical methods used for the samplings and/or margins of error; and (3) fluctuation in the PFAS concentration of MFG's influent." (Doc. 1184-1 at 10); *see also* (MFG SOMF, Doc. 1184-2 ¶ 65; Richards Dep., Doc. 1184-12 at 40:6-41:21).

Thus, like Americhem, MFG contends that the influent of finished water from Dalton Utilities has PFAS levels that are comparable to or even higher than MFG's effluent, showing it did not contribute PFAS to the wastewater.

In response, Plaintiff contends that WSP's sampling confirms higher PFAS concentrations in effluent at two of the three plants, "and not by a narrow margin":

| Brooks Road | | | |
|---|---|---|---|
| | Influent #1 (BR-INF-1) | Influent #2 (BR-INF-2) | Influent #3 (BR-INF-3) | Effluent (BR-EFF-1) |
| PFOA+PFOS | 11 ppt | 11.5 ppt | 11 ppt | 21.3 ppt |
| "Sum of PFAS" | 15.15 ppt | 15.65 ppt | 14.5 ppt | 25.09 ppt |
| Callahan Road | | | |
| | Influent #1 (CR-INF-1) | Influent #2 (CR-INF-2) | n/a | Effluent (CR-EFF-1) |
| PFOA+PFOS | 10.8 ppt | 11 ppt | n/a | 30.9 ppt |
| "Sum of PFAS" | 14.89 ppt | 14.6 ppt | n/a | 33.78 ppt |

(Doc. 1356 at 6) (citing Doc. 1184-8 at 9).

However, MFG and its expert Timothy Richards, reject the conclusion that can be drawn from these results that the PFAS in the effluent from two of MFG's

44

three plants is significantly greater than the PFAS in the influent. *See, e.g.*, (Richards Memo, Doc. 1184-8 at 3 (concluding that the PFAS concentrations in the effluent from the MFG facilities is less than or substantially equal to the PFAS concentrations in the influent)). Plaintiff argues the Court should refuse to consider Mr. Richards's interpretation of the data as unreliable, for the reasons explained in his separately filed Motion to Exclude the Testimony of Mr. Richards (Doc. 1250). The Court will turn to that Motion now before continuing its discussion.

## B. Motion to Exclude Expert Testimony of Timothy Richards

### i. Legal Standards Governing *Daubert* Motions

Federal Rule of Evidence 702 governs the admissibility of expert testimony. This rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The United States Supreme Court explained the basis for this rule in *Daubert*. "Unlike an ordinary witness, *see* Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand

45

knowledge or observation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). But a jury may have difficulty evaluating an expert's opinion. *See id.* Accordingly, trial courts must act as gatekeepers to ensure that an expert witness's testimony is not only relevant, but reliable. *Id.* "The proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence it is reliable." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3rd Cir. 1994)). Thus, the inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. *Daubert*, 509 U.S. at 595.

Under Rule 702, the trial court must consider whether the expert witness is qualified to opine as she does, whether her testimony is reliable, and whether her testimony is helpful to the trier of fact. More specifically, "[t]rial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

The proponent of expert testimony bears the burden to show that his expert is qualified to testify competently regarding the matters she intends to address, the

methodology by which the expert reached her conclusions is sufficiently reliable, and the testimony assists the trier of fact. *Frazier*, 387 F.3d at 1260 (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113-1114 (11th Cir. 2005) (explaining that it is the proponent's burden to lay the foundation for admission of expert testimony).

The objective of *Daubert*'s gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *accord Frazier*, 387 F.3d at 1260. And the district court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999).

While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability. *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech. D C-8, Inc. v. Hurel-Dubois UK Ltd*, 326 F.3d 1333, 1341-42 (11th Cir. 2003)). Because "one may be considered an expert but still offer unreliable testimony," it remains a basic foundation for admissibility under Rule 702 and *Daubert* that proposed expert testimony must be based on "good grounds." *Frazier*, 387 F.3d at 1261.

### ii.  The Reliability of Timothy Richards' Testimony

As discussed above, MFG hired WSP USA, Inc. to conduct additional sampling of both the influent and effluent water sources at MFG's three manufacturing facilities in Dalton in November 2022. A table summarizing the results at the MFG facilities is reproduced below:

| Brooks Road | | | | |
|---|---|---|---|---|
| | Influent #1 (BR-INF-1) | Influent #2 (BR-INF-2) | Influent #3 (BR-INF-3) | Effluent (BR-EFF-1) |
| PFOA+PFOS | 11 ppt | 11.5 ppt | 11 ppt | 21.3 ppt |
| "Sum of PFAS" | 15.15 ppt | 15.65 ppt | 14.5 ppt | 25.09 ppt |

| Callahan Road | | | | |
|---|---|---|---|---|
| | Influent #1 (CR-INF-1) | Influent #2 (CR-INF-2) | n/a | Effluent (CR-EFF-1) |
| PFOA+PFOS | 10.8 ppt | 11 ppt | n/a | 30.9 ppt |
| "Sum of PFAS" | 14.89 ppt | 14.6 ppt | n/a | 33.78 ppt |

| Kimberly Park Drive[21] | | | | | |
|---|---|---|---|---|---|
| | Influent #1 (KP-INF-1) | Influent #2 (KP-INF-2) | Influent #3 (KP-INF-3) | Effluent (KP-EFF-1) | Effluent (KP-EFF-2) |
| PFOA+PFOS | 9.9 ppt | 10.2 ppt | 8.9 ppt | 0 | 0 |
| "Sum of PFAS" | 13.1 ppt | 13.8 ppt | 11.89 ppt | 0 | 7.6 |

---

[21] As reflected in this chart, the testing at Kimberly Park Drive revealed low or zero PFAS concentrations at the effluent locations tested. However, testing of two intermediate water use locations (a cooling tower and a production area sump) showed higher concentrations of PFAS in the "intermediate effluent" (mid-process) samples. (Richards Memo, Doc. 1184-8 at 9). Specifically, the results at the intermediate effluent location of the cooling tower showed a PFOA + PFOS concentration of 7.6 parts per trillion and a total PFAS concentration of 10.68 parts per trillion (*Id.*). The results at the intermediate effluent location of the production area sump showed a PFOA + PFOS concentration of 18 parts per trillion and a total PFAS concentration of 21.4 parts per trillion. (*Id.*). Plaintiff includes only those highest results from the production area sump (18 and 21.4 ppt, respectively) as the sole "Effluent" measurement in his Motion to Exclude Testimony of Timothy Richards, (Doc. 1268-1 at 3). The Court finds this does not accurately reflect the full picture of the WSP testing results. In any event, the Kimberly Park Drive results have little bearing on the Court's analysis, since in his response to MFG's summary judgment motion, Plaintiff relies on WSP's 2022 sampling results from the Brooks Road and Callahan Road locations—and not on the results from the Kimberly Park Drive location— to support the contention that MFG contributed PFAS to the water supply.

(Doc. 1184-8 at 9).

As discussed, Plaintiff relies on these 2022 sampling results to show that, considering the higher concentrations of PFAS in the effluent than in the influent at the Brooks Road and Callahan Road MFG facility locations, a fact-finder could reasonably infer that MFG is a contributor of PFAS to the POTW through its industrial wastewater discharge. In response to MFG's summary judgment motion, Plaintiff explains that MFG and Mr. Richards have drawn a different conclusion from this sampling data by adding together the PFAS concentrations of each facility's influent sample points, which they compare against the effluent from a single sample point. So, for example, at the Brooks Road plant, MFG would add together the 11, 11.5, and 11 parts per trillion readings taken at each of the three influent sampling locations, for a total of 33.5 parts per trillion. From there, MFG would compare that total of "33.5" to the effluent reading of "21.3" parts per trillion from the single effluent sampling location, to conclude that the PFAS in MFG's effluent is present in a lower concentration than the PFAS in MFG's influent. Mr. Richards' deposition testimony regarding the testing results outlined above confirms this:

> Q:[22]   Let's finish our review of Table 1.[23] Do you see the heading for Callahan Road is 30.9 parts per trillion combined PFOA and PFOS?

---

[22] This deposition colloquy is between Plaintiff's counsel Mr. Tapley as the questioner and MFG's expert Mr. Richards as the deponent.

[23] "Table 1" as referenced in this deposition testimony contains the same data that is reproduced in the chart just above. *See* (Doc. 1184-8 at 9).

A:     That's right.

Q:     You agree with me that that's essentially three times higher than the influent [readings of 11, 11.5, and 11 parts per trillion]?

A:     I – one thing I want to clarify. I think I – I understand now why this looks this way. So in our evaluation, I think when I'm making my opinions, I am considering the sum of the influent. So in this case, it would be – well, let's go back to the last case, I guess – 11 plus 11.5 plus 11 is 33.5 as a total influent coming into the plant, and, therefore, what we're seeing on the discharge end of that in the Brooks Road example is less than that total sum.

Q:     Why would you do that? Why would you sum concentrations?

A:     It – well, in my view, it's three different sources coming into the facility.

Q:     And that concentrates it?

A:     I mean, that's – in my opinion, I think that could be contributing to that higher – yes.

Q:     Where did you learn to add concentrations?

A:     Well, it's three different sources of water that were coming into the plant, so that's what I did.

Q:     Do you think that's scientifically valid to add concentrations?

A:     I think that there's a – I think if there are three different sources coming into the facility, you – they – they compound, yes.

(Doc. 1139-5, Richards Dep. 40:4-24).

The problem with this methodology is obvious. A reading of "11 parts per trillion" reflects the ***concentration*** of PFAs within the water at a given sampling location. It is not a hard-number measurement, the way that "11 grams" might be. If there were 33.5 grams of PFAS entering the facility and only 21.3 grams of PFAS leaving the facility, it would make sense to say that the input amount exceeds the

output amount. However, a measurement of "X parts per trillion" is a **ratio**, reflecting the percentage of any given sample of water that is made up of PFAS. Put another way, adding up the "11, 11.5, and 11" parts per trillion readings taken at each of the three influent sampling locations to reach a total of 33.5 would only be a sensible way of evaluating how much PFAS was in the influent if the "parts per trillion" were also converted to "parts per **three** trillion." That measurement would accurately reflect the concentration of PFAS in the influent, measured across all three influent sources. And, of course, 33.5 parts per three trillion could also be stated as 11.166 parts per trillion. There is no reliable methodology by which the influent measurement across the three sources of 11 ppt, 11.5 ppt, and 11 ppt should result in a calculation of 33.5 parts per trillion.

For that reason, the Court will exclude consideration of Mr. Richards's faulty interpretation of the data as showing that the PFAS concentrations in MFG's effluent is "less than or substantially equal to" the PFAS concentration present in the influent sources. (Doc. 1184-8 at 3). Nonetheless, the Court finds it premature to exclude Mr. Richards's testimony in whole at the summary judgment stage, when the case is before the Court and not a jury. "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005). As discussed a bit more below, Mr. Richards offers other opinion testimony beyond this methodologically faulty one, which Plaintiff has not challenged in his Motion to Exclude. That is good reason for the Court to act conservatively at this juncture.

51

Accordingly, the Court will **GRANT in part and DENY in part** Plaintiff's Motion to Exclude the Testimony of Timothy Richards. The parties may raise the same arguments in a *Daubert* motion as the case draws nearer to trial.[24]

### C. Whether the Sampling Evidence Creates a Triable Fact

Returning now to MFG's motion, once again, the Court agrees that the 2009 – 2016 sampling results showing the presence of PFAS in the effluents from MFG's facilities—without any comparative sample of the presence of PFAS in the influents—are not sufficient evidence to create a triable fact as to whether MFG has contributed the PFAS to its discharge. Indeed, that argument was a winning one for Americhem. The problem for MFG is that the more recent 2022 sampling results from MFG's facilities *did* contain comparative values for the PFAS concentrations in the influents. And, unlike the sampling results from Americhem's facilities, the sampling results from MFG's facilities show that the PFAS concentrations in its effluents were much greater than the PFAS concentrations in its influents, at least with respect to the Brooks Road and Callahan Road facilities. Therefore, a reasonable jury could conclude from the results of that sampling that MFG contributes PFAS to its wastewater discharge.

The Court acknowledges that MFG has an answer to the 2022 data, in the form of Mr. Richards's expert opinion. Notably, Mr. Richards's opinions go beyond the shaky sum-of-concentrations analysis discussed above. In particular, Mr.

---

[24] MFG's related Motion for Oral Argument [Doc. 1337] will also be **DENIED as moot**. The Court will consider holding a pretrial *Daubert* hearing if and when either party requests a Daubert hearing closer to trial.

Richards opines that the difference between, for example, 11 parts per trillion in an influent source and 33.78 parts per trillion in an effluent source could be attributable merely to variability in the two different analytical methods used for the samples, and/or to margin of error. (Richards Dep., Doc. 1139-5 at 35:22-37:5; 42:23-43:12). Additionally, the PFAS concentration in MFG's influent could fluctuate by minuscule amounts within a given day, and one part per trillion is equivalent to roughly a single drop of water in twenty million gallons. (Richards Decl., Doc. 1332-2 ¶ 4). Thus, MFG argues that a variance of approximately 20 parts per trillion is so small that it cannot amount to viable evidence from which a reasonable jury could conclude that MFG produced, used, or discharged PFAS at its facilities. (Doc. 1332 at 6).

True, a reasonable jury might find these opinions from Mr. Richards persuasive. But it also might not. The data from the 2022 samplings presents an alternative plausible conclusion that the PFAS concentrations in the effluent of MFG's Brooks Road and Callahan Road facilities, being two to three times higher than the PFAS concentration detected in any influent source, indicate that MFG is contributing to the PFAS in its discharge.

Further, as discussed in detail above in Part IV.A. the 2022 sampling data is not the only evidence that a reasonable fact-finder could construe in Plaintiff's favor. Viewing the evidence in the light most favorable to Plaintiff, the results of the 2022 sampling data, paired with evidence that MFG has kept PFAS-containing

materials in its inventory, are sufficient to create a triable issue as to whether MFG contributed PFAS to the water supply.

Accordingly, the Court will **DENY** MFG's Motion for Summary Judgment [Doc. 1184].[25]

## V.    Sealing Motions

The Court has one other matter to attend to. A number of filings discussed in this Order are the subject of pending motions to seal [Docs. 1187, 1354, 1357]. For the reasons that follow, all of these motions to seal are **DENIED**.

First, Defendant MFG Chemical, LLC filed a Motion to Seal [Doc. 1187] Exhibit A in support of its Motion for Summary Judgment (Doc. 1185), which is an expert rebuttal report of Joseph A. Krock, Ph.D (the "Krock Report"). MFG moves

---

[25] MFG also filed a Motion to Strike Plaintiff's Response to its Summary Judgment Motion [Doc. 1559], on the basis that Plaintiff has exceeded the allotted 25-page limit by incorporating by reference certain arguments he made in his 103-page omnibus response brief (Doc. 1403), which responds to six different summary judgment motions filed by other Defendants. The Court will deny the Motion to Strike for two reasons. First, Rule 12(f) provides that the Court "may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). Thus, "[o]nly materials included in a 'pleading' may [the] be subject of a motion to strike." *Lowery v. Hoffman*, 188 F.R.D. 651, 653 (M.D. Ala. 1999) (citing 2 James W. Moore, et al., Moore's Federal Practice § 12.37 [2] (3d ed. 1999)); *accord Jordan v. Cobb Cnty., Ga.*, 227 F. Supp. 2d 1322, 1346 (N.D. Ga. 2001) (recognizing that Rule 12(f) only applies to matter within the pleadings and the "proper method for challenging the admissibility of evidence in an affidavit is to file a notice of objection to the challenged testimony"). Plaintiff's Response to MFG's Motion for Summary Judgment is not a pleading. *See* Fed. R. Civ. P. 7(a). Thus, it is not susceptible to a motion to strike. Second, the Court would deny the Motion to Strike in any event. As Plaintiff points out in his Response to the Motion to Strike, had he simply included his 13-page Response to MFG's Motion for Summary Judgment in his existing omnibus response brief (Doc. 1403), its length would only be 116 pages, far short of the 175 pages to which he would be entitled in an omnibus response to seven summary judgment motions. Therefore, the Court finds Plaintiff has not overstepped the bounds of the Local Rules by incorporating certain arguments in his omnibus brief by reference.

to seal the Krock Report because 3M designated it as confidential during discovery. [Doc. 1187 at 1]. 3M filed a response to the Motion to Seal, indicating that it does not oppose public filing of the Krock Report. (Doc. 1572-3 at 1). Accordingly, the Motion to Seal [Doc. 1187] is **DENIED**. The Clerk is **DIRECTED** to lift the provisional seal on the Krock Report (Doc. 1184).

Second, Plaintiff filed a Motion to Seal [Doc. 1354] his Response to Americhem's Motion for Summary Judgment (Doc. 1353) because certain exhibits attached to the Response had been deemed confidential by Defendants 3M and Dalton Utilities, respectively. [Doc. 1354 at 2]. Plaintiff opposes filing the Response and supporting exhibits under seal, [*id.*], and Defendants bear the burden of proving why sealing is necessary under Section II.J.2.(e) of Appendix H of the Court's Revised Electronic Case Filing Standing Order and Administrative Procedures. Dalton Utilities has filed a Response to the Motion to Seal, stating that it does not request that the Court seal Plaintiff's Response to Americhem's summary judgment motion. (Doc. 1569). 3M has not filed any response explaining why the documents should be kept under seal. *See* (Doc. 1572) (3M Response to various other Motions to Seal, but not including Plaintiff's Motion to Seal at Docket Entry 1354 or mentioning the email correspondence at Exhibit 11 to Plaintiff's Response that 3M purportedly designated as confidential). Accordingly, the

Motion to Seal [Doc. 1354] is **DENIED**. The Clerk is **DIRECTED** to lift the provisional seal on the Response (Doc. 1353).

Finally, Plaintiff filed a Motion to Seal [Doc. 1357] his Response to MFG's Motion for Summary Judgment (Doc. 1356), based on assertions of confidentiality by 3M and Dalton Utilities. Dalton Utilities has filed a response stating that it does not request that the Court seal any of the documents identified in Plaintiff's Motion to Seal [Doc. 1357] that it had previously marked as confidential in the litigation. (Doc. 1569). For its part, despite filing an omnibus response to various motions to seal related to documents it had designated as confidential in the litigation (Doc. 1572), 3M has not taken any position on this particular Motion to Seal [Doc. 1357]. Additionally, the September 2014 3M email correspondence at issue (Exhibit 9 to Plaintiff's Response to MFG's Motion for Summary Judgment), which was purportedly stamped confidential by 3M, is also not mentioned in 3M's omnibus response, which provides three separate lists of documents that 3M either wishes to maintain under seal, wishes to redact, or does not oppose publicly filing in full. *See generally* (Doc. 1572). Accordingly, seeing no support in the record from 3M to support the sealing request, the Court **DENIES** Plaintiff's Motion to Seal [Doc. 1357]. The Clerk is **DIRECTED** to lift the provisional seal on Plaintiff's Response in opposition to MFG's Motion for Summary Judgment (Doc. 1356).

## VI.    Conclusion

For the foregoing reasons, Defendant Americhem's Motion for Summary Judgment [Doc. 1183] is **GRANTED.** The Clerk is **DIRECTED** to enter judgment in favor of Americhem, Inc. by separate order.

Defendant MFG's Motion for Summary Judgment [Doc. 1184] and Motion to Strike [Doc. 1559] Plaintiff's Response to the Motion are **DENIED**. Plaintiff's Motion to Exclude Expert Testimony of Timothy Richards [Doc. 1268] is **GRANTED in part** and **DENIED in part**, and Defendant MFG's Motion for Oral Argument [Doc. 1337] is **DENIED as moot**. However, the Court will consider holding a pretrial *Daubert* hearing if and when either party requests a *Daubert* hearing closer to trial.

Finally, the Court **DENIES** the various Motions to Seal discussed in this Order [Docs. 1187, 1354, 1357].

**IT IS SO ORDERED** this 30th day of September, 2025.

**Honorable Amy Totenberg**
**United States District Judge**